Filed
RECEIVED

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA

2016 MAY 20  AM 10: 48

MIDDLE D. . . .
ORLANDO, FL

| | |
|---|---|
| ANTHONY LENNEN and BETH LENNEN, Individually and on behalf of all others similarly situated, | **CASE NO.:** |
| Plaintiffs, | 6:16-cv-855-Orl-41TBS |
| v. | **CLASS ACTION COMPLAINT** |
| MARRIOTT OWNERSHIP RESORTS, INC., MARRIOTT VACATIONS WORLDWIDE CORPORATION, d/b/a MARRIOTT VACATION CLUB, MARRIOTT RESORTS TRAVEL COMPANY, INC., d/b/a MVC EXCHANGE COMPANY, MARRIOTT TITLE INSURANCE, MVC TRUST OWNERS ASSOCIATION, FIRST AMERICAN FINANCIAL, FIRST AMERICAN TRUST, FSB, FIRST AMERICAN TITLE COMPANY, ORANGE COUNTY FLORIDA, and ORANGE COUNTY COMPTROLLER, MARTHA O. HAYNIE, | **JURY TRIAL DEMANDED** |
| Defendants. | |

DATED: May 19, 2016

**THE POLASZEK LAW FIRM, PLLC**
Christopher S. Polaszek
3407 W. Kennedy Blvd.
Tampa, FL 33609
(813) 574-7678
chris@polaszeklaw.com

**NEWMAN FERRARA LLP**
Lucas A. Ferrara
Jeffrey M. Norton
Roger A. Sachar, Jr.
1250 Broadway, 27th Fl.
New York, NY 10001
(212) 619-5400
lferrara@nfllp.com
jnorton@nfllp.com
rsachar@nfllp.com

Soomi Kim, Esq.
2400 South College Drive
High Point, NC  27260
(336) 471-8769
soomiwork@gmail.com

**TABLE OF CONTENTS**

*Page No.*

I.     INTRODUCTION ....................................................................................................1

II.    SUMMARY OF THE ACTION ..............................................................................2

       *a.  Background* ....................................................................................................2

       *b.  MVC is neither a legitimate timeshare estate nor a legitimate
            beneficiary interest in a Florida land trust* ..............................................4

       *c.  The MVC Land Trust lacks a legitimate beneficiary interest* ...................6

       *d.  Conflicts Abound and Marriott Controls* .................................................8

       *e.  MVC Owners and Legacy Owners suffer harm* ......................................10

III.   PARTIES .................................................................................................................10

       *a.  Plaintiffs* ....................................................................................................10

       *b.  Defendants* .................................................................................................11

IV.    JURISDICTION AND VENUE ...........................................................................14

V.     CLASS ALLEGATIONS .......................................................................................15

       *a.  Class Definition* .........................................................................................15

       *b.  Numerosity* .................................................................................................18

       *c.  Existence and Predominance of Common Questions of Law and Fact* .......18

       *d.  Adequacy of Representation* ......................................................................21

       *e.  Superiority* ..................................................................................................21

       *f.  Manageability* .............................................................................................22

VI.    STATEMENT OF FACTS .....................................................................................22

       *a.  Marriott's Legacy Timeshare Estates* ......................................................22

       *b.  The MVC Product* ......................................................................................24

c. *The MVC Product Lacks a Legitimate Property Interest (Points are Illusory)* ..................................................................................................30

d. *The MVC Land Trust Is Unlawful and Lacks Beneficiary Interest* ........................33

e. *The First American Title Policy* ..........................................................................38

f. *The MVC Owners Association is a Sham Entity* ...................................................42

g. *Defendants Blatantly Flout Florida's Statutory Mandates Concerning Timeshares* ...........................................................................................................46

h. *Legacy Owners Harmed by MVC Product* ............................................................53

i. *2010 Law Applies* ................................................................................................54

VII.   CAUSES OF ACTION ................................................................................................56

COUNT I: Declaratory Relief: Void Deed (No Real Property Interest Conveyed) ...................................................................................................................56

COUNT II: Declaratory Relief: Defective Title (Title Policy Coverage Triggered) ....................................................................................................................58

COUNT III: Declaratory Relief: Defective Right to Occupy (Title Policy Coverage Triggered) ..................................................................................................60

COUNT IV: Declaratory Relief: Void Deed (Defective Title and Right to Occupy) ........................................................................................................................61

COUNT V: Violation of Fla. Stat. § 697.10: Impairment of Title Due to Improper Legal Description ..........................................................................................62

COUNT VI: Negligence: Breach of Official Duties ......................................................62

COUNT VII: Declaratory Relief Pursuant to Fla. Stat. § 721.21: MVC Owners Association is Sham Entity – Not Independent From Marriott ....................67

COUNT VIII: Violation of Fla. Stat. § 718: Failure to Comply with Condominium Requirements ...........................................................................................69

COUNT IX: Violation of Fla. Stat. § 721.57 (2010): Failure to Transfer Accommodations to Trustee ..........................................................................................72

COUNT X: Violation of Fla. Stat. § 721.03(7) (2010): Failure to Designate Independent Trustee...........................................................74

COUNT XI: Violation of Fla. Stat. § 721.08: Breach of Duty of Escrow Agent.......................................................................................................76

COUNT XII: Violation of Fla. Stat. § 721.08(2)(C)(2)(C)(III) (2010): Improper Transfer of Accommodations and Facilities to a Trust................81

COUNT XIII: Violation of Fla. Stat. § 721.03(10): Failure to Comply with the One-to-One Nightly-Use Ratio ..............................................82

COUNT XIV: Violation of Fla. Stat. § 721.442(3)(b): Improper Addition of Property to Multistate Timeshare Plan ......................................88

COUNT XV: Violation of Fla. Stat. § 721.13(1): Improper Designation of the MVC Owners Association as Managing Entity.......................90

COUNT XVI: Violation of Fla. Stat. § 721.15: Improper Collection of Common Expenses.........................................................................94

COUNT XVII: Violation of Fla. Stat. § 721.13: Managing Entity Breach of Duty .........................................................................................97

COUNT XVIII: Violation of Fla. Stat. § 721.56: Reservation System .....................100

Florida RICO Claims ..................................................................................103

Florida RICO COUNT I: Conspiracy to Unlawfully Withdraw Proceeds from Escrow in Violation of Fla. Sat. § 721.8 ..........................................105

Florida RICO COUNT II: Conspiracy to Violate Fla. Stat. § 721.08(2)(C)(4)..........................................................................................110

Florida RICO COUNT III: Punitive Damages - Specific Allegations Supporting Claim .....................................................................................111

VIII.   PRAYER FOR RELIEF .........................................................................134

IX.   DEMAND FOR JURY TRIAL ...............................................................137

Plaintiffs Anthony Lennen and Beth Lennen ("Plaintiffs" or the "Lennens"), by their undersigned counsel, bring this class action complaint against Marriott Ownership Resorts, Inc., Marriott Vacations Worldwide Corporation, d/b/a Marriott Vacation Club, Marriott Resorts Travel Company, Inc., d/b/a MVC Exchange Company (collectively, "Marriott," unless identified specifically), Marriott Title Insurance, MVC Owners Association, First American Financial, First American Trust, FSB, First American Title Company (collectively, "First American"), Orange County Florida, and Orange County Comptroller, Martha O. Haynie (collectively "Defendants"), for claims including violations of the Florida Vacation and Timeshare Act, § 721.01, Fla. Stats., *et seq.*, the Florida Racketeer Influenced and Corrupt Organization Act ("Florida RICO"), § 895.01, *et seq.,* for common law claims of negligence and breach of fiduciary duty, and for declaratory and injunctive relief. Plaintiffs' allegations are based upon knowledge as to their own acts and upon information and belief as to all other matters. Plaintiffs' information and belief is based upon, among other things, investigation undertaken by their attorneys.

## I.   **INTRODUCTION**

This action involves allegations that Defendants, through a series of convoluted and patently illegal transactions, engaged (and continue to engage) in a scheme to convey illusory real property ownership interests to purchasers of Marriott's points-based timeshare product (the MVC Product"). While purchase of the MVC Product is said to convey both title to a Florida timeshare estate and a beneficial interest in a Florida land trust, it, in fact, conveys neither. At bottom, the MVC Product conveys to its purchasers ("MVC Owners") nothing more than a use license for selected corporately-owned timeshare estates ("Legacy Timeshare Estates) in 44 locations in 11 different states. For Defendants, however, the façade of the MVC Product

provides significant opportunities for revenue that would not otherwise exist in connection with an awards program of this nature or even with the sale of Legacy Timeshare Estates of the type Marriott has sold for decades.

While Marriott, First American, and others have profited greatly from sales of the MVC Product, purchasers of that product ("MVC Owners"), continue to suffer the consequences of the deception. For one, MVC Owners are deprived of any of the benefits of real-property ownership while shouldering all the burdens, costs, and fees as if they had such title. Moreover, MVC Owners continue to suffer harm as a result of Marriott's opaque and discretionary point-valuation process, which results in significant dilution and lacks any reliable metric for tracking their so-called beneficial interests, as well as Marriott's unfettered process of adding and restricting access to properties in the underlying land trust.

Finally, as Defendants continue to exploit and profit from the MVC Product owners of Legacy Timeshare Estates ("Legacy Owners"), suffer harm as well due to continued and increasing interference with their and *actual* ownership interests and Marriott's unlawful exchange and reservation procedures that restrict their ability to use and enjoy their ownership rights.

## II.     SUMMARY OF THE ACTION

### a. Background

1.      Beginning with United States real estate market collapse in 2008, Marriott found itself in possession of a rapidly increasing inventory of unsold and foreclosed Legacy Timeshare Estates held in its condominium resorts located throughout the country (the "Legacy Timeshare Condominiums").

2

2.     As the carrying costs (*i.e.*, maintenance costs and fees) associated with holding tens of thousands of timeshare properties skyrocketed, Marriott devised a way to monetize its inventory of corporate-owned Legacy Timeshare Estates and to avoid costs through a new points-based program, the MVC Product.

3.     The MVC Product was sold and packaged as a Florida timeshare estate in real property, coupled with a beneficiary interest in a Florida land trust. This was drastically different in form and structure than the Legacy Timeshare Estates Marriott had been selling since 1984.

4.     Whereas Legacy Timeshare Estates entitle the purchaser to a fractional-interest in real property in the form of a specific week (or weeks) at a designated Legacy Timeshare Condominium, MVC Owners are allotted increments of points that can be used to book days at units at various Legacy Timeshare Condominiums that are contained in the land trust forming the basis for the MVC Product (the "MVC Land Trust").

5.     Purportedly, the more points an MVC Owner has, the greater the access that individual has to reserve units at Legacy Timeshare Condominiums. For this reason, Marriott markets the MVC Product not just to unaffiliated consumers but to Legacy Owners who can use the points in conjunction with their existing Legacy Timeshare Estates to maximize exchange and upgrade options.

6.     Despite the untethered nature of the MVC Product, it is nonetheless sold as a Florida timeshare estate vested as a beneficiary interest in a Florida statutory land trust. The MVC Land Trust, in turn, is made up of Marriott's corporately-held Legacy Timeshare Estates in various Legacy Timeshare Condominiums around the country. Therefore, ownership in the MVC Product (measured beneficial interests "BI" and points) is ostensibly both a beneficiary interest in a Florida land trust *and* a non-specific and unidentifiable timeshare estate in thousands of

timeshares physically located in Legacy Timeshare Condominiums located in eleven different states.

7.     As described in herein, MVC Owners are not purchasing a valid timeshare estate under Fla. Stat. §721.05(34) but rather a contractual right to occupy selected units in Marriott-owned Legacy Timeshare Estates.

8.     Of course, if the MVC Product were sold as a legitimate awards-based program, Defendants would be deprived of the significant revenue and cost-savings that is derived from real-property timeshare transactions, including closing costs and fees, title policy premiums, maintenance and operational fees, tax revenue, dues, and inventory control.

### b. MVC is neither a legitimate timeshare estate nor a legitimate beneficiary interest in a Florida land trust

9.     Under Florida law, a timeshare estate is a timeshare interest premised on real property must reflect an actual ownership interest in real property.

10.    There is no question that Legacy Timeshare Estates are interests in real property. The Legacy Owner acquires a specific, exclusive, fractional interest in real property. The Legacy Owner's interest is tangible - meaning it has a legal description and can be specifically identified in property records in the county and state where the Legacy Timeshare Condominium is located.

11.    For example, the Plaintiffs are owners of two separate weeks in a Legacy Timeshare Condominium located in Marco Island, Florida known as Crystal Shores. The deed for this property, which is recorded and can be located in the official records of Collier County, Florida, describes Plaintiffs' interests as follows:

> Unit 503/Week 34 and Unit 507/Week 2, in Crystal Shores Condominium fee simple absolute in a condominium parcel and undivided interest in the common elements is subject to the Declaration of Condominium as recorded in Official Records Book 4646 at Page 3299 in the Public Records of Collier County, Florida.

4

12.     Unlike the specific language of the legal description contained in Plaintiffs'
Crystal Shores deed, the Plaintiffs' deed conveyed with the MVC Product purchase (the "MVC
Consumer Deed") filed in the official records of the Orange County Comptroller's office,
purports to convey the following: "Legal Description: H04815, H04816, H04817, and H04818."

13.     H04815, H04816, H04817, and H04818 are arbitrary codes. These codes do not
correlate to any parcels of real property in Florida or any other state, they are not fractional
interests in any real property, they are not recorded in the land records of any county in any state,
and they cannot be valued or sold in any meaningful way. Stated otherwise, H04815, H04816,
H04817, and H04818 are not real property. Instead, these codes represent nothing more than a
contractual right to occupy units in Marriott-owned units in selected Legacy Timeshare
Condominiums.

14.     Fla. Stat. § 721.05(34)(2010)[1] contains the definition of a timeshare estate under
Florida law. It defines a timeshare estate as:

> a right to occupy a timeshare unit, coupled with a freehold estate or an estate for
> years with a future interest in a timeshare property or a specified portion thereof.
> The term shall also mean an interest in a condominium unit pursuant to s. 718.103,
> an interest in a cooperative unit pursuant to s. 719.103, or an interest in a trust that
> complies in all respects with the provisions of s. 721.08(2)(c) 4., provided that the
> trust does not contain any personal property timeshare interests. *A timeshare
> estate is a parcel of real property under the laws of this state.*

15.     The MVC Product does not meet the various statutory subsections under Fla Stat.
§ 721.05(34) for a number of reasons described more fully below. Most importantly, however,
the arbitrary codes Marriott assigns to purchases of the MVC Product do not represent "a right to
occupy a timeshare unit, coupled with a freehold estate or an estate for years with a future
interest in a timeshare [real estate] property or a specified portion thereof." At most, these codes

---

[1]     The MVC Product timeshare instrument provides that the 2010 versions of Fla. Stat. § 721
apply to the creation and operation of the MVC Product.

represent some inchoate use right to unspecified property. Whatever the codes are, they are not a "parcel of real property" and thus not a valid Florida timeshare estate.

16.     For its part, First American did not, and could not have conducted a valid title search or survey before issuing a title policy for a title does not legally exist. Nonetheless, First American sold title policies to each and every MVC Owner, collecting significant premiums in the process. These policies are either void or must be paid on due to the manifest defects in title.

17.     Further, the Orange County Comptroller recorded deeds for each and every MVC Consumer Deed despite the total absence of any legal property description as required by statute. Nevertheless, the Orange County Comptroller disregarded its statutory mandate to verify that the recordings evidenced the transfer of real property and collected fees on each MVC Consumer Deed recorded.

### c.   *The MVC Land Trust lacks a legitimate beneficial interest*

18.     Similarly, H04814, H04816, H04817, and H04818 do not represent a beneficial interest in a Florida land trust.

19.     Under Florida law, a land trust means:

> any express written agreement or arrangement by which a use, confidence, or trust is declared of any land, or of any charge upon land, under which the title to real property, including, but not limited to, a leasehold or mortgagee interest, is vested in a trustee by a recorded instrument that confers on the trustee the power and authority prescribed in s. 689.073(1)...

Fla. Stat. § 689.071.

20.     While the MVC Land Trust purports to contain real property located within Florida, a vast majority of the property contained in the MVC Land Trust is located outside the State of Florida, including properties in South Carolina, Arizona, California, Nevada, Hawaii,

Utah, and Colorado. Marriott's attempted transfer of real property outside Florida into a Florida land trust does not make it Florida real property.

21.     Further, it is only Marriott, not the MVC Owners, which has a true beneficial interest in the MVC Land Trust.

22.     Under Florida law, beneficiaries of a land trust are deemed the true owners of the real property included in the land trust. While their interests remain undisclosed, they retain control over the real property. Beneficiaries of a Florida land trust own a distinct and definable percentage of the real property in a trust; have a fractional sales interest in the event the trust is sold, have access to the properties in the land trust, and pay a pro-rata and disclosed portion of the taxes and common fees. And, critically, the land trust trustee is beholden to the land trust beneficiaries.

23.     MVC Owners have none of the statutory rights of land trust beneficiaries in the MVC Land Trust.

24.     First, the purported beneficiaries do not possess a distinct and definable percentage of the real property in the MVC Land Trust. In fact, their proportional interest changes daily, and sometimes hourly. The MVC Trust Agreement states:

> AS ADDITIONAL PROPERTY IS SUBMITTED TO THE TRUST, EACH BENEFICIARY'S UNDIVIDED INTEREST IN THE TRUST WILL BE RECALIBRATED BASED UPON THE FORMULA SET FORTH IN THE BYLAWS.

However, as described herein, the formula set forth in the Bylaws is opaque and indecipherable and is based partially on undisclosed metrics. Further, Marriott retains absolute discretion to change the formula as it deems appropriate.

7

25.     Since June of 2010, there have been more than 60,000 recalibrations as points are sold to MVC Owners (which equals roughly 25 recalibrations per day). This is not the distinct and definable percentage of ownership interest envisioned for beneficiaries under Florida law.

26.     Further, in the event the timeshare plan for the MVC Product (the "MVC Timeshare Plan") is terminated, MVC Owners retain no ownership right in the properties in the MVC Land Trust as Marriott unilaterally controls the sales process of those properties. Indeed, MCV Owners are not entitled to a pro-rata portion of the proceeds, but rather a "refund" based on a discretionary formula determined by Marriott.

27.     Because Marriott is frequently manipulating the inventory of the MVC Land Trust, MVC Owners are unable to determine, at any given time, what property is in the purported Florida land trust. In fact, at any time, Marriott may place properties in the MVC Land Trust through a Notice of Addition ("NOA"). These NOAs require the owners of the MVC Product to bear all the costs associated with the new additions.

28.     Notably, until Marriott files a Notice of Use ("NOU"), any property added to the MVC Land Trust is deemed "restricted" and the MVC Owners are unable to access the property.

29.     Marriott retains full discretion on whether and when to file an NOU on a restricted property and, in the interim, Marriott can and does use the properties for its own purpose. It often takes Marriott more than a year to file a NOU on properties added to the MVC.

d. *Conflicts abound and Marriott controls*

30.     Whereas a critical attribute of land trust is having a trustee which is duty-bound to act at the behest of and in the best interests of the land trust's beneficiaries, here, the trustee of the MVC Land Trust, First American, is beholden to Marriott, not to the MVC Owners.

31.     This conflict is in part due to the fact that First American works hand-in-hand with Marriott and wears numerous hats in all MVC transactions, including that of MVC timeshare trustee, title insurer, and escrow agent. First American's interests are therefore aligned overwhelmingly with Marriott and not MVC Owners to whom it owes specific fiduciary duties.

32.     As an example of the manifest conflict, as a timeshare trustee, First American is charged with a regulatory function, including auditing a timeshare's plan sponsor, in this case, Marriott. However, there is no indication that First American has ever audited Marriott, ever inquired into how MVC points are determined, whether the valuations and frequent recalibrations are fair and accurate, whether NOAs and NOUs are harming or whether Marriott is acting in the best interest of the MVC Owners.

33.     In 2010, Marriott designated the MVC Owners Association ("MVC Owners Association"), as the managing entity for the MVC Timeshare Plan.

34.     Purportedly installed to represent the MVC Owners, the MVC Owners Association is nothing more than Marriott's straw man. Indeed, since its inception, the MVC Owners Association has operated out of Marriott's headquarters in Orlando and has been run by Marriott executives.

35.     MVC Owners have never been given the opportunity to vote for the three directors to the MVC Owners Association Board of Directors (the "Board") – two of which are consistently Marriott executives, and, one, a Marriott designee.

36.     According the MVC Owners Association Bylaws, two directors constitute a quorum of any directors' meeting, Thus, Marriott executives and/or designees are in a position to make all decisions for the MVC Owners.

9

### e. MVC Owners and Legacy Owners suffer harm

37.     Marriott's activities, in conjunction with the MVC Owners Association and First American, have harmed not just the MVC Owners but also the Legacy Owners.

38.     MVC Owners are being duped into believing they are obtaining title to a real-property interest upon purchasing the MVC Product when, in fact, they are merely getting a right-to-use license for selected Marriott-owned Legacy Timeshare Estate Estates. However, MVC Owners are paying the costs and taking on the burdens associated with real-property ownership, including closing costs, recording fees, title policy premiums, taxes, and various operational and maintenance fees and dues.

39.     Legacy Owners also have had their interests in the Legacy Timeshare Estates materially diluted and their rights vis-à-vis the Legacy Timeshare Condominiums, where their real property interests vest, infringed upon.

40.     Finally, both MVC Owners and Legacy Owners are continuing to be harmed as a result of Marriott's ongoing violation of the multisite reservation requirements (codified in Fla. Stat. § 721.52(6)) and one-to-one use ratio requirements (codified in Fla. Stat. § 721.03(10)).

41.     As a result of the foregoing and the allegations contained herein, Plaintiffs and the proposed Subclasses (defined *infra*) have suffered and continue to suffer harm as a result of Defendants' numerous violations of Florida statutory and common law.

### III.     PARTIES

#### a. Plaintiffs

42.     Plaintiffs Anthony Lennen and Beth Lennen (the "Lennens" or the "Plaintiffs") are citizens of the State of Indiana, residing in Shelbyville, Indiana. The Lennens are both Legacy Owners and MVC Owners.

*b. Defendants*

43.     Defendant Marriott International, Inc. ("Marriott Intl."), is a Delaware Corporation with its principle place of business located in Baltimore, Maryland. Marriott Intl., through its subsidiaries (described below) acted in the following capacities with regard to the MVC Timeshare Plan until November of 2011:

> (a) Defendant Marriott Ownership Resorts, Inc. ("MORI"), is a Delaware Corporation with its principal place of business in Orlando, Florida. MORI is a "developer" as that term is defined by Fla. Stat. § 721.05, specifically, a:
>
> > i.   "creating developer" as defined in Fla. Stat. §721.05(10)(a)(1) for creating the MVC Timeshare Plan in 2010;
> >
> > ii.  "predecessor developer" as the operator of the MVC Timeshare Plan subsequent to the creation of the MVC Timeshare Plan. Marriott Intl. operated the MVC Timeshare Plan from 2010 until November, 2011.
>
> (b) Defendant Marriott Resorts, Travel Company, Inc. ("MRTX") is a Delaware Corporation with its principle place of business located in Orlando, Florida. MRTX is a wholly-owned subsidiary of MORI. MRTX performed the function of an "exchange company" as defined in Fla. Stat. § 721.05(15);
>
> (c) Defendant Marriott Resorts Hospitality Corporation, Inc. ("Marriott Hospitality"), is a South Carolina Corporation with its principle place of business in Orlando, Florida. Marriott Hospitality is a wholly–owned subsidiary of MORI. Marriott Hospitality performed the function of "management firm" pursuant to Fla. Stat. § 721.13;

11

> (d) Defendant Marriott Resorts Title Company, Inc. ("Marriott Title"), is a Delaware
> Corporation with its principle place of business located in Orlando, Florida.
> Marriott Title is a wholly-owned subsidiary of MORI. Marriott Title sold title
> policies to the MVC Owners.

44.    Defendant Marriott Vacations Worldwide, Inc. is a Delaware Corporation with its principle place of business located in Orlando, Florida. through its subsidiaries (described below) acted in the following capacities with regard to the MVC Product following its spin-off from Marriott Intl. in November 2011:

> (a) Defendant MORI (identified above), acted as a "successor developer" as defined by
> Fla. Stat. § 721.05(10)(a)(2);

> (b) Defendant MRTX (identified above), performed the function of an "exchange
> company" as defined by Fla. Stat. § 721.05(15);

> (c) Defendant Marriott Hospitality (identified above), performed the function of
> "management firm" pursuant to Fla. Stat. § 721.13;

> (d) Defendant Marriott Title (identified above) sold title policies to the MVC Owners.

45.    Unless identified separately, Marriott Intl., MVC, and their subsidiaries are referred to collectively as "Marriott."

46.    Notwithstanding any spin-off agreement or contracts between Marriott Intl. and MVC, Marriott Intl. remains liable for its responsibilities, duties, and liabilities arising out of the MVC Timeshare Plan as the creating and predecessor developer.

47.    Under Fla. Stat. § 721.05(10)(C), MVC is liable for its responsibilities, duties, and liabilities *after* its spin-off from Marriott Intl. in November 2011.

48.     Furthermore, a transfer by Marriott Intl. to MVC constitutes fraudulent transfer if Marriott Intl. made the transfer with intent to defraud the MVC Owners or to an insider under Fla. Stat. § 721.05(10)(C).

49.     Defendant MVC Owners Association ("MVC Owners Association") is a Florida Not-for-Profit Corporation with its principle place of business in Orlando, Florida. The MVC Owners Association is the "managing entity" of the MVC Timeshare Plan as defined in Fla. Stat. § 721.05(22).

50.     Under Fla. Stat. § 721.13(2), the MVC Owners Association, as the managing entity and Marriott, as the managing firm, are jointly and severally liable for faithfully operating the MVC Timeshare Plan.

51.     Defendant First American Financial, Inc. ("First American"), through its subsidiaries and/or agents (described below) acted in the following capacities with regard to the MVC:

    (a) Defendant First American Trust, FSB, is a federal bank, headquartered in Orange County, California and doing business in nine states in its capacity as the Trustee of MVC Land Trust, 1082-0300-00;

    (b) Defendant First American Title Company ("First American Title"), is a wholly-owned subsidiary of First American and is a headquartered in Orange County, California. First American Title Company, jointly with Defendant Marriott Title, insured the title to MVC.  First American Title also acted as an escrow agent of MVC Timeshare Plan.

52.     Unless identified separately, First American and First American Title are referred to collectively as "First American."

