**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION**

ANTHONY LENNEN and BETH LENNEN,
Individually and on behalf of others similarly
situated,

        Plaintiffs,

vs.

           CASE NO.:  6:16-cv-00855-CEM-TBS

MARRIOTT OWNERSHIP RESORTS, INC.,
MARRIOTT VACATIONS WORLDWIDE
CORPORATION d/b/a MARRIOTT VACATION
CLUB, MARRIOTT RESORTS TRAVEL
COMPANY, INC. d/b/a MVC EXCHANGE
COMPANY, MARRIOTT TITLE INSURANCE,
MVC TRUST OWNERS ASSOCIATION, FIRST
AMERICAN FINANCIAL, FIRST AMERICAN
TRUST, FSB, FIRST AMERICAN TITLE
COMPANY, ORANGE COUNTY FLORIDA,
ORANGE COUNTY COMPTROLLER,
MARTHA O. HAYNIE, and MARRIOTT
INTERNATIONAL, INC.

        Defendants.
_____/

**DEFENDANT MVC TRUST OWNERS ASSOCIATION, INC.'S MOTION TO DISMISS
COUNTS 7, 13, 15, 16, 17, AND 18 OF THE COMPLAINT**

Pursuant to Federal Rules of Civil Procedure 8, 10 and 12(b)(6), Defendant MVC

TRUST OWNERS ASSOCIATION ("TOA")[1] hereby moves to dismiss all Counts of the

Complaint alleged against it, specifically Counts 7, 13 and 15-18.[2]

_____

[1] Defined terms are as set forth in the brief that the Marriott Defendants have submitted in support of their motion to dismiss the Complaint, which is being filed simultaneously herewith (the "Marriott Defendants' brief").

[2] In addition to the arguments made herein, the TOA will rely on the Marriott Defendants' brief, including, but not limited to, its Statement of Facts and the arguments made in POINT II, Sections D(2), F, G and H of the brief, which address claims also alleged against the TOA.  The TOA will also rely on the documents that are attached as exhibits to the Declaration of Jeanette Greene submitted in support of the Marriott Defendants' motion to dismiss the Complaint, which are properly considered on this motion. *See Infante v. Bank of Am. Corp.*, 468 Fed. Appx. 918, 921 (11th Cir. 2012) (documents referenced in

## INTRODUCTION

Plaintiffs have filed a 138-page, 639-paragraph, 21-Count Complaint.  In addition to being grossly over-long, the Complaint is poorly organized and full of vague and conclusory allegations.  Moreover, each of its Counts repeats and re-incorporates all prior allegations.  Thus, it is an impermissible "shotgun pleading" and should be dismissed as such under Federal Rules of Civil Procedure 8 and 10.

To the extent the Complaint is not dismissed under Rules 8 and 10, it should be dismissed under Rule 12(b)(6) because, if anything can be discerned from this mish-mash with any clarity, it is that Plaintiffs have failed to state a claim upon which relief could be granted.  Plaintiffs' allegations against the TOA are directly contradicted, not only by the statute governing timeshares in this State, Fla. Stat. § 721.01 *et seq.* (the Timeshare Act), but also by the Governing Documents.

## ARGUMENT

## I.     THE COMPLAINT SHOULD BE DISMISSED UNDER FED. R. CIV. P. 8 AND 10

A pleading filed in federal court must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  Courts routinely dismiss pleadings that do not comply with Rule 8.  *See, e.g., Magluta v. Samples,* 256 F. 3d 1282, 1284 (11th Cir. 2001) (directing district court to dismiss a 58-page complaint that violated Rule 8).  Plaintiff must also "state its claims or defenses in numbered paragraphs, each limited as far as practicable to a single set of circumstances."  Fed. R. Civ. P. 10(b).  Complaints that fail to do that, i.e., complaints that "incorporate[] every allegation by reference into each subsequent claim

complaint were properly considered on motion to dismiss); *Reynolds v. Gables Residential Servs., Inc.,* 428 F. Supp. 2d 1260, 1263-64 (M.D. Fla. 2006) (documents are properly considered on motion to dismiss when they "are referred to in the plaintiff's complaint, are central or integral to the plaintiff's claim, and [are] undisputed").