53.     Defendant Orange County ("Orange County") is a governmental entity responsible for fulfilling the duties and obligations under the laws of the county and the laws of the state of Florida as they pertain to Orange County, including recording, indexing, and maintaining documents relating to real property in the public records.

54.     Defendant Orange County Comptroller, Martha O. Haynie, ("Orange County Comptroller") is an officer of Orange County responsible for carrying out specific duties and obligations under the laws of the county and the laws of the state of Florida as they pertain to Orange County. The Orange County Comptroller is required to implement a uniform methodology to keep official records of chain of title of a real property located in Orange County, Florida and to record, index, and maintain documents relating to real property in the public records.

IV.     **JURISDICTION AND VENUE**

55.     This Court has diversity subject-matter jurisdiction over this class action pursuant to the Class Action Fairness Act of 2005, Pub. L. No. 109-2 Stat. 4 ("CAFA"), which, *inter alia*, amended 28 U.S.C. § 1332, with new subsection (d), conferring federal jurisdiction over class actions where, as here: (a) there are 100 or more members in the proposed Class; (b) at least some members of the proposed Class have a different citizenship from the Defendants; and (c) the claims of the proposed Class members exceed the sum or value of five million dollars ($5,000,000) in the aggregate. *See* 28 U.S.C. § 1332(d)(2).

56.     This Court has personal jurisdiction over the Plaintiffs because they submit to the jurisdiction of the Court.

57.     This Court has personal jurisdiction over Marriott because it is headquartered in the State of Florida, transacts business within the State of Florida, and by virtue of the fact that

14

Marriott's executive offices are located in the State, Marriott systematically and continually conducts business throughout the State.

58. This court has personal jurisdiction over First American because it has extensive business dealings and transactions within the State of Florida and in this district.

59. Furthermore, First American, the MVC Owners Association and Marriott are parties to the MVC Trust Agreement and the amendments (the "MVC Trust Agreement") which provide this court as the exclusive venue for any actions to be brought in federal court pertaining to the subject-matter.

60. This Court has personal jurisdiction over Marriott Title because it is incorporated under the laws of Florida, transacts business within the State of Florida, and by virtue of the fact that Marriott Title's executive offices are located in the State, Marriott Title systematically and continually conducts business throughout the State.

61. As a municipality and municipal officer located in the State of Florida, this Court has personal jurisdiction over Orange County and the Orange Country Comptroller.

62. Venue is proper under 28 U.S.C. §1391 (b)(3) because Marriott, the MVC Owners Association, and Orange County are residents of this judicial district.

## V. CLASS ALLEGATIONS

### a. Class Definition

63. Plaintiffs bring this class action on their own behalf and on the behalf of all similarly situated current and former owners of timeshare interests connected to Marriott properties (the "Class") during the applicable statute of limitations. The proposed Class is divided into two "Subclasses" as follows:

15

(a) the MVC Owners Subclass consists of all purchasers of the MVC Product from its inception in June 15, 2010 through and including the present;

(b) the Legacy Owners Subclass consists of all purchasers of Legacy Timeshare Estates that own or have owned Legacy Timeshare Estates anytime between June 25, 2010, and the present in one of the following Legacy Timeshare Condominiums:

| Name | Located In |
|---|---|
| Barony Beach Club | South Carolina |
| BeachPlace Towers | Florida |
| Canyon Villas | Arizona |
| Crystal Shores | Florida |
| *Cypress Harbour* | *Florida* |
| *Desert Springs I* | *California* |
| Desert Springs II | California |
| Fairway Villas | New Jersey |
| Frenchman's Cove | US Virgin Islands |
| Grand Chateau | Nevada |
| Grande Ocean | South Carolina |
| Grande Vista | South Carolina |
| Harbour Club | South Carolina |
| Harbour Lake | Florida |
| Harbour Pointe | South Carolina |
| Heritage Club | South Carolina |
| Imperial Palms | Florida |
| Kalanipu'u | Hawaii |
| Kauai Beach Club | Hawaii |
| Ko'Olina | Hawaii |
| Lakeshore Reserve | Florida |
| Legends Edge | Florida |

16

| | |
|---|---|
| Manor Club Sequel | Virginia |
| Manor Club | Virginia |
| Maui Ocean Club Sequel | Hawaii |
| Maui Ocean Club | Hawaii |
| Monarch at Sea Pines | South Carolina |
| Mountain Side | Utah |
| Mountain Valley Lodge | Colorado |
| Newport Coast | California |
| Ocean Pointe | Florida |
| Ocean Watch | South Carolina |
| Oceana Palms | Florida |
| Royal Palms | Florida |
| Sabal Palms | Florida |
| Shadow Ridge | California |
| Streamside | Colorado |
| Summit Watch | Utah |
| Sunset Pointe | South Carolina |
| Surfwatch | South Carolina |
| Timber Lodge | California |
| Villas at Doral | Florida |
| Waiohai | Hawaii |

64.    Excluded from the Legacy Owner Subclass are Legacy Owners that purchased Legacy Timeshare Estates in Legacy Timeshare Condominiums that have not been added to the MVC Land Trust.

65.    Plaintiffs, by virtue of their ownership of Marriott timeshare interests in both the MVC Product and the Legacy Timeshare Estates, are representatives of both the Class and the respective Subclasses.

66.     Class certification is appropriate in that: (a) the Class and Subclasses are so numerous that joinder of all members is impracticable; (b) there are questions of law or fact common to each Class and respective Subclass member which predominate over any questions affecting only individual members; (c) the Plaintiffs will fairly and adequately protect the interests of the Class and Subclasses; and (d) a class action is an appropriate method for the fair and efficient adjudication of this controversy.

**b.  *Numerosity***

67.     Plaintiffs are informed and believe that each of the Subclasses contains thousands of similarly situated persons. The true number and identity of class members is known only by the Defendants such that the number and identity of these individuals can be easily determined from the records maintained by the Defendants and/or their agents.

68.     The disposition of their claims in a class action will be of benefit to the parties and to the Court.

69.     Under any circumstances, the Subclasses are so numerous and so geographically diverse that joinder of all members would be impracticable.

**c.  *Existence and Predominance of Common Questions of Law and Fact***

70.     Common questions of law or fact exist as to all members of the Class and Subclasses and such questions predominate over questions affecting only individual Class and Subclass members. The common legal and factual questions arise over the Defendants' uniform course of conduct towards the Class and Subclass members, and include but are not limited to, the following:

(a) Whether the MVC Product is a valid Florida timeshare estate in real property;

(b) Whether the MVC Land Trust is a valid Florida land trust;

18

(c) Whether Plaintiffs and members of the Class have a beneficial interest in the Florida land trust;

(d) Whether the MVC Consumer Deed of Plaintiff and the members of the MVC Owners Subclass are void as a matter of law for failure to convey a real property interest;

(e) Whether there is a defect in title vested in the MVC Product;

(f) Whether Plaintiffs and the MVC Owners Subclass are able to enforce their rights under their title policy as a result of a defect in title;

(g) Whether Plaintiffs and the MVC Owners Subclass are able to enforce their rights under their title policy as a result of a defective right to occupy;

(h) Whether Plaintiffs and the MVC Owners Subclass have had their title impaired due to an improper legal description;

(i) Whether Orange County and the Orange County Comptroller were negligent in carrying out their official duties in recording the trust instruments;

(j) Whether the MVC Owners Association is not independent from Marriott as required by Fla. Stat. § 721.21;

(k) Whether Marriott and the MVC Owners Association have met the statutory condominium requirements codified in Fla. Stat. § 718;

(l) Whether Marriott has violated Fla. Stat. § 721.57 by failing to properly transfer accommodations to the designated trustee;

(m) Whether Marriott has violated Fla. Stat. § 721.08 by failing to properly designated an appropriate trustee;

(n) Whether First American has breached its duty as an escrow agent;

19

(o) Whether Marriott and the MVC Owners Association failed to comply with the one-to-one nightly-use ratio in the MVC Product codified in Fla. Stat. §721.03(10);

(p) Whether Marriot has improperly added property to the MVC, in derogation of the rights of the MVC Owners Subclass and in violation of Fla. Stat. § 721.552(3)(b);

(q) Whether Marriott has improperly designated the MVC Owners Association as a managing entity of the MVC Product in violation of Fla. Stat. § 721.13(1);

(r) Whether Marriot has improperly calculated and collected common expenses form the MVC Owners Subclass in violation of Fla. Stat. § 721.15;

(s) Whether MVCTO breached its duty as managing entity of the MVC Product in violation of Fla. Stat. § 721.13;

(t) Whether Marriott, the MVC Owners Association, and MRTX violated Fla. Stat. § 721.56 by providing a multisite reservation system open to individuals outside the MVC;

(u) Whether Marriott, and First American (the "RICO Defendants") violated Florida RICO, Fla. Stat. §§ 895.05(6), 895.02(1)(a)(21);

(v) Whether the RICO Defendants constituted an "Enterprise" under Fla. Stat. § 895.02(3);

(w) Whether the RICO Defendants engaged in a pattern of "Racketeering" activity under Fla. Stat. § 895.02(4);

(x) Whether the RICO Defendants conspired to violate Fla. Stat. § 721.08;

(y) Whether, and to what extent, Plaintiffs and members of the Class and Subclasses are entitled to declaratory and injunctive relief; and

(z) Whether, and to what extent, Plaintiffs and members of the Class and Subclasses have been damaged by the Defendants' conduct and the proper measure of damages.

### d. Adequacy of Representation

71.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and the Subclasses.

72.    Plaintiffs' claims are typical of the claims of the members of the Class and Subclasses because they arise from the same practices and course of conduct that gave rise to the claims of the Class and Subclasses and are based upon the same legal theories.

73.    Plaintiffs have retained counsel experienced in complex class action litigation, and Plaintiffs' intend to prosecute this action vigorously.

74.    The Plaintiffs have no adverse or antagonistic interests to those of the Class.

### e. Superiority

75.    A class action is superior to all other available means for the fair and efficient adjudication of this controversy. The damages or other financial detriment suffered by individual members of the Class and Subclasses are relatively small compared to the burden and expense occasioned by individual litigation of the claims of the Class and Subclasses.

76.    Indeed, due to the statutory nature of the claims, it would thus be virtually impossible for the members of the Class and Subclasses, on an individual basis, to obtain effective redress for the wrongs done to them without affecting the rights of other members of the Class and Subclasses.

77.     Furthermore, even if members of the Class or Subclasses could afford individualized litigation, the judicial system could not. Individualized claims brought by members of the Class and Subclasses would create the danger of inconsistent or contradictory judgments arising from the same set of facts. Individualized litigation would also increase the delay, expense, and burdens to all parties and the court system from the issues raised by this action.

*f.  Manageability*

78.     In contrast to other methods of adjudication, the class action device provides the benefits of determining these issues in a single proceeding, including economies of scale, streamlined and efficient discovery and motion practice, and comprehensive supervision by a single court.

79.     Further, this case presents no unusual management difficulties. The issues of law and documents and agreements at issue are the same or so similar as to be legally and factually indistinguishable in all material respects and Florida law applies to all claims.  As a result, it will not be difficult for the Court or the jury to determine whether the Defendants have violated the Florida Vacation and Timeshare Act, Florida RICO, and Florida common law.

80.     This Court is an appropriate forum for this dispute.

## VI.    STATEMENT OF FACTS

### a.  Marriott's Legacy Timeshare Estates

81.     There are Legacy Timeshare Estates in 44 different Legacy Timeshare Condominiums, in eleven different states, including eleven in the state of Florida. While all Legacy Timeshare Condominiums share the same essential characteristics, each respective

Legacy Timeshare Condominium (and the Legacy Timeshare Estates associated therewith) is subject to a separate Declaration of Condominium ("Condo Declaration").

82.     For instance, each Legacy Timeshare Estate: (a) is subject to a Condo Declaration by the operation of the law because the covenant runs with the land; (b) comes with a deed conveying title that expressly incorporates the Condo Declaration by reference; (c) is a parcel of real property that was created by recording of a Condo Declaration before being sold; (d) is identifiable by the legal description provided in the respective Condo Declaration; (e) has appurtenant beneficial interest in the total accommodations and facilities and use-license that is indivisible and cannot be partitioned without amendment to the respective Condo Declaration; (f) vests the Legacy Owner with ownership of a 7-day reservation use-license and a beneficial interest in a specific Legacy Timeshare Condominium, representing a fractional ownership of that specific property; (g) cannot be partitioned into smaller units without amending the specific Condo Declaration; (h) is subject to a detailed reservation procedure for reconciling scheduling among a pre-defined pool of Legacy Owners according to use-license in each Legacy Timeshare Estate (even for floating weeks); and (i) has a mandatory owners' association ("Owners' Association") that requires representation by Legacy Owners according to the voting interest appurtenant to each Legacy Timeshare Estate (after Marriott had sold certain portion thereof).

83.     On January 24, 2008, the Lennens purchased from Marriott two Legacy Timeshare Estates in Crystal Shores – a Legacy Timeshare Condominium located in Marco Island, Florida.

84.     As part of the transaction, Marriott conveyed to the Lennens a deed legally describing the Crystal Shores Legacy Timeshare Estates as:

> Unit 503/Week 34 and Unit 507/Week 2, in Crystal Shores Condominiums fee simple absolute in a condominium parcel and undivided interest in the common

23

elements is subject to the Declaration of Condominium as recorded in Official
Records Book 4246 at Page 3299 in the Public Records of Collier County, Florida.

85.     First American issued to the Lennens a title policy for two Legacy Timeshare

Estates in Crystal Shores which insured the title against any title defect in the property, legally

described as:

> Weeks 34 in Unit 503 and Weeks 21 in Unit 507, Crystal Shores Condominium,
> together with an undivided interest in the common elements appurtenant thereto,
> according to the Declaration of Condominium as recorded in Official Records
> Book 4246 at Page 3299 in the Public Records of Collier County, Florida.

### b. The MVC Product

86.     In June 2010, Marriott began offering the MVC Product, a points-based product

in a multisite timeshare plan. The MVC Product has two components: (1) it purports to be a

Florida timeshare estate; and (2) it purports to convey a beneficiary interest in a Florida statutory

land trust.

87.     The MVC Product is marketed as a program that allows purchasers (*i.e.*, MVC

Owners) to use any available unit in the 44 Legacy Timeshare Condominiums, physically located

in eleven different states, that Marriott has included in the MVC Timeshare Plan.

88.     Marriot filed the timeshare instrument for the MVC Product on March 11, 2010.

As noted above, the first offering occurred when Marriott first sold the MVC Product in June,

2010.

89.     For the MVC Product, the timeshare instruments consist of the following

documents:

> (a) MVC Trust Agreement;
>
> (b) MVC Owners Association Bylaws;
>
> (c) Reservation procedures; and

(d) Rules and regulations;

90.     The MVC Trust Agreement is the primary timeshare instrument of the MVC Product. The MVC Owners Association Bylaws (p. 36, Art. XXII, Priorities in Case of Conflict) provide that, "In the event of a conflict between or among the provisions of the any of the following, the order of priorities to determine the controlling provision, shall be, from highest priority to lowest":

(a) MVC Trust Agreement;

(b) Articles of Incorporation;

(c) MVC Owners Association Bylaws;

(d) Reservation procedures; and

(e) Rules and regulations.

91.     By June 2010, the majority of the Legacy Timeshare Condominiums were owned by Legacy Owners such that Marriott's MVC Timeshare Plan materially conflicted with the pre-existing ownership rights delineated in the recorded Condo Declarations of the Legacy Timeshare Estates which would have required inclusion of interests of MVC Owners.

92.     At no time did Marriott amend the respective Condo Declarations to accommodate the MVC Product and the purported property interests of the MVC Owners.

93.     Among other things, amending the respective Condo Declarations would have triggered the Legacy Owners' voting rights in the 44 Legacy Timeshare Condominiums.

94.     Instead, Marriott and First American devised a scheme creating a five-step, proprietary process, that disregarded the rights and property ownership interests of the Legacy Owners, effectively scrubbed the 44 respective Condo Declarations from thousands of Legacy

Timeshare Estates, and created Beneficial Interests ("BI" or "BI/Points" or "Points") that are subject to only the MVC Product timeshare instruments. Each BI equates to 250 points.

95.     Through this process, MVC Owners are sold BI/Points that purport to be an interest in a Florida timeshare estate and a beneficiary interest in a Florida land trust.

96.     The five-step process works as follows:

(a) **Step 1**:   Marriott continuously acquires large numbers of Legacy Timeshare Estates from Legacy Owners through either resale purchase or pursuant to foreclosure to add to Marriott's existing inventory of unsold Legacy Timeshare Estates;

(b) **Step 2**:  Through Notices of Addition ("NOA"), Marriott continuously adds their Legacy Timeshare Estates into the MVC Land Trust by executing deeds to First American (which serves as the trustee of Florida land trust at the heart of the MVC Product). In this transaction, Marriott is the grantor and First American is grantee in each land trust deed. Since May 2010, Marriott has delivered thousands of land trust deeds to First American to effectuate the submission of tens of thousands of Legacy Timeshare Estates to MVC Land Trust.   Below is an example of the individual steps to effectuate this transfer:

i.  On April 11, 2011, a land trust deed transferred title of following four Crystal Shores Legacy Timeshare Estates from Marriott to First American:

| Season | Unit No. | Weeks | View |
|---|---|---|---|
| Platinum | 307 | 12 | Gulf Side |
| Gold | 205 | 32 | Gulf Front |
| Gold | 409 | 30 | Gulf View |
| Platinum | 1009 | 4 | Gulf View |

ii. First American's transfer of the above Legacy Timeshare Estates was taken expressly subject to the Crystal Shores Condo Declarations: "This conveyance is subject to and by accepting this Special Warranty Deed Trustee agrees to assume the following ... Declaration of Condominium of Crystal Shores Condominium as recorded in Official Records Book 4246 at Page 3299 in the Public Records of Collier County, Florida, and Exhibits attached thereto, and any amendments thereof."

iii. A title search of the specific Legacy Timeshare Estates shows the following chain of title prior to Marriott's re-acquisition of this property:

A. Unit 307/12: Marriott acquired title from owner on 05/28/2009 (Resale Deed, Instr. No. 4341045, Clerk of Circuit Court, Collier County, FL);

B. Unit 205/32: Marriott acquired title through foreclosure on 11/17/2010 (Certificate of Title, Instr.No.4500252, Clerk of Circuit Court, Collier County, FL);

C. Unit 409/30: Marriott acquired title from owner on 01/20/2011 (Resale Deed, Instr. No. 4528034, Clerk of Circuit Court, Collier County, FL);

D. Unit 1009/4: Marriott acquired title from owner on 07/03/2010 (Resale Deed, Instr. No.4481351, Clerk of Circuit Court, Collier County, FL)

(c) **Step 3**: The out-of-state Legacy Timeshare Estate is automatically converted into Florida real property through an additional declaration on the land trust deed and with consent by First American. For example,

i. Atlantic City County Clerk, NJ, Instr. No.2011021140, evidences that Marriott conveyed a land trust deed to First American for a Legacy Timeshare Estate at Fairway Villas at Seaview Condominium in Atlantic City, NJ:

27

This conveyance is further subject to and by accepting this Special Warranty Deed Trustee consents to and agrees to comply with the following conditions, restrictions, limitations, and reservations shall run with land and shall be binding upon Trustee and Trustee's successors, assigns, mortgagees, tenants, licensees, and invitees:

11. The Interest created by this Special Warranty Deed constitutes Florida real property.
12. Grantor has established a timeshare plan with respect to the property subject to the MVC Trust Agreement ("Trust Property"), which timeshare is known as Marriott Vacation Club Destinations ("Trust Plan").

Owners of Interest will be the beneficiaries of the Trust ("Beneficiaries") and will receive, at closing, a Florida deed conveying an interest in the Trust.

Each interest constitutes a Florida timeshare estate under Chapter 721, Florida statutes, and thereby is considered a Florida real property interest.

ii. Through this conversion process, Marriott sells the MVC Product as a Florida timeshare estate and beneficiary interest in a Florida land trust despite the fact that the physical property is located outside the state of Florida.

iii. By law, a land trust deed must be recorded in the county where the property is physically located.

(d) __Step 4__: Upon adding Legacy Timeshare Estates from Florida and other states in to the MVC Land Trust, three things are said to have automatically occurred by operation of law: (1) Units of BI/Points assigned to each Legacy Timeshare Estate are said to immediately vest in Marriott; (2) Condo Declarations appurtenant to the Legacy Timeshare Estates are effectively scrubbed away by the transfer and replaced by *unrecorded* MVC Product timeshare instruments (thereby negating the control of said Condo Declarations on BI/points created from transferred

Legacy Timeshare Estates); and (3) BI/Points that vest in Marriott purport to become a parcel of Florida "real property" and a timeshare estate that is subject only to the unrecorded MVC timeshare instruments.

  i. Notwithstanding, regardless of where the land trust deed is recorded, every NOA is recorded in Orange County in the office of the Orange County Comptroller to summarize the BI/Points that were created by the land trust deed.

  ii. Each NOA contains the list of the Legacy Timeshare Estates that were submitted to MVC Land Trust with a summary of the BI/Points attributed to that property.

  iii. Between May 11, 2010 and January 5, 2016, 729 NOAs have been recorded in Orange County, summarizing the submission of tens of thousands of Legacy Timeshare Estates.

  iv. In each instance, Marriott unilaterally amended the MVC Trust Agreement so that BI/points attributed to each Legacy Timeshare Estate cannot be identified in the land trust deed.

  v. This act also makes it virtually impossible to obtain comprehensive data to track whether Marriott has increased BI/Points attributed to same category of Legacy Timeshare Estates from earlier submission.

(e) **Step 5**: Marriott sells the BI/Points that are attributed to the Legacy Timeshare Estates to the purchasers of the MVC Product (*i.e.*, MVC Owners) as a Florida timeshare estates and beneficial interest in a Florida Land trust.

97.    In 2012, total BI attributed to Legacy Timeshare Estates in the MVC Land Trust was 259,381BI/5,005,250 Points.    As of January 5, 2016, that total grew to 1,343,309 BI/335,877,250 Points.

98.    In December 2014, the Lennens purchased BI/Points in the MVC Product and thereby became MVC Owners.

### c.  The MVC Product Lacks a Legitimate Property Interest (Points Are Illusory)

99.    On January 14, 2015, Marriott delivered a Florida Special Warranty Deed (*i.e.*, the MVC Consumer Deed) to the Lennens. First American acted as the escrow agent and title insurer for Lennens.  Subsequently, Marriott recorded the Lennens' MVC Consumer Deed in Orange County.  The Lennens paid $81.20 in Florida transfer tax in connection with transaction.

100.    The Lennens' MVC Consumer Deed provides the following legal description of the property ownership interest:

(a) Legal Description: H04815, H04816, H04817 and H04818;

(b) Beneficial Interest: 4 BI; and

(c) Use-license: 1000 points – Point Chart is published each year. (*See* 2016 Vacation Club Points Chart, www.my-vacationclub.com).

101.    Although the MVC Product is sold as a timeshare estate in Legacy Timeshare Condominiums, H04815, H04816, H04817, and H04818 are neither identified in any of the 44 Condo Declarations as timeshare estates nor can they be located as a timeshare estate or a parcel of real property in any state.  Stated otherwise, other than on paper, H04815, H04816, H04817, and H04818 do not exist.

102.    While pre-existing fractional interests in Legacy Timeshare Condominiums cannot be further divided without amending the applicable Condo Declaration, none of the

30

Condo Declarations (or the MVC Product timeshare instruments for that matter), provide a formula or explanation of the beneficial interest (represented in either percentages or specified proportion for 4BI sold) of the Lennens' proportional fractional ownership therein.

103.    In any event, it would be impossible for the 4BI sold to the Lennens to maintain proportionate ownership of all the Legacy Timeshare Estates submitted to the MVC Land Trust since, from the outset, the MVC Product timeshare instruments have not provided formula for how BI or Points are attributed to the subject Legacy Timeshare Estates and Legacy Timeshare Condominiums.

104.    Indeed, it would be impossible for Marriott to pre-conceive a legitimate (non-diluting) formula that would allow beneficial interests appurtenant to the MVC Product to maintain its specific proportion since Marriott continuously submits NOAs for the Legacy Timeshare Estates is acquires and adds to the land trust. Therefore, proportionate changes to beneficial interests cannot be pre-determined where new inventory is contingent on unit availability and Marriott's activity in the market.

105.    It thus appears that Marriott, in its sole discretion, has the unfettered authority to value the BI/Points in any manner it deems appropriate (or rather financially advantageous).

106.    Despite being a trustee, it appears First American has no function in regulating Marriott's BI/Points valuation process.

107.    While the MVC Product timeshare instruments do not contain formula for maintaining proportional beneficial interest, Marriott purports to employ a methodology called "recalibration" that has multiple variables that are unknown.

108.    The MVC Trust Agreement, Page 13, Article V, Section 5.2, describes "recalibration" as:

AS ADDITIONAL PROPERTY IS SUBMITTED TO THE TRUST, EACH BENEFICIARY'S UNDIVIDED INTEREST IN THE TRUST WILL BE RECALIBRATED BASED UPON THE FORMULA SET FORTH IN THE BYLAWS.

For example, assuming that **Trust Property for which a Notice of Use Right has been delivered** consists of property that is valued at 20,000 Points for Sale by Developer, then a Beneficiary owning a base Interest (in this case, 6 interests or 1500 points), will have seven and a half % interest in the Trust (1,500/20,000). If Developer subsequently delivers to the Association a Notice of Rights for property with a value of 10,000 points for sale, then the total points for sale of the trust will be 30,000 points and the beneficiary's base interest will have 5% interest in the trust.

(Emphasis added).

109.    Marriott periodically changes its undisclosed formula to increase the units of BI assigned to Legacy Timeshare Estates as they are transferred to First American.

110.    While Marriott cannot change previous assignment of BI attributed to Legacy Timeshare Estates previously submitted to the MVC Land Trust, Marriott can increase BI assigned to future Legacy Timeshare Estates in the same category. Therefore, Marriott can effectively create additional inventory of BI without proportionately increasing inventory of Legacy Timeshare Estates.

111.    If an MVC Owner bought 10 BI in 2012, his beneficial interest would be 10BI/259,381BI. While this can be easily converted into fraction, it does not establish a proportionate fractional beneficial interest as to entire inventory of Legacy Timeshare Estates in the MVC Land Trust.

112.    Thus, recalibration is not a methodology that can be used to maintain specific proportion of beneficial interests – especially considering the fact that additional Legacy Timeshare Estates frequently are submitted to MVC Land Trust.

113.    Marriot has recalibrated BI approximately 60,000 times since June 2010. There is simply no legitimate way to ensure through recalibration that BI in 2010 represented proportionate ownership from 2010 to 2016.