for relief," are called "shotgun pleadings." *Perret v. Wyndham Vacation Resorts, Inc.*, 846 F.Supp.2d 1327, 1334 (S.D. Fla. 2012). Shotgun pleadings are impermissible because "'it is virtually impossible to know which allegations of fact are intended to support which claim(s) for relief.'" *Id.* (quoting *Anderson v. Dist. Bd. of Trustees of Central Fla. Comm. Coll.*, 77 F.3d 364, 366 (11th Cir.1996)). Thus, "the judicial work that results from shotgun pleadings is far more time consuming than the work required up front to prevent the case from proceeding beyond the pleadings until the issues are reasonably well defined." *See Johnson Enter. of Jacksonville, Inc. v. FPL Grp., Inc.*, 162 F. 3d 1290, 1333 (11th Cir.1998). In short, shotgun pleadings "wreak havoc on the judicial system." *Byrne v. Nezhat*, 261 F. 3d 1075, 1129-31 (11th Cir. 2001).

Shotgun pleadings also include complaints that "assert[] multiple claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions, or which of the defendants the claim is brought against." *Weiland v. Palm Beach County Sheriff's Office*, 792 F. 3d 1313, 1323 (11th Cir. 2015); *see also Smith v. Rainey*, 747 F.Supp.2d 1327, 1348 (M.D. Fla. 2010) (shotgun pleadings force defendants and courts "to engage in a time consuming, exhaustive attempt to comprehend the various theories of liability and relief sought, distinguish between the several defendants, the theories of liability alleged against each, and the relief sought against each"). Given all of the serious problems caused by shotgun pleadings, defendants "cannot and will not be expected to frame a responsive pleading" to them. *Cosby v. Lee County*, 55 F.Supp.3d 1393, 1398 (M.D. Fla. 2014).

The Complaint in this case -- a 138-page, 639-paragraph, 21-Count behemoth -- is a classic example of a shotgun pleading. First, it is "replete with conclusory, vague, and immaterial facts not obviously connected to any particular cause of action." *Weiland*, 792 F. 3d at 1323. In addition, each of its 21 Counts incorporates all of the preceding allegations. As a

result, the number of paragraphs in the Complaint effectively increases exponentially with each successive Count.  Moreover, some Counts are alleged against certain Defendants even though no allegations of wrongdoing are made against them.  For example, although the TOA is named in Count 13, no wrongdoing is alleged against the TOA in that Count.  The TOA should not be forced to sift through the entire Complaint and try to guess what, if any, allegation(s) Plaintiffs might be "realleging" against the TOA in Count 13.

Plaintiffs also define "Marriott" inconsistently.  The opening paragraph of the Complaint defines "Marriott" to include, collectively, Marriott Ownership Resorts, Inc., Marriott Vacations Worldwide Corporation, d/b/a Marriott Vacation Club, and Marriott Resorts Travel Company, Inc., d/b/a MVC Exchange Company.  *See* Compl., p. 1.  But, later in the Complaint, "Marriott" is defined as "Marriott Intl., MVC [undefined], and their subsidiaries."  *Id.* at ¶ 45.  This definitional deficiency is, by itself, sufficiently serious to warrant dismissing the Complaint, particularly given that most of the Counts alleged against the TOA are also alleged against "Marriott."  The TOA cannot properly respond to those Counts without knowing how "Marriott" is being defined.

For all of these reasons, Plaintiffs' Complaint should be dismissed for failure to comply with Rules 8 and 10.

## II.     PLAINTIFFS HAVE FAILED TO STATE ANY CLAIM UPON WHICH RELIEF COULD BE GRANTED

A 12(b)(6) motion to dismiss tests a complaint's legal sufficiency.  A complaint will be dismissed if it does not allege sufficient facts to "raise a right to relief above the speculative level." *Watts v. Fla. Int'l Univ.*, 495 F. 3d 1289, 1295 (11 th Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007)).  To meet that standard, a complaint must contain "well-pled allegations" of fact that are sufficient "to state a claim to relief that is plausible on its face."

4

*Twombly,* 550 U.S. at 570.   A recitation of legal elements held together with "conclusory allegations, unwarranted factual deductions or legal conclusions masquerading as facts will not prevent dismissal." *Davila v. Delta Airlines Inc.,* 326 F. 3d 1183, 1185 (11th Cir. 2003).   A complaint will also be dismissed if its allegations are contradicted by documents governing the claims alleged. *See Crenshaw v. Lister,* 556 F. 3d 1283, 1292 (11th Cir. 2009) ("It is the law in this Circuit that 'when the exhibits [to a complaint] contradict the general and conclusory allegations of the pleading, the exhibits govern.'") (quoting *Griffin Indus., Inc. v. Irvin,* 496 F. 3d 1189, 1206 (11th Cir. 2007)).   The Complaint here does not meet this standard.   Accordingly, if it is not dismissed for failure to comply with Rules 8 and 10, then it should be dismissed under Rule 12(b)(6) for failure to state a claim upon which relief could be granted.