114.    Critically, under the MVC Product timeshare instrument, MVC Owners have no beneficial interest in restricted-use property. Any property added to the MVC Land Trust is restricted-use property until Marriott delivers a Notice of Use Right ("NOU") to the MVC Owners Association (which, as described below, is in fact Marriott). An NOU is not recorded and Marriott has the sole discretion to determine when to deliver an NOU.

115.    Because the NOA summarizes all properties submitted to MVC Land Trust, including restricted-use property and BI/Points attributed to each submission, it necessarily follows that total points for sale or total interest for sale has no relationship to the calculation of relative beneficial interest.

116.    According to the MVC Trust Agreement (p. 13, Art. V. § 5.2), beneficial interest must be recalibrated only for Legacy Timeshare Estates for which an NOU has been delivered.

### d.  The MVC Land Trust Is Unlawful and Lacks Beneficiary Interest

117.    While the MVC Product purports to convey a beneficial interest in a land trust, this is not so. In fact, the MVC Land Trust bears no resemblance to a lawful land trust.

118.    Beneficiaries of land trusts are deemed the true owners of the real property included in land trust. While their interests remain undisclosed, they retain total control over the real property and remain responsible for maintaining the property and paying the taxes.

119.    A land trust trustee, who is appointed by the land trust beneficiaries, holds legal and equitable title to the trust property and is charged with effectuating the trust's purpose of

asset protection and privacy for the beneficiaries. The land trust trustee is duty-bound to follow the direction, and act in the best interest, of the trust's beneficiaries.

120.   Land trust agreements are between the land trust trustee and the beneficiary. Moreover, a beneficiary agreement represents a contract among multiple beneficiaries.

121.   These agreements are never recorded because the primary function of land trust is to protect the identity of the beneficiaries whose identity cannot be disclosed without a court order. The privacy aspect also provides protection for real property submitted to a land trust from the claims of the creditors of the beneficiaries.

122.   The MVC Trust Agreement is a combination of the land trust agreement and land trust beneficiary agreement. As is typical with land trusts, these agreements are not recorded.

123.   While the MVC Trust Agreement identifies MVC Owners as beneficiaries of the land trust, this designation is patently false. As described herein, Marriott is, in fact, the sole beneficiary of the land trust and MVC Owners are merely contractual licensees of the trust property with some economic rights.

124.   In fact, MVC Owners have no power of direction as to the land trust properties as beneficiaries and retain no ownership therein. Instead, the power of direction is delegated to Marriott (through the MVC Owners Association) and ownership interest remains with Marriott.

125.   As noted throughout this complaint, most of the Legacy Timeshare Estates submitted to MVC Land Trust are physically located in Legacy Timeshare Condominiums outside the state of Florida. While Marriott purports to convert these out-of-state properties to Florida real property, it is axiomatic that the Florida land trust statute has no enforceability over real property located outside of Florida. Moreover, only handful of states even recognize land

trusts and the states that do recognize land trusts, the real properties in those states are subject to their own statutes or common law rather than the Florida land trust statute.

126.    Legitimate beneficiary interests in a land trust, unlike other revocable living trusts, must touch and concern the underlying real property. The MVC Product (and the MVC Owners' interest therein) does not touch upon and concern the Legacy Timeshare Estates submitted to the MVC Land Trust.

127.    The MVC Trust Agreement contains no property listed as exhibits to the agreement or in the body of the agreement.

128.    MVC Owners do not know (and have no means to discern) what properties they supposedly own because the NOU is never delivered to the MVC Owners and NOUs are never recorded. Moreover, there is a substantial discrepancy between the inventory of the property in the MVC Land Trust, the NOAs, and what NOUs have been delivered.

129.    In fact, there is an approximate 30% difference in inventory between the properties that are in the MVC Land Trust and the properties that have been delivered NOU.

130.    As a result, MVC Owners cannot even be said to have constructive notice what properties they purportedly have a beneficial interest in.

131.    Furthermore, in the event that the timeshare plan is terminated, MVC Owners retain no ownership right in the properties in the MVC Land Trust. Thus, if the MVC Timeshare Plan is terminated, Marriott unilaterally controls the sales process of the properties in the MVC Land Trust and the MVC Owners are entitled to a refund based on formula developed and open to manipulation by Marriott.

132.    In a legitimate timeshare estate, owners in condominiums have right to control the sale of the condominium and have fixed right to sales proceeds that are directly proportional to

their fractional ownership. However, as explained above, BI is a completely made-up unit by Marriott that defies conversion in any manner to a fixed-ratio of beneficial interest in the Legacy Timeshare Estates submitted to the MVC Land Trust.

133.    By way of example, all 52 Legacy Timeshare Estates created from one-bedroom condominium unit in the Legacy Timeshare Condominium Custom House is 1.1185% regardless of the use-license. However, based on the points chart for 2016 (available at www.my-vacationclub.com/common/vc/en-us/pdfs/enrollment_legal_docs/points_charts.pdf), depending on the week, there are following differences for a full week reservation:

| Week | Points |
|---|---|
| Jan 8 – Jan 28 | 2,000 |
| Nov 18 – Dec 22 | 2,000 |
| Jan 29 – May 26 | 2,900 |
| May 27 – Jun 30 | 3,175 |
| Jul 8 – Nov 17 | 3,175 |
| Jan 1 – Jan 7 | 2,000 |
| Jul 1 – Jul 7 | 3,175 |
| Dec 23 – Dec 29 | 3,275 |
| Dec 30 – Jan 5 | 3,450 |

Under the MVC Product timeshare instrument, 1 unit of BI is equal to 250 points. To convert beneficial interest of 1.1185% and weekly use-license to BI and points of the 52 timeshare estates created in the condominium, BI assigned to all 52 timeshare estates may be 6 BI but the appurtenant point assignment ranges from 2000 points to 3,450 points. The points are different depending on the weekly use-license. Thus, it can never be 1 unit of BI = 250 points.

134.    Thus, like MVC Consumer Deeds and the recording procedures, BI has no real function other than to perpetuate the charade of real property ownership.

135.    Once a timeshare plan is created by timeshare instruments that legally bind the real property to their substantive terms, individual owners of timeshare interests may transfer

their timeshare interests to a land trust only *if* the timeshare property is located in a state that recognizes the land trust form.

136.    However, unlike Marriott and First American have attempted to do here, a timeshare plan cannot be created with land trust instruments. Timeshare instruments must be recorded to run with the land to be legally enforceable against any interest holder outside of the timeshare plan. Therefore, while a valid land trust executed by land trust instruments are binding on the non-parties as to the form of the land trust for asset protection and privacy purposes, the substantive content contained in the land trust agreements are only binding on contracting parties to the trust agreement or to the beneficiary agreement.

137.    Under the MVC Timeshare Plan, First American serves a dual function of both the land trust trustee and the timeshare trustee for the purchasers of the MVC Product.

138.    Whereas a land trust trustee serves a ministerial function, a timeshare trustee serves regulatory function, charged with auditing the timeshare plan's developer (*i.e.*, Marriott). While a land trust trustee has minimal personal liability -- proportionate only to its limited role – a timeshare trustee is subject to significant liability punishable as felony for its breach of its fiduciary duties.

139.    As a result, having First American serve simultaneously in both capacities gives rise to unavoidable and irreconcilable conflicts of interest.

140.    Neither First American nor the MVC Owners Association has any role in auditing Marriott's methodology in assigning BI/Points to Legacy Timeshare Estates submitted to the MVC Land Trust. Marriott, in its sole discretion arbitrarily determines how the points are created and the formulas to ascribing value.

141.    In light of the above, the MVC Land Trust is neither a legitimate land trust nor a basis for a lawful timeshare estate.

### e.  The First American Title Policy

142.    On December 3, 2014, in connection with the MVC Product purchase, the Lennens purchased a title insurance policy from Marriott, through Marriott Title, which was underwritten and to be issued by First American (the "First American Policy").

143.    On February 10, 2015, First American issued the First American Policy to the Lennens for the purpose of insuring the transfer to them of record title to the MVC Product, as evidenced by the MVC Consumer Deed.

144.    The First American Policy, Covered Risks provision purports to insure, *inter alia*:

(a) "Title being vested other than as stated in Schedule A" [¶1];

(b) "Any defect in ... Title"[¶2];

(c) "Unmarketable Title"[¶3];

(d) "No right of access to and from the Land"[¶4];

(e) "The violation or enforcement of any law, ordinance, permit, or governmental regulation"[¶5]; and

(f) "Title being vested other than as stated in Schedule A" [¶9];

145.    Schedule A of the First American Policy describes the "estate or interest in the Land that is insured by this policy" as "A Timeshare Estate as defined by Section 721.05 of Florida Statutes and as further defined in the MVC Trust Agreement," and that "[t]he property described in Exhibit "A" represents an occupancy right, pursuant to that certain MVC Trust Agreement dated March 11, 2010, in a multisite timeshare project with Component sites specifically described in the Notice of Addition ["NOA"] of Property to MVC Trust recorded at

Official Records Book 10042, Page 3996, Public Records of Orange County, Florida, and any all

subsequent Notices of Addition that have been recorded in the Public Records of Orange County,

Florida."

146.    Exhibit A of Schedule A provides for an occupancy right to "4 interests

(numbered for administrative purposes: H04815 & H04816 & H04817 & H04818) in the MVC

Trust ... evidenced for administrative, assessment and ownership purposes by 1,000 points (250

Points for each Interest) ..."

147.    Under the First American Policy, the Lennens occupancy right to use 1000 points

to occupy the Legacy Timeshare Estates both then listed in the NOA and any Legacy Timeshare

Estates added thereafter by subsequent NOA.

148.    As indicated in the MVC Trust Agreement (p. 5, Art. II, § 2.33), NOAs include

both restricted-use Legacy Timeshare Estates and also Legacy Timeshare Estates to which an

NOU is delivered to Marriott (via the MVC Owners Association) and First American. The NOUs

are not recorded.

149.    Restricted-use property is defined in the MVC Trust Agreement (p. 5, Art. II, §

2.43) as:

> Trust Property that has not been made available for use and occupancy by
> Beneficiaries other than Developer pursuant to a Notice of Use Rights. Developer
> shall be solely responsible for any Restricted Use Property Expenses and
> Developer shall retain all rights to the use, occupancy, enjoyment, and rental of
> each Restricted Use Property until the effective date of the Notice of Use Rights
> that has been delivered to the Association and Trustee by Developer with respect
> to such Restricted Use Property.

150.    The Lennens have no ownership rights or occupancy rights as to the restricted-use

properties contained in the NOAs under the MVC Trust Agreement.

151.    The MVC Trust Agreement (p. 14, Art. V., § 5.2(b)) provides that beneficial interest to be "recalibrated" only against the Legacy Timeshare Estates for which an NOU has been delivered.

152.    The tens of thousands of Legacy Timeshare Estates specifically described in the NOA are subject to superior claims of the Legacy Owners of the component sites pursuant to the recorded Condo Declarations that encumber the Lennens' vested title as provided in Schedule A.

153.    Each Legacy Timeshare Estate that was submitted to MVC Trust as a trust property is subject to the respective Condo Declarations that are recorded on the 44 Legacy Timeshare Condominiums.

154.    Each Marriott Timeshare Condo Declaration clearly provides that Legacy Timeshare Estates and the appurtenant beneficial interest and use-license appurtenant to the Legacy Timeshare Estates cannot be divided or partitioned without amending the Condo Declaration.

155.    Title conveyed to the Lennens by the MVC Consumer Deed purports to vest a fractional ownership of all the Legacy Timeshare Estates submitted to the MVC Trust (with the exception of the restricted-use properties). However, 4BI and 1000 points appurtenant to the Lennens' MVC Product represent a division or partitioning of an indivisible beneficial interest which is nothing more than a use-license appurtenant to the Legacy Timeshare Estates in the MVC Land Trust.

156.    Furthermore, use-right appurtenant to the Lennens' purported title in the MVC Product is conveyed as 1000 points to occupy Legacy Timeshare Estates included in the MVC Trust.  However, because use rights pertaining to the Legacy Timeshare Estates are subject to the

respective Marriott Timeshare Condo Declarations, there exists a direct conflict with the use-rights provided by the MVC Product timeshare instruments.

157. First American had actual knowledge of the actual title defect of the Lennens' ownership right of the MVC Product (and that of all other MVC Owners) and the appurtenant use-right in its capacity as the land trust trustee of the MVC Land Trust.

158. First American took title to Legacy Timeshare Estates as the trustee of the MVC Trust subject to the recorded Condo Declarations.

159. Schedule B of the First American Policy provides that:

**Exceptions from coverage.**

The Component Sites are affected by certain exceptions listed below, which exceptions may affect the Insured's right to use one or more Component Sites:

4. All covenants, conditions, restrictions, easements ,liens, charges, terms and provisions contained in those certain declarations, community governing instruments, declarations of covenants, or such other documents which might now or in the future encumber and govern any portion of a Component (each a "Component Declaration"), as may be recorded the Public Records of each county in which one or more Components are located, each of which Component Declarations provides that a violation thereof shall not defeat or render invalid the lien of any first mortgage made in good faith and for value, but deleting any covenant, condition or restriction indicating a preference limitation or discrimination based on marital status, ancestry, source of income or disability to the extent of such covenant, conditions or restriction violates Title 42, Section 3605(C)of the United States Code. Lawful restrictions under state or federal law on the age of occupants in senior housing for older persons shall not be construed as restriction based on familial status.

160. Although the ambiguous and uncertain statement in the Schedule B that Lennens' use-rights as to one or more Legacy Timeshare Estates *"may"* or may not be restricted by the respective Condo Declarations, this does not constitute express disclosure of actual title defect where, as here, First American had actual knowledge that the Condo Declarations posed an

actual title defect to the Lennens' right to use all Legacy Timeshare Condominiums (in all 44 component sites).

### f. The MVC Owners Association is a Sham Entity

161.    In 2010, Marriott designated the MVC Owners Association as the managing entity for the MVC Timeshare Plan.

162.    The MVC Owners Association is represented in the MVC Product timeshare instruments as a Florida not-for-profit corporation that is completely independent from Marriott. However, the MVC Owners Association has no separate existence from Marriott as Marriott retains complete and total operational control over the MVC Owners Association and the MVC Owners Association serves no function as an independent Owner's Association.

163.    Since 2010, Marriott and the MVC Owners Association have operated together out of Marriott's headquarters, both listing a principle place of business, located at 6649 Westwood Boulevard, Orlando, Florida 32821-6090.

164.    Among other things, the MVC Owners Association does not have staff independent of Marriott (i.e., Marriott employees serve as MVTOA representatives), maintain its own listed phone number, or maintain a designated website.

165.    In 2012, the MVC Owners Association Annual Report, which required certification by signature of a director or officer of the MVC Owners Association, was in fact signed by Lana J. Cullum, an employee of Marriott (who was neither a director or officer of the MVC Owners Association).

166.    Vested with the fiduciary responsibilities of a trustee, the purpose and function of the MVC Owners Association is to act in the best interests of the MVC Owners – whether or not those interests conflict with the pecuniary interests of Marriott.

167.    Since the interim the MVC Owners Association board was appointed by Marriott in 2010, the composition of the board has remained the same – consisting of three directors who also act as the three officers of the MVC Owners Association.

168.    Marriott has continued to make unilateral appointments to the MVC Owners Association board consisting of two Marriott employees and another Marriott designee.

169.    For instance, in 2013, Marriott appointed Nick Rossi, Barbara Ryan, and Orlando Figueroa to the MVC Owners Association board. Mr. Rossi, who also served as the MVC Owners Association President, was the Senior Vice President of Global Inventory and Revenue for all Marriott Vacations Worldwide brands, and Ms. Ryan, who served as the MVC Owners Association Treasurer and Secretary, was the Senior Director of Strategic Planning for Marriott Vacations Worldwide.  At that time, both Mr. Rossi and Ms. Ryan worked out of Marriott's headquarters.

170.    Currently, the MVC Owners Association board includes Marriott appointees, Jeff Comfort, Stacey Jackson-Rauso, and Daniel Craig.  Mr. Comfort, who serves as the MVC Owners Association President, is currently the Vice President of Asset and Brand Management of Marriott Vacations Worldwide, and Ms. Jackson-Rauso, who serves as the MVC Owners Association Treasurer and Secretary, is currently the Senior Director of Asset Management at Marriott Vacation Club International.  Both Mr. Comfort and Ms. Jackson-Rauso currently work out of Marriott's headquarters.

171.    Although an amendment to the MVC Owners Association Bylaws provides that only the one member who is not an employee of Marriott may be paid for serving on the board, it is nothing more than a pretense of independence as the two board members that are also Marriott executives continue to be paid employees of Marriott.

43

172.   Except for decision to file for bankruptcy or to terminate the timeshare plan, all MVC Owners Association decisions require only majority of votes of board of directors without consent or notification to the MVC Owners. Since there are only three board members, two votes constitute majority votes. Therefore, Marriott's two employees are in a position to make all decisions for the MVC Owners.

173.   At all meetings of the board, a majority of directors constitute a quorum. Therefore, only two board members are required to establish a quorum for a meeting. However, no meetings are required for the two current employees of Marriott to make routine decisions on behalf of all MVC Owners. Therefore, for all financial, budgetary, and operational decisions that the MVC Owners Association makes on behalf MVC Owners, there are no minutes tracking the decision-making process of the MVC Owners Association board.

174.   Even though the MVC Timeshare Plan has been in effect for almost six years and the MVC Owners Association is the majority owner of properties in the MVC Trust Agreement, MVC Owners have never been given the opportunity to vote for the appointees to the MVC Owners Association board.

175.   Year after year, Marriott continues unilaterally to appoint the MVC Owners Association directors without seeking the approval of MVC Owners.

176.   In fact, under the MVC Product timeshare instruments, MVC Owners *will never* have the right to vote for the MVC Owners Association board regardless of the proportionate ownership. Indeed, even if MVC Owners owned 100% of the MVC Trust Properties, Marriott would retain the sole right to appoint all three directors to the MVC Owners Association board.

177. Even if an MVC Owner could discern his or her voting rights from the convoluted and complex process described in the MVC Owners Association Bylaws, it would only confirm that the purported "right" is entirely illusory.

178. At bottom, before MVC Owners could avail themselves of their voting rights, Marriott must first have ceased selling the MVC Product for a period of no less than two years (an event that has not occurred and likely will not occur for the foreseeable future).

179. Even in the unlikely event that the precondition of Marriott having ceased selling the MVC Product for at least two years comes to pass, Marriott could simply acquire a single Legacy Timeshare Estate from the secondary market or from foreclosure at least once every four years, and transfer that interest to First American in order to maintain exclusive control over the MVC Owners Association board. Therefore, in effect, Marriott remains in a position to never surrender complete and unfettered dominion and control over the MVC Owners Association.

180. As with all other MVC Owners, as a part of the purchase of the MVC Product, Marriott required Plaintiffs to sign Certificate of Voting Members to exercise the voting rights for their ownership interests. Notwithstanding, as a result of the foregoing requirements and conditions precedent, neither the Plaintiffs nor any other MVC Owner will ever have an opportunity to vote for the MVC Owners Association board.

181. In its 2015 Annual Report filed with the SEC, Marriott describes the MVC Owners Association in a manner that disguises the fact that Marriott retains total dominion and control over the MVC Owners Association:

> Vacation ownership resorts are often managed by a nonprofit property owners' association of which owners of vacation ownership interests are members. Most property owners' associations are governed by a board of trustees or directors that includes owners and which may include representatives of the developer for so long as the developer owns interests in the resort. Some vacation ownership resorts are held through a trust structure in which a trustee holds title to the resort

and manages the resort. The board of the property owners' association, or trustee, as applicable, typically delegates much of the responsibility for managing the resort to a management company, which is often affiliated with the developer.

182.    Here, the MVC Owners Association serves no independent function that would benefit the MVC Owners because MVC Owners lack any representation or ability to participate in the MVC Owners Association.

183.    The MVC Owners Association does not perform any of the functions of a timeshare condominium's owner's association as the MVC Trust Properties are managed by the owner's associations of the various Legacy Timeshare Condominiums.

184.    Any provisions in MVC timeshare instruments pertaining to budgetary and property management of the MVC Trust Properties are either fraudulent or unenforceable because such duties are delegated to the respective owners' associations of the various Legacy Timeshare Condominiums pursuant to the respective Legacy Timeshare Condominiums Declarations.

### g. *Defendants Blatantly Flout Florida's Statutory Mandates Concerning Timeshares*

185.    The purpose of Fla. Stat. § 721.08 is to prevent a developer from selling timeshare estates and the use-rights in the timeshare properties that the developer does not fully or exclusively own.

186.    Under Fla. Stat. § 721.08, having an independent trustee and escrow agent function as fiduciaries for the timeshare purchasers serves the quasi-regulatory function of auditing and monitoring the developer's sale of timeshare interests.

187.    The role of the trustee and the escrow agent under Fla. Stat. § 721.08 is to make an independent verification that the sale of specific timeshare estates and their appurtenant use-rights are free and clear from the competing claims of a third party (*i.e.*, other interestholders).

46

188.    For each sale of a timeshare estate, Marriott is required to deposit 100% of the sales proceed from to an escrow account until the escrow agent allows a withdrawal pursuant to Fla. Stat. § 721.08.

189.    To make valid withdrawal from the escrow account, Marriott is first required to deliver an affidavit to First American, the sole escrow agent for the MVC Timeshare Plan, that closing has been completed. *See* Fla. Stat. § 721.08(2)(C)(a)(III).

190.    Closing for a timeshare estate is defined in Fla. Stat. § 721.05(5)(a), as follows:

For any plan selling timeshare estates, conveyance of the legal or beneficial **title to a timeshare estate** as evidenced by the delivery of a deed for conveyance of legal title, or other instrument for conveyance of beneficial title, to the purchaser or to the clerk of the court for recording or conveyance of the equitable title to a timeshare estate as evidenced by the irretrievable delivery of an agreement for deed to the clerk of the court for recording.

191.    Once First American, acting as an escrow agent, receives the affidavit, First American must independently verify that *both* the timeshare estate and the accommodations and facilities of MVC Timeshare Plan are free and clear from competing claims of an interestholder.

192.    "Interestholder," as defined in Fla. Stat. § 721.05(21), includes an owner of the underlying fee or any person having an interest in or encumbrance against the accommodations and the facilities of the timeshare plan (not just the specific timeshare estate).

193.    MVC Timeshare Plan's accommodations consist of Legacy Timeshare Condominium units and facilities of the MVC Timeshare Plan consist of permanent amenities of the Legacy condominiums such as swimming pool affixed to the timeshare property.

194.    Legacy Owners have fractional ownership interest in the Legacy Timeshare Condominiums, which are the accommodations and facilities of the MVC Timeshare Plan. Legacy Owners also have property interest to enforce the use-right pursuant to their respective

47

Condo Declarations. Therefore, Legacy Owners are Interestholders of the accommodations and facilities of the MVC Timeshare Plan.

195.     As     Interestholders,     Legacy     Owners     have     not     executed     Nondisturbance Instruments pursuant to Fla. Stat. § 721.08(3)(2010) to subordinate their use-rights to that of the MVC Trust Owners.

196.     Accordingly, Marriott has not recorded any legally-enforceable Nondisturbance Instruments or Notice of the Creditors Instrument protecting use-rights of the MVC Trust Owners to bind the accommodations and facilities of the MVC Timeshare Plan.

197.     Furthermore, Marriott has not transferred the accommodations and the facilities of the MVC Timeshare Plan to a "trust" meeting the requirements of Fla. Stat. § 721.08(2)(C)(4)(2010).

198.     For valid transfer to take place to a trust meeting the requirements of Fla. Stat. § 721.08(2)(C)(4)(2010), the following must take place:

> Prior to the transfer by **each** Interestholder of the subject accommodations and facilities, or all use rights therein, to a trust, any lien or other encumbrance against such accommodations and facilities, or use rights therein, shall be made subject to a Nondisturbance and notice to creditors instrument pursuant to sub(3).

199.     Not only did Marriott failed to make valid transfer to a trust pursuant to Fla. Stat. § 721.08, First American does not meet the multiple requirements for a trustee under Fla. Stat. § 721.08(2)(C)(4)(2010).

200.     First, although Marriott had designated First American to act as a Timeshare Trustee meeting the requirements Fla. Stat. § 721.08(2)(C)(4), in lieu of meeting other escrow requirements, First American did not accept the responsibility to act as a Timeshare Trustee.

201.     It is evident that Marriott had designated First American to act as a trustee meeting the requirements of Fla. Stat. § 721.08 (2010) because, in the MVC Trust Agreement (p.

48

27, Art. XI.,11.2 Amendment by Developer), Marriott asserts its right to amend the MVC Trust

Agreement unilaterally:

> As it may be necessary, in [MARRIOTT's] Sole Discretion, to engage however, that no amendment of this Trust Agreement permitted to be unilaterally made by Developer shall be in contravention of the provisions of Fla. Stat. § 721.08(2)(C)(4) or its successors.

202.    However, because a designated Timeshare Trustee is subject to severe criminal

liability and substantial personal liability, Florida law provides that the Timeshare Trustee <u>must</u>

expressly accept the responsibility of a Timeshare Trustee designation. Specifically, Fla. Stat. §

721.08(2)(C)(4)(b), provides that "no transfer shall become effective until the trustee accepts

such transfer and the responsibilities set forth herein."

203.    First American signed the MVC Trust Agreement and subsequent amendments

exclusively as a land trust trustee in the following form "TRUSTEE, First American Trust, FSB,

a federal savings Bank, Solely as Trustee of Land Trust No. 1082-0300-00 (a.k.a MVC Trust).

204.    First American's consent to act as a trustee for MVC Land Trust does not fulfill

the requirement of Fla. Stat. § 721.08(2)(C)(4)(b) as the Timeshare Trustee's function (and its

proportionate liability) is significantly different than that of a land trust trustee.   Whereas the

Timeshare Trustee performs the regulatory function of auditing Marriott, the land trust Trustee

acts as an agent of Marriott and has minimal liability proportionate to its ministerial function.

205.    Therefore, Fla. Stat. § 721.08(2)(C)(4)(b) is not met because First American <u>did</u>

<u>not</u> accept the responsibility to perform the function of a Timeshare Trustee when it signed the

MVC Trust Agreement solely as a land trust trustee.

206.    Second, First American is not an independent trustee which is a requirement

under Fla. Stat. § 721.08(2)(C)(4)(b)(2010)(I). Under Fla. Stat. § 721.03(7)(2010), any trustee

performing a function under Fla. Stat. § 721 must be independent.