### A.    Count 7 Fails to State a Claim against the TOA upon Which Relief Could Be Granted[3]

Count 7 purports to seek a declaration that the TOA is a "sham entity" that is "not independent" from "Marriott."  Compl. ¶¶ 304-12.  In support of that request, Plaintiffs allege, in a wholly conclusory fashion, that, although Fla. Stat. § 721.13(2)(a) requires the "managing entity" of a timeshare plan (e.g., the TOA)[4] to "act in the capacity of a fiduciary to the purchasers of the timeshare plan," the TOA "is necessarily prevented from functioning as a fiduciary for [BI] Owners." *Id.* at ¶ 306.  The only support that Plaintiffs provide for that bare assertion is the allegation that the TOA "is prohibited from taking actions on behalf of the [BI] Owners that would be detrimental to Marriott's ability to sell the MVC Product without Marriott's written permission as long as Marriott holds a single unit of BI." *Id.* at ¶ 307.  Even if that allegation were comprehensible, it identifies no actions that the TOA is supposedly prohibited from taking.

---

[3] See also the Marriott Defendants' brief on this issue (POINT II, Section D2), with which the TOA joins.

[4] The statute expressly states that "an owners' association" may act as the managing entity of a timeshare plan. *See id.*

Also vague and conclusory is Plaintiffs' allegation that the TOA has discretion to make decisions that are "outside of the scope of authority for a managing entity of a timeshare plan or for an owner's association of a timeshare estate." Compl. ¶ 309.  Plaintiffs do not identify either the decisions the TOA allegedly has discretion to make or the "scope of authority" that those decisions supposedly exceed.  Nor do Plaintiffs explain how the TOA's alleged discretion violates any fiduciary duty to the MVC Owners.

Plaintiffs further complain that the TOA "is required to delegate various operational and managerial functions to Marriott."[5]  *Id.* at ¶ 308.  Again, they fail to explain how that alleged delegation of authority violates any fiduciary duty to BI Owners.  Nor could they do so, as the very statute they cite permits the TOA to "enter[] into a contract with a manager or management firm to provide some or all of the management services to the timeshare plan," *see* Fla. Stat. § 721.13(1)(b)2, and nothing in the Timeshare Act prohibits an entity from serving as the managing entity of a timeshare plan because of its relationship with the developer or seller of the timeshare plan.  Indeed, the Timeshare Act permits the developer itself to be the managing entity.  *See* Fla. Stat. § 721.13(1)(a) ("For each timeshare plan, the developer shall provide for a managing entity, which shall be either the developer, a separate manager or management firm, or an owners' association.").  Plaintiffs never explain how "Marriott's" alleged performance of certain operational and managerial functions (pursuant to statute) violates a fiduciary duty to BI Owners.  Plaintiffs' "sham entity" allegation, therefore, fails.  The Timeshare Act simply does not require the level of independence from a developer that Plaintiffs posit.

---

[5] Although unclear, it appears that, in this instance, Plaintiffs are using the term "Marriott" to refer to Marriott Hospitality (which has not been named as a Defendant in this case), as, earlier in the Complaint, they allege that Marriott Hospitality was appointed to serve as a "management firm" pursuant to Fla. Stat. § 721.13.  *See* Compl. ¶¶ 43(c), 44(c).

Finally, Plaintiffs' request for a declaration that the TOA is not a valid nonprofit entity under Fla. Stat. § 617.0301 is improper.  *See* Compl. ¶ 311(e) (describing that statute as "provi[di]ng that an entity may … only be lawfully incorporated as a Florida not for profit corporation[] if the entity's purpose is not for pecuniary profit").  Nowhere in the Complaint do Plaintiffs allege that the TOA's purpose is to make "pecuniary profit."  In any event, this request for relief is beyond the scope of § 721.21, which provides a cause of action for violations of "this chapter," not every chapter in the Florida statutes.  For all of these reasons, Count 7 should be dismissed.