207. Fla. Stat. § 721.05(20)(b) provides that a trustee is independent if it has no financial relationship with the developer or its subsidiaries other than payment of transactional service fee. Notwithstanding, even setting aside the apparent symbiotic relationship of Marriott and First American in the MVC Product, Marriott and First American are specifically engaged together in wholesale/retail profit sharing with regard to the sale of title insurance to the MVC Owners.

208. A profit-sharing relationship for sale of an insurance product clearly is outside the scope of a permissible financial relationship limited to the payment of transactional service fee.

209. Third, First American does not perform any of the functions required of a Timeshare Trustee under Fla. Stat. § 721.08(2)(C)(4)(b)(IV). Any decision-making as trustee under Fla. Stat. § 721.08 is instead delegated either to the Marriott-controlled MVC Owners Association or to Marriott directly.

210. As a land trust trustee, First American performs the ministerial function of taking directions from Marriott and the MVC Owners Association – which is a thinly-veiled business unit of Marriott. The MVC Trust Agreement (p. 20, Art. VII, 7.4) provides that:

> It is agreed by the parties that Trustee will deal with the Trust Property only when authorized and directed to do so in writing by the Board, or Developer, as applicable pursuant to this Trust Agreement. On written direction of the Board, Trustee shall execute deeds, mortgages, or trust deeds, or leases with respect to the Trust property, or otherwise deal with title to the real property.

> Trustee shall not be required to inquire into the proprietary or genuineness or authenticity of any written direction by the Board and/or Developer or authority of the person signing said direction and may rely on such written direction therefrom for any action taken or omitted to be taken by it in good faith in reliance thereon.

211. First American serves no function of making any type of independent judgment as a Timeshare Trustee to audit Marriott's sale of the MVC Product or Marriott's operation of the MVC Timeshare Plan.

212.    As evident in the Lennens' MVC Consumer Deed, Marriott, rather than First American, is the grantor even though First American holds title to MVC Timeshare Plan's accommodations and facilities.

213.    Furthermore, Marriott makes discretionary and unilateral decisions regarding the BI/Points that are attributed to each Legacy Timeshare Estate submitted to MVC Land Trust.

214.    Similarly, Marriott makes discretionary and unilateral decisions whether to change the formula to periodically increase BI/Points that are attributed to each Legacy Timeshare Estate that will be submitted to MVC Land Trust, and Marriott makes discretionary and unilateral decisions whether the properties will be restricted-use properties or accommodations available to MVC Owners.

215.    Therefore, First American does not serve any of the statutory functions of the trustee under Fla. Stat. § 721.08 to verify that conveyance of timeshare estate and the appurtenant use-rights are not encumbered by competing claims of a third party.

216.    First American also serves no function of ensuring that the one-to-one use ratio is maintained as to all accommodations and facilities in the MVC Timeshare Plan. In this regard, again, Marriott makes discretionary and unilateral decisions on how many points are created using its proprietary procedure.

217.    Fourth, First American did not expressly accept the personal liability pursuant to Fla. Fla. Stat. § 721.08(2)(C)(4)(b)(IV). Under this provision, First American is required to accept personal liability arising out of First American's function as a Timeshare Trustee without exceptions as governed by Fla. Stat. §§ 736.08125, 736.08163, 736.1013, and 736.1015.

218.    Under MVC Trust Agreement, First American's liability is waived for performing its functions so long as it is not expressly required under Fla. Stat. §§ 736.08125, 736.08163,

51

736.1013, and 736.1015. Since Fla. Stat. §§ 736.08125, 736.08163, 736.1013, and 736.1015 are not substantive statutes, First American's acceptance of personal liability, as provided in the MVC Trust Agreement, is meaningless and does not meet the requirements of Fla. Stat. § 721.08(2)(C)(4)(2010).

219.    Furthermore, First American's acceptance of personal liability for performing the function of a trustee is rendered meaningless by the indemnification clause in the MVC Trust Agreement. MVC Trust Agreement requires the Marriott-controlled MVC Owners Association to indemnify not only First American and its subsidiaries but all of First American's affiliates for all demands, liabilities and expenses arising out of the performing the trustee's function pertaining to the MVC Trust Agreement.

220.    MVC Trust Agreement (p. 23, Art. VIII, ¶ 2) contains the following indemnification clause:

> To the extent permitted by applicable law, the Trustee, Trustee's parents, subsidiaries and affiliates and the officers, directors, managers, equity holders, employees or agents ("Trustee Indemnified Parties") shall be indemnified, defended, held harmless and reimbursed by the Associations against all claims, demands, liabilities, obligations, loss, cost, and expense, including attorney's fees and expenses and court costs at all levels, or imposed upon the Indemnified parties in connection with any action, suit, or proceeding to which the Trustee Indemnified Parties may be made by a party, …. By reason of the Trustee acting as Trustee.

221.    Unlike conventional indemnification clause that only cover acts or omissions of the indemnifying parties, the MVC Owners Association must indemnify First American for First American's own acts and omissions.

222.    Since Marriott controls the MVC Owners Association Board, the indemnification clause under the MVC Trust Agreement effectively allows Marriott to assume liability arising out of First American's failure to perform the duty of a Timeshare Trustee.  However, allowing

52

Marriott to assume liability would defeat the legislative purpose of Fla. Stat. § 721.08 to which imposes a substantial risk of liability for failure to act independently (i.e., auditing Marriott to protect MVC Owners, for example).

223.    Furthermore, while Marriott controls the MVC Owners Association Board, MVC Owners would ultimately incur the cost of indemnifying First American collectively. Therefore, under the MVC Timeshare Plan, MVC Owners are required to incur the cost of liability for First American's breach of fiduciary duties to the MVC Owners. Not only is this utterly nonsensical, the very notion flies in the face of Fla. Stat. § 721.08(2)(C)4's mandate to protect MVC Owners.

224.    Therefore, Marriott failed to transfer all subject accommodations and facilities to a trust meeting the requirements of Fla. Stat. § 721.08(2)(C)4 (2010).

### h.  Legacy Owners Harmed

225.    Legacy Owners, as Interestholders of the subject Legacy Timeshare Condominium units and facilities of the Legacy Timeshare Estates that were submitted to the MVC Land Trust, are subject to various harms from the MVC Product and any determination with regard to the legality and enforceability of the MVC Product will directly impact their rights.

226.    In particular, Legacy Owners are fractional owners of the Legacy Timeshare Condominiums containing the facilities and the accommodations of that are included in the MVC. As a result, Legacy Owners' interests are in the zone of interest protected by Fla. Stat. § 721.08 (2010).

227.    Marriott's sale of MVC, deprived and continues to deprive Legacy Owners' ability to use Legacy Condominium units according to the terms of the respective Condo Declarations. Legacy Owners' right to use the Legacy Timeshare Condominiums are not only contractual rights but are property ownership rights that run with the land.

228.     Marriott's failure to create a timeshare estate before selling the MVC Product allowed Marriott to over-sell use-license appurtenant to the Legacy Condominiums. This directly and necessarily impacts Legacy Owners' rights to use the Legacy Condominium units according to the respective Condo Declarations.

229.     Moreover, First American's failure as an escrow agent to independently verify that the subject accommodations and facilities of the MVC Timeshare Plan directly caused injuries to Legacy Owners.

*i.*     ***2010 Law Applies***

230.     Critically, the MVC Product timeshare instrument provides that the 2010 versions of the Fla. Stat. §§ 689.010 and 721 apply to the creation and the operation of the MVC.

231.     Specifically, the MVC Owners Association Bylaws (p. 41, Art. XXIX., § 5) provide that: "The Interests and the Interests of the Beneficiaries in the Trust Property are Real Property Interest and may be transferred as such and only transferred pursuant to the provisions of the Trust Agreement, Section 689.071, Florida Statutes (2010), and Chapter 721."

232.     Similarly, the MVC Trust Agreement makes clear that Marriott intends to establish a land trust pursuant to Fla. Stat. § 721.071 (2010), providing "Witnesseth: Whereas Developer desires to establish a land trust (as further defined in Article II below, the "trust", as settlor of the Trust pursuant to Section 689.071, Florida Statutes (2010)."

233.     The MVC Trust Agreement (p. 6, Art. III. § 3.1, Declaration and Title) provides further that, as of the Effective Date, there is established a trust in accordance with Fla. Stat. § 689.071 (2010).

234.     The beneficial interest of the MVC Product is described in the MVC Trust Agreement (p. 9, Art. IV., § 4.1 (b), Interests of Beneficiaries; Nature of Interests) as: "the

Interests will each be deemed to be Florida real property interests and may be transferred as such and only transferred pursuant to the provision of this Trust Agreement, Section 689.071, Florida statutes (2010), and Chapter 721."

235.    Interest, as provided in the definition section of the MVC Trust Agreement (p. 4, Art. II, § 2.30, Definitions), "mean[s] a beneficial interest in the Trust created pursuant to this Trust Agreement, Section 689.071, Florida Statutes (2010), and Chapter 721. Each Interest entitles the owner of such interest to reserve, use, and occupy the Trust Property in accordance with the Trust Plan Documents. Each Interest shall constitute a timeshare estate as that term is defined by Section 721.05, Florida statutes"

236.    Under the MVC Trust Agreement, the MVC Trust Plan means "Marriott Vacation Club Destinations, the vacation ownership plan established by Developer pursuant to this Trust Agreement and in accordance with Chapter 721." Therefore, the "Trust Plan" means the MVC Timeshare Plan.

237.    "Chapter 721" is defined in the MVC Trust Agreement (p. 2, Art. II, § 2.13, Definitions) to mean, "The provisions of the Chapter 721, Florida Statutes, as the same is constituted on the Effective Date of the this Trust Agreement except to the extent that the applicability of future amendments to Chapter 721 is mandatory or unless otherwise stated in this Trust Agreement."

238.    Specifically excepted from Fla Stat. § 721 (2010), the MVC Trust Agreement addresses substitutions (p. 15, Art. V. § 5.3 (b), Substitutions) – which is the only provision of the MVC Trust Agreement that provides for automatic application of non-mandatory amendment to Fla. Stat. § 721 (2010):

**Substitutions:**
Substitution of Trust Property is not currently permitted by applicable law. However, if substitution of other property is allowed by law or applicable law is amended subsequent to the Effective Date to permit the substitution of other property for then existing Trust Property, Developer may, from time to time, in its sole and absolute discretion, perform such substitution subject to the following (unless applicable law is subsequently amended to permit more flexible standards and procedures for the substitution of Trust Property, in which case such applicable law will govern at the option of Developer and Developer may unilaterally amend this Trust Agreement to provide for such standards and procedure.)

239. Therefore, under the MVC Product timeshare instruments, Fla Stat. § 689.071 (2010) applies without exception as to the MVC Product.

240. Under the MVC Product timeshare instruments, Fla. Stat. § 721 (2010) applies unless the subsequent statutory amendment is mandatory as such regulatory provisions or such amendment pertains to "Substitution" of "Trust Property."

241. Fla. Stat. § 721.52(1) (2010) defined applicable law to mean the jurisdiction where the accommodations and facilities referred are located. The 2010 version of the statute applies that is expressly incorporated by Fla. Stat. § 689.071 or § 721 (such as § 718 or the applicable condominium and timeshare laws of the component jurisdiction).

## VII.  CAUSES OF ACTION

### COUNT I

**Declaratory Relief**
**Void Deed (No Real Property Interest Conveyed)**
*(Against Marriott on behalf of the Plaintiffs and the MVC Owners Subclass)*

242. Plaintiffs repeat and reallege the allegations set forth above as if fully set forth herein.

243. Fla. Stat. § 721.05(34) provides that "[a] timeshare estate is a parcel of real property under the laws of this state."

244.    Under Florida law, for a deed to transfer title to a parcel of real property, the deed must contain a sufficient description of the property to be conveyed. *See Mendelson v. Great W. Bank, F.S.B.*, 712 So. 2d 1194, 1196 (Fla. Dist. Ct. App. 1998). At minimum, that means the deed must contain enough reference to specific real property such that the property can be located. *See Mitchell v. Thomas*, 467 So. 2d 326, 328 (Fla. Dist. Ct. App. 1985)

245.    A deed that does not sufficiently describe a parcel of real property is void. *See Davis v. Hinson*, 67 So. 3d 1107, 1111 (Fla. Dist. Ct. App. 2011)

246.    Even a governmentally assigned parcel numbers may not substitute for the legal description of real property required to convey real property by deed, as the legal description must be sufficient for a surveyor to locate the land. *See* Fla. Stat. § 689.02(2).

247.    Similar to other members of the MVC Owners Subclass, rather than a legal description of a parcel of real property being conveyed, the Lennens' MVC Consumer Deed provides a code (*i.e.*, H04815, H04816, H04817, and H04818).

248.    Further, as noted above, the codes H04815, H04816, H04817, and H04818 do not correspond to any specific and identifiable parcel of real property that could be located by an interested party, surveyor, or title company.

249.    By virtue of the foregoing, Marriott has not effectuated a real property closing and the Lennens' MVC Consumer Deed is void under the Florida law.

250.    Accordingly, Plaintiffs and members of the MVC Owners Subclass are entitled to: (a) a declaration that the MVC Consumer Deed is void, and that Marriott has not effectuated a property sale closing of a timeshare estate pursuant to Fla. Stat. § 721.05(5)(a); (b) an order invalidating the MVC Consumer Deed; and (c) an award of damages including refund of the

MVC Product purchase price, closing fees and costs, pre- and post-judgment interest,  and attorney's fees, costs and expenses.

## COUNT II

### Declaratory Relief
### Defective Title (Title Policy Coverage Triggered)
*(Against Marriott Title and First American on behalf of*
*the Plaintiffs and MVC Owners Subclass)*

251.    Plaintiffs repeat and reallege the allegations set forth above as if fully set forth herein.

252.    Fla. Stat. § 627.784, provides that "[a] title insurance policy or guarantee of title may not be issued without regard to the possible existence of adverse matters or defects of title."

253.    Under Florida law, a title company has a duty to make a thorough and competent search of the record title pursuant to Fla. Stat. § 627.784 and may not issue a title insurance binder, commitment, endorsement, title insurance policy, or guarantee of title until it has conducted a reasonable search and examination of the title and of such other information as may be necessary.

254.    The Lennens' First American Policy insured the vesting of title as evidenced in their MVC Consumer Deed which purports to transfer legal title to a Florida timeshare estate, legally described as H04815, H04816, H04817 and H04818.

255.    Under the Covered Risks provision, the First American Policy insures as of date of policy against loss or damage not exceeding the amount of the insurance sustained or incurred by the reason of "[t]itle being vested other than as stated in Schedule A."

256.    Schedule A provides that "[t]he estate or interest in Land that is insured by this policy is: A Timeshare Estate as defined by Section 721.05 of Florida Statutes and is further defined in the MVC Trust Agreement."

257.    As noted above, the MVC Consumer Deed is void for lack of legal description.

258.    Because First American did not (and could not have) conducted a valid title search or survey, and did not (and could not) locate and/or identify any parcel of real property (described as H04815, H04816, H04817 and H04818) purportedly conveyed through the MVC Consumer Deed, First American issued a policy for title that does not legally exist.

259.    Even assuming the lack of legal title does not render the First American Policy void on its face, this material fact is not disclosed expressly as a title defect in the First American Policy.

260.    Under Florida law, where a title insurer fails to disclose known title defects, the policy holder may recover under the policy, irrespective of whether it knew or should have known of the defect.

261.    Like other members of the MVC Owners Subclass, the Lennens were conveyed defective title in the MVC Product, a defect First American knew or should have known of and yet failed to disclose,

262.    Accordingly, Plaintiffs and members of the MVC Owners Subclass are entitled to full coverage payment on the First American Policy, closing fees and costs, pre- and post-judgment interest, and attorney's fees, costs and expenses.

263.    In the alternative, if the First American Policy is deemed void *ab initio*, the Lennens and members of the MVC Owners Subclass are entitled to a full refund of the title insurance premiums, plus interest.

## COUNT III

**Declaratory Relief**
**Defective Right to Occupy (Title Policy Coverage Triggered)**
*(Against Marriott Title and First American on behalf of*
*the Plaintiffs and MVC Owners Subclass)*

264.    Plaintiffs repeat and reallege the allegations set forth above as if fully set forth herein.

265.    The First American Policy does not disclose expressly any encumbrance to Lennens' occupancy right as to the restricted-use properties in the NOA as a title defect in Conditions or Exceptions in Schedule B.

266.    As First American stands as a trustee and signatory to the unrecorded document that created the encumbrance, it was necessarily in a position to know of the encumbrance.

267.    Further, First American, as a recipient of the NOU, knows of the Trust Properties that the Lennens have a legal right to occupy.

268.    Therefore, the Lennens' title and occupancy rights vested in properties other than the Trust Properties listed in the NOAs, constitute a covered risk under the First American Policy.

269.    Like other members of the MVC Owners Subclass, since the Lennens' occupancy rights as to the respective properties in the NOA has diminished since taking title and will continue to diminish, they have suffered harm.

270.    Accordingly, Plaintiffs and members of the MVC Owners Subclass are entitled to full coverage payment on the First American Policy, closing fees and costs, pre- and post-judgment interest, and attorney's fees, costs and expenses.

271.    In the alternative, if the First American Policy is deemed void *ab initio*, the Lennens and members of the MVC Owners Subclass are entitled to a full refund of the title insurance premiums, plus interest.

## COUNT IV

### Declaratory Relief
### Void Deed (Defective Title and Right to Occupy)
*(Against Marriott Title and First American on behalf of*
*Plaintiffs and the MVC Owners Subclass)*

272.   Plaintiffs repeat and reallege the allegations set forth above as if fully set forth herein.

273.   Because the Lennens are deemed to own a fraction of each Legacy Timeshare Estate in the MVC Trust, title conveyed to Lennens by the delivery of the MVC Consumer Deed is voidable pursuant to the recorded Condo Declarations for the respective properties in the MVC Land Trust.

274.   Further, because the MVC Trust Timeshare Instruments are not recorded and the terms are not legally enforceable as to the Legacy Timeshare Estates submitted to the MVC Trust, the Lennens' use-license is voidable pursuant to the recorded Condo Declarations.

275.   Because First American failed to conduct a thorough title search before issuing the First American Policy title policy (which would have revealed the encumbrances it already had actual knowledge of) and failed to expressly disclose the encumbrances as a title defect, First American is bound to provide coverage under the policy.

276.   Accordingly, Plaintiffs and members of the MVC Owners Subclass are entitled to full coverage payment on the First American Policy, closing fees and costs, pre- and post-judgment interest, and attorney's fees, costs and expenses.

277.   In the alternative, if the First American Policy is deemed void *ab initio*, the Lennens and members of the MVC Owners Subclass are entitled to a full refund of the title insurance premiums, plus interest.

## COUNT V

### Violation of Fla Stat. § 697.10
### Impairment of Title Due to Improper Legal Description
*(Against Marriott on behalf of Plaintiffs and the MVC Owners Subclass)*

278.    Plaintiffs repeat and reallege the allegations set forth above as if fully set forth herein.

279.    Fla. Stat. § 697.10 provides that:

In any action relating to real property, *if the court shall find that any person has prepared an instrument which due to an inaccurate or improper legal description impairs another person's title to real property,* the court may award to the prevailing party all costs incurred by her or him in such action, including reasonable attorney's fees, and in addition thereto may award to the prevailing party all actual damages that she or he may have sustained as a result of such impairment of title.

(Emphasis added)

280.    Because Marriott delivered to the Plaintiffs and all other MVC Owners deeds with inaccurate, improper, and unlawful legal descriptions, resulting in defective title to any real property interest or valid timeshare estate, Marriott is liable under Fla. Stat. § 697.10.

281.    Accordingly, Plaintiffs and members of the MVC Owners Subclass are entitled to an award of damages, including closing fees and costs, pre- and post-judgment interest, and attorney's fees, costs and expenses.

## COUNT VI

### Negligence
### Breach of Official Duties
*(Against Orange County and Orange County Comptroller,
Martha O. Haynie on behalf of the Plaintiffs and the MVC Owners Subclass)*

282.    Plaintiffs repeat and reallege the allegations set forth above as if fully set forth herein.

283.     Under the Florida law, "the clerk of the circuit court is the recorder of all instruments that he or she may be required or authorized by law to record in the county where he or she is clerk." Fla. Stat. § 28.222(1).

284.     In Orange County, Florida, the Orange County Comptroller fulfills the statutory function of a clerk of the circuit court to record instruments under the Official Records and index them in the same manner as prescribed in Fla. Stat. § 28.222. *See* Advisory Legal Opinion - AGO 75-276.

285.     Sovereign immunity is waived where a governmental entity and/or officer breaches a "statutory" or "common law" duty by acting negligently in the carrying out of that duty. *See First American Title Ins. v. Dixon,* 603. So. 2d. 562 (1992). In such circumstances, "the state and its subdivisions shall be liable for tort claims in the same manner and to the same extent as a private individual under like circumstances." *Id.*

286.     The function of the Orange County Comptroller, as an official custodian of recorded instruments, is "to record, index, and maintain documents relating to real property in the public records." *Id.* The "clerk's negligent recording and indexing of instruments in the public records" gives rise to a cause of action not protected by sovereign immunity. *Id.*

287.     The Orange County Comptroller is required to implement a uniform methodology to keep official records of chain of title of a real property located in Orange County, Florida. Further, the Orange County Comptroller must record, index, and maintain documents relating to real property in the public records. *See* Fla. Stat. § 28.222.

288.     On March 16, 2010, the Orange County Comptroller recorded the MVC Trust Agreement submitted by Marriott. The MVC Trust Agreement neither contained a legal property description nor was it a recognized land trust instrument. Indeed, under Florida law in 2010, the

63

MVC Trust Agreement was not a document that the Orange County Comptroller was required or permitted to record. *See* Fla. Stat. § 28.222.

289.    Since 2010, the Orange County Comptroller has recorded and indexed tens and thousands of deeds, mortgages, liens and notices and other instruments. Some instruments pertaining to the MVC Product were indexed as to MVC Trust Agreement while others were indexed in other manner without any uniform consistency.

290.    The Orange County Comptroller recorded tens and thousands of MVC Consumer Deeds.

291.    Florida law is clear that a deed is void for lack of a description of real property and that a void deed can neither convey legal title nor be recorded. In fact, "[i]t is only instruments that have some validity, and that may in some manner affect real estate, that can be recorded legally. So the record of a void deed cannot be invoked to support or bolster up a disputed title; for the record is worth no more than the original deed itself." *See Wright v. Blocker*, 198 So. 88 (Fla. 1940).

292.    A deed is one of the instruments that the Orange County Comptroller is required to record as the official custodian of instruments affecting real property. *See* Fla. Stat. § 28.222(3). The Orange County Comptroller recorded MVC Consumer Deeds submitted by Marriott even though the MVC Consumer Deeds uniformly lacked legal description or any type of acceptable property descriptions required by law. In fact, the MVC Consumer Deeds uniformly failed to even identify the county or state where the subject property is located. As such, the MVC Consumer Deed is void.

293.    Because the MVC Consumer Deed is void, the Orange County Comptroller was negligent in accepting it.

294.    In particular, the Orange County Comptroller violated its statutory duty as the official custodian of real property records in Orange County to uniformly maintain public records of real property in Orange County and to record and index the instruments pursuant to the Fla. Stat. § 28.222.

295.    The Orange County Comptroller's recording of MVC Consumer Deed without a legal description or indexing procedure of instruments pertaining to the MVC Product deviates from the lawful practices of other clerk's offices in Florida. For example: (a) Miami-Dade County requires that a deed may only be recorded if "the property [is] located within Miami-Dade County" (http://www.miami-dadeclerk.com/document_code_typesB.asp); Broward County requires that "[i]n order for Broward County to record your deed, it must [contain a] ... [l]egal description of property (must be located in Broward County)" (http://www.broward.org/RECORDSTAXESTREASURY/RECORDS/Pages/RecordingYourDeed.aspx); and Hendry County expressly provides that "[t]he requirements for recording a deed [include] ... "[a] complete legal description" (http://www.hendryclerk.org/clerk/recording.php);

296.    Here, not only do the MVC Consumer Deeds lack a legal description but they also purport to relate interests in property (*i.e.*, 44 Legacy Timeshare Condominiums) located mainly outside of Orange County, Florida.

297.    Moreover, the recording of MVC Consumer Deeds deviated from Orange County Comptroller's own procedures. It appears that only Marriott and First American are permitted to record deeds without a legal description and that the Orange County Comptroller used a different methodology for indexing instruments affecting the MVC Product than it does for everyone else. Accordingly, it appears that the Orange County Comptroller deviated from its duties by

accommodating the specific needs of Marriott and First American – creating a procedure that narrowly affects only the instruments pertaining to the MVC Product.

298.    By making this special, albeit unlawful, accommodation for Marriott and First American, the Orange County Comptroller has generated considerable revenue from recording fees since May, 2010.

299.    In addition, the Orange County Comptroller directly caused MVC Owners to incur Florida Transfer tax on transfer of title of an interest that is neither real property nor Florida property.

300.    On January, 2016, the Orange County Comptroller issued a notice on its website without any explanation that, "As of 1/1/2016, Orange County Comptroller Official Records will no longer assign book/page numbers on recorded documents, except plats." (http://or.occompt.com/recorder/web/).

301.    Due to the arbitrary manner in which the Orange County Comptroller has indexed the instruments (*i.e.*, the book number NOAs are indexed specifically to the book/page number of MVC Trust Agreement), there is no plat number pertaining to the MVC Trust Agreement. Without an instrument assigning book/page numbers, it is virtually impossible to locate instruments affecting the MVC Product. Accordingly, this recent policy allows Marriott and First American to further avoid transparency to the detriment of the MVC Owners.

302.    As a result of the Orange County Comptroller's breach of its duty to act as the official custodian of real property records in Orange County, Florida, which permitted and fostered Marriott and First American's scheme to sell nonexistent real property, MVC Owners and Legacy Owners were harmed.

66

303.    Accordingly, Plaintiffs and members of the Class and Subclasses are entitled to:

(a) refund of recording fees to MVC Owners; (b) refund of improper transfer tax payments; (c)

an order directing the Orange County Comptroller to assign book/page numbers on all MVC

instruments recorded since January 1, 2016; and (d) attorney's fees, costs and expenses.

## COUNT VII

**Declaratory Relief Pursuant to Fla. Stat. § 721.21**
**MVC Owners Association is Sham Entity - Not Independent from Marriott**
*(Against Marriott and the MVC Owners Association on behalf of*
*the Plaintiffs and the MVC Owners Subclass)*

304.    Plaintiffs repeat and reallege the allegations set forth above as if fully set forth

herein.

305.    Under Fla. Stat. § 721.13(1)(a), Marriott is required to provide a managing entity

for a timeshare plan which shall be either "the developer, a separate manager or managing firm,

or an owner's association."