### B.  Count 13 Fails to State a Claim against the TOA upon Which Relief Could Be Granted[6]

Count 13 alleges that "Marriott" and the TOA violated the provision of the Timeshare Act that prohibits "[a] developer or seller [from] offer[ing] any number of timeshare interests that would cause the total number of timeshare interests offered to exceed a one-to-one use right to use night requirement ratio."  *See* Compl. ¶ 389 (quoting Fla. Stat. § 721.03(10)).  First, this provision is aimed solely at developers and sellers of timeshares.  Plaintiffs do not, nor could they plausibly, allege that the TOA is a developer or seller of timeshares.  Moreover, in this entire 34-paragraph Count, the TOA is only mentioned twice, and in neither instance is any wrongdoing alleged against it.  *See id.* at ¶¶ 413, 413 (referencing TOA's budgets and budget estimates).  Accordingly, Count 13 should be dismissed as against the TOA.

---

[6] See also the Marriott Defendants' brief on this issue (POINT II, Section G), with which the TOA joins.

## C.    Count 15 Fails to State a Claim against the TOA upon Which Relief Could Be Granted[7]

In Count 15, Plaintiffs allege that the TOA is "an illegitimate owners' association under Fla. Stat. § 721.13(1)." Compl. ¶ 447. Plaintiffs misunderstand that statute. In Paragraph 438 of the Complaint Plaintiffs cite Fla. Stat. § 721.13(1)(b), which provides:

> 1. With respect to a timeshare plan which is also regulated under chapter 718 or chapter 719, or which contains a mandatory owners' association, the board of administration of the owners' association shall be considered the managing entity of the timeshare plan.
>
> 3. An owners' association which is the managing entity of a timeshare plan that includes condominium units or cooperative units shall not be considered a condominium association pursuant to the provisions of chapter 718 or a cooperative association pursuant to the provisions of chapter 719, unless such owners' association also operates the entire condominium pursuant to s. 718.111 or the entire cooperative pursuant to s. 719.104.

In Paragraphs 439 through 442 of the Complaint, Plaintiffs claim that, because the property that has been committed to the MVC trust contains condominium interests located both within and outside the state of Florida, that either (i) there must be multiple managing entities of the MVC timeshare plan, or (ii) a single managing entity of a timeshare plan cannot manage properties located in more than one state. See Compl. ¶ 442 ("Therefore . . . the managing entity of the MVC Timeshare Plan can only be the owners' association of the Legacy Timeshare Condominium where the Legacy Timeshare Estate is located."). While it is difficult to determine from the wording of the Complaint which of these positions is being taken by Plaintiff, either position demonstrates a clear misinterpretation of Fla. Stat. § 721.13(1). Under the statutory language of Fla. Stat. § 721.13(1), the MVC Association is not considered a condominium association unless the MVC Association "*also operates [an] entire condominium.*" Plaintiffs have somehow interpreted this definitional language as a requirement.

_____

[7] See also the Marriott Defendants' brief on this issue (POINT II, Section D2), with which the TOA joins.

The MVC Association operates the MVC timeshare plan, not condominium projects (*see* MVC Association Bylaws (Ex. I)); thus, pursuant to the statute, it is not a condominium association. But it need not be a condominium association (in Florida or any other state) in order to be the managing entity of a timeshare plan.  Nothing in the Florida timeshare statutes requires the MVC Association to also be a Chapter 718 condominium association.  Neither do the Florida timeshare statutes prohibit a managing entity from managing a timeshare plan containing property in more than one state.

Plaintiffs also make the implausible allegation that the MVC Association violated Fla. Stat. § 721.13(1) because it was created after the "first closing" of condominium units that pre-existed the MVC timeshare plan and that were subsequently added to the plan.  *See* Compl. at ¶ 440.  That is nonsensical, as the MVC Association could not possibly have been created before the sale of condominium units that existed before the MVC timeshare was formed.  Under Plaintiffs' logic, no developer would ever be able to add existing inventory to a new timeshare plan because such inventory would always have been sold before the managing entity of the timeshare plan was created.  Moreover, the MVC Trust Agreement makes clear that the interests being sold under the MVC timeshare are beneficial interests in a Florida land trust, not interests in a specific condominium project.  Thus, it is immaterial that some of the interests in the underlying condominium projects were sold before the MVC timeshare plan was created. Plaintiffs are mixing apples and oranges in an attempt to piece together a viable cause of action, but their attempt has failed.