306.    Fla. Stat. § 721.13(2)(a), provides that the "[t]he managing entity shall act in the

capacity of a fiduciary to the purchasers of the timeshare plan." Here, the MVC Owners

Association (the managing entity) is necessarily prevented from functioning as a fiduciary for

MVC Owners.

307.    For instance, the MVC Owners Association is prohibited from taking actions on

behalf of the MVC Owners that would be detrimental to Marriott's ability to sell the MVC

Product without Marriott's written permission as long as Marriott holds single unit of BI.

308.    Further, the MVC Owners Association Board is required to delegate various

operational and managerial functions to Marriott.

309.    Under the MVC Trust Agreement, the MVC Owners Association has broad

discretion to make unilateral decisions on behalf of the MVC Owners that are outside of the

scope of authority for a managing entity of a timeshare plan or for an owner's association of a timeshare estate.

310. Marriott has used and continues to use the MVC Owners Association to circumvent multiple provisions of the Fla. Stat. § 721 and to misrepresent the terms of the timeshare instruments created pursuant to that law.

311. Therefore, on behalf of themselves and all other MVC Owners, Plaintiffs seek declaratory relief for finding that:

    (a)    Marriott is the actual managing entity for the MVC Product;

    (b)    as the managing entity of the MVC Product, Marriott owes a fiduciary duty to MVC Owners;

    (c)    the MVC Owners Association is not independent of Marriott;

    (d)    the MVC Owners Association is not a valid managing entity pursuant to Fla. Stat. § 721.13(1)(a); and

    (e)    the MVC Owners Association is not a valid entity under Florida's Not for Profit Corporation Act, codified in Fla. Stat. § 617.0301 (proving that an entity may be only be lawfully incorporated as a Florida not for profit corporations if the entity's purpose is not for pecuniary profit);

312. In addition, on behalf of themselves and all other MVC Owners, Plaintiffs seek injunctive relief, including, but not limited to:

    (a)    Revise the MVC Product timeshare instruments to fully disclose the role and duties of Marriott;

(b)   Ordering the formation of a truly independent owners association for the MVC Product, together operating and voting procedures that do not vest effective control in the hands of Marriott;

(c)   Prohibit Marriott executives from serving simultaneously as employees and as board members of the MVC Owners Association; and

(d)   Declassify the MVC Owners Association as a Florida not for profit.

## COUNT VIII

### Violation of Fla. Stat. § 718
### Failure to Comply with Condominium Requirements
*(Against Marriott on behalf of the Plaintiffs and the MVC Owners Subclass)*

313.   Plaintiffs repeat and reallege the allegations set forth above as if fully set forth herein.

314.   Fla. Stat. § 721.03(2), provides that "[w]hen a timeshare plan is subject to both the provisions of this chapter and the provisions of chapter 718 or chapter 719, the plan shall meet the requirements of both chapters unless exempted as provided in this section." This applies to eleven (11) of Marriott's Timeshare Condominiums located within the State of Florida (the "Florida Timeshare Condominiums"):

- Beachplace Towers
- Crystal Shores
- Cypress Harbor
- Harbor Lake
- Imperial Palms
- Legends Edge
- Ocean Pointe
- Oceana Palms
- Royal Palms
- Sabal Palms
- Villas at Doral

69

315.    Under Fla. Stat. § 718, timeshare estates are partitioned units of condominium parcels.  Like a condominium parcel, a timeshare is a parcel of real property, and, once created, the timeshare estate is indivisible and the appurtenant interests are indivisible.

316.    A condominium parcel is comprised of two elements: (i) a unit, which is "a part of the condominium property which is subject to exclusive ownership" (Fla. Stat. § 718.103(27)), together with; (ii) an undivided share in common elements appurtenant to the units Fla. Stat. § 718.103(12)).

317.    Fla. Stat. § 718.104(4)(d) provides that a condominium parcel is created by recording a condominium declaration which must contain an identification of each condominium parcel and its legal description of the land and the appurtenant interests.

318.    Fla. Stat. § 718.106 provides the following appurtenance, possession and enjoyment of a condominium parcel:

(1)    A condominium parcel created by the declaration is a separate parcel of real property, even though the condominium is created on a leasehold.

(2)    There shall pass with a unit, as appurtenances thereto:

(a) An undivided share in the common elements and common surplus.

(b)    The exclusive right to use such portion of the common elements as may be provided by the declaration, including the right to transfer such right to other units or unit owners to the extent authorized by the declaration as originally recorded, or amendments to the declaration adopted pursuant to the provisions contained therein. Amendments to declarations of condominium providing for the transfer of use rights with respect to limited common elements are not amendments that materially modify unit appurtenances as described in s. 718.110(4).

319.    Fla. Stat. § 718.109 provides how each condominium shall be legally described:

Following the recording of the declaration, a description of a condominium parcel by the number or other designation by which the unit is identified in the declaration, together with the recording data identifying the declaration, shall be a

70

sufficient legal description for all purposes. The description includes all appurtenances to the unit concerned, whether or not separately described, including, but not limited to, the undivided share in the common elements appurtenant thereto.

320.    Fla. Stat. § 721.03(10) provides that a developer may partition a condominium parcel into as many timeshare estates it wants so long as no single condominium unit counts as providing more than 365 use nights, and the appurtenant percentage of beneficial interests as to the condominium add up to a whole. *See also* Fla. Stat § 721.05(25) ("No individual timeshare unit may be counted as providing more than 365 use nights per 12-month period.").

321.    Pursuant to Fla. Stat. § 718.104, a timeshare estate may be created from a condominium parcel only if there are specific provisions in the condominium declaration allowing the creation of timeshare estates. These requirements include: delineation of degree, quantity, nature, and extent of the timeshare estate that will or may be created; a statement of the minimum duration of the recurring periods of rights of use, possession, or occupancy that may be created with respect to any unit; the proportionate fractional ownership of the condominium parcels for each timeshare estate; and the nature of the use-licenses.

322.    Once created, a timeshare estate is an undivided real property parcel where ownership is divided into percentages of ownership of the condominium and its common elements as provided in the recorded timeshare condominium's declaration.

323.    Like a condominium parcel, the legal description of each timeshare estate must be identifiable the recorded timeshare condominium's declarations.

324.    On December, 2014, Marriott sold Plaintiffs purported Florida timeshare estates with the legal description H04815, H04816, H04817, and H04818 and 4BI and 1000 as the appurtenant and indivisible interests.

325.   H04815, H04816, H04817, and H04818 purport to relate to both the Florida Timeshare Condominiums as well as other Legacy Timeshare Condominiums located in states other than Florida.

326.   H04815, H04816, H04817, and H04818 are not, however, identifiable as timeshare estates in any of the condominium timeshare declarations of the Florida Timeshare Condominiums.

327.   Accordingly, the purported Florida timeshare estates that Marriot sold to the Plaintiffs, and to any other MVC Owner, having not been created in compliance with Fla. Stat. § 718 and Fla. Stat. § 721.03(2), are illusory and do not exist.

328.   Because no closings can take place for void Florida deeds conveying title to non-existent timeshare estates (*see* Fla. Stat. § 721.05(5)), proceeds from the Plaintiffs' and other MVC Owners' purchases were released unlawfully from escrow. *See* Fla. Stat. § 721.08(2).

329.   Accordingly, Plaintiffs and members of the MVC Owners Subclass are entitled to: (a) refund of the purchase price, plus interest from the date of purchase that should have been held in escrow, (b) refund of all closing costs and fees; and (c) attorney's fees, costs and expenses.

## COUNT IX

### Violation of Fla. Stat. § 721.57 (2010)
### Failure to Transfer Accommodations to a Trustee
*(Against Marriott on behalf of the Plaintiffs and the MVC Owners Subclass)*

330.   Plaintiffs repeat and reallege the allegations set forth above as if fully set forth herein.

331.    Marriott sold the MVC Product as a timeshare estate as defined in Fla. Stat. §
721.05 (2010) in a multisite real property timeshare plan. Therefore, the instrument to convey
title to MVC Owners must meet the requirements of Fla. Stat. § 721.57 (2010).

332.    Marriott violated Fla. Stat. § 721.57 because the MVC Consumer Deed, an
instrument to convey title to MVC Owners, does not meet its requirements.

333.    Under Fla. Stat. § 721.57(2) (2010), the timeshare instrument conveying multisite
timeshare plan in which a timeshare estates are offered, *other than trust meeting the
requirements of Fla. Stat. § 721.08,* must provide for the following:

> The purchaser will receive a timeshare estate as defined in s. 721.05 in one of the
> component sites of the multisite timeshare plan. The use rights in the other
> component sites of the multisite timeshare plan shall be made available to the
> purchaser through the reservation system pursuant to the timeshare instrument.

334.    The MVC Consumer Deed does not convey a timeshare estate in one component
site and use-rights granted in component sites pursuant to Fla. Stat. §721.57(2) (2010). Instead,
the MVC Product is created ostensibly in 44 Legacy Timeshare Condominiums – or 44 different
component sites.

335.    Therefore, for the MVC Consumer Deed to constitute a valid conveyance of a
timeshare estate in a multisite timeshare plan pursuant to Fla. Stat. § 721.57(2010), the MVC
Timeshare Plan must meet the requirement of Fla. Stat. § 721.08(2010).

336.    As alleged herein, Marriott did not transfer all accommodations and facilities of
the MVC Timeshare Plan to a trust and the trustee meeting the requirements of Fla. Stat. §
721.08 (2010). Therefore, Marriott failed to deliver a legally-compliant timeshare instrument to a
timeshare estate in a multisite timeshare plan in violation of Fla. Stat. § 721.57 (2010).

73

337.    By virtue of the foregoing, both Legacy Owners and MVC Owners entitled to declaratory relief, damages and injunctive remedy caused by Marriott's conduct in unlawfully conveying the MVC Product.

338.    As for declaratory relief, pursuant to Fla. Stat. § 721.21, an order declaring that: (a) the MVC Product is not a timeshare estate pursuant to Fla. Stat. § 721.57(1) but rather an offer of "a timeshare license"; (b) the MVC Land Trust is not a trust that meets all the requirements of Fla. Stat. § 721.08(2)(C)(4) (2010); and (c) First American is not a trustee meeting the requirements of Fla. Stat. § 721.08(2)(C)(4).

339.    In addition, Plaintiffs and the MVC Owners Subclass are entitled to damages from conveyance of a void deed, including closing costs and fees, damages caused by Marriott's violation of the one-to-one use ratio; and damages measured in the diminution of value between a timeshare estate and contract-based timeshare use-right that is subject to competing and superior claims of Legacy Owners.

340.    Plaintiffs and the Legacy Owners Subclass are entitled to damages caused by Marriott's violation of the one-to-one use ratio guaranteed by applicable Condo Declarations, and damages arising out of artificially-depreciated sales prices for Legacy Owners that sold their interests since June 25, 2010.

## COUNT X

### Violation of Fla. Stat. § 721.03(7)(2010)
### Failure to Designate Independent Trustee
*(Against Marriott on behalf of the Plaintiffs and the MVC Owners Subclass)*

341.    Plaintiffs repeat and reallege the allegations set forth above as if fully set forth herein.

342.    Under Fla. Stat. § 721.03(7)(2010), any trustee performing a function under Fla. Stat. § 721 must be independent.

343.    Fla. Stat. § 721.05(20)(b) provides that a trustee is independent if it has no financial relationship with the developer or its subsidiaries other than payment of transactional service fee.

344.    First American is not independent as Marriott and First American have mixed financial interests in virtually every aspect of every MVC Product transaction. The most direct of these is the fact that Marriott and First American jointly sell and share in the profit of title insurance to the MVC Owners.

345.    A profit-sharing relationship for sale of an insurance product clearly is outside the scope of a permissible financial relationship limited to the payment of transactional service fee.

346.    Further, First American does not perform any of the functions required of a Timeshare Trustee under Fla. Stat. § 721.08(2)(C)(4)(b)(IV).

347.    First American serves no function of making any type of independent judgment as a Timeshare Trustee to audit Marriott's sale of the MVC Product or Marriott's operation of the MVC Timeshare Plan.

348.    Accordingly, First American is not independent.

349.    By virtue of the foregoing, MVC Owners are entitled to damages, including closing costs and fees, pre- and post-judgment interest; and attorney's fees, costs and expenses.

350.    Further, Plaintiffs and MVC Owners are entitled to declaratory relief in the form of an order finding that that First American was not an independent trustee.

## COUNT XI

### Violation of Fla. Stat. § 721.08
### Breach of Duty of Escrow Agent
*(Against First American on behalf of the Plaintiffs and the Subclasses)*

351.    Plaintiffs repeat and reallege the allegations set forth above as if fully set forth herein.

352.    Both Legacy Owners and MVC Owners have independent standing to bring a claim for declaratory and injunctive relief and damages against First American for its failure to perform a function of an escrow agent pursuant to Fla. Stat. § 721.08(2)(C)(2)(d) (2010).

353.    First American performed the function of an exclusive escrow agent for Marriott's sale of the MVC Product, a Florida timeshare estate.

354.    Fla Stat. § 721.03(7), provides that every escrow agent must be "independent." Independent is defined in Fla. Stat. § 721.05(20)(b), as:

> There is no financial relationship, other than the payment of fiduciary fees or as otherwise provided in this subsection, between the escrow agent or trustee and the developer, seller, or managing entity, or any officer, director, affiliate, or subsidiary thereof.

355.    First American is not independent as Marriott and First American have mixed financial interests in virtually every aspect of every MVC Product transaction. The most direct of these is the fact that Marriott and First American jointly sell and share in the profit of title insurance to the MVC Owners.

356.    A profit-sharing relationship for sale of an insurance product clearly is outside the scope of a permissible financial relationship limited to the payment of transactional service fee.

357.    Fla. Stat. § 721.08(2) (2010), requires that Marriott deposit 100% of the proceeds for the purchase of MVC in an escrow account. As the escrow agent, First American may not

allow Marriott to withdraw the proceeds from the sale of MVC from escrow unless Marriott had

submitted an affidavit that closing has been completed.

358.    Fla. Stat. § 721.05(5)(a) provides that closing for a timeshare estate

occurs upon:

> For any plan selling timeshare estates, conveyance of the legal or beneficial **title to a timeshare estate** as evidenced by the delivery of a deed for conveyance of legal title, or other instrument for conveyance of beneficial title, to the purchaser or to the clerk of the court for recording or conveyance of the equitable title to a timeshare estate as evidenced by the irretrievable delivery of an agreement for deed to the clerk of the court for recording. (Emphasis added)

359.    Because Marriott's affidavit to First American was based on an invalid

conveyance of title and on a recording that failed to comply with the recording laws, it was

improper for First American to release escrow funds to Marriott.

360.    Further, upon receiving the affidavit from Marriott that closing has been

completed, First American had a further duty to independently verify that the specific timeshare

estate sold to the MVC Owners was free from competing property interests of an Interestholder.

Indeed, an escrow agent must verify that the specific timeshare estate that was sold in a

condominium actually exists by locating the specific timeshare estate in the recorded Condo

Declaration. However, since Marriott never created MVCs as legitimate timeshare estates, First

American could never fulfill this duty.

361.    First American could not verify that the timeshare estates sold to MVC Owners

were free and clear from any Interestholder (through any of the options provided in Fla. Stat. §

721.08(2)(C)(2)(d) (2010).

362.    First, pursuant to Fla. Stat. § 721.08(2)(C)(2)(d)(I) (2010), First American had a

duty obtain adequate evidence that the specific timeshare estate that was sold to MVC Owner

was "[f]ree and clear of the claims of any Interestholders, other than the claims of Interestholder

that, through a recorded instrument, are irrevocably made subject to the timeshare instrument and the use rights of purchasers made available through the instrument."

363.    First American did not (and could not) verify that timeshare estate was free and clear because no Interestholder, through a recorded instrument, is irrevocably made subject to the MVC Product timeshare instruments and the use rights of the MVC Owners.

364.    In fact, not even the MVC Owners are bound by the terms of MVC timeshare instruments through a recorded document. MVC Owners are contractually bound only by the terms of the unrecorded MVC timeshare instrument.

365.    Accordingly, MVC Owners' right to use the Legacy Timeshare Estates submitted to the MVC Land Trust are not binding on anyone that is not contractually bound by the MVC Product timeshare instruments. Legacy Owners, as Interestholders, are not irrevocably subject to the MVC Product timeshare instruments or the use-rights therein.

366.    Therefore, First American did not meet the requirements under Fla. Stat. § 721.08(2)(C)(2)(d)(I) (2010) to verify that the specific timeshare estate sold to a MVC Owner was free and clear from competing Interestholder.

367.    Similarly, First American could not verify under the second option under Fla. Stat. § 721.08(2)(C)(2)(d)(II) (2010), which required it obtain adequate evidence that the specific timeshare estate sold to the MVC Owner was: "subject to a recorded Nondisturbance and Notice to creditor instrument that complies with Subsection (3) and S. 721.17."

368.    The requirements under Fla. Stat. § 721.08(2)(C)(2)(d)(I) (2010) could not be met because Subsection (3) provides that each Interestholder must execute a Nondisturbance Instrument. Because Legacy Owners (as Interestholders) never executed Nondisturbance

Instruments to subordinate their interest to the MVC Owners, First American did not comply with this requirement.

369.    Furthermore, because the subject accommodation and facility are in a condominium, the Nondisturbance instrument must be recorded in public records of the county where the Legacy Timeshare Condominiums are located in order to amend or become incorporated into the specific Condo Declaration. Neither Marriott nor any Legacy Owner has recorded a Nondisturbance instrument to bind any Legacy Timeshare Estate or Legacy Timeshare Condominium.

370.    In any event, as a practical matter, because the specific timeshare estates sold to MVC Owners do not actually exist, they cannot be subject to a recorded Nondisturbance instrument.

371.    Accordingly, First American has not fulfilled its function to as an escrow agent to verify that the MVC Product is a timeshare estate that was properly created. Furthermore, First American failed to obtain evidence that the MVC Product was free and clear from competing property interests of an Interestholder.

372.    Because Legacy Owners are the owners of the Legacy Timeshare Condominiums that contain subject accommodations in the MVC Timeshare Plan, they have suffered injuries directly as First American's violation of its duties as an escrow agent.

373.    Marriott's failure to create a timeshare estate before selling MVC allowed Marriott to over-sell use-licenses appurtenant to the Legacy Timeshare Condominiums. This prevented Legacy Owners from using the Legacy Timeshare Condominium units according to the specific Condo Declarations.

374.    By failing to create timeshare estates to sell the MVC Product, Marriott is able to inflate the inventory of real property and use-license through manipulation. This allows Marriott to create points in excess of the use-license that is allotted to the specific Legacy Timeshare Estates submitted to MVC Land Trust such that the one-to-one use ratio cannot be maintained. Therefore, Legacy Owners' use-rights as to the Legacy Timeshare Condominiums have been diminished in violation of their legally enforceable property ownership rights.

375.    First American's breach its statutory duty not to release escrow has thus directly injured Legacy Owners who are Interestholders as provided in Fla. Stat. § 721.08(2) (2010).

376.    MVC Owners were also injured by First American's violation of statutory fiduciary duty as an escrow agent pursuant to Fla. Stat. § 721.8(1) due to First American's failure to verify that the specific timeshare estates that they purchased from Marriott actually existed and were free and clear from any Interestholder.

377.    By First American failing in its statutory duty as an escrow agent, MVC Owners have incurred all the liability of fractional condominium ownership without any of the protection or benefits thereof.

378.    By virtue of the foregoing, Legacy Owners are entitled to damages arising out of artificially depreciated sales prices for interests in Legacy Timeshare Estates that have been sold since June 25, 2010, pre- and post-judgment interest,  and attorney's fees, costs and expenses.

379.    By virtue of the foregoing, MVC Owners are entitled to damages, including: (a) closing costs and fees; (b) the diminution in value between a timeshare estate and contract-based use right; (c) mortgage interests and costs; (d) any loss resulting from unlawful foreclosure of nonexistent timeshare estate; (e)  pre- and post-judgment interest; and (f) attorney's fees, costs and expenses.

80

380. Both MVC Owners and Legacy Owners are further entitled to declaratory relief in the form of an order finding that that First American violated Fla. Stat. § 721.08 (2010).

## COUNT XII
### Violation of Fla. Stat. § 721.08(2)(C)(2)(C)(III) (2010)
### Improper Transfer of Accommodations and Facilities to a Trust
*(Against Marriott on behalf of the Plaintiffs and the Subclasses)*

381. Plaintiffs repeat and reallege the allegations set forth above as if fully set forth herein.

382. In lieu of following the requirements under Fla. Stat. § 721.08(2)(C)(2)(C) (2010) to withdraw proceeds from the sale of the MVC Product, Marriott elected instead to transfer all accommodations and facilities of the MVC Timeshare Plan to a trust meeting the requirements of Fla. Stat. § 721.08(2)(C)(4).

383. However, as alleged herein, Marriott did not, in fact, meeting the requirements for transfer under of Fla. Stat. § 721.08(2)(C)(4) (2010).

384. By failing to make valid transfer pursuant to the trustee pursuant to Fla. Stat. § 721.08(2)(C)(4) (2010), Marriott unlawfully withdrew proceeds from sales of the MVC Product from the escrow account without providing evidence that the accommodations and the facilities of the MVC Timeshare Plan were free and clear from that of interesthholders.

385. Marriott's violation of Fla. Stat. § 721.08(2)(C)(4) (2010) caused harm to Legacy Owners, who are interestholders of the Legacy Timeshare Condominiums in the MVC Timeshare Plan's accommodations, as well as the MVC Owners who were sold use-rights that are subject to claims by Legacy Owners.

386. By virtue of the foregoing, Plaintiffs and members of the Legacy Owners subclass are entitled to damages arising out of Marriott's continuous violation of their use-rights

81

enforceable pursuant to the respective Condo Declarations as well as any and all damages arising out of artificially depreciated sales prices for Legacy Owner units that sold their interests since June 25, 2010.

387.    In addition, Plaintiffs and members of the MVC Owners Subclass are entitled to damages, including closing costs and fees, and damages measured as the difference between a timeshare estate in real property (the product they were sold) and the contract-based use rights (which is what they actually own) which are subject to the superior property-ownership rights of Legacy Owners.

## COUNT XIII

### Violation of Fla. Stat. § 721.03(10)
### Failure to Comply with the One-to-One Nightly-Use Ratio
*(Against Marriott and the MVC Owners Association on behalf*
*of the Plaintiffs and the Subclasses)*

388.    Plaintiffs repeat and reallege the allegations set forth above as if fully set forth herein.

389.    Fla. Stat. § 721.03(10), provides that:

A developer or seller may not offer any number of timeshare interests that would cause the total number of timeshare interests offered to exceed a one-to-one use right to use night requirement ratio.

390.    The MVC Product consists of thousands of Legacy Timeshare Estates that have been submitted to MVC Land Trust. Legacy Timeshare Estates are subject to timeshare plans pursuant to respective Condo Declarations. The MVC Timeshare Plan does not, in actuality, have its own accommodations and facilities.

391.    Timeshare property, by its very definition, must be subject to one timeshare instrument. Fla. Stat. § 721.05(40), defines Timeshare property as: "one or more timeshare units

**subject to the same timeshare instrument**, together with any other property or rights to property appurtenant to those timeshare units. (Emphasis added).

392.    Each timeshare property in the MVC Product is subject to one timeshare instrument pursuant to its respective Condo Declaration. Unrecorded timeshare instruments cannot legally bind the Legacy Timeshare Condominiums included in the MVC Timeshare Plan.

393.    Every Condo Declaration guarantees that each condominium unit shall maintain a one-to-one use ratio. This requirement applies whether the timeshare interest being offered for sale is a timeshare estate, personal property timeshare interest, or a timeshare license. *See* Fla. Stat.§ 721.03(10).

394.    Legacy Owners have property ownership rights to enforce the terms of their respective Condo Declaration.

395.    One-to-one use ratio does not mean the approximate ratio of available use-licenses in a particular timeshare plan to use-licenses being sold. Rather, as defined in Fla. Stat. § 721.05(25), one-to-one ratio means:

> that the sum of the nights that owners are entitled to use in a given 12-month period shall not exceed the number of nights available for use by those owners during the same 12-month period. No individual timeshare unit may be counted as providing more than 365 use nights per 12-month period or more than 366 use nights per 12-month period that includes February 29. The use rights of each owner shall be counted without regard to whether the owner's use rights have been suspended for failure to pay assessments or otherwise.

396.    Marriott may only add accommodations and facilities to a timeshare plan if a one-to-one use ratio is maintained at all times in each condominium unit. Therefore, no matter how many BI/Points are added to the MVC Timeshare Plan, each fractional interest must add up to a Legacy Timeshare Condominium unit that only has 365 use nights (or 366 use nights in a leap year).

83

397.    The MVC Product is sold as a timeshare estate in Legacy Timeshare Condominiums. However, the MVC Product's appurtenant beneficial interest in the Legacy Timeshare Condominiums is represented only by BI and the use-rights are represented by Points.

398.    Because Marriott never created the MVC Product in the actual Legacy Timeshare Condominiums before selling the MVC Product, it violates Fla. Stat. § 721.03(2), which requires compliance with condominium laws for a timeshare estate created in a condominium. (*See* Count VIII, *supra*). If a timeshare license or timeshare estate was legally created in a timeshare condominium, the one-to-one use night requirement ratio would automatically be maintained because each timeshare interest has pre-determined use rights.

399.    If a Legacy Timeshare Condominium unit were divided into 52 weekly Legacy Timeshare Estates (or 104 weekly semi-annual Legacy Timeshare Estates for every other year use-licenses), the interests created and conveyed would be pre-determined appurtenant use rights in compliance with a one-to-one ratio before the timeshare estates were sold. For all future sales, the one-to-one use ratio would be maintained automatically. Configuring such pre-determined use-rights are the legal requirement for every timeshare estate created in a condominium pursuant to Fla. Stat. § 718 and is typical of the condominium laws of states outside of Florida.

400.    However, because MVC was never created as a timeshare estate in the subject Legacy Timeshare Estates, the total use-rights of timeshare estates can never be pre-determined and cannot be automatically maintained.

401.    Furthermore, the MVC Product timeshare instrument does not contain any type of methodology to maintain a one-to-one use ratio.

402.    The MVC Product's accommodations consist of Legacy Timeshare Estates that were added periodically as they were acquired by Marriott and deeded to First American.

However, the MVC Product timeshare instruments do not delineate how BI/Points were converted from use-rights that are appurtenant to each Legacy Timeshare Estate that were submitted to MVC Land Trust.

403.   The NOAs track the points for sales that were added to the MVC Land Trust. Since the first sale of the MVC Product in June, 2010, points that represent use-rights appurtenant to all accommodations in the MVC Product have increased exponentially.