Plaintiffs also assert that the MVC Association serves no additional function because the property interests from the individual condominium projects in the MVC trust are already governed by condominium associations.  *See* Compl. ¶ 445.  But the MVC Association's duties

as managing entity of the MVC timeshare plan are separate and distinct from the duties of the condominium associations that manage the individual condominium projects: they do not overlap, and they are not duplicative.

Because Plaintiff's claims in Count 15 are based solely on their misinterpretation of Fla. Stat. § 721.13(1), Count 15 should be dismissed.

**D.     Count 16 Fails to State a Claim against the TOA upon Which Relief Could Be Granted[8]**

In Count 16, Plaintiffs allege that the TOA improperly calculates expenses associated with Restricted Use Properties (i.e., properties that are "not yet sold by the developer") using a different formula than is used to calculate Common Expenses.  Compl. ¶¶ 455- 66.  In support of that allegation, Plaintiffs rely on Fla. Stat. § 721.15(1)(a), which provides:

> The timeshare instrument shall provide for the allocation of common expenses among all timeshare units or timeshare interests on a reasonable basis, including timeshare interests owned or not yet sold by the developer. The timeshare instrument may provide that the common expenses allocated may differ between those timeshare units that are part of the timeshare plan and those units that are not part of the timeshare plan; however, the different proportion of expenses must be based upon reasonable differences in the benefit provided to each. The timeshare instrument shall allocate common expenses to timeshare interests owned or not yet sold by the developer on the same basis that common expenses are allocated to similar or equivalent timeshare interests sold to purchasers.

Fla. Stat. §721.15(1)(a) does not apply here because it deals with how the "Common Expenses" of a timeshare plan are calculated, and expenses related to Restricted Use Properties are not included in the Common Expenses assessed upon BI Owners.  *See* MVC Trust Agmt. (Ex. B) § 2.15 (defining "Common Expenses" as all expenses properly incurred in the ownership . . . and replacement of the Trust Property (exclusive of Restricted Use Property Expenses) . . . .") (emphasis added); *id.* at § 2.44 ("Restricted Use Property Expenses shall only be assessed against Developer . . . ."); *id.* at § 3.3(a) ("Developer shall pay all Restricted Use Property

---

[8] See also the Marriott Defendants' brief on this issue (POINT II, Section F), with which the TOA joins.

Expenses incurred with respect to each Restricted Use Property, and no Common Expenses shall be assessed against the Beneficiaries with respect to such Restricted Use Property (nor shall the Association be obligated to furnish maintenance or other services to the Restricted Use Property until the Notice of Use Rights is delivered).").  Thus, because MORI pays all costs and expenses related to the Restricted Use Properties, and none of those costs and expenses are passed on to BI owners as Common Expenses, Count 16 should be dismissed.

**E.     Count 17 Fails to State a Claim against the TOA upon Which Relief Could Be Granted**[9]

In Count 17, Plaintiffs allege that, as their fiduciary, the TOA made decisions that benefit "Marriott" to Plaintiffs' detriment.   Compl. ¶¶ 468-73.  Specifically, Plaintiffs allege that, for "no conceivable reason" except to benefit Marriott, the TOA entered into an agreement with the MVC Exchange Company that "arbitrarily" allowed MVC Exchange Company to charge transfer fees when BI Owners transfer their BIs to third parties.  *See id.* at ¶ 474.  But Plaintiffs do not, and cannot, cite any provision of the Timeshare Act, the MVC Trust Agreement, the TOA Bylaws or any other Governing Document that (1) precludes the TOA from entering into agreements with the MVC Exchange Company, or (2) prohibits the MVC Exchange Company from charging fees in connection with the transfer of BIs.  To the contrary, the Exchange Procedures (by which Plaintiffs are bound, *see* MVC Trust Agmt. (Ex. B) §§ 4.1(b), 4.3) expressly disclose and authorize the Exchange Company to collect an "initiation fee" from the purchaser of BIs (not the seller), unless the purchaser is an existing BI Owner or a member of the selling BI Owner's family.  *See* Exchange Procedures (Ex. O) § VII.D; *see also* Affiliation

---

[9] See also the Marriott Defendants' brief on this issue (POINT II, Section F), with which the TOA joins.