404.   Whereas the total points for sale upon conveyance to real property to First American as provided in the first NOA recorded on May 11, 2010, was approximately 5 million points., the total points for sale upon conveyance to real property to First American as the most recent NOA recorded on January 6, 2016, was approximately 335.86 million points.

405.   Therefore, vast majorities of BI/Points added to the MVC Timeshare Plan occurred after the MVC Product was first offered for sale on August, 2010.

406.   Marriott's methodology for assigning BI/Points to Legacy Timeshare Estates added to MVC Land Trust is undisclosed and proprietary which allows Marriott to change the formula for assigning value to BI/Points in subsequent submissions of Legacy Timeshare Estates of the same category.

407.   While the MVC Product timeshare instrument purports to allow Marriott to unilaterally change the BI/Points assigned to later-added Legacy Timeshare Estates so as long as "Points for Sale" do not exceed total "Points for Use," this rule is meaningless in terms of calculating a one-to-one use ratio of the Legacy Timeshare Estates that constitute the accommodations in the MVC Timeshare Plan.

408.   Points for Sale is what Marriott ascribes to each Legacy Timeshare Estate that is submitted to MVC (as summarized by NOA) and includes points that are assigned to restricted-

85

use property. However, Points for Sale has no relevance to MVC Owner's use-rights as to the subject accommodations and facilities.

409.    Points for Use include the number of points that are required to reserve a particular accommodation.

410.    MVC Trust Timeshare Instrument provides that MVC Owners have no right to use or no ownership rights of Legacy Timeshare Estates in the MVC Product that are categorized as restricted-use property. Therefore, the points attributed to restricted-use property do not represent the total use-rights of MVC Timeshare Plan.

411.    MVC Owners' only have rights to use unrestricted properties in the MVC Product. Thus, there is a discrepancy between points ascribed to these properties and the total points allotted to all properties (restricted and unrestricted) in the MVC Product.

412.    Therefore, it is these "usable" points, rather than total points (*i.e.*, Points for Sale), that are the total of use-license available to calculate one-to-one use ratio for Legacy Timeshare Estates in the MVC Timeshare Plan.

413.    Comparing the MVC Owners Association's Budgets for the years 2011, 2013, and 2014, and NOAs during that same period, the discrepancy between these "usable" points and Points for Sale are as follows:

| Year | Usable Points | Points For Sale |
|------|---------------|-----------------|
| 2014 | 231,790,500   | 303,841,000     |
| 2013 | 173,895,250   | 230,465,750     |
| 2011 | 64,845,250    | 118,192,250     |

414. In 2015 and 2016 budget estimate, the MVC Owners Association ceased providing the number of interests available for occupancy. Thus, the discrepancies between usable points and total Points for Sale after 2014 cannot be determined.

415. In any event, if the points that are sold to MVC Owners equal to Point for Sale, the one-to-one use ratio has been violated.

416. Therefore, even if Marriott complied with all the procedures as delineated in the MVC Product timeshare instrument, Marriott would necessarily violate the one-to-one ratio of Fla. Stat. § 721.03.

417. Marriott's sale of the MVC Product deprived Legacy Owners of the ability to use the Legacy Timeshare Condominium units according to the respective terms of the applicable Condo Declarations.

418. Legacy Owners' rights to use the Legacy Timeshare Estates are not only contractual rights, they are rights of property ownership that run with the land.

419. Conversely, MVC Owners have a right to a timeshare plan that maintains a one-to-one use ratio. Their right to use the accommodations using points have been compromised by Marriott's failure and inability to maintain a one-to-one use ratio.

420. By virtue of the foregoing, Legacy Owners are entitled to damages arising from Marriott's violation of the one-to-one use ratio calculated as to each Legacy Timeshare Estate for each calendar year, pre- and post-judgment interest, and attorney's fees, costs and expenses.

421. By virtue of the foregoing, MVC Owners are entitles to damages attributable to each year Marriott violated the one-to-one use ratio, pre- and post-judgment interest, and attorney's fees, costs and expenses.

87

422. Both MVC Owners and Legacy Owners are further entitled to injunctive relief ordering the revision of the MVC Product to meet the statutory requirements to maintain one-to-one use ratio as provided in Fla. Stat. § 721.03(10).

## COUNT XIV

### Violation of Fla. Stat. § 721.552(3)(b)
### Improper Addition of Property to Multistate Timeshare Plan
*(Against Marriott on behalf of the Plaintiffs and the MVC Owners Subclass)*

423. Plaintiffs repeat and reallege the allegations set forth above as if fully set forth herein.

424. Under Fla Stat. § 721.552(1)(b), Marriott owes fiduciary duties to MVC Owners when adding accommodations to the MVC Timeshare Plan. Specifically, that section provides that:

> Any person who is authorized by the timeshare instrument to make additions to the multisite *timeshare plan* pursuant to this subsection shall act as a fiduciary in such capacity in the best interests of the purchasers of the plan as a whole and shall adhere to the demand balancing standard set forth in s. 721.56(6) in connection with such additions. Additions that are otherwise permitted may be made only so long as a one-to-one use right to use night requirement ratio is maintained at all times. (Emphasis added).

425. Under the MVC Trust Agreement (p. 14, Art. V, § 5.3, Additions and Substitutions), Marriott has the sole discretion to add accommodations and facilities to the MVC Land Trust. Specifically:

> Developer may, from time to time, in its sole and absolute discretion, cause additional Submission Property to be transferred into the trust or otherwise made available to the Beneficiaries and the Trust without the consent of the Beneficiaries, the Associations, or the Trustee.

426. However, Marriott's addition of Legacy Timeshare Estates to the MVC Land Trust *does not* constitute addition to the MVC Timeshare Plan pursuant to Fla Stat. § 721.552(1)(b).

88

427. When Marriott adds Legacy Timeshare Estates to the MVC Land Trust, the properties remain restricted-use property until Marriott decides to deliver an NOU to the MVC Owners Association.

428. This procedure allows Marriott to add Legacy Timeshare Estates to the MVC Product (which MVC Owners ostensibly are beneficiaries of) while preventing the MVC Owners access to those Legacy Timeshare Estates via the reservation procedures, until Marriott, in its sole discretion, decides to make them available (if ever).

429. A review of the restricted-use properties that Marriott holds back from MVC Owners appear to consist of many high-demand Legacy Timeshare Estates in comparison to the properties to which Marriott has delivered NOUs on and permits access to via the reservation procedures. Whether Marriott rents out these high-demand restricted-use properties through other channels presently is unknown but it is reasonable to assume that Marriott is not letting valuable Legacy Timeshare Estates at its disposal remain vacant. In fact, many of the identical properties that are listed as MVC properties, but are invariably unavailable to MVC Owners, are simultaneously listed as available on the separate Marriott Rewards website as available to the public.

430. Restricting access to any Legacy Timeshare Estates in the MVC Product unfairly and unreasonably increases competition among MVC Owners. Indeed, while the proportion of BI/Points (and thereby MVC Owners) increases as Marriott adds Legacy Timeshare Estates (including restricted-use properties) to the MVC Product, availability of unrestricted properties decreases as more MVC Owners vie for reservations for those units.

431.    Marriott's unchecked, gross manipulation of properties and property access in the MVC Product is a breach of its fiduciary duty to the MVC Owners in violation of Fla Stat. § 721.552(1)(b).

432.    Marriott also violates its fiduciary duty to MVC Owners when it adds Legacy Timeshare Estates to the MVC Product without providing any type of formula for maintaining one-to-one use ratio.

433.    Indeed, by virtue of the fact that Marriott intentionally delays delivery of the NOUs for certain Legacy Timeshare Estates - even after it has sold BI/Points ascribed to those properties – it is diluting point value.

434.    Accordingly, MVC Owners are entitled to damages arising out of Marriott's violation of Fla. Stat. § 721.552(1)(b), including pre- and post-judgment interest, and attorney's fees, costs and expenses.

435.    Additionally, MVC Owners are further entitled to injunctive relief ordering Marriott to comply with its duties under Fla. Stat. § 721.552(1)(b), including timely delivery of NOU and procedures to ensure a one-to-one use ratio.

## COUNT XV

### Violation of Fla. Stat. § 721.13(1)
### Improper Designation of the MVC Owners Association as Managing Entity
*(Against Marriott and the MVC Owners Association on behalf of*
*the Plaintiffs and the Subclasses)*

436.    Plaintiffs repeat and reallege the allegations set forth above as if fully set forth herein.

437.    Fla. Stat. § 721.13(1)(a) provides that:

For each timeshare plan, the developer shall provide for a managing entity, which shall be either the developer, a separate manager or management firm, or an

owners' association. *Any owners' association shall be created prior to the first closing of the sale of a timeshare interest.*

438.    Fla. Stat. § 721.13(1)(b) provides that:

1. With respect to a timeshare plan which is also regulated under chapter 718 or chapter 719, or which contains a mandatory owners' association, the board of administration of the owners' association shall be considered the managing entity of the timeshare plan.

****

3. An owners' association which is the managing entity of a timeshare plan that includes condominium units or cooperative units shall not be considered a condominium association pursuant to the provisions of chapter 718 or a cooperative association pursuant to the provisions of chapter 719, *unless such owners' association also operates the entire condominium pursuant to s. 718.111* or the entire cooperative pursuant to s. 719.104.

(Emphasis added).

439.    The MVC Product is sold as a Florida timeshare estate in Legacy Timeshare Condominiums – only some of which are actually located in Florida -- and therefore regulated by Fla. Stat. § 718. Therefore, the "managing entity" of the MVC Timeshare Plan must be the owner's association of Florida-based Legacy Timeshare Condominiums if the owner's association is mandatory.

440.    To the extent the MVC Product is sold as a Florida timeshare estate in Legacy Timeshare Condominiums located outside the state of Florida, he managing entity of the MVC Timeshare Plan must be the owner's association of the Legacy Timeshare Condominium if the owner's association is mandatory under the "applicable law." Applicable law is defined under Fla. Stat. § 721.52(1) as "the law of the jurisdiction where the accommodations and facilities referred to are located."

441.    The owner's association is mandatory in Legacy Timeshare Condominium if the MVC Product is a valid timeshare estate. The owner of a Legacy Timeshare Estate has a fee simple, fractional ownership interest of a unit in the particular Legacy Timeshare Condominium

91

where that timeshare estate is based. Accordingly, an owners' association for real property timeshare plan offering a timeshare estate is mandatory under Fla. Stat. § 718 and the applicable law.

442.    Therefore, assuming the MVC Product is what it purports to be (*i.e.*, a real property timeshare plan offering a timeshare estate), the managing entity of the MVC Timeshare Plan can only be the owners' association of the Legacy Timeshare Condominium where the Legacy Timeshare Estate is located.

443.    Nonetheless, even if the MVC Product was a legitimate Florida timeshare estate and that it provided MVC Owners with real beneficial interest in the land trust property (*i.e.*, Legacy Timeshare Estates and the related ownership interests in the Legacy Timeshare Condominiums where they are located), the structure would still run afoul of the managing entity and owners' association requirements of Fla. Stat. § 721.13(1).

444.    First, the Legacy Timeshare Estates that are included in the MVC Product are already included in timeshare plans where the "first closing" of a timeshare interest occurred well *before* the creation of the MVC Product. Because the MVC Owners Association was created *after* the first closing on those Legacy Timeshare Estates, it does not comply with Fla. Stat. § 721.13(1)(a).

445.    Furthermore, the Legacy Timeshare Estates that are included in the MVC Product are already managed by the owners' associations that were created as part of the respective timeshare plans at the respective Legacy Timeshare Condominiums where they are located. Thus, the MVC Owners Association serves no additional function not already legally served by those owners' associations.

446.   Third, Fla. Stat. § 721.13(1)(b) requires that the owners' association have operating authority over "the entire condominium." However, the MVC Owners Association does not have any operating authority over any of the 44 Legacy Timeshare Condominiums with units that have been included in the MVC Product.   Again, these 44 Legacy Timeshare Condominiums already have owners' associations that are vested with the required operating authority.

447.   As a result of the foregoing, the MVC Owners Association is an illegitimate owners' association under Fla. Stat. § 721.13(1).

448.   Both MVC Owners and Legacy Owners are harmed by the establishment and existence of the MVC Owners Association.

449.   MVC Owners are burdened with an illegitimate owners' association that does not protect their interests but rather those of Marriot – which asserts total dominion and control over the MVC Owners Association. Further, MVC Owners are responsible for fees and costs associated with the MVC Owners Association that Marriott has no authority to charge.

450.   Legacy Owners have enforceable property ownership rights to under the terms of the respective Condo Declarations which delineate the governing and operation of the owner's association at their particular Legacy Timeshare Condominium.   As a result, the MVC Owners Association infringes on their rights of proportional voting and representation, rights to be governed by a representative owners' association, and rights appurtenant to their fractional ownership interests in the Legacy Timeshare Condominiums.

451.   By virtue of the foregoing, MVC Owners are entitled to damages arising out of the unlawful acts of the MVC Owners Association and illegal contracts that the MVC Owners Association entered into with Marriott and First American on behalf of the MVC Owners,

including, but not limited to refund of all annual maintenance fees assessed and all exchange fees, pre- and post-judgment interest, and attorney's fees, costs and expenses.

452.    By virtue of the foregoing, Legacy Owners are entitled to damages arising out of any impairment of rights or costs incurred as a result of the MVC Owners Association infringing on their rights enumerated in the applicable Condo Declarations, pre- and post-judgment interest, and attorney's fees, costs and expenses.

453.    Further, both the MVC Owners and Legacy Owners are entitled to injunctive relief in the form of an order invalidating the MVC Owners Association as an owners' association and reversing any decision or determination made in its capacity as an owners' association.

**COUNT XVI**

**Violation of Fla. Stat. § 721.15**
**Improper Collection of Common Expenses**
*(Against Marriott and the MVC Owners Association on behalf of*
*the Plaintiffs and the MVC Owners Subclasses)*

454.    Plaintiffs repeat and reallege the allegations set forth above as if fully set forth herein.

455.    Fla. Stat. § 721.15(1)(a), provides that:

> The timeshare instrument shall provide for the allocation of common expenses among all timeshare units or timeshare interests on a reasonable basis, including timeshare interests owned or not yet sold by the developer ... The timeshare instrument shall allocate common expenses to timeshare interests owned or not yet sold by the developer on the same basis that common expenses are allocated to similar or equivalent timeshare interests sold to purchasers.

456.    In order for Marriott to comply with the statute, it must ensure that its portion of the annual common expenses as to unsold property is calculated using the same formula that applies uniformly to other MVC Owners.

94

457.    The MVC Product timeshare instrument appears to provide an objective formula to calculate proportionate amount of common expenses that apply uniformly for all MVC Owners except for restricted-use properties owned by Marriot.

458.    According to the MVC Owners Association Bylaws (p. 19, Art. VII, § 1, Exhibit A), the formula assessed for all MVC Owners is:

$$M = \{A \times Y/X\} + E$$

Where:

> $M$ =  Beneficiary's share of the Common Expenses to be determined
>
> $A$ =  The total amount of the Common Expenses (other than the expenses related to Owner Services (as described below)).
>
> $Y$ =  The number of Points that are associated with all of the particular Beneficiary's Interests.
>
> $X$ =  The then current total number of Points for Sale in the Trust attributable to Trust Property for which a Notice of Use Rights has been delivered.
>
> $E$ =  The amount of Exchange Company Dues charged to the Association for the Beneficiary Pursuant to the Exchange Company Documents.

459.    Every year, MVC Owners share of the common expenses have been calculated according to the same formula and increased incrementally as summarized below:

- 2011 - $100.00 Per BI + E
- 2012 - $107.50 Per BI + E
- 2013 – $109.25 Per BI + E
- 2014 - $112.50 Per BI + E
- 2015 - $118.75 Per BI + $175 Per Owner.
- 2016 - $125.62 Per BI + $185 Per Owner.

460.    Under the MVC Product timeshare instrument, there is an exception carved out for calculating the common expenses associated with the restricted-use property whereby restricted-use property is excluded from being subject to the same formula:

> None of the points associated with Restricted Use Property Shall be included in determining the Developer's share of the Common Expenses, until the effective date of a Notice of Use Rights has been delivered by Developer to the Association and Trustee with respect to such Restricted Use Property.

461. As noted herein, restricted-use means properties to which Marriott *in its discretion* has not delivered an NOU to the MVC Owners Association and First American. It is a euphemistic way of disguising the fact that Marriott's ownership of the MVC Product is not subject to the same formula for calculating common expenses.

462. Not surprisingly, according the MVC Owners Association Bylaws (p. 14, Art. III, § 18), restricted-use property expenses are determined solely by the MVC Owners Association (*i.e.*, Marriott), using an entirely discretionary, undisclosed process:

> It is expressly understood that there is *not a precise formula* for allocating the Restricted Use Property Expenses incurred with respect to each Restricted Property; however, the Association will use commercially reasonable method for making such allocation as determined to be equitable by the Association in the Association's sole discretion.

463. Based on the above subjective determination of what is "reasonable," Marriott can avoid paying the inflated common expenses that are passed along and assessed against the MVC Owners.

464. Because the MVC Owners Association owes statutory fiduciary duty to MVC Owners, it has a duty to use the same equitable, commercially reasonable calculation that it applies to the MVC Owners as it applies to Marriott.

465. Instead, Plaintiffs and other MVC Owners were assessed and paid the rate of common expenses that increased under a formula in the timeshare instruments that increased each year.

466. By virtue of the foregoing, Plaintiffs and MVC Owners are entitled to damages, including a refund all of all common expenses and exchange fees paid since the first offering of

MVC Timeshare Plan or the difference between amounts paid and what would have been appropriate based on a reassessment of the common expenses that includes and reflects any amount Marriott contributed to common expenses on restricted-use properties.

## COUNT XVII

**Violation of Fla. Stat. § 721.13**
**Managing Entity Breach of Duty**
*(Against the MVC Owners Association on behalf of the*
*Plaintiffs and the MVC Owners Subclass)*

467.    Plaintiffs repeat and reallege the allegations set forth above as if fully set forth herein.

468.    For MVC Timeshare Plan, Marriott was required to establish a managing entity before the first sale of the MVC Product. Under Fla. Stat. § 721.13(1)(a):

> For each timeshare plan, the developer shall provide for a managing entity, which shall be either the developer, a separate manager or management firm, or an owners' association. Any owners' association shall be created prior to the first closing of the sale of a timeshare interest.

469.    Fla. Stat. § 721.05(22) defines managing entity as the person who operates or maintains the timeshare plan. The managing entity of the MVC Timeshare Plan owes fiduciary duty to MVC Owners but not to Marriott. Fla. Stat. § 721.13(2)(a) provides that:

> The managing entity shall act in the capacity of a fiduciary to the purchasers of the timeshare plan. No penalty imposed by the division pursuant to s. 721.26 against any managing entity for breach of fiduciary duty shall be assessed as a common expense of any timeshare plan.

470.    Fla. Stat. § 721.05(30) makes clear that purchaser means a person *other than a developer* who acquires interest in a timeshare plan.

97

471.    The managing entity and the management company are jointly and severally liable to the purchaser of a timeshare plan for breach of fiduciary duties. Fla. Stat. § 721.13(2) provides that:

> During any period of time in which such owners' association has entered into a contract with a manager or management firm to provide some or all of the management services to the timeshare plan, both the board of administration and the manager or management firm shall be considered the managing entity of the timeshare plan and shall be jointly and severally responsible for the faithful discharge of the duties of the managing entity.

472.    For the MVC Timeshare Plan, the MVC Owners Association is the managing entity. Marriott is identified as the management company, program manager, or association's delegee in the MVC Trust Agreement. Therefore, the MVC Owners Association and Marriott are jointly and severally liable for violation of their fiduciary duties to MVC Owners (*i.e.*, purchasers of the MVC Product).

473.    The MVC Owners Association makes decisions that benefit Marriott to the detriment of the MVC Owners.

474.    First, the MVC Owners Association entered into contract with MVC Exchange Company, a subsidiary of Marriott, to arbitrarily impose fees on transfers of MVC Product BI/Points. Fees of $500 per BI with $3000.00 minimum apply to each transfer. This transfer fee directly lowers the sales price that MVC Owners received from resale purchasers. There is no conceivable reason for the MVC Owners Association to consent on behalf of all MVC Owners to assume transfer fees in an exchange agreement other than to allow Marriott to charge fees to which it is not entitled.

475.    Second, every year, the MVC Owners Association enters into contract with Marriott on behalf of MVC Owners to pay separately for performing management services fees that were already paid in the form of exchange fees for providing reservation services or

operating fee for maintaining the component properties as included in the maintenance fee. Consequently, MVC Owners were charged twice every year for the receiving the same service.

476.     Third, the MVC Owners Association assesses a restricted-use expense for Marriott that is substantially lower than annual expenses paid by MVC Owners.

477.     Fourth, the Board of the MVC Owners Association enters into contract with First American and Marriott without a formal meeting or notification to the MVC Owners. Since the Board of the MVC Owners Association is controlled by Marriott, without any representation by MVC Owners, Marriott is in effect negotiating contracts with itself. Therefore, the MVC Owners Association uniformly makes decisions that are solely for the benefit of Marriott to the detriment of MVC Owners.

478.     Both MVC Owners Association and Marriott are jointly and severally liable for damages for violating the fiduciary duties pursuant to Fla. Stat. § 721.13(2).

479.     By virtue of the foregoing, the Plaintiffs and members of the MVC Owners Subclass are entitled to damages in the form of a refund of all transfer fees/initiation fees that they incurred as a result of breach of fiduciary duties; refund of excess management fees from Marriott that they paid each year; compensation for loss arising out of contracts that MVC Owners Association has entered into with Marriott and First American that are detrimental to MVC Owners; and recovery of loss equal to the diminution in value between annual expenses and restricted-use expenses.

## COUNT XVIII

### Violation of Fla. Stat. § 721.56
### Reservation System
*(Against Marriott, the MVC Owners Association, and MRTX on behalf of the Plaintiffs*
*and the Subclasses)*

480.    Plaintiffs repeat and reallege the allegations set forth above as if fully set forth herein.

481.    Under Fla. Stat. § 721.52(6) Marriott must provide a reservation system for multisite timeshare plans to occupy any accommodation or facility of the multisite timeshare plan. These reservation procedures must provide a method to compete with other purchasers of **the same timeshare plan**.

482.    Fla. Stat. § 721.52(6) provides that a reservation system for multisite timeshare plan is not utilization of the exchange company. Further, an exchange company does not "include the assignment of the right to use and occupy accommodations and facilities to purchaser pursuant to a particular multisite timeshare plan's reservation system. (*See also* Fla. Stat. 721.56 (6))

483.    In establishing the reservation system for the multisite timeshare plan, pursuant to Fla. Stat. § 721.52(6), "developer is required to use its best efforts, in good faith based upon all reasonably available evidence under the circumstance to further the best interests of the purchasers of the plan as a whole with respect to their opportunity to use and enjoy the accommodations and facilities of the plan."

484.    The MVC Product's Reservation Procedure ("MVC Exchange Program") is one of the MVC Product timeshare instruments that is incorporated into the MVC Trust Deed. Because MVC Timeshare Plan is a non-specific, multisite timeshare plan that is not affixed to

any real property, the MVC Product can become virtually unusable without a strictly managed reservation system.

485.   MVC Owners have statutory right to a multisite reservation system that allows them to only compete with other MVC Owners (*i.e.,* in the "same" timeshare plan) to reserve the accommodations and facilities in the MVC Timeshare Plan.

486.   In 2012, the MVC Owners Association entered into a contract with MRTX, a subsidiary of Marriott, to replace its reservation system with the MVC Exchange Program. In this process, the MVC Owners Association deposited all the use-license appurtenant to the property in the MVC Exchange Program.

487.   The MVC Exchange Program combines three distinct timeshare plans under a single reservation program without regards to the reservation procedure provided in the respective timeshare instruments. This includes Legacy Owners that voluntary enroll in the Marriott Destinations program on annual basis and deposit points assigned to their Legacy Timeshare Estates, Ritz Carlton Legacy Owners that enroll in the exchange program, and MVC Owners.

488.   After the MVC Owners Association board decided unilaterally decided to replace the reservation procedure with the MVC Exchange Program, the MVC Owners Association did not notify MVC Owners that the fundamental aspect of the MVC Product had been materially altered.

489.   Although the law provides that a managing company may hire an exchange company to operate the multisite timeshare's reservation procedure, the exchange program cannot replace the reservation procedure.

490. The MVC Product's timeshare instrument provides that its reservation system is not an exchange program. In the MVC Product's Reservation Procedure, it is provided that, "An exchange may offer Special benefit through the Exchange Program to certain Trust Owners from time to time. Such Special benefit may vary, **are not** part of the Trust Reservation Procedure."

491. Furthermore, notwithstanding anything in the timeshare instruments, enrollment in the exchange program is voluntary pursuant to its statutory definition. Thus, if voluntary enrollment in the exchange program is not available on an individual basis, whether to enroll in the exchange program as a timeshare plan should have been decided collectively. However, MVC Owners do not have voting rights to vote for the board of the MVC Owners Association and never had the opportunity to vote to decide whether to enroll all MVC Owners in the exchange program.

492. From 2010-2012, Marriott required mandatory enrollment in the exchange program as a way of charging junk fees. Before Marriott combined multiple timeshare plans into a single reservation system, there was no legal basis for charging exchange fees for point-based multisite timeshare plan. Therefore, there is no benefit to the program.

493. From 2012 on, Marriott used the improper exchange program to eliminate the MVC Timeshare Plan's reservation procedure to maximize its own profits. Indeed, because maintenance costs include the cost of operating the MVC Timeshare Plan's reservation system, exchange dues constitute double charging for the same service.

494. As a result of the foregoing, Plaintiffs and members of the Subclasses suffered injuries and are entitled to damages in the form of refunds of all exchange dues, loss attributed to three years of diminished ability to reserve the MVC Product's accommodations and facilities,

disgorgement of profits realized from manipulating reservation procedures among three different

timeshare interests, pre- and post-judgment interest, attorneys' fees, costs and expenses.

495.    In addition, Plaintiffs and members of the Subclasses are entitled to injunctive

relief in the firm of an order requiring Marriott to maintain appropriate reservation procedures

and to make available all the accommodations and facilities that are in the MVC Product,

including presently restricted properties.

## FLORIDA RICO CLAIMS

### Florida RICO, Fla. Stat. §§ 895.05(6), 895.02(1)(a)(21)

496.    Plaintiffs repeat and reallege the allegations set forth above as if fully set forth

herein.