Agmt. (Ex. P) § 6.2 (authorizing the MVC Exchange Company to charge an initiation fee).[10]
Accordingly, the transfer fee is not "arbitrary" as Plaintiffs claim.

The Governing Documents also contradict Plaintiffs' allegation that they are being double-billed for services. *See* Compl. ¶ 475 (alleging that the "service management fee" assessed upon BI Owners is duplicative of either "exchange fees for providing reservation services" or the "operating fee for maintaining the component properties"). The "service management fee" -- which is the annual management fee that the TOA must pay to the "Trust Manager" (Marriott Hospitality) in consideration for the services it provides in "the day-to-day management and operation of the Trust Property (*see* Multisite POS (Ex. Q) § 9.b) -- is authorized and disclosed by the Governing Documents and is properly included in the Common Expenses. *See* First Amendment to Management Agreement (Ex. S) § 14 (Marriott Hospitality "shall be paid a management fee" as "compensation for its services" under the Management Agreement); MVC Trust Agmt. (Ex. B) §§ 2.5, 9.1; TOA Bylaws (Ex. I) Art. VI §§ 2(o) and 2(p). This fee is entirely separate, both from the Exchange Company Dues that the TOA must pay annually to the MVC Exchange Company for its "operation of the [MVC] Exchange Program" (*see* MVC Trust Agmt. (Ex. B) § 2.25),[11] and the "assessments due under any Component Declarations" governing the underlying Component Sites at which the MVC Trust is a Legacy Owner, which are also properly included in the Common Expenses *See id.* § 2.15;

---

[10] Any documents on which Plaintiffs base a claim or allegation are fairly considered and examined in determining the adequacy of the claim or allegation. *SFM Holdings, Ltd. v. Banc of America Secs., LLC*, 600 F.3d 1334, 1337 (11th Cir. 2010).

[11] *See also* Affiliation Agmt. (Ex. P) § 3.2(e) ("The services provided by Exchange Company do not include Manager's operation, management and assessment collection duties for MVC Trust, which are set forth in the Management Agreement.").

TOA Bylaws (Ex. I) Art. VI § 2(l).  Accordingly, Plaintiffs cannot plausibly allege that they are being double-billed for the same service.[12]

Likewise implausible is Plaintiffs' allegation that, simply because the TOA enters into contracts with First American and "Marriott" without a formal meeting or notification to the owners, the contracts must necessarily benefit "Marriott" to the detriment of BI Owners.  *See* Compl. ¶ 477.   Section 617.0821 of the Florida Not-for-Profit Corporation Act expressly authorizes not-for-profit corporations to take actions without conducting a formal meeting, and the TOA Bylaws specifically authorize the TOA President to execute contracts on the TOA's behalf.  *See* TOA Bylaws (Ex. I) Art. V § 5.  Similarly, Plaintiffs' allegation that the TOA's Board of Directors contains "Marriott" employees does not support an inference that all of the contracts the TOA enters are "solely for the benefit of Marriott to the detriment of [BI] Owners." *See* Compl. ¶ 477.  Count 17 is based solely on unsupported allegations and conclusions and should, therefore, be dismissed.

## F.   Count 18 Fails to State a Claim against the TOA upon Which Relief Could Be Granted[13]

In Count 18, Plaintiffs allege that the TOA violated Fla. Stat. § 721.52(6) by replacing the Trust Reservation System with the MVC Exchange Program, because that supposedly denied them the right to participate in a reservation system exclusive to BI Owners.  *See* Compl. ¶ 485. Fla. Stat. § 721.52(6) provides:

> 'Reservation system' means the method, arrangement, or procedure by which a purchaser, in order to reserve the use and occupancy of any accommodation or facility of the multisite timeshare plan for one or more use periods, is required to compete with other purchasers in the same multisite timeshare plan regardless of

---

[12] Plaintiffs repeat the same allegation concerning Restricted Use Property expenses that they made in Count 16 (*see* Compl. ¶ 476), which is addressed and refuted in the preceding Point II(D).

[13] See also the Marriott Defendants' brief on this issue (POINT II, Section H), with which the TOA joins.

whether such reservation system is operated and maintained by the multisite timeshare plan managing entity, an exchange company, or any other person.