497.    Under Florida RICO, Fla. Stat. § 895.03(1), an individual or entity is liable, if he,

she, or it:

> with criminal intent received any proceed derived directly or indirectly, from a
> pattern of racketeering activity or through the collection of an unlawful debt to
> use or invest, whether directly or indirectly, any part of such proceeds, or the
> proceeds derived from the investment or use thereof, in the acquisition of any title
> to, or any right, interest, or equity in, real property or in the establishment or
> operation of any enterprise.

498.    Florida RICO also imposes liability where an individual or entity conspires with

another to engage in a pattern of racketeering activity and receives proceeds from the enterprise.

499.    Fla. Stat. § 895.02(3) defines "Enterprise" to mean:

> any individual, sole proprietorship, partnership, corporation, business trust, union
> chartered under the laws of this state, or other legal entity, or any unchartered
> union, association, or group of individuals associated in fact although not a legal
> entity; and it includes illicit as well as licit enterprises and governmental, as well
> as other, entities. A criminal gang, as defined in s. 874.03, constitutes an
> enterprise.

500.    An enterprise does not need to be a formally organized entity such as a

corporation as the Florida Supreme Court has held that "an 'enterprise' consists of (1) an

ongoing organization, formal or informal, with a common purpose of engaging in a course of conduct, which (2) functions as a continuing unit." *Gross v. State,* 765 So.2d 39, 45 (Fla.2000), *internal citations omitted..* An Enterprise "can be a loose and informal amoeba-like infra-structure that controls a secret criminal network." *Burgese v. Starwood Hotels & Resorts Worldwide, Inc.,* 101 F. Supp. 3d 414, 423-24 (D.N.J. 2015), *citing Gross* at 45. In addition, an entity may be a "Person" and also part of an "Enterprise." *See Palmas Y Bambu, S.A. v. E.I. Dupont De Nemours & Co.,* 881 So. 2d 565, 574 (Fla. Dist. Ct. App. 2004) (citing *United States v. Goldin Indus., Inc.,* 219 F.3d 1271, 1277(11th Cir. 2001) (holding that three corporations could each be a RICO person and part of a RICO enterprise comprised of a union of the three corporations).

501.    Therefore, under Florida RICO, Defendants Marriott and First American are each RICO Persons and also part of a RICO Enterprise organized both formally and informally through business dealings and contractual relationships.

502.    Under Fla. Stat. § 895.02(4), the pattern of racketeering activity is defined as:

[E]ngaging in at least two incidents of racketeering conduct that have the same or similar intents, results, accomplices, victims, or methods of commission or that otherwise are interrelated by distinguishing characteristics and are not isolated incidents, provided at least one of such incidents occurred after the effective date of this act and that the last of such incidents occurred within 5 years after a prior incident of racketeering conduct. 898.03(1)(a), Fla. Stat.

503.    Fla. Stat. § 895.02(1)(a) provides a list of the activities that that may constitute racketeering activity under Florida RICO. Among those, Fla. Stat. § 895.02(1)(a)(21) specifically includes unlawful acts under Fla. Stat. § 721.08, relating to real estate timeshare plans.

504.    As alleged below, Defendants, through a pattern of various racketeering activities, conspired to and did violate Fla. Stat. § 721.08.

## FLORIDA RICO COUNT I

### Conspiracy to Unlawfully Withdraw Proceeds from Escrow
### in Violation of Fla. Stat. § 721.08
*(Against Marriott and First American*
*on behalf of the Plaintiffs and the Subclasses)*

505.    Fla. Stat. 721.08(10)(a) provides that:

Any developer, seller, or escrow agent who intentionally fails to comply with the provisions of this concerning the establishment of an escrow account, deposits of funds into escrow, and withdrawal therefrom is guilty of a felony of the third degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084, or the successor thereof.

506.    Consequently, where, as here, Marriott and First American conspired to violate Fla. Stat. § 721.08 in allowing Marriott to unlawfully withdrawal MVC proceeds from escrow, they are liable under Florida RICO.

507.    As alleged herein, Marriott and First American, repeated and continue to repeat this conduct thousands of times in connection with each MVC sale. This open-ended racketeering activity thereby establishes a pattern. This pattern of racketeering is the enterprise's regular way of doing business and threatens repetition in the future.

508.    Marriott and First American created a RICO criminal enterprise for, *inter alia:* (a) the purpose of allowing Marriott to make withdrawals from the escrow account in violation of Fla. Stat. § 721.08 in connection with sales of invalid timeshare estates to MVC Owners; and (b) providing First American with a robust revenue stream of escrow fees and title insurance premiums despite the absence of title.

509.    To initiate this process, Marriott submitted fraudulent affidavits to First American that closing has been completed pursuant to Fla. Stat. § 721.05(5)(a). Although Marriott did deliver MVC Consumer Deeds to MVC Owners and went through the artifice of recording the MVC Consumer Deeds to satisfy the recording requirement of Fla. Stat. § 721.05(5)(a), Marriott,

and First American knew that no legal title had passed to the MVC Owners of any timeshare estate.

510.   First American (ostensibly the foremost expert in what constitutes legal title) knowingly accepted Marriott's fraudulent affidavit even though it knew in its capacity as the title insurer that MVC Consumer Deeds lacked any property description to transfer lawful title.

511.   First American also knew that the MVC Consumer Deeds were recorded only in the Orange County Comptroller's office, which knowingly failed to comply with any known recording laws or in a manner that touch and concern the trust property.

512.   Furthermore, First American knew in its capacity as trustee of the MVC Land Trust that the legal or equitable title of the trust property could only pass from First American to MVC Owners rather than from Marriott.

513.   First American further knew that the grantor of MVC Consumer Deeds was Marriott which did not have legal or equitable title to trust properties submitted to MVC Land Trust.   In fact, in First American's own publication summarizing uses of land trust, First American provides that:

> For title-insurance and recording purposes, the land trust would need to be grantor on the deed, and the deed would need to be signed by the trustee in its capacity as trustee under the trust agreement, similar to the following:
>
> _____BANK NATIONAL ASSOCIATION, not personally but as trustee under the Trust Agreement dated _____, 20 \_\_\_\_and known as Trust Number _____
>
> By: _____
>        Authorized Signature

*See* http://www.firstam.com/title/resources/reference-information/jack-murray-law-library/the-use-of-land-trusts-and-business-trusts-in-real-estate-transactions.html.

514.    Therefore, First American knowingly accepted fraudulent affidavits from Marriott that the closing had been completed pursuant to Fla. Stat. § 721.05(a).

515.    Under Fla. Stat. § 721.08, upon receiving the affidavit from Marriott that closing has been completed, First American had further duty to independently verify that the specific timeshare estate and the accommodations and the facilities of the MVC Timeshare Plan were free from competing property interest of an interestholder.

516.    First American, as title insurer and escrow agent for the Legacy Timeshare Estates for decades, knew that timeshare estates created in condominiums must be located in the specific Condo Declaration.  First American also knew as the title insurer of the MVC Product, that a valid timeshare estate did not exist.  First American in fact did not (and could not) locate the MVC Product in the Legacy Timeshare Estate Condo Declarations.

517.    First American had actual knowledge in its capacity as the trustee for the MVC Land Trust that the properties submitted to MVC Land Trust are subject to the respective Legacy Timeshare Estate Condo Declarations. Therefore, First American knew that the accommodations and facilities of the MVC Timeshare Plan were and remain subject to superior claims of Legacy Owners that have property ownership rights to enforce the terms of the respective Condo Declarations.

518.    Despite its knowledge that the MVC Product and the MVC Timeshare Plan are not free and clear from claims of interestholders, First American allowed Marriott to make withdrawal from the escrow account in violation of Fla. Stat. § 721.08.

519.    Under Fla. Stat. §721.08(10)(a), First American commits an indictable offense punishable as a felony for its violation of its duty as an escrow agent because its action was intentional and purposeful.

520. First American's knowledge of the encumbrances created by Legacy Timeshare Estate Condo Declarations on the MVC Timeshare Plans' accommodations is demonstrated by the Lennens' title policy.

521. Specifically, in Schedule B of the Lennen's First American title policy, First American delineated the following exceptions created by Legacy Timeshare Estate Condo Declarations:

### Exceptions from coverage

The Component Sites are affected by certain exceptions listed below, which exceptions may affect the Insured's right to use one or more Component Sites:

4. All covenants, conditions, restrictions, easements, liens, charges, terms and provisions contained in those certain declarations, community governing instruments, declarations of covenants, or such other documents which might now or in the future encumber and govern any portion of a Component (each a "Component Declaration"), as may be recorded the Public Records of each county in which one or more Components are located, each of which Component Declarations provides that a violation thereof shall not defeat or render invalid the lien of any first mortgage made in good faith and for value, but deleting any covenant, condition or restriction indicating a preference limitation or discrimination based on marital status, ancestry, source of income or disability to the extent of such covenant, conditions or restriction violates Title 42, 3605(C)of the United States Code.

522. There is clear and convincing evidence that First American purposefully, knowingly and intentionally allowed Marriott to withdraw proceeds from the sale of the MVC Product from the escrow account in violation of Fla. Stat. § 721.08.

523. Therefore, under Fla. Stat. § 721.08(10)(a), Marriott and First American have each committed more than 60,000 counts of felony since June, 2010 which establishes a patterns of racketeering under Florida RICO. In fact, collectively, First American and Marriott have committed more than 180,000 incidents of racketeering conduct within a five year period. Fla.

Stat. § 895.02(4) requires only two in a five-year period. Therefore, the threshold statutory requirement is met.

524. Furthermore, the pattern of racketeering activity is established only if there is continuity between each racketeering conduct. Continuity in the context of racketeering activity "is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *State v. Lucas,* 600 So. 2d 1093, 1094 (Fla. 1992).

525. The racketeering activity of Marriott and First American is the typical manner in which the enterprise has conducted and will continue to conduct in the future.

526. Since the first sale of the MVC Product in 2010, First American has been exclusive escrow agent for the MVC Product. As long as Marriott continuously sells the MVC Product, First American, as its exclusive escrow agent, will continue to commit felonies pursuant to Fla. Stat. § 721.08(10)(a), thus continuing the pattern of racketeering activity pursuant to Florida RICO.

527. Therefore, Marriott and First American function as a continuing unit of criminal enterprise. Without First American's full participation as the escrow agent and trustee, Marriott could not continue to profit from selling the MVC Product because, among other things, the proceeds from the unlawful sale would remain in the escrow account.

528. Both Legacy Owners and MVC Trust Owners have met their burden to show that they were injured by reason of Marriott and First American's violation of Florida RICO.

529. Therefore, under Fla. Stat. § 772.104, Legacy Owners and MVC Trust Owners are entitled to recover damages threefold of the actual damages sustained for the aforementioned violations of Fla. Stat. § 721.08.

## FLORIDA RICO COUNT II

### Conspiracy to Violate Fla. Stat. § 721.08(2)(C)(4)
*(Against Marriott and First American on behalf of the Plaintiffs and the Subclasses)*

530.    Plaintiffs repeat and reallege the allegations set forth above as if fully set forth herein.

531.    Under Fla. Stat. § 721.08(10)(b), an individual or entity is guilty of a felony of the third degree if, as a developer, he, she, or it intentionally fails to comply with the provisions of Fla. Stat. § 721.08 concerning the establishment of a trust.

532.    Unlike the criminal penalty imposed pursuant to Fla. Stat. § 721.08(10)(a) for the violation of an escrow account requirement, intent does not have to be proven for violation of the trust requirements under Fla. Stat. § 721.08(10)(b).

533.    Fla. Stat. § 721.08(10)(b) provides that the failure to transfer property into the trust meeting the requirements of Fla. Stat. § 721.08(2)(C)(4) is "is prima facie evidence of an intentional and purposeful violation of this section."

534.    In order to circumvent other requirements pursuant to Fla. Stat. § 721.08(2)(C)(2)(C) (2010) and Fla. Stat. § 721.57(2010), Marriott, with the knowledge and assistance of First American, opted to transfer each of the accommodations and facilities of the MVC Timeshare Plan to a trust meeting the requirements of Fla. Stat. § 721.08(2)(C)(4).

535.    To effectuate the transfer, Marriott transferred tens and thousands of Legacy Timeshare Estates to the MVC Land Trust by delivering the deeds to First American, the MVC Land Trust trustee.

536.    However,  as alleged herein, the transfer of Legacy Timeshare Estates to the MVC Land Trust does not constitute a valid transfer to a trust meeting the requirements of Fla. Stat. § 721.08(2)(C)(4).

537.    As a result, Marriott and First American violated Fla. Stat. § 721.08(2)(C)(2)(C)

(2010) and Fla. Stat. § 721.57 (2010) by failing to effectuate a valid transfer of the MVC

Timeshare Plan's accommodations and facilities to a trust  in compliance with § 721.08 in lieu

of meeting alternate statutory requirements.

538.    The foregoing violations account for well over 100,000 incidents of felonious

conduct of the third degree.

539.    By conspiring to commit an indictable crime in violation of Fla. Stat. § 721.08,

Marriott and First American engaged in continuous racketeering act to further the objective of

criminal enterprise to sell use-rights and real property in excess of inventory, sell fraudulent title

policies and mortgages, and impose other fees.

540.    Therefore, under Fla. Stat. § 772.104, Legacy Owners and MVC Owners are

entitled to recover damages threefold of the actual damages sustained for the aforementioned

violations of Fla. Stat. 721.08.

## FLORIDA RICO COUNT III

### Punitive Damages
### Specific Allegations Supporting Claim
*(Against Marriott and First American on behalf of the Plaintiffs and the Subclasses)*

541.    Plaintiffs repeat and reallege the allegations set forth above as if fully set forth

herein.

542.    Pursuant to Fla. Stat. § 768.72(1), Plaintiffs, on behalf of themselves and the

members of the Legacy Owners and MVC Owners Subclasses, plead this demand for punitive

damages against Marriott and First American for intentionally violating Fla. Stat. § 721.08 and

causing the harm alleged herein.

543.    The following allegations provide specific facts demonstrating that Marriott and First American acted intentionally and/or with wilful disregard of the rights of MVC Owners and Legacy Owners.

544.    Marriott and First American conceived an intricate conspiracy for Marriott to designate First American as an escrow agent and a timeshare trustee pursuant to Fla. Stat. § 721.08. In the process, First American agreed to overlook the fact that Marriott was selling contract-based use-rights as parcels of real property with appurtenant property based use-rights and also agreed to overlook Marriott's complete indifference to the property ownership rights of the Legacy Owners.

545.    In exchange for violating its statutory duty pursuant to Fla. Stat. § 721.08, First American received a substantial share of the profit and also Marriott's promise for indemnification in case the conspiracy was discovered and resulted in legal action.

546.    It is indisputable that both Marriott and First American had actual knowledge that the BI/Points that are appurtenant to the MVC Product accommodations and facilities for use of Legacy Timeshare Condominiums are subject to pre-existing competing property interests of Legacy Owners. Indeed, as escrow agent and title insurer for Legacy Timeshare Estates, First American has known for decades that Legacy Owners have property ownership rights to enforce the terms of the respective Legacy Timeshare Estate Condo Declarations. As the MVC Land Trust trustee, First American expressly took title to Legacy Timeshare Estates submitted to the MVC Land Trust that were subject to the 44 Legacy Timeshare Estate Condo Declarations.

547.    Marriott and First American also knew that to lawfully operate the conflicting MVC Timeshare Plan from the same Legacy Timeshare Condominiums would require Marriott to either obtain the Legacy Owners' consent to subordinate their use-rights to the MVC

Timeshare Plan or, in the alternative, to obtain Legacy Owners' votes sufficient to amend the substantive provisions of the respective Condo Declarations to accommodate the conflicting MVC Timeshare Plan.

548.    At the time that Marriott had first offered the MVC Product in June 2010, Legacy Owners were majority owners of many of the Legacy Timeshare Condominiums and actually had greater share of the voting rights than Marriott.

549.    Notwithstanding, Marriott willfully disregarded Legacy Owners' property ownership rights by failing to allow Legacy Owners to vote on whether to amend the respective Condo Declarations.

550.    Marriott also made no attempt to compensate Legacy Owners in any way for operating a timeshare plan that conflicted directly with the property ownership rights that are afforded to them by respective Condo Declarations.

551.    Instead of amending the respective Condo Declarations, Marriott collaborated with First American to structure the MVC Timeshare Plan in a fraudulent Florida land trust form to disguise that they are violating Legacy Owners' property ownership rights.

552.    There is no legitimate purpose of structuring the MVC Timeshare Plan as a Florida land trust form. Indeed, the MVC Land Trust serves none of the intended functions of a legitimate land trust.

553.    The Florida land trust statute was enacted to give statutory recognition of the Illinois land trust. The primary purpose of a land trust is to shield the identity of the beneficiaries from creditors and others. The identity of the land trust cannot be disclosed without a court order. Another advantage of the land trust was to allow the beneficiary interest to be transferred without the expense associated with deed transfers.

554.    First American and Marriott knew that the MVC Land Trust would serve none of the legitimate functions of a land trust. Specifically, the MVC Land Trust beneficiaries (*i.e.*, MVC Owners) are identified in the MVC Consumer Deeds which are recorded. Therefore, privacy of land trust beneficiary is not achieved. Moreover, MVC Product beneficiary interest is sold as a timeshare estate parcel of real property. Therefore, MVC Owners, as land trust beneficiaries incur all the costs associated with deed transfers.

555.    Further, First American and Marriott completely disregarded the land trust form once it created the MVC Land Trust thereby voiding the land trust. Despite the requirement to do so, Marriott, not First American as trustee, is the one executing the deeds to purportedly transfer trust property to the MVC Owners. Similarly, Marriott, not First American, directly conveys interest in MVC Land Trust form and manages the land trust properties. And, Marriott, not First American, is the grantor in all MVC Consumer Deeds.  Therefore, Marriott and First American cannot show that MVC Land Trust was created to serve any legitimate function of a Florida land trust.

556.    Marriott and First American used the land trust form with the specific purpose of disguising the unlawful replacement of recorded Condo Declarations with unrecorded MVC Land Trust instruments.

557.    Because land trust agreements cannot be recorded, the land trust form provided a convenient way for Marriott to avoid recording MVC Timeshare Instruments thereby hiding the conflict with the recorded Condo Declarations.

558.    The land trust form also allowed Marriott to conceal its unlawful operation of the MVC Timeshare Plan's conflicting reservation procedure in 44 Condominiums in violation of the recorded Condo Declarations.

114

559.    Marriott and First American also exploited the use of trustee in land trust context and in timeshare context pursuant to Fla. Stat. § 721.08, knowing that land trust trustee and timeshare trustee performs vastly different functions.

560.    First American and Marriott knew that that MVC Consumer Deeds were void and any mortgage secured on the MVC Product is void.

561.    First American knew that Marriott was making up numeric numbers and/or alpha numeric numbers that it provided as legal description in the MVC Consumer Deeds.

562.    Lack of actual real property did not prevent Marriott from charging MVC Owners closing costs, including the cost of conducting title searches even though no title search can ever be conducted on the MVC Product.

563.    After First American had agreed to serve as an exclusive escrow agent, land trust trustee and title insurer for the MVC Timeshare Plan, Marriott began submitting Legacy Timeshare Estates to the MVC Land Trust by delivering deeds to First American. From 2010 on, Marriott and First American added thousands of Legacy Timeshare Estates – most from 10 other states outside of Florida. However, the Florida Land Trust Act (Fla. Stat. § 689.07 (3)), as it existed in 2010, specifically provided that only Florida real property can be submitted to Florida land trust:

> OWNERSHIP VESTS IN TRUSTEE.—Every conveyance, deed, mortgage, lease assignment, or other instrument heretofore or hereafter made, hereinafter referred to as the "recorded instrument," transferring any interest in *real property in this state*, including, but not limited to, a leasehold or mortgagee interest, to any person or any corporation, bank, trust company, or other entity duly formed under the laws of its state of qualification, in which recorded instrument the person, corporation, bank, trust company, or other entity is designated "trustee" or "as trustee," whether or not reference is made in the recorded instrument to the beneficiaries of such trust or to any separate collateral unrecorded declarations or agreements, effective to vest.

564.    In March 2010, Marriott and First American recorded Memorandum of Trust Agreement that lacked any property description in the Orange County Comptroller's Office. The only purpose of Memorandum of Trust Agreement was to circumvent the recording laws of every state that instrument that uniformly provide that real property must be recorded in the county clerk's office where the real property is located. The Memorandum of Trust Agreement was not a legal or recognized land trust instrument in the 2010 version of Fla. Stat. § 689.071. In fact, this Memorandum of Trust Agreement was used specifically as an instrument to circumvent the recording laws of Florida and 10 other states where Legacy Timeshare Estates submitted to the MVC Land Trust are located.

565.    From 2010 to July 2013, Marriott and First American executed hundreds of land trust deeds to transfer thousands of Legacy Timeshare Estates located outside of Florida to the MVC Land Trust, a Florida land trust.

566.    From 2010 to July 2013, Marriott sold over 54,000 MVC Product as a beneficial interest in a Florida land trust even though the MVC Land Trust contained properties outside of Florida in violation of Fla. Sta. § 689.07 (3). In connection therewith, Marriott performed over 54,000 closings on sales of the MVC Product by delivering MVC Consumer Deeds that lacked any legal property description and recorded the same in the Orange County Comptroller's office.

567.    At the same time, First American insured the transfer of legal title of properties in the MVC Land Trust as effectuated by MVC Consumer Deeds knowing that title transfer was invalid.

568.    First American, as land trust trustee, knew that First American rather than Marriott had legal and equitable title to properties in MVC Land Trust.

116

569.    First American, as a party to the MVC Trust Agreement, also knew that the MVC Owners had no legal or equitable title as to the MVC Land Trust properties. The relevant provision of the MVC Trust Agreement provides: "No Legal or Equitable Title. No Beneficiary shall have any right, title, or interest in or to any portion of the legal and equitable title to the Trust Property."

570.    From 2010 to July 2013, Marriott sold mortgages secured on the MVC Product and recorded all mortgages in Orange County Comptroller's office. Mortgages, like the MVC Consumer Deeds, lacked any property description. First American provided the mandatory lender's title policy on all mortgages executed.

571.    No entity outside of Marriott and First American, that had accurate knowledge of the actual structure of the MVC Product, has ever validated its legal form. In fact, Marriott has never, in any of the required SEC filings, accurately represented the actual form of the MVC Product.

572.    The only two entities that had the opportunity to review the legal form of the MVC Product did not support Marriott's representation of the MVC Product as a valid Florida real property interest.

573.    In 2011, Marriott's own attorney, Foley & Lardner LLP ("Foley"), which personally handled the registration of the MVC Timeshare Plan, submitted a legal opinion letter as an exhibit to the SEC disclosure in connection with the credit agreement between Marriott and its lenders. The lenders included several banks as Marriott was borrowing $200 million in order to finance mortgages for the MVC Product. Therein, Foley submitted a legal opinion letter that did not support Marriott and First American's contention that the MVC Product is only subject to Fla. Stat. § 689.071 and Fla. Stat. § 721.

574.   In particular, the Foley legal opinion letter states that the MVC Product must meet the laws of the state in which the timeshare parcel is physically located, stating:

> In rendering this opinion letter, we have relied as to factual matters upon the Certificate and assumed, without any independent investigation, that the statements made therein are accurate and complete. Additionally, we have examined and relied on certain closing and conveyance documents for the Timeshare Interests, and have relied upon the Certificate and assumed, without any independent review or examination, that the statements made therein are accurate and complete.
>
> We have also relied, with your permission, on opinions of counsel from each state in which real property held by the MVC Trust is located providing that, among other things, the property conveyed to the MVC Trust (the "Trust Property") constitutes real property pursuant to the laws of the state in which such property is located and that the conveyance of the real property to the MVC Trust constitutes the conveyance of real property pursuant to the laws of the state in which such property is located.

575.   The Foley legal opinion that mortgages are perfected and enforceable against the MVC Land Trust is followed by long list of assumptions and qualifications, most notably that the legal descriptions of the real property and personal property appearing in the mortgage are accurate and correctly identify the real or personal property with respect to which such legal descriptions are intended to apply:

> We express no opinion as to the ownership or existence of or the title to any of the underlying Timeshare Interests and we assume that at the time of offering Timeshare Interests, (i) MORI as the developer of the MVC Trust was the owner of the Timeshare Interests, and (ii) that the Timeshare Interests and the Trust Property are free and clear of all liens, encumbrances, and claims of other interest holders, other than the Mortgage.

576.   In addition, Foley's letter includes the qualifications that:

> We express no opinion as to the legal or other description of or title to any of the "Mortgaged Property," as such term is defined in the Mortgage that MORI has provided to us. In giving the opinions set forth herein, we have made no investigation as to, and do not purport to opine with respect to, the status of title to any of the real or personal property constituting such Mortgaged Property, or the priority of any mortgage, lien, security interest or other encumbrance. We express no opinion as to the perfection of any security interest in any portion of the Mortgaged Property except for a security interest which may be perfected solely

118

by recording and/or filing a mortgage in the proper office in the State of Florida. No legal or other conclusion is expressed herein with respect to the validity, enforceability, or priority, by MORI

577.    While Foley's legal opinion expressed a view that the security interest of the MVC Land Trust is legally enforceable and valid, that short statement is qualified by approximately 6 pages of assumptions which it expressly states were not independently verified.

578.    Notably, Foley states that its conclusions can be relied upon only if the following assumptions are true: (a) that the conveyance of property in MVC Land Trust constitutes the conveyance of "real property" pursuant to laws of all 11 states where the Legacy Timeshare Condominiums are located; (b) that the legal description provided in the mortgage is correct; and (c) that the legal description of the MVC Product is correct.

579.    However, because the MVC Land Trust does not constitute conveyance of real property outside of Florida, and because mortgages and the MVC Product both lack legal descriptions, the assumptions relied by Foley are baseless.

580.    Therefore, Foley's legal opinion actually supports the opposite conclusion that the security interest on mortgages on the MVC Product is not perfected and does not comply with the Florida law.

581.    Most telling is that Foley made it a point to disclaim any direct knowledge of the approval of registration of the MVC Product by the State of Florida despite the fact that the approval for the registration of the MVC Product was sent directly to Foley:

August 10, 2010

Foley & Lardner, LLP
Attorneys at Law
111 North Orange Avenue, Suite 1800
Orlando, FL 32801-2386

RE: Marriott VACATION CLUB DESTINATIONS

119

The amendment to the filing for the referenced timeshare plan(s) received by the Division on August 3, 2010, was reviewed pursuant to the provisions of Chapters 718 and 721, Florida Statutes, as applicable.

Based upon the representations contained in your letter, accompanying information and subsequent correspondence, the Division approves the following document(s) for use effective November 15, 2010.