As a preliminary matter, this is a definition; it is not a requirement. The provision goes on to state that, "[w]hen an exchange company utilizes a mechanism for the exchange of use of timeshare periods among members of an exchange program, such utilization is not a reservation system of a multisite timeshare plan." *Id.* Thus, an exchange company is not prohibited from using "a mechanism for the exchange of use of timeshare periods"; the statute simply provides that, if such a mechanism is used, the system is not a "reservation system" as defined under the statute. Thus, even if the TOA had replaced the Trust Reservation System with the MVC Exchange Program, that still would not violate Fla. Stat. § 721.52(6), which does not prohibit the use of an exchange program.

In any event, the MVC Trust Agreement and the TOA Bylaws make clear that the "replacement" Plaintiffs allege has not occurred. The MVC Trust Agreement explicitly states that "[e]ach Beneficiary's Interest shall include the right of such Beneficiary to reserve and use the Trust Property (excluding the Restricted Use Property) in accordance with the Trust Plan Documents. Furthermore, for so long as the Trust remains affiliated with an Exchange Program, such Beneficiary shall be entitled to make exchange reservations in accordance with and subject to the provisions of the applicable Exchange Company Documents." MVC Trust Agmt. (Ex. B) § 4.1(b). The MVC Trust Agreement's definition of "Trust Plan Documents" includes the MVC Plan's Reservation Procedures but does not include the MVC Exchange Procedures. *See id.* at § 2.5; *see also* TOA Bylaws (Ex. I) Art. XXVIII, § 2, Art. XXIX, § 4 (providing that the Trust Reservation System will be "operated in conjunction with" the MVC Exchange Procedures and that "[t]he services provided by an Exchange Company may include the operation of the Trust's Reservation Procedures coincident with the operation of the applicable Exchange Program's

14

reservation system", respectively).  In other words, the Trust Reservation System and the MVC Exchange Procedures operate concurrently, and no "replacement" has occurred.

Plaintiffs further allege that, because BI Owners did not vote on whether to use the MVC Exchange Program, their enrollment in the program is not "voluntary," which they claim is required.  This allegation fails for multiple reasons.  First, the Timeshare Statute does not require BI Owners' enrollment in the program to be voluntary.  What is "voluntary" is a BI Owner's decision to make use of the program.  *See* Fla. Stat. § 721.05(16) ("'Exchange program' means any method, arrangement, or procedure <u>for the voluntary exchange of the right to use and occupy accommodations and facilities among purchasers</u>.") (emphasis added).  Finally, Plaintiffs' allegation is directly contradicted by § 721.52(6), which provides: "In the event that a purchaser <u>is required</u> to use an exchange program as the purchaser's principal means of obtaining the right to use and occupy a multisite timeshare plan's accommodations and facilities, such arrangement shall be deemed a reservation system."  (Emphasis added).  Thus, the statute itself contemplates that a purchaser may be required to use an exchange program as the principal reservation system. Accordingly, Count 18 should be dismissed.

## CONCLUSION

For the reasons set forth above and in the Marriott Defendants' brief, the TOA respectfully requests that the Court either (i) dismiss the Complaint in its entirety for failure to comply with Rules 8 and 10 and order Plaintiffs to file an amended pleading that corrects the Complaint's deficiencies, or (ii) dismiss the claims asserted against the TOA with prejudice, pursuant to Rule 12(b)(6), for failure to state a claim upon which relief could be granted.

Dated: September 15, 2016

**SHUTTS & BOWEN LLP**

By:  */s/Alfred J. Bennington, Jr.*
**ALFRED J. BENNINGTON, JR., ESQ.**
Florida Bar No. 0404985
E-mail:  bbennington@shutts.com
Secondary E-mail:  jclaudio@shutts.com
**CLAY DEATHERAGE, ESQ.**
Florida Bar No. 0672920
E-mail:  cdeatherage@shutts.com
Secondary E-mail:  bpearson@shutts.com
**HAROLD E. MORLAN III ESQ**.
Florida Bar No. 0024250
E-mail:  hmorlan@shutts.com
Secondary E-mail:  kgranofsky@shutts.com
300 S. Orange Avenue, Suite 1000
Orlando, Florida 32801
Telephone: (407) 835-6755
Facsimile: (407) 849-7255
*Attorneys for Defendant, MVC* TRUST OWNERS
ASSOCIATION

16

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 15th day of September, 2016, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will serve a copy upon all counsel of record.

/s/ Alfred J. Bennington, Jr.
**Alfred J. Bennington, Jr., Esq.**

ORLDOCS 14906468 7