This approval verifies the developer's substantial compliance with the filing and disclosure requirements of Chapters 718 and 721, Fla. Stat. (as applicable).

This approval does not relieve the developer of any duty or responsibility under Florida Statutes, the rules promulgated by the Division hereunder, or any other applicable laws.

582.    Furthermore, Internal Revenue Services ("IRS") has made a determination that the MVC Product is an economic right rather than real property ownership. This is disclosed expressly in the public offering statement delivered to MVC Owners:

For income tax purposes only, the transfer of an Interest by the Developer to a Beneficiary will be characterized by the Developer and the Trust as the transfer by the Developer to such Beneficiary of: (1) the rights to use (in accordance with the Trust Plan Documents) all Trust Property held or to be held in the Trust for which a Notice of Use Rights has been or is delivered; and (2) an economic interest in the Trust ("**Economic Rights**"). The Economic Rights consist primarily of the right to receive cash distributions from the Trust in the unlikely event that any Trust Property (other than Restricted Use Property) held by the Trust is sold and the sales proceeds are not fully reinvested in other Trust Property for which a Notice of Use Rights has been or is delivered, as more particularly provided in the Trust Plan Documents. The purchase price paid by the Beneficiary to the Developer will be allocated between the use rights and the Economic Rights in such proportions as determined by the Developer. This allocation of purchase price will be used to determine the Beneficiary's initial tax basis in her or his use rights and the Beneficiary's initial tax basis in her or his Economic Rights.

583.    Due to the IRS determination that ownership of the MVC Product is an "economic right" rather than real property ownership, mortgage interest and property expenses are not tax deductible as they are for legitimate timeshare estate ownership.

584.   In order to avoid further public scrutiny of the defective MVC from potential challenge of tax election, Marriott made it an express requirement for the MVC Owners to delegate the right to designate tax election to the MVC Owners Association. This provision was an express condition for accepting the delivery of the MVC Consumer Deeds pursuant to the MVC Product public offering statement:

> By accepting a deed to a Beneficial Interest, the Beneficiaries are acknowledging and agreeing that the Board will have the sole discretion and authority to make or revoke any tax elections on behalf of the Trust, and that for U.S. federal and state income tax purposes the **Beneficiaries will not take any position with respect to the classification of the Trust or the treatment of the transfer of an Interest by the Developer to a Beneficiary that is inconsistent with the positions that have been communicated to them by the Board.**

> The foregoing statements in this discussion are based upon current provisions of the Internal Revenue Code of 1986, as amended from time to time, existing and currently proposed Treasury Regulations, and existing administrative rulings and judicial decisions, all of which are subject to change, and such statements are only a general summary of certain federal income tax considerations that may be relevant to a prospective Beneficiary. The effect of existing federal income tax laws and the income tax laws of any applicable state or local taxing authority will vary with the particular circumstance.

> (Emphasis added).

585.   Since the MVC Owners Association Board is solely controlled by Marriott, this in effect ensures that MVC Owners cannot dispute IRS designation of tax election of the MVC Product as an economic right rather than real property ownership.

586.   To feasibly explain the MVC Consumer Deed's lack of property description and obviously noncompliant recording procedure to outside industry professionals that are not its approved-broker, Marriott claimed that its approved attorney places all legal descriptions onto a single recordable conveyance for MVC Consumer Deeds. In actuality, Marriott creates as many

121

BI/Points as it wants and assigns arbitrary numbers as legal descriptions in the MVC Consumer Deeds.

587.    Marriott-approved attorneys or brokers have no role in verifying that legal description in the MVC Consumer Deeds is consolidated into recordable form.

588.    In 2009, before the MVC Product was first sold, Marriott proactively obtained an advisory opinion from the Florida Department of Revenue as to whether a conveyance of the MVC Product was subject to Florida transfer tax. However, in seeking the advisory opinion, Marriott was careful and selective in the facts it provided so that it could obtain a desired result which would allow Marriott to evade further scrutiny as to irregularity of the MVC Product as an interest in real properties outside the state of Florida.

589.    Critically, Marriott omitted the following facts from its request to the Florida Department of Revenue omitted that:

(a) That the MVC Land Trust contains mostly real properties that are located outside the State of Florida. Although Marriott stated that it owns real property in Florida and in other states and desired to create a multi-site timeshare plan, Marriott did disclose that real property in the MVC Land Trust would consist primarily of real property located outside of Florida. This obviously is a material fact in any transfer tax analysis of Florida property.  As such, it is evident that the Florida Department of Revenue's opinion did not take into account the fact that real property outside of Florida would be submitted to the MVC Land Trust;

(b) The MVC Consumer Deeds lacked legal descriptions of property and conveyed proprietary units that had no conversion value to land trust property. It is evident

that the Florida Department of Revenue's opinion is based on the presumption

that MVC Consumer Deeds are valid deeds that convey real property;

(c) That, from 2010 on, Marriott selectively recorded MVC Consumer Deeds and

other instruments only in the Orange County Comptroller's office to which it had

obtained cooperation in advance. This allowed Marriott to minimize public

scrutiny as to the validity of the MVC Consumer Deeds that lacks the most

essential element of a deed – *i.e.*, a description of the property that is being

conveyed.    In Marriott's request for an advisory opinion from the Florida

Department of Revenue, Marriott actually redacted the identity of the Orange

County Comptroller from public records. While redaction is permitted from

public records for limited purposes (like for protection of trade secrets) redacting

the identification of Orange County Comptroller as the entity that would record

**all** MVC Consumer Deeds would likely have attracted further scrutiny because of

its manifest irregularity. In Florida, as in other states, deeds must be recorded in

the county where real property is physically located. In 2008, the Florida

legislature enacted legislation to eliminate the DR-219 form being used by county

recorder's offices in Florida. Without the legislative enactment, DR-219 would

have required the Orange County Comptroller to identify the property address to

which transfer taxes are collected when MVC Consumer Deeds are located. The

Florida Department of Revenue was not made aware that Marriott and First

American had collaborated with Orange County Comptroller to record all MVC

Consumer Deeds.

123

590.    By providing selective and incomplete information to various agencies, Marriott and First American have successfully evaded further scrutiny.

591.    In 2013, Marriott encountered its first and only regulatory obstacle as it was attempting to securitize the mortgages secured on the MVC Product as mortgage-backed securities. However, unlike previous regulatory reviews in different contexts, the securitization process of a new investment product required much more extensive legal review due to the stringent securities regulations involved.

592.    During the securitization process, Marriott and First American were no longer able to hide the fact that their proprietary procedure in executing instruments to create, convey the MVC Product, and perfecting security interest in the MVC Product, deviated substantially from the Florida Land Trust Act, codified in Fla. Stat. § 689.071 (2010).

593.    Faced with significant exposure and well aware that the manner in which the MVC Product was created, marketed, and sold violated the Florida Land Trust Act, Marriott and First American set about trying to make their illegal conduct legal by having the rule makers change the rules. So, in early 2013, Marriott and First American proposed specific statutory amendments and lobbied the Florida Legislature to give statutory recognition to the form of the MVC Trust Agreement as a valid land trust instrument.

594.    Marriott and First American's efforts proved a total success. In July 2013, the Florida Legislature amended Fla Stat. § 689.071 which, *inter alia*, validated the recording of mortgages secured on land trust interests rather than perfection of security interests pursuant to the Uniform Commercial Code as personal property interest. The 2013 amendment also removed the requirement for land trust properties to be located in the state of Florida.

595.   As      is       evidenced      in      the      legislative      history (https://www.flsenate.gov/Session/Bill/2013/1172/Analyses/2013s1172.pre.ju.PDF),                                                     the amendments to the Florida Land Trust Act were enacted specifically to accommodate the needs of First American and Marriott in securitizing mortgages secured on the MVC Land Trust, thereby validating the noncompliant perfection of security interests in the MVC Product:

> The Florida Vacation Plan and Timeshare Act authorizes the creation and marketing of timeshare estates through trusts. Because timeshare estates are defined as real property the purchasers of Florida timeshare estates typically finance their purchase with a mortgage recorded against the timeshare estate. However, if the timeshare estate is created as a beneficial interest in a timeshare trust a land trust is created. As a result, two different statutes prescribe two different methods of perfection, causing possible confusion in the mechanics of perfecting the lien.

> As noted above in the discussion of timeshare interests, current statutes authorize the use of trusts for the creation and marketing of timeshare estates and specify similar requirements for using trusts for multi-site vacation clubs. These statutes specify that certain provisions of the Florida Trust Code govern the liability of the trustees of such qualifying trusts and these provisions are usually recited in the trust agreements. If such an existing timeshare trust were created as a land trust, however, then the trust agreement would contain provisions stating that the trust is a land trust (making it a land trust) and would also refer to governance.

596.   Not coincidentally, on August 13, 2013, Marriott announced that securitization of mortgages on the MVC Product had been completed, stating:

> [T]he completion of a securitization of a pool of approximately $263 million of vacation ownership loans, $237 million of which were purchased on August 8, 2013 by the MVW Owner Trust 2013-1 (the "Trust") and up to $26 million of which will be purchased by the Trust within the next three months, and the issuance by the Trust of approximately $250 million of notes (the "Notes"). The Notes were offered in a private placement within the United States to qualified institutional buyers pursuant to Rule 144A and outside the United States in accordance with Regulation S under the Securities Act of 1933, as amended.

597.   Unfortunately for Marriott and First American, the 2013 amendment may have given cosmetic cover to recording of unsecuritized mortgages, paving the way for Marriott to

complete the securitization process, but it did nothing to validate the form or the substance of the MVC Product as a beneficiary interest in a Florida land trust.

598.    First, the 2013 amendment did not validate MVC Consumer Deeds to be issued without a legal description of a property.  No statute or common law validates MVC Consumer Deeds as an instrument to convey any type of property ownership.

599.    Additionally, the 2013 amendment did not allow recording of MVC Consumer Deeds in the Orange County Comptroller's office for beneficiary interests in real property located outside of Orange County, Fl. The amended recorded procedure in 2013 amendment to Fla. Stat. § 689.071 only affected deeds of trust, which are mortgages rather than deeds that convey real property.

600.    Fla. Stat. § 689.071 (8)(2)(C) (2013) provides that:

If a beneficial interest in a land trust is determined to be real property as provided in sub(6), then to perfect a lien or security interest against that beneficial interest, the mortgage, **deed of trust**, security agreement, or other similar security document must be recorded in the public records of the county that is specified for such security documents in the recorded instrument or in a declaration of trust or memorandum of such declaration of trust recorded in the public records of the same county as the recorded instrument. If no county is so specified for recording such security documents, the proper county for recording such a security document against a beneficiary's interest in any trust property is the county where the trust property is located.

601.    Furthermore, most of the Legacy Timeshare Estates that were submitted to the MVC Land trust are located outside of Florida.  As a result, Fla. Stat. § 689.071 has no enforceability over real property physically located outside the State of Florida. And, only handful of states even recognize land trusts.

602.    In First American's published land trust article, First American recognizes that:

Florida, Hawaii, Illinois, Indiana, North Dakota have statutes that permit forms of land trusts; while states such as Arizona, California and Ohio have permitted the

creation of land trusts through court decisions. **The majority of states do not recognize, or permit the use of, land trusts.**

603.    Even the few states that do recognize the land trust form, the real properties located within the borders of such states are subject to their own land trust statute or common law rather than the land trust statute of Florida.

604.    Therefore, most of the Legacy Timeshare Estates in the MVC Timeshare Plan were not validly submitted to the MVC Land Trust. Accordingly, Florida legislature's 2013 amendment of Fla. Stat. § 689.071 has no effect to include out of state properties as trust properties of a Florida land trust.

605.    More importantly, the 2013 amendment to Fla. Stat. § 689.071 had no substantive effect on validating the MVC Product as a beneficial interest in a land trust because the parties are unambiguously bound by the 2010 version of Fla. Stat. § 689.071.

606.    Thus, with the exception of the recording procedure of mortgages which has retroactive effect, the 2013 amendment has no effect on the MVC Product or the MVC Timeshare Plan.

607.    No statutory change can render the MVC Product a real property interest unless the entire definition of real property includes intangible contract-based interest.

608.    As a practical matter, purpose of land trust cannot be achieved unless the beneficiary interest in the land trust is personal property interest. However, Marriott and First American caused the change to the Florida Land Trust Act in an attempt to retroactively render the MVC Product a real property interest. The 2013 amendment included provisions that attempted to render the MVC Product a real property interest rather than a personal property interest in a land trust:

127

In all cases in which the recorded instrument or the trust agreement, as hereinabove provided, contains a provision defining and declaring the interests of beneficiaries of a land trust to be personal property only, such provision is controlling for all purposes when such determination becomes an issue under the laws or in the courts of this state. **If no such personal property designation appears in the recorded instrument or in the trust agreement, the interests of the land trust beneficiaries are real property.**

609.    The MVC Product is sold as a timeshare estate. A timeshare estate is a real property parcel. While conveyance of a timeshare estate appears to conflict with a beneficiary interest in a land trust (which is a personal property interest), in actuality, it immaterial whether beneficiary interest in a land trust is a personal property interest or real property interest for purpose of conveying a legally valid timeshare estate.

610.    The distinction between personal property interest and real property interest in the context of land trust beneficiary interest is semantics because beneficiaries are owners of the trust property and the land trust trustee (while holding equitable title) is merely an agent that holds the trust property for narrow purpose of effectuating the land trust form.

611.    The critical distinction lies in the fact that a timeshare estate is a "fee simple" ownership of a parcel of real property or, if a timeshare estate is in a condominium, a fractional ownership of the condominium. Timeshare licenses and personal property timeshare interests, on the other hand, are lesser-forms of property interests. The distinction between a timeshare estate and timeshare license is the difference between owning land and only having the right to use the land.

612.    The personal property and real property are not interchangeable concepts under Fla. Stat. §§ 721 and 689.071. Under its current form, the MVC Product will never be a personal property beneficiary interest OR a real property beneficial interest in a land trust. Indeed, the MVC Product is not any type of property interest.

128

613.    At bottom, the MVC Product is nothing more than a contractual use right being sold by Marriott and First American as a timeshare estate and beneficial interest in a Florida land trust.

614.    BI/Points are represented as the unit of ownership in the MVC Land Trust Property. For example, the Lennens own 4BI of the properties in the MVC Land Trust that are not restricted-use properties.

615.    Because Marriott arbitrarily assigns units of BI to each of the properties as they are submitted to the MVC Land Trust, there is no possible way to convert 4BI to a cognizable beneficial interest.

616.    Because BI has no way to touch and concern the properties in the MVC Land Trust and because the formula for assigning BI is subject to Marriott's sole discretion, BI cannot be deemed a percentage or specified portion of properties in the MVC Land Trust.

617.    BI also does not convert to any beneficial interest appurtenant to a Legacy Timeshare Estate which is fractional ownership of a Legacy Timeshare Condominium. BI does not appear in any of the instruments that bind the underlying Legacy Timeshare Estates submitted to MVC Land Trust.

618.    Like MVC Consumer Deeds or the recording procedures of MVC Trust Deeds and other instruments, BI has no function other than to perpetuate the charade of real property ownership by Marriott and First American.   Indeed, BI could be completely eliminated from MVC Timeshare Plan without affecting the rights of the MVC Owners.

619.    Even under the 2013 amendment of the Florida Land Trust Act, beneficiary interest must be conveyed in a way that can be converted into actual property ownership as an

ownership of a parcel of real property, specified portion or parcel of trust property or of a land

trust. In particular, Fla. Stat. § 689.071(8)(b) provides that:

1.  If provided in the recorded instrument, in the trust agreement, or in a
beneficiary agreement:
   a.  A particular beneficiary may own the beneficial interest in a particular
   portion or parcel of the trust property of a land trust;
   b.  A particular person may be the holder of the power of direction with
   respect to the trustee's actions concerning a particular portion or parcel of
   the trust property of a land trust; and
   c.  The beneficiaries may own specified proportions or percentages of the
   beneficial interest in the trust property or in particular portions or parcels
   of the trust property of a land trust.
2.  Multiple beneficiaries may own a beneficial interest in a land trust as tenants
in common, joint tenants with right of survivorship, or tenants by the entireties.

620.  Because MVC Owners are not party to the MVC Trust Agreement, and because

they are not beneficiaries but merely contractual licensee of Marriott, the sole beneficiary of the

MVC Land Trust, Marriott's designation of MVC Owners as timeshare estate owners and land

trust beneficiaries is unlawful.

621.  Land trusts, unlike other revocable living trusts, must touch and concern the

underlying real property and a land trust agreement must provide a list of real property. The

MVC Trust Agreement does neither.

622.  Indeed, MVC Owners have no way of knowing what portion of the MVC Land

Trust property they supposedly own. And, MVC Owners do not have any interest or use-rights in

restricted-use properties which are controlled by Marriott.

623.  For MVC Land Trust properties that are not restricted-use property, NOUs are

never recorded. Therefore, MVC Owners do not even have constructive notice what properties

they supposedly own.

624.     Further, MVC Owners have no power of direction as to the properties in the MVC

Land Trust as such is delegated exclusively to the MVC Owners Association – which is merely a

proxy for Marriott that lacks any representation by MVC Owners.

625.     Under the MVC Trust Agreement, any power that is not otherwise delegated to

the MVC Owners Association is reserved solely for Marriott:

> Except as otherwise set forth in this Trust Agreement, it is agreed by the Parties
> that Trustee will deal with the Trust Property only when authorized and directed
> to so in writing by the Board or Developer, as applicable pursuant to This Trust
> agreement.

626.     To be conveyed property-based use-right and  timeshare license pursuant to Fla.

Stat. § 721, MVC Owners would have received:

(a) Delivery of instrument that fully vests in MVC Owners full use-rights under the

plan.    For condominiums, such instrument must bind the Condominium

Declaration;

(b) Use-rights as provided in timeshare instrument that legally binds the

accommodations and facilities of a timeshare plan and is free and clear from

interest holder;

(c) Property-based use-rights have finite inventory and accommodations that

automatically maintain one to one use rights.  Each condominium unit can

only have 365 nights of use and 366 nights; and

(d) Disclosure conspicuously in a public offering statement that Marriott will

control the managing entity like MVC Owner's Association more than a year

after first sale of timeshare interest.

627.     What MVC Owners did receive was a property-based use-right that more closely

reflects a timeshare license.

628.    In the process of forming and growing the MVC Product, Marriott and First American harmed Legacy Owners in various ways.

629.    MVC Timeshare Plan's reservation procedures operate in a manner that is inconsistent with the property ownership rights of the Legacy Owners. Marriott operates two conflicting reservation procedures to use the same Legacy Timeshare Condominium units by giving limited reservation priorities to Legacy Owners. However, granting limited priority reservation does not grant Legacy Owners the full exercise its use-rights appurtenant to their Legacy Timeshare Estates.

630.    Legacy Owners have ownership rights to use Legacy Timeshare Condominium units during specific weeks or floating weeks as long as they make reservations prior to the limited pool of competing Legacy Owners. Limited reservation priority given to Legacy Owners over MVC Owners still deprives Legacy Owners of their full use-rights that are appurtenant to their property ownership of Legacy Timeshare Estates.

631.    Furthermore, Condo Declarations that bind the MVC Land Trust properties dictate a 7-day reservation period. Therefore, breaking up the 7-day reservation period that is allowed under MVC Timeshare Plan automatically decreases the availability of 7-day reservation periods for the Legacy Owners.

632.    Because MVC Owners are granted contract-based use-rights that are not limited in inventory, the use rights of the Legacy Timeshare Condominiums are oversold.

633.    Marriott, in its sole discretion, can create as many points as it wants. And, while Marriott cannot change the points assigned to the Legacy Timeshare Estates that were previously submitted to MVC Land Trust, it can increase the points assigned to future submissions of the same class of Legacy Timeshare Estates.

634.    Unlike property-based points that have limited inventory of 365 nights of use-rights per each condominium unit, points appurtenant to the MVC Product have no such limitations. Points appurtenant to the MVC Product are purely contract-based use rights that do not have finite inventory like points that represent property-based use rights. Nothing in the MVC Timeshare Instruments support that MVC Timeshare Plan has or can continuously maintain one-to-one use-ratio as thousands of new Legacy Timeshare Estates are submitted to MVC Land Trust.

635.    Furthermore, the continuous violation of the one-to-one use-ratio requirement in each Legacy Timeshare Condominium unit is further exacerbated by Marriott's maintenance of separate inventory of restricted properties within the MVC Land Trust that are off-limits to the MVC Owners.

636.    In the MVC Land Trust, Marriott maintains an inventory of as much as 30% classified as restricted-use properties. The use-rights appurtenant to restricted-use properties can never be used by MVC Owners. However, the MVC Timeshare Instruments fraudulently balance the use rights that can be sold against total Points of Sales (which are attributed to restricted-use properties). As a result, Point for Sales is completely meaningless metric in calculating the one-to-one use-ratio and meaningless in terms of determining the total points that were sold to MVC Owners.

637.    Marriott and First American also specifically intended to usurp the powers of the owners' association boards of the various Legacy Timeshare Condominiums by making decisions that injure the Legacy Owners, including increasing the common expenses and management fees.

133

638. For almost six years, Marriott has been unlawfully taking over the governing board of the Legacy Timeshare Condominiums and making decisions that are detrimental to Legacy Owners so as to promote the more profitable MVC.

639. Because there is clear evidence of specific intent to cause the injuries that were actually sustained by Legacy Owners and MVC Owners, the statutory cap limiting punitive damages under the Florida law does not apply to claims against Marriott and First American for their violation of Fla. Stat. § 721.

## VIII.  PRAYER FOR RELIEF

WHEREFORE, and for the foregoing reasons, Plaintiffs pray this Court enter judgment on their behalf and on behalf of the Class and Subclasses herein, adjudging and decreeing that:

A.  This action may proceed as a class action pursuant to Rule 23(b)(3), with Plaintiffs designated Class representatives and the representatives of the Subclasses, as described above, and their chosen counsel designated Class Counsel;

B.  An order declaring that the deeds of Plaintiffs and the MVC Owners Subclass are void for failure to convey a real property interest;

C.  An order declaring that the title insurance policy coverage of Plaintiffs and the MVC Owners Subclass is triggered due to title defects;

D.  An order declaring that the tile insurance policy coverage of Plaintiffs and the MVC Owners Subclass is triggered due to a defective right to occupy;

E.  An order declaring that the deeds of Plaintiffs and the MVC Owners Subclass are void because the title is defective and the Plaintiffs and the MVC Owners Subclass have no right to occupy;

F.  An order declaring that the deeds of Plaintiffs and the MVC Owners Subclass violate Fla. Stat. § 697.10 due to an improper legal description;

G.  An order declaring on behalf of Plaintiffs and the MVC Owners Subclass that the Orange County Comptroller was negligent in her official duties as a custodian of recorded instruments;

H.  An order on behalf of Plaintiffs and the MVC Owners Subclass declaring that the MVC Owners Association is a sham entity in violation of Fla. Stat. § 721.13;

I.  An order on behalf of Plaintiffs and the MVC Owners Subclass declaring that Marriott has failed to comply with the condominium requirements of Fla. Stat. § 718;

J.  An order on behalf of Plaintiffs and the MVC Owners Subclass declaring that Marriott has failed to transfer accommodations to the trustee in violation of Fla. Stat. § 721.57;

K.  An order on behalf of Plaintiffs and the MVC Owners Subclass declaring that Marriot has failed to designate an independent trustee in violation of Fla. Stat. § 721.03(7);

L.  An order on behalf of Plaintiffs and the Subclasses declaring that First American has breached the duty of an escrow agent in violation of Fla. Stat. § 721.08;

M.  An order on behalf of Plaintiffs and the Subclasses declaring that Marriott has engaged in an improper transfer of accommodations and facilities to a trust;

N.  An order on behalf of Plaintiffs and the Subclasses declaring that Marriott has violated Fla. Stat. § 721.03(10) for failure to comply with the One-to-One-Nightly-Use Ratio;

O. An order on behalf of Plaintiffs and the MVC Owners Subclass declaring that Marriott has improperly added property to a multistate timeshare plan in violation of Fla. Stat. § 721.552(3)(b);

P. An order on behalf of Plaintiffs and the MVC Owners Subclass declaring that Marriot Owners Association as been improperly designated as the trust's managing entity;

Q. An order on behalf of Plaintiffs and the MVC Owners Subclass declaring that the Common Expenses have been improperly collected;

R. An order on behalf of Plaintiffs and the MVC Owners Subclass declaring that the MVC Owners Association has breached its duty to them;

S. An order on behalf of Plaintiffs and the MVC Owners Subclass declaring that Marriott's reservation system violates Fla. Stat. § 721.56;

T. Pursuant to Florida RICO, Fla. Stat. §§ 895.05(1) (a)-(e), an order:

    i. requiring Marriott and First American to divest *all* real property submitted to MVC Land Trust since May 2010, including the restricted-use properties and other properties separately maintained. And, the transfer of title to all MVC Land Trust properties to a newly-formed owners' association meeting the requirements of Fla. Stat. § 721.08(2)(c)(5) to act as the managing entity;

    ii. permanently restricting First American from acting as an escrow agent, trustee, timeshare trustee, or title insurer for the MVC Timeshare Plan or any Legacy Timeshare Plans;

    iii. dissolving and restructuring any of the entities that are instrumentation of the criminal enterprise, including, the MVC Land Trust and the MVC Owners Association;

136

    iv.  temporarily suspending Marriott's license to sell title insurance and real property until review by an appropriate licensing agency; and

    v.  temporarily suspending First American's license to sell title insurance, act as escrow agent, land trust trustee, or timeshare trustee until review by an appropriate licensing agency.

U.  An award of punitive damages for Florida RICO violations;

V.  An award of attorney's fees and costs;

W.  An award of pre-judgment interest; and

X.  Any other relief this Court deems just and equitable.

## IX.  DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a trial by jury on all issues so triable.

DATED: May 19, 2016

                      Respectfully submitted,

                      **THE POLASZEK LAW FIRM, PLLC**

                      *s/ Christopher S. Polaszek*
                      Christopher S. Polaszek
                      3407 W. Kennedy Blvd.
                      Tampa, FL 33609
                      (813) 574-7678
                      chris@polaszeklaw.com

                      **NEWMAN FERRARA LLP**
                      Lucas A. Ferrara
                      Jeffrey M. Norton
                      Roger A. Sachar, Jr.
                      1250 Broadway, 27th Fl.
                      New York, NY 10001
                      (212) 619-5400
                      lferrara@nfllp.com
                      jnorton@nfllp.com
                      rsachar@nfllp.com

Soomi Kim, Esq.
2400 South College Drive
High Point, NC  27260
Tel.: (336)471-8769
soomiwork@gmail.com

138