# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA

| | |
|---|---|
| ANTHONY LENNEN and BETH LENNEN, Individually and on behalf of all others similarly situated,<br><br>    Plaintiffs,<br><br> v.<br><br>MARRIOTT OWNERSHIP RESORTS, INC., MARRIOTT VACATIONS WORLDWIDE CORPORATION, d/b/a MARRIOTT VACATION CLUB, MARRIOTT RESORTS TRAVEL COMPANY, INC., d/b/a MVC EXCHANGE COMPANY, MARRIOTT TITLE INSURANCE, MVC TRUST OWNERS ASSOCIATION, FIRST AMERICAN FINANCIAL, FIRST AMERICAN TRUST, FSB, FIRST AMERICAN TITLE COMPANY, ORANGE COUNTY FLORIDA, ORANGE COUNTY COMPTROLLER, MARTHA O. HAYNIE and MARRIOTT INTERNATIONAL, INC.<br><br>    Defendants. | Case No. 6:16-cv-0855<br><br>Hon. Judge Carlos E. Mendoza |

## FIRST AMERICAN DEFENDANTS' MOTION TO DISMISS COUNTS II, III, IV, X, XI AND RICO COUNTS I, II AND III OF PLAINTIFFS' COMPLAINT PURSUANT TO RULES 8, 10 AND 12(b)(6)

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.      Introduction ........................................................................................................... 1

II.     Background ............................................................................................................ 2

        A.      First American's Services to The MVC Program ............................................ 2

        B.      The MVC Program ......................................................................................... 3

        C.      Plaintiffs' Purchases of Marriott Timeshare Properties .................................. 4

III.    Argument ............................................................................................................... 7

IV.     Plaintiffs Fail to State a Claim Arising Under the Title Policy .......................... 8

        A.      Count II: Plaintiffs Fail to State a Claim That First American Failed to
                Disclose a Defect in the Title Policy ................................................................ 9

        B.      Count III: Plaintiffs Fail to State a Claim that First American Failed to
                Disclose "Restricted Use Property" as an Encumbrance .............................. 13

        C.      Count IV: Plaintiffs Fail to State a Claim that First American Failed to
                Disclose Condo Declaration Restrictions as an Encumbrance ...................... 15

V.      Plaintiffs Fail to State a Claim Against First American as Trustee ................. 17

VI.     Plaintiffs Fail to State a Claim Against First American as Escrow Agent ....... 19

VII.    Plaintiffs Fail to State A Claim for Conspiracy to Violate Fla. Stat. § 721.08 ................ 21

VIII.   Plaintiffs Fail to State a Claim under RICO Count III ..................................... 24

CONCLUSION .................................................................................................................. 25

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allstate Ins. Co. v. Adrabi*,
    78 So. 3d 7 (Fla. Ct. App. 2011) ...................................................................... 14

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ........................................................................................... 8

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ..................................................................................... 8, 20

*Bohr v. First Am. Title Ins. Co.*,
    2008 WL 2977353 (M.D. Fla. July 30, 2008) ................................................. 13

*Boyd v. Standard Fire Ins. Co.*,
    2014 WL 6607009 (M.D. Fla. Nov. 19, 2014) ................................................... 7

*Butler v. State Dep't of Ins.*,
    680 So. 2d 1103 (Fla. Ct. App. 1996) ............................................................ 18

*City of Delray Beach v. Agricultural Ins. Co.*,
    936 F. Supp. 931 (S.D. Fla. 1994) ................................................................. 14

*Coronado Condo. Ass'n, Inc. v. La Corte*,
    103 So. 3d 239 (Fla. Ct. App. 2012) .............................................................. 25

*Day v. Taylor*,
    400 F.3d 1272 (11th Cir. 2005) .................................................................. 9, 14

*Ernie Haire Ford, Inc. v. Ford Motor Co.*,
    260 F.3d 1285 (11th Cir. 2001) ...................................................................... 15

*Fenn v. Litton Loan Serv. LP*,
    2010 WL 8318866 (M.D. Fla. Dec. 10, 2010) ........................................... 13, 15

*Fla. Power & Light Co. v. Allis Chalmers Corp.*,
    85 F.3d 1514 (11th Cir. 1996) .......................................................................... 8

*Flynn v. Marriott Ownership Resorts, Inc.*,
    2016 WL 843251 (D. Haw. Feb. 29, 2016) ...................................................... 1

*Fuller v. Home Depot Servs., LLC,*
512 F. Supp. 2d 1289 (N.D. Ga. 2007) ........................................................... 22

*Great Am. Assurance Co. v. Elliot,*
846 F. Supp. 2d 1258 (M.D. Fla. 2012) .......................................................... 14

*Harding v. NCL (Bahamas) Ltd.,*
90 F. Supp. 3d 1305 (S.D. Fla. 2015) ............................................................. 20

*Horsley v. Feldt,*
304 F.3d 1125 (11th Cir. 2002) ......................................................................... 9

*Hutchinson Island Realty, Inc. v. Babcock Ventures, Inc.,*
867 So. 2d 528 (Fla. Ct. App. 2004) ........................................................ 11, 12

*IberiaBank v. Coconut 41, LLC,*
984 F. Supp. 2d 1283 (M.D. Fla. 2013) .......................................................... 21

*Jackson v. BellSouth Telecomms.,*
372 F.3d 1250 (11th Cir. 2004) ................................................... 7, 22, 23, 24

*Kaye v. Macari Bldg. & Design, Inc.,*
967 So. 2d 1112 (Fla. Ct. App. 2007) ............................................................. 17

*Kirkland v. Ocean Key Assocs., Ltd.,*
2007 WL 3343083 (S.D. Fla. Nov. 8, 2007) ................................................... 16

*Lawyers Title Ins. Corp. v. D.S.C. of Newark Enters., Inc.,*
544 So. 2d 1070 (Fla. Ct. App. 1989) ....................................................... 15, 16

*Maxum Indem. Co. v. Fla. Constr. Servs., Inc.,*
59 F. Supp. 3d 1382 (M.D. Fla. 2014) ............................................................ 14

*Mendelson v. Great W. Bank F.S.B.,*
712 So. 2d 1194 (Fla. Ct. App. 1988) ............................................................. 11

*Morales v. Attorneys' Title Ins. Fund, Inc.,*
983 F. Supp. 1418 (S.D. Fla. 1997) ................................................................ 18

*OBS Co. v. Pace Constr. Corp.,*
558 So. 2d 404 (Fla. 1990) .............................................................................. 17

*Oginski v. Paragon Props. of Costa Rica, LLC,*
282 F.R.D. 672 (S.D. Fla. 2012) ..................................................................... 13

iii

*Regions Bank v. Commonwealth Land Title Ins. Co.,*
    977 F. Supp. 2d 1237 (S.D. Fla. 2013) ............................................................ 12

*Scottsdale Ins. Co. v. Pursley,*
    487 F. App'x. 508, 511 (11th Cir. 2012) ........................................................... 14

*Ship Constr. & Funding Servs., Inc. v. Star Cruises,*
    174 F. Supp. 2d 1320 (S.D. Fla. 2001) ......................................................... 15, 16

*Spain v. Brown & Williamson Tobacco Corp.,*
    363 F.3d 1183 (11th Cir. 2004) ...................................................................... 23, 24

*Spence-Jones v. Rundle,*
    991 F. Supp. 2d 1221 (S.D. Fla. 2013) ......................................................... 23, 24

*Tiller v. Ford Motor Co.,*
    2006 WL 166530 (M.D. Fla. Jan. 21, 2006) ................................................. 25

*U.S. v. Vaghela,*
    169 F.3d 729 (11th Cir. 1999) ......................................................................... 22

*Villa v. Miami-Dade Cty.,*
    65 F. Supp. 3d 1371 (S.D. Fla. 2014) ............................................................ 19

*Village Carver Phase 1 LLC v. Fidelity Nat'l Title Ins. Co.,*
    128 So. 3d 107 (Fla. Ct. App. 2013) .............................................................. 8

*Viridis Crop. v. TCA Glob. Credit Master Fund, L.P.,*
    155 F. Supp. 3d 1344 (S.D. Fla. 2015) .......................................................... 22

*W. Suburban Bank of Darien v. Badger Mut. Ins. Co.,*
    141 F.3d 720 (7th Cir. 1998) ........................................................................... 3

*Wallace v. Midwest Fin. & Mortg. Servs., Inc.,*
    714 F.3d 414 (6th Cir. 2013) ......................................................................... 22

*Warner v. Schmidt,*
    2011 WL 2784492 (M.D. Fla. July 15, 2011) .............................................. 7, 8

*Warner v. Schmidt,*
    2011 WL 2784492 (M.D. Fla. July 15, 2011) .............................................. 8

*Waterford Twp. Gen. Emps. Ret. Sys. v. BankUnited Fin. Corp.,*
    2010 WL 1332574 (S.D. Fla. Mar. 30, 2010) ............................................... 8

*Wilson v. EverBank, N.A.*,
   77 F. Supp. 3d 1202 (S.D. Fla. 2015)................................................................ 21

**Statutes**

Fla. Stat. § 721.05(20)(b) ..................................................................................... 18

Fla. Stat. § 721.05(20)(d)(4) ................................................................................. 17

Fla. Stat. § 721.05(21)............................................................................................ 21

Fla. Stat. § 721.08(10)(a) ................................................................................. 22, 23

Fla. Stat. § 721.08(10)(b) ....................................................................................... 22

Fla. Stat. § 721.08(2)(C)(2)..................................................................................... 19

Fla. Stat. § 721.08(2)(C)(2)(c)(iii) ......................................................................... 21

Fla. Stat. § 721.52(5) .............................................................................................. 10

Fla. Stat. § 768.72(2)............................................................................................... 24

Fla. Stat. § 768.72(2)(a) ..................................................................................... 24, 25

Fla. Stat. § 768.72(2)(b) .......................................................................................... 25

Fla. Stat. § 772.104(3)............................................................................................. 24

Fla. Stat. § 895.05(6)............................................................................................... 24

**Other Authorities**

FLA. ADMIN. CODE ANN. R. 4–186.003(11)(a)–(b) (1995)............................... 18

## I.      Introduction

Under Marriott's traditional timeshare program, "timeshare owners . . . buy weeks during a specific period at a specific resort" at a specific property.  *See Flynn v. Marriott Ownership Resorts, Inc.,* 2016 WL 843251, at *1 (D. Haw. Feb. 29, 2016).  As discussed below, in 2010, Marriott introduced the MVC Program, a points-based timeshare program which offers participants more variety and flexibility in choosing a vacation destination.  To participate in the MVC Program, individuals purchase a desired amount of points, which gives participants the ability to reserve time at their choice of one of the many properties held in the MVC Trust—rather than providing only the right to use a specific unit like a traditional timeshare program.  *See* Exh. 1.  First American Financial, First American Trust, FSB and First American Title Co. (collectively "First American") performed three discrete activities in connection with the MVC Program: providing title insurance, managing escrow, and acting as a trustee for the Florida Land Trust created by the MVC Program.

In their Complaint, Plaintiffs assert claims against First American on the grounds that the MVC Program does not comply with Florida law because it does not convey a timeshare estate or a beneficiary interest in a Florida land trust.  Compl. ¶¶ 6-19.  Plaintiffs' claims against First American fail as a matter of law because they are premised on a misreading of Florida statutes, as well as allegations centered on incomplete and inaccurate excerpts from the core documents—including the deed and title policy—on which the claims are based.[1]

---

[1]  For the sake of brevity, First American hereby adopts certain arguments by Marriott in its Motion to Dismiss including Sections I, II.A.-II.E., and II.I. The First American Defendants also refer the Court to the description of the MVC Program contained in Marriott's Motion, at 3-10.

Specifically, Plaintiffs selectively quote from the deed conveying their property. When read in full and considered in the context of a timeshare plan where a participant has certain rights to use multiple properties, the deed clearly provides a sufficient description of the property being conveyed.  Plaintiffs also make claims under their title insurance policy that are expressly excluded from coverage.  Plaintiffs further misread Florida's escrow statute, omitting that it provides First American with alternative mechanisms for compliance not addressed by Plaintiffs' allegations. Finally, Plaintiffs ignore the governing statute and controlling trust documents that define First American's limited role as Trustee.  In light of these deficiencies, Plaintiffs' RICO claims also fail because they do not allege that First American engaged in any underlying illegal conduct.

## II.      Background

### A.      First American's Services to The MVC Program

First American sold title insurance products to individual purchasers of timeshares from the MVC Program, including at Plaintiffs' election, the title insurance sold to the Lennens when they purchased both of their timeshare properties from Marriott.  Compl. ¶ 51(b).  First American also provided escrow account services for Marriott's property sales. *Id.*  Its obligations as escrow agent are described in Florida statutes including section 721.08, and the governing escrow agreement ("Escrow Agreement").  *See* Exh. 2.

First American Trust is a federal savings bank which provides trustee services, including recordkeeping, tax preparation and accounting, for the MVC Trust ("Trust"). Compl. ¶ 51(a).  Its obligations are described in the operative trust agreement ("Trust Agreement") and applicable statutes.  *See* Exh. 3.  First American Financial is a publicly

traded parent company which had no role in connection with the MVC Program.

## B.     The MVC Program

The MVC Program sold "Florida timeshare estate[s] in real property, coupled with a beneficiary interest in a Florida land trust." Compl. ¶ 3. Unlike under a traditional timeshare, where a purchaser receives a right to reserve a specific unit for a specific period of time, under the Program, "MVC Owners are allotted increments of points that can be used to book days at units at various Legacy Timeshare Condominiums that are contained in the land trust forming the basis for the MVC Product." *Id.* ¶ 4. The Trust provides participants with access to multiple properties located at 44 different condominiums in 11 different states. *Id.* ¶ 81. Under Florida law, Marriott was required to, and did, receive regulatory approval to operate the MVC Program. *See* Exh. 4, 1/6/10 Florida Dep't of Business & Professional Regulation letter.

After regulatory approval, in March 2010, Marriott recorded documents in Orange County, Florida describing the MVC Program and Trust, including a Memorandum of Trust ("MOT"). Compl. ¶ 564. The MOT summarizes the Trust Agreement (which is not recorded).[2] *See* Exh. 5, MOT at A. The MOT expressly states that it is "a land trust [] in accordance with Section 689.071, *Florida Statutes*" and that each interest created in the trust "constitutes a Florida timeshare estate under Chapter 721, Florida Statutes, and thereby is considered a Florida real property interest." Exh. 5, MOT at A-B. The MOT specifically describes how to identify Trust properties: pursuant to the terms of the Trust Agreement,

---

[2]     *W. Suburban Bank of Darien v. Badger Mut. Ins. Co.,* 141 F.3d 720, 725-26 (7th Cir. 1998) ("Illinois land trusts [on which Florida Land Trusts are based] allow for greater secrecy in real estate ownership because the identities of beneficiaries in this type of trust need not be…a matter of public record.").

Marriott "submit[s] certain real property into such Trust from time to time…each submission of which shall be evidenced by the recordation of a Notice of Addition of Property to the MVC Trust in the Public Records of Orange County, Florida." *See* Exh. 5, MOT at A. Notices of Additions ("NOA") include detailed descriptions of each parcel conveyed to the Trust and also state that the Trust is "established…pursuant to section 689.071, *Florida Statutes*." *See* Exh. 6, NOA at A.  Each NOA summarizes its impact on the Trust, noting the number of "additional points for sale upon conveyance of Real Property to Trustee" and the number of "additional Interests resulting from the addition of Real Property." Exh. 6, NOA at E.  New property added to the Trust through NOA is considered a "Restricted Use Property" under the Trust Agreement.  Compl. ¶ 149.  The Trust Agreement provided notice to purchasers, including the Lennens, that Restricted Use Property is not available for reservation by MVC Owners until Marriott issues a Notice of Use for that particular property.  *Id.* ¶¶ 28, 150; Exh. 3, Trust Agreement § 2.42.

### C.    Plaintiffs' Purchases of Marriott Timeshare Properties

On January 24, 2008, prior to the creation of the MVC Program about which they complain, Plaintiffs purchased a traditional timeshare property in the Crystal Shores Condominium, located in Marco Island, Florida.  Compl. ¶ 11.  This purchase entitled the Plaintiffs to use "Unit 503/Week 34 and Unit 507/Week 2" at the Crystal Shores Condominium.  *Id.* ¶ 11.  Based on this original purchase, Plaintiffs claim to be "Legacy Owners" as defined in the Complaint.

In December 2014, six years after becoming Legacy Owners, the Lennens elected to purchase a separate interest in the MVC Program.  *Id.* ¶ 98.  The Lennens' deed for their

4

MVC Program property was described as "[a] timeshare estate as defined by section 721.05, *Florida Statutes* more fully described as **4** interests (numbered for administrative purposes: H04815 & H04816 & H04817 & H04818) in the MVC Trust [ ] evidenced for administrative, assessment and ownership purposes by **1,000** Points (250 Points for each Interest)." *See* Exh. 7 (emphasis added).  As a result, the Lennens received 4 Beneficial Interest ("BI") in the Trust and were assigned 250 points per BI, giving them 1000 total points with which to reserve one or more of the multiple properties contained in the Trust. *See* Exh. 7.  The Lennens' deed is recorded in Orange County, Florida (the "MVC Deed"). Compl. ¶ 17.

In connection with the purchase of a timeshare in the MVC Program, the Lennens had the option to and elected to purchase title insurance from First American (the "Title Policy"). *Id.* ¶ 51(b).  The Title Policy insures ten "[c]overed [r]isks" including "[t]itle being vested other than as stated in Schedule A."  *Id.* ¶ 144.  Schedule A describes the title as "vested in: Anthony B. Lennen and Beth A. Lennen as tenants by the entirety and the Trustee of the MVC Trust Agreement, as each of their interests are created therein."  Exh. 8, Title Policy at 7.  The Title Policy uses the full legal property description from the MVC Deed,[3] and further explains that it insures "an occupancy right, pursuant to that certain Trust Agreement dated March 11, 2010, in a multisite timeshare project with Component sites specifically described in the Notice of Addition [ ] of Property to the Trust recorded at Official Records Book 10042, Page 3996, Public Records of Orange County, Florida, and any all subsequent

---

[3]   Plaintiffs' allegations fail to reference the deed's express references to the Trust and the MOT which is publicly available in the Orange County public records, and which points a title searcher to the specific parcels of property held in the Trust.  *Compare* Compl. ¶ 100 and Exh. 7, Deed.

Notices of Addition that have been recorded in the Public Records of Orange County Florida." Compl. ¶ 145; Exh. 8, Title Policy at 7.  Over time, to enhance the MVC Program offerings, Marriott added properties to the Trust using NOAs (which describe the parcels of property added to the Trust).  *See* Exh. 6, NOA ¶ E.

The First American Title Policy for the Lennens contains "Exceptions from Coverage" that include certain express "exceptions" applicable to the properties added through NOAs (referred to as "Components"):

> (3) Terms, provisions and restrictions as contained in the Trust Agreement, the Articles of Incorporation of MVC Trust Owners Association, Inc., a Florida corporation not-for-profit (the "Association"), the Bylaws of the Association, the Reservation Procedures, and the Rules and Regulations, as such terms are defined in the Trust Agreement.
>
> …
>
> (5) All covenants, conditions, restrictions, easements, assessments, liens, charges, terms and provisions contained in those certain condominium declarations, community governing instruments, declaration of covenants, or such other documents which might now or in the future encumber and govern any portion of a Component….

*See* Exh. 8, Title Policy at 9-10.

Before completing the purchase, Marriott provided the Lennens documents explaining every aspect of the MVC program and describing the nature of the timeshare interest they were purchasing (the "Disclosure Documents").  *See* Exh. 9.[4]  For example, the Disclosure Documents described in detail the rules applicable to Restricted Use Property, explaining that "[u]ntil a Notice of Use Rights is delivered by [Marriott] with respect to a

---

[4] The Receipt of Documents that purchasers received includes: Public Offering Statement Text, Trust Agreement, Trust Association Articles of Incorporation, Trust Association Bylaws, Memo. of Trust Agreement, Reservation Procedures for Trust, Estimated Operating Budget, Copy of Executed Purchase Contract, Description of Exhibits not delivered, Rules and Regulations for Trust, Trust Component Site Information, MVC Exchange Company Exchange Disclosure.  *See* Exh. 9.

particular Trust Property, such Trust Property will be considered Restricted Use Property."
Exh. 1, POS at 23.  "Restricted Use Property" is defined to mean "Trust Property that has not
been made available for use and occupancy by Beneficiaries other than Developer."  *Id.* at 6.
The Disclosure Documents also expressly explained certain limitations of the purchase
including that there is no guarantee that purchasers could reserve a specific unit in the Trust
at a particular time, *id.* at 10,[5] and that additional people buying timeshares would affect
purchasers' ability to make reservations for specific units.[6]  *Id.* at 23.

## III.    Argument

"On a motion to dismiss, this Court accepts as true all allegations in the complaint
and construes them in the light most favorable to the plaintiff."  *Boyd v. Std. Fire Ins. Co.*,
2014 WL 6607009, at * 1 (M.D. Fla. Nov. 19, 2014) citing *Jackson v. BellSouth Telecomms.*,
372 F.3d 1250, 1262 (11th Cir. 2004).  However, "a plaintiff's obligation to provide the
grounds of his entitlement to relief requires more than labels and conclusions, and a
formulaic recitation of the elements of a cause of action will not do."  *Warner v. Schmidt*,
2011 WL 2784492, at *1 (M.D. Fla. July 15, 2011) citing *Bell Atl. Corp. v. Twombly*, 550
U.S. 544, 555 (2007).  "[C]onclusory allegations, unwarranted deductions of facts or legal
conclusions masquerading as facts will not prevent dismissal."  *Waterford Twp. Gen. Emps.
Ret. Sys. v. BankUnited Fin. Corp.*, 2010 WL 1332574, at * 6 (S.D. Fla. Mar. 30, 2010).

---

[5]    It stated:  "The ability of a Beneficiary to reserve a Use Period at a particular Component may be severely
limited due to the limited number of Accommodations that may be committed to the Trust Plan at that
Component.  Please refer to the Point Schedule for more information regarding the number of
Accommodations available at any particular Component."

[6]    It stated:  "In the event that additional Submission Property is committed to the Trust Plan…[A]
Beneficiary should not expect to be able to reserve the use of an Accommodation at any particular time."

When evaluating a plaintiff's claims on a motion to dismiss, federal courts must: "1) eliminate any allegations in the complaint that are merely legal conclusions; and 2) where there are well-pleaded factual allegations, 'assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.'"  *Warner*, 2011 WL 2784492, at *1, citing *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).  Here, the Court should dismiss Plaintiffs' Complaint in its entirety because it is premised on faulty legal conclusions and factual allegations that are inconsistent with the documents quoted in the Complaint.  Because there is no set of facts under which Plaintiffs could revise their Complaint to cure these fatal defects, the Court should dismiss the Complaint with prejudice.  *Fla. Power & Light Co. v. Allis Chalmers Corp.*, 85 F.3d 1514, 1520-21 (11th Cir. 1996) (denying motion to amend where futile).

## IV.  Plaintiffs Fail to State a Claim Arising Under the Title Policy

Plaintiffs allege that First American issued a non-compliant Title Policy because it failed to disclose a deed defect and encumbrances in Plaintiffs' MVC Deed.  Compl. ¶¶ 251-77 (Counts II, III, IV).  Plaintiffs can only make this claim by misreading the Title Policy. *See Village Carver Phase 1 LLC v. Fidelity Nat'l Title Ins. Co.*, 128 So. 3d 107, 111 (Fla. Ct. App. 2013) ("Title insurance policies are indemnity contracts against actual monetary loss resulting from specified causes.").

Here, the Title Policy transparently ***excluded from coverage*** in plain terms those items which Plaintiffs now claim were undisclosed encumbrances.  Because the exclusions from coverage were clear and unambiguous, under Florida law, there are no defects with Lennens' deed and the Court cannot invalidate the MVC Program transactions.  Because

Plaintiffs cannot plausibly allege a defect with the MVC Deed, these fundamental deficiencies in Plaintiffs' allegations require dismissal of Counts III and IV with prejudice as cure is not possible.

A. **Count II: Plaintiffs Fail to State a Claim That First American Failed to Disclose a Defect in the Title Policy**

Plaintiffs allege that the MVC Deed's description of property (also used in the Title Policy) was insufficient, and claim that First American "insured the vesting of title as evidenced in [Plaintiffs'] MVC Consumer Deed which purports to transfer legal title to a Florida timeshare estate, legally described as H04815, H04816, H04817 and H04818." Compl. ¶ 254.  Plaintiffs assert that the MVC Deed only uses Marriott's administrative codes to describe the property, *id.* ¶ 100, and that this property description is "void for lack of [a] legal description."  *Id*. ¶ 257 (emphasis added).  These factual allegations are and can only be made based on an incomplete quotation of the MVC Deed.  On a motion to dismiss, the Court should consider the fulsome description provided in the MVC Deed and should disregard the selective description referenced by Plaintiffs.  *Day v. Taylor*, 400 F.3d 1272, 1275-76 (11th Cir. 2005).[7]

The actual language in the Lennens' MVC Deed fully describes the property consistent with Florida law:

> "A timeshare estate as defined by section 721.05, *Florida Statutes* more fully described as **4** interests (numbered for administrative purposes:  H04815 & H04816 & H04817 & H04818) in the MVC Trust ("Trust") evidenced for

---

[7]    In determining whether documents are "central" to Plaintiff's claim, the Eleventh Circuit considers such factors as: (1) whether the claims depend on the documents; (2) whether contents of the documents are alleged in the complaint; and (3) whether the documents form a "necessary part of [plaintiff's] effort to make out [his] claim."  *Day*, 400 F.3d at 1276; *Horsley v. Feldt*, 304 F.3d 1125, 1134-35 (11th Cir. 2002). All three of those factors are easily satisfied here.

9

administrative, assessment and ownership purposes by **1,000** Points (250 Points for each Interest), which Trust was created pursuant to and further described in that certain MVC Trust Agreement dated March 11, 2010, executed by and among First American Trust, FSB, a federal savings bank, solely as trustee of Land Trust No. 1082-0300-00 (a.k.a. MVC Trust), Marriott Ownership Resorts, Inc., a Delaware corporation, and MVC Trust Owners Association, Inc., a Florida corporation not-for-profit, as such agreement may be amended and supplemented from time to time ("Trust Agreement"), a memorandum of which is recorded in Official Records Book 10015, Page 4176, Public Records of Orange County, Florida ("Trust Memorandum").  The Interests shall have a Use Year Commencement date of **January 01, 2016** (subject to Section 3.5 of the Trust Agreement).

*See* Exh. 7 (emphasis added).

Plaintiffs make several arguments about the MVC Deed's property description, each of which fails to state a claim.  First, Plaintiffs allege that the description could never be adequate because "the codes H04815, H04816, H04817, and H04818 do not correspond to any specific and identifiable parcel of real property that could be located by an interested party, surveyor, or title company."  Compl. ¶ 248.  This assertion is contrary to black letter Florida timeshare law, which provides that timeshare properties need not be tied to specific parcels.  *See* Fla. Stat. § 721.52(4) ("'multisite timeshare plan' means any method, arrangement, or procedure with respect to which a purchaser obtains, by any means, a recurring right to use and occupy accommodations or facilities of more than one component site, only through use of a reservation system … Timeshare estates may only be offered in a multisite timeshare plan pursuant to s. 721.57."); *see also* Fla. Stat. § 721.52(5) ("nonspecific multisite timeshare plan" means a "plan with respect to which a purchaser receives a right to use all of the accommodations and facilities, if any, of the multisite timeshare plan through the reservation system, but no specific right to use any particular accommodations and facilities for the remaining term of the multisite timeshare plan in the event that the

10

reservation system is terminated for any reason prior to the expiration of the term of the multisite timeshare plan.")  As fully disclosed, the MVC Program was offered, sold, and conveyed as a multisite timeshare plan.  *See* Exh. 1, POS (titled "Multisite Public Offering Statement").  Consequently, the Lennens purchased a valid property interest recognized under Florida law.

Plaintiffs, who had full access to the closing documents, now complain that even if they did purchase a valid property interest, it was insufficiently described in the MVC Deed. Compl. ¶ 257.  Putting aside the questionable lack of damages, this assertion too contradicts established Florida law: "[A]lmost any description that could possibly be explained by parole evidence or research of historical records will suffice."  *Hutchinson Island Realty, Inc. v. Babcock Ventures, Inc.*, 867 So. 2d 528, 532 (Fla. Ct. App. 2004).  Further, "a property description may be aided by reference to the public records if the instrument contains information sufficient to identify the property through that line of inquiry."  *Id.* (citing *Mendelson v. Great W. Bank F.S.B.*, 712 So. 2d 1194, 1197 (Fla. Ct. App. 1988)).  When read in its entirety, the MVC Deed unambiguously references the MOT, recorded "in Official Records Book 10015, Page 4176" in Orange County, Florida.  *See* Exh. 7, Deed.  A title searcher can locate the MOT which refers the searcher to the NOAs recorded for each property parcel conveyed to the Trust.  *See* Exh. 3.  The title searcher then can search for any other NOAs for the MVC Program in the Orange County, Florida records, which together contain detailed descriptions of all underlying parcels of property in the Trust.  *See* Exh. 6.

As a result, Plaintiffs' claim that "the codes H04815, H04816, H04817, and H04818 do not correspond to any specific and identifiable parcel of real property that could be

11

located by an interested party, surveyor, or title company" is demonstrably false.  Compl.

¶ 248.  Under Florida law, the sufficiency of the property description in the Lennens' deed is

evaluated based on the deed *and* other materials in the Orange County public records

referenced in the deed.  *Hutchinson Island Realty*, 867 So. 2d at 532-33.  Because the Chart

of Component Sites provided to the Lennens and the recorded NOAs describe the specific

parcels of property conveyed to the Trust and sold to the Lennens, this argument fails.  *See*

Ex. 10.  Plaintiffs cannot legitimately challenge the MVC Deed's complete property

description read with the other documents incorporated by reference into the MVC Deed, so

their claim that the Title Policy failed to disclose a defect arising from the property

description also fails.  Compl. ¶ 258.

While not altogether clear, Plaintiffs further appear to base Count II on Fla. Stat.

§ 627.784.  Compl. ¶¶ 252-53.  This is improper, as there is no private right to enforce that

provision.  *Regions Bank v. Commonwealth Land Title Ins. Co.*, 977 F. Supp. 2d 1237, 1270

(S.D. Fla. 2013) ("even if a violation of the Insurance Code existed . . . Florida law does not

permit [a party] to assert its own violation defensively because the statute and rule on which

it relies do not create a private cause of action or defense.").  In any event, § 627.784 is

inapposite, as it only prohibits insuring title without conducting any type of title search.

Plaintiffs only allege that "First American failed to conduct a *thorough* title search," an

allegation which does not reach the statutory prohibition.  *See* Compl. ¶ 275 (emphasis

added).[8]

---

[8] Plaintiffs fail to, and likely cannot, further allege any damage from the Title Policy.  *Bohr v. First Am. Title Ins. Co.*, 2008 WL 2977353, at *5 (M.D. Fla. July 30, 2008) ("insured has the burden of establishing the

In short, Plaintiffs can identify no defect or encumbrance under which Plaintiffs can recover under the Title Policy.[9]  Because Plaintiffs' allegations are inconsistent with the plain language of documents on which their claims are based, they cannot improve their allegations, and this claim should be dismissed with prejudice.  *See Fenn v. Litton Loan Serv. LP*, 2010 WL 8318866, at *3 (M.D. Fla. Dec. 10, 2010) ("There is no amendment that can cure the defects in Plaintiffs' complaint; that is, with the facts presented, Plaintiffs will not be able to state a claim for relief that could be granted").

### B.    Count III: Plaintiffs Fail to State a Claim that First American Failed to Disclose "Restricted Use Property" as an Encumbrance

Plaintiffs again ignore the operative documents in complaining about Restricted Used Properties.  Plaintiffs allege that the concept of the addition of Restricted Use Properties, the process by which new properties are added to the MVC Program for the benefit of participants, is an encumbrance that First American failed to disclose in the Title Policy. Compl. ¶ 265.  Reading the actual Title Policy reveals that Restricted Use Properties are excluded from coverage under the Title Policy.[10]

"Insurance contracts are construed according to their plain meaning."  *Great Am. Assurance Co. v. Elliott*, 846 F. Supp. 2d 1258, 1261 (M.D. Fla. 2012).  "The applicability of

---

amount of his loss up to the face amount of the policy, which is the upper limit to which the insurer is liable.").

[9]    This type of individual claim is likely not capable of class relief, as it is elective. *See Oginski v. Paragon Props. of Costa Rica, LLC*, 282 F.R.D. 672, 678 (S.D. Fla. 2012) (no commonality where named plaintiffs entered into at least two variations of written agreement for deed, modifications of original agreements, and varying factual scenarios presented numerous discrete legal issues and affected types of damages available to individual plaintiffs).

[10]    Since the Title Policy is central to the Complaint, the Court should review it in full. *Day*, 400 F.3d at 1276.

[an] exclusion is a matter of law that can be properly resolved on the pleadings."[11] *Maxum Indem. Co. v. Fla. Constr. Servs., Inc.*, 59 F. Supp. 3d 1382, 1385 (M.D. Fla. 2014) citing *Scottsdale Ins. Co. v. Pursley*, 487 F. App'x. 508, 511 (11th Cir. 2012); *see also Allstate Ins. Co. v. Adrabi*, 78 So. 3d 7, 10 (Fla. Ct. App. 2011) ("[c]overage determinations are legal questions decided by the court, not a jury").

The Lennens' Title Policy unambiguously states that for certain listed "Exceptions from Coverage," the "policy does not insure against loss or damage and the Company will not pay costs, attorneys' fees, or expenses, that arise by reason of… [c]ertain Component Sites [which] have been conveyed to the trustee of the Trust Agreement…[and] are affected by certain exceptions…which exceptions may affect the Insured's right to use one or more Component Sites."  Exh. 8, Title Policy at Sch. B.  The Title Policy includes among these exceptions any "Terms, provisions and restrictions as contained in the Trust Agreement."  *Id.*  The Trust Agreement describes Restricted Use Property in detail. Exh. 3, Trust Agreement at § 2.42.  Thus, the plain language of the Title Policy does not cover any losses arising from "restrictions" provided in the Trust Agreement.

Where, as here, exemptions to a title insurance policy are plain, Plaintiffs cannot recover for any alleged failure to disclose encumbrances stemming from an exemption.  *See Ernie Haire Ford, Inc. v. Ford Motor Co.*, 260 F.3d 1285, 1290-91 (11th Cir. 2001) (contracting parties are bound to clear contract terms and may not rewrite the contract to make it more advantageous or reasonable).  The Title Policy's reference to "Terms,

---

[11]   Under Florida law, "where the essential facts of the case are not in dispute, it is appropriate for the district court to interpret an insurance contract to determine whether any ambiguities exist as to coverage as a matter of law."  *City of Delray Beach v. Ag. Ins. Co.*, 936 F. Supp. 931, 936 (S.D. Fla. 1994).

provisions and restrictions as contained in the Trust Agreement" unambiguously incorporates all restrictions which arise under the Trust Agreement, including "Restricted Use Property."[12]

What's more, even if Restricted Use Properties constituted encumbrances, no liability arises because Plaintiffs had actual knowledge of them from the Disclosure Documents provided before sale.  *See, e.g., Lawyers Title Ins. Corp. v. D.S.C. of Newark Enters., Inc*., 544 So. 2d 1070, 1073 (Fla. Ct. App. 1989) (courts are "loathe to impose liability on a title insurer for a condition of which the insured had actual, express knowledge," even if such condition was "not excepted from coverage").  Because recovery for any restriction from "Restricted Use Property" is barred under the Title Policy's plain terms, and was disclosed to Plaintiffs before their purchase, Count III should be dismissed with prejudice.  *Ship Constr. & Funding Servs., Inc. v. Star Cruises*, 174 F. Supp. 2d 1320, 1326 (S.D. Fla. 2001); *Fenn,* 2010 WL 8318866, at *3.

### C.     Count IV: Plaintiffs Fail to State a Claim that First American Failed to Disclose Condo Declaration Restrictions as an Encumbrance

Similar to the flawed allegations regarding Restricted Use Properties, Plaintiffs assert that the condominium properties included in the Trust have certain restrictions on their use that continue to apply after the properties are conveyed to the Trust.  Compl. ¶¶ 81-82, 273. As with Count III, Plaintiffs cannot recover under Count IV because any restriction arising as a result of Condo Declarations are on their face excluded from Title Policy coverage:

> "This policy does not insure against loss or damage and the Company will not pay costs, attorneys' fees, or expenses that arise by reason of…(5) All

---

[12]   There is no ambiguity about which agreement is referenced.  "Trust Agreement" is defined on the same page of the Title Policy's list of exclusions to mean "that certain MVC Trust Agreement with an effective date as of the 11th day of March 2010 (as same may be amended and supplemented from time to time, the "Trust Agreement")." *See* Exh. 8; Title Policy at Sch. B.

> covenants, conditions, restrictions, easements, assessments, liens, charges, terms and provisions contained in those **certain condominium declarations**, community governing instruments, declaration of covenants, or such other documents which might now or in the future encumber and govern any portion of a Component…."

Exh. 8, Title Policy at Sch. B (emphasis added).

Thus, as a matter of law, Plaintiffs have no grounds for recovery for any restrictions arising from a Condo Declaration. *See Kirkland v. Ocean Key Assocs., Ltd.*, 2007 WL 3343083, at *4 (S.D. Fla. Nov. 8, 2007); *Ship Constr.*, 174 F. Supp. 2d at 1326. And as Legacy Owners, the Lennens had actual knowledge of Condo Declarations, which also defeats their right to recovery. *Lawyers Title*, 544 So. 2d at 1073.

Undeterred by this express exclusion, Plaintiffs further complain that because the Title Policy's language provides only that "Legacy Timeshare Estates '*may*' or may not be restricted by the respective Condo Declarations," it cannot constitute an "express disclosure of [an] actual title defect." Compl. ¶ 160. Plaintiffs misstate the law, which requires only that the Title Policy specifically reference the Condo Declarations, not that it must further describe or explain the language in those Declarations. In Florida, "where a writing expressly refers to and sufficiently describes another document, that other document, or so much of it as is referred to, is to be interpreted as part of the writing." *OBS Co. v. Pace Constr. Corp.*, 558 So. 2d 404, 406 (Fla. 1990); *see also Kaye v. Macari Bldg. & Design, Inc.*, 967 So. 2d 1112, 1113 (Fla. Ct. App. 2007) ("The American Institute of Architects Documents No. A–201, April 1997 Edition," adequately incorporated document by reference). The Title Policy both expressly refers to and sufficiently incorporates the Condo Declarations by reference so individual provisions need not be repeated in the Title Policy.

*See* Exh. 8, Title Policy at Sch. B.  Put another way, there is no law that required First

American to articulate the legal impact of such Condo Declarations.

**V.      Plaintiffs Fail to State a Claim Against First American as Trustee**

Plaintiffs allege that the Trustee, First American was not independent, as is required

under Fla. Stat. § 721.03(7).  Compl. ¶¶ 342-50.  In support of this claim, Plaintiffs make

only the conclusory allegation that First American has "mixed financial interests" with

Marriott based on "shar[ing] the profit [from] title insurance" sold to MVC Owners and that

First American "wears numerous hats in all MVC transactions."  *Id.* ¶¶ 31, 344.  These

claims again ignore Florida law.

First American's independence is not defeated merely because it sold title insurance,

acted as trustee, and escrow agent for the MVC Program, as Plaintiffs essentially allege.  The

statute defining independence contemplates that one company may perform ***multiple services***

as part of a transaction.  Though uncited by Plaintiffs, the governing Florida statute states

that a "person shall not be disqualified to serve as…a trustee solely because . . . [the] trustee

performs closings for the developer or seller or issues owner's or lender's title insurance

commitments or policies in connection with such closings."  Fla. Stat. § 721.05(20)(d)(4).

Thus, First American's multiple roles are actually permitted by statute.

More particularly, Plaintiffs' allegations that Marriot and First American engaged in

"profit sharing" again are defeated by statute.  Plaintiffs do not take issue with First

American's fees for serving as a trustee (nor could they), but instead point to supposed

"profit sharing" as evidence of lack of independence.  *See* Fla. Stat. § 721.05(20)(b)

(Independent "for purposes of determining eligibility of escrow agents and trustees" means

(in relevant part) having "no financial relationship, other than payment of fiduciary fees" between the trustee and the developer).  The alleged "profit sharing" occurred "with regard to the sale of title insurance to the MVC Owners" because they "jointly sell and share in the profit of title insurance to the MVC Owners."  Compl. ¶¶ 207, 344.  However, taking the Plaintiffs' allegations that First American "jointly with Defendant Marriott Title, insured the title" as true at the pleading stage, Florida law requires the division of title insurance premiums between First American as title insurer and insurance agents.  *See* FLA. ADMIN. CODE ANN. R. 4–186.003(11)(a)–(b) (1995); *Butler v. State Dep't of Ins.,* 680 So. 2d 1103, 1104-05 (Fla. Ct. App. 1996) ("By statute, title insurers must retain no less than 30% of the premium for policies sold by agents. § 627.782(1), Fla. Stat. (1993)").  Plaintiffs acknowledge that Marriott and First American worked together with respect to the sale of title insurance, which was optional to the purchasers.  *See* Compl. ¶¶ 43(d), 51(b).  Therefore, such fee sharing was expressly authorized by statute.  Because Plaintiffs' allegations relate to First American's alleged "mixed financial interests" with Marriott based on "shar[ing] the profit [from] title insurance," and nothing more, this claim should be dismissed.  *See Morales v. Attorneys' Title Ins. Fund, Inc.*, 983 F. Supp. 1418, 1424 (S.D. Fla. 1997) (granting dismissal where "plaintiffs are challenging…the defendants' alleged practice of 'always or nearly always' adhering to a 70/30 split of title insurance premiums with their agents, even though such a percentage split is explicitly allowed by Florida law.").

Plaintiffs' allegations related to any other supposed profit sharing are conclusory and unsupported.  *See* Compl. ¶ 344 ("First American is not independent as Marriott and First American have mixed financial interests in virtually every aspect of every MVC Product

transaction"); *id.* ¶ 545; *Villa v. Miami-Dade Cty.*, 65 F. Supp. 3d 1371, 1378 (S.D. Fla. 2014) ("conclusory allegations 'carry no weight' in the Court's analysis").  In addition, Plaintiffs' claim that First American was not independent because it did not conduct audits of Marriott is not a requirement in the statute, and is of no import to this analysis.

## VI.     Plaintiffs Fail to State a Claim Against First American as Escrow Agent

In their broad-brush allegations, Plaintiffs further charge that First American improperly released escrow funds to Marriott without complying with the statutory requirements of Section 721.08(2)(C)(2).  Compl. ¶ 359.  This claim should be dismissed because Plaintiffs ignore another section of the same statute, Fla. Stat. § 721.08(5)(a) that provides First American with alternative mechanisms to comply with escrow laws.  To state a valid claim, Plaintiffs must allege that First American improperly released escrow funds. Fla. Stat. § 721.08(2)(C)(2).  This, they cannot do.  The escrow statute expressly provides alternative means, ignored by Plaintiffs, by which escrow can be released.

Count XI's central allegation is that First American failed to comply with Fla. Stat. § 721.08(2)(C)(2) because First American did not verify that each timeshare estate sold to MVC Owners was free and clear from competing interest holders or that each parcel owner had recorded a non-disturbance agreement.   Compl. ¶ 366-77.  Omitted from the Complaint, however, is any reference to § 721.08(5)(a), which expressly provides a separate and independent grounds to comply with escrow requirements: "[i]n lieu of any escrows required by this section, the director of the division shall have the discretion to accept other assurances, including, but not limited to, a surety bond issued by a company authorized and licensed to do business in this state as surety or an irrevocable letter of credit in an amount

equal to the escrow requirements of this section."[13]  Plaintiffs do not acknowledge this provision in their 639-paragraph long Complaint.  Without allegations that First American failed to comply with § 721.08(5)(a), in addition to § 721.08(2)(C)(2), Count XI fails as a matter of black letter law.[14]

   In addition, Count XI still does not state a claim because Plaintiffs have not demonstrated First American's actual failure to comply with § 721.08(2)(C)(2).  For example, Plaintiffs assert, "First American may not allow Marriott to withdraw the proceeds from the sale of MVC from escrow unless Marriott had submitted an affidavit that closing has been completed," but that "Closing" could never occur because the deeds were allegedly defective because a sale of property in the MVC Program was "based on an invalid conveyance of title and on a recording that failed to comply with the recording laws." Compl. ¶ 357-59.  These arguments fail, because the MVC Deed was not defective, as is explained in Section IV.A.  Plaintiffs' other challenges under § 721.08(2)(C)(2) are also deficient because nondisturbance instruments are not required for properties transferred to a trust.  *See* Fla. Stat. § 721.08(2)(C)(2)(c)(iii) and because the Legacy Owners do not fit the definition of "interest holders" since they do not participate in the MVC Program.  *See* Fla. Stat. § 721.05(21); Compl. ¶ 63(b).

---

[13]   The Escrow Agreement between First American and Marriott specifically contemplates the use of alternate assurances in lieu of specific escrow.  *See* Exh. 2, Escrow Agreement at ¶ 8.

[14]   Count XI also fails because Plaintiffs' allegations merely state their view on legal requirements for escrow. *See e.g.* Compl. ¶¶ 189, 191. Because the claim does not allege any actual *facts* about First American's conduct relating to its holding or release of escrow, this claim is fatally flawed.  *Twombly*, 550 U.S. at 570 (threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice); *accord Harding v. NCL (Bahamas) Ltd.*, 90 F. Supp. 3d 1305, 1307 (S.D. Fla. 2015).

Besides, Plaintiffs have not and cannot allege damages relating to a release of escrow. Plaintiffs do not state any well-pled damages arising from a release from escrow in the Complaint.  Compl. ¶ 229 ("First American's failure as an escrow agent to independently verify that the subject accommodations and facilities of the MVC Timeshare Plan directly caused injuries to Legacy Owners"); *id.* ¶¶ 375-77.  Plaintiffs paid for and received their bargained for interest in the MVC Trust.  Absent a claim for damage arising from the release of escrow, this claim fails for this independent reason as well. *See, e.g., IberiaBank v. Coconut 41, LLC*, 984 F. Supp. 2d 1283, 1303 (M.D. Fla. 2013) ("It is axiomatic that a plaintiff must prove damages resulting from the defendant's wrongdoing to be entitled to recover.") (citation omitted).

### VII.   Plaintiffs Fail to State A Claim for Conspiracy to Violate Fla. Stat. § 721.08

Plaintiffs allege that Marriott and First American conspired to violate Florida timeshare laws, allegedly committing third degree felonies.  In RICO Count I, Plaintiffs allege that First American released escrow funds for sales of MVC Program properties even though the affidavits it received from Marriott confirming closing of the sale were "fraudulent."[15]  *Id.* ¶¶ 510, 518.  In RICO Count II, Plaintiffs allege that "Marriott, with the knowledge and assistance of First American, opted to transfer each of the accommodations and facilities of the MVC Timeshare Plan to a trust" without meeting the requirements of § 721.08(2)(C)(4).  *Id.* ¶ 534.  Such claims are not actionable as a RICO claim, as Plaintiffs

---

[15]   RICO Count I also fails because Plaintiffs' allegation that First American released escrow funds after receiving "fraudulent affidavits" implicates, but cannot satisfy Rule 9(b)'s heightened pleading standard. *See Wilson v. EverBank, N.A.*, 77 F. Supp. 3d 1202, 1225 (S.D. Fla. 2015) ("Because Plaintiffs' RICO claims are predicated on allegations of fraud, their allegations must satisfy the heightened pleading requirement of Fed. R. Civ. P. 9(b)"); *Viridis Crop. v. TCA Glob. Credit Master Fund, L.P.*, 155 F. Supp. 3d 1344, 1361 (S.D. Fla. 2015).

do not allege facts demonstrating that First American "intentionally failed to comply with the provisions of this section concerning the establishment of an escrow account" or to "intentionally fail[] to comply with the provisions of this section concerning …conveyances of property into the trust." Fla. Stat. § 721.08(10)(a); § 721.08(10)(b).  Indeed, Plaintiffs have failed to allege that First American improperly released escrow funds or improperly transferred property to a trust.

Therefore, Plaintiffs cannot sufficiently allege a RICO claim because they have not (and cannot) validly allege any predicate crime.  It is fundamental that "what *is* required to support a claim of RICO conspiracy is that plaintiffs allege an illegal agreement to violate a substantive provision of the RICO statute." *Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1269 (11th Cir. 2004); *Fuller v. Home Depot Servs., LLC*, 512 F. Supp. 2d 1289, 1295-96 (N.D. Ga. 2007) (dismissing conspiracy claim because the claim alleges conduct that is not illegal); *Wallace v. Midwest Fin. & Mortg. Servs., Inc.*, 714 F.3d 414, 423 (6th Cir. 2013) (yield premiums that mortgagee paid broker for securing high long-term interest rate did not evidence agreement to commit unlawful act because premiums were not illegal per se under federal law); *Cf. U.S. v. Vaghela*, 169 F.3d 729, 733-34 (11th Cir. 1999) (cannot be guilty of conspiring to commit acts that are not themselves illegal).

As discussed in Section V, Plaintiffs cannot establish that First American improperly released escrow funds because Plaintiffs ignore the alternative methods of compliance and thus fail to allege that First American did not comply with the escrow requirements of § 721.08(5)(a).  Because Plaintiffs have not alleged First American's complete failure to protect escrow as is permitted in Florida, First American could not have conspired to violate

§ 721.08.  *Spain v. Brown & Williamson Tobacco Corp.*, 363 F.3d 1183, 1199 (11th Cir. 2004) ("A conspiracy itself furnishes no cause of action. The gist of the action is not the conspiracy but the underlying wrong that was allegedly committed. If the underlying cause of action is not viable, the conspiracy claim must also fail." (internal quotation marks and citation omitted)).  Moreover, without improperly releasing escrow, First American cannot have "intentionally fail[ed] to comply with the provisions [ ] concerning the establishment of an escrow account," as is required to commit the felony provision of section 721.08.  Fla. Stat. § 721.08(10)(a); *Jackson*, 372 F.3d at 1269 ("parties cannot be found guilty of conspiring to commit an act that is not itself against the law") (citation omitted); *Spence-Jones v. Rundle*, 991 F. Supp. 2d 1221, 1255 (S.D. Fla. 2013) (dismissing RICO claim where "complaint fails to allege a predicate act, fails to allege an illegal agreement to conduct acts of a sufficiently continuous nature to constitute a pattern of racketeering activity, and fails to allege facts sufficient to confer standing or damages.").

Similarly, Plaintiffs fail to assert a claim under RICO Count II because they have not stated any facts to show that First American improperly transferred property into a trust. RICO Count II contains only a recitation of the elements of a violation, but does not include allegations of any *facts* describing what was improper about the conveyance of property to the Trust.  *See e.g.*, Compl. ¶ 534 ("Marriott, with the knowledge and assistance of First American, opted to transfer each of the accommodations and facilities of the MVC Timeshare Plan to a trust…").  Allegations in the rest of the Complaint do not revive the claim, as Count XII ("Improper Transfer of Accommodations and Facilities to a Trust") also includes only legal conclusions.  *See e.g.*, *id* ¶ 384 ("By failing to make valid transfer

23

pursuant to the trustee pursuant to Fla. Stat. § 721.08(2)(C)(4) (2010), Marriott unlawfully withdrew proceeds from sales…").  To the extent that Plaintiffs' argument of an improper trust is based on their allegations that First American was not an independent trustee, these allegations fail for the reasons described above in Section V.  Thus, because Plaintiffs have not adequately alleged any underlying violation, they cannot allege a conspiracy to violate a law, and RICO Count II fails.  *Jackson*, 372 F.3d at 1269 ("parties cannot be found guilty of conspiring to commit an act that is not itself against the law") (citation omitted); *Spain*, 363 F.3d at 1199; *Spence-Jones* 991 F. Supp. 2d at 1255.

**VIII.   Plaintiffs Fail to State a Claim under RICO Count III**

Plaintiffs cannot recover punitive damages based on Florida's RICO statutes because the statutes expressly prohibit punitive damages for civil RICO violations.  *See* Fla. Stat. § 772.104(3) ("In no event shall punitive damages be awarded under this section."); Fla. Stat. § 895.05(6) (allowing only for injunctive relief for a private right of action).

Even if Plaintiffs could collect punitive damages for RICO under § 768.72(2), which they cannot, they have not alleged the required level of intent.  Section 768.72 permits a plaintiff to seek punitive damages only if it sufficiently alleges intentional conduct or gross negligence.  Fla. Stat. § 768.72(2).  Plaintiffs fail to allege that First American acted with "actual knowledge of the wrongfulness of the conduct and the high probability that injury or damage to the claimant would result," required to show "intentional misconduct."  Fla. Stat. § 768.72(2)(a).  On the contrary, Plaintiffs allege repeated compliant conduct.  *See* Compl. ¶ 85 ("First American issued to the Lennens a title policy for two Legacy Timeshare Estates"); *id.* ¶ 203 ("First American signed the MVC Trust Agreement…").  Plaintiffs

likewise do not allege that First American acted with gross negligence because none of its allegations support conduct that was "reckless or wanting in care that it constituted a conscious disregard or indifference to the life, safety, or rights of persons exposed to such conduct." Fla. Stat. § 768.72(2)(b). There is simply no well-pled fact that First American intended to violate the law.

Accordingly, Plaintiffs' claim for punitive damages fails. *See, e.g., Coronado Condo. Ass'n, Inc. v. La Corte*, 103 So. 3d 239, 241 (Fla. Ct. App. 2012) (plaintiff did not show that condo association ratified the conduct of others to establish punitive damages claim); *Tiller v. Ford Motor Co.*, 2006 WL 166530 at *3 (M.D. Fla. Jan. 21, 2006) (insufficient evidence to establish punitive damages because evidence showed that [defendant] complied with government standards when it design the roof of the car).[16]

## CONCLUSION

For all of the reasons stated, Count II, III, IV, X, XI, and RICO Counts, I, II and III should be dismissed with prejudice.

---

[16] Plaintiffs' requested relief that the Court "temporarily suspend" Marriott and First American's licenses until "review by an appropriate licensing agency" is improper and should be denied because Plaintiffs have not posted nor have offered to post the required surety bond. *See* Fla. Stat. § 895.05(6).

25

Dated:  September 15, 2016

Respectfully submitted,

/s/ Douglas B. Brown
_____

W.L. Kirk, Jr.
Florida Bar No. 0111973
bkirk@rumberger.com (Primary)
docketingorlando@rumberger.com and
bkirksecy@rumberger.com (secondary)
Douglas B. Brown
Florida Bar No. 0242527
dbrown@rumberger.com (Primary)
docketingorlando@rumberger.com and
dbrownsecy@rumberger.com (Secondary)
RUMBERGER, KIRK & CALDWELL, P.A.
Post Office Box 1873
Orlando, Florida  32802-1873
Telephone:    (407) 872-7300
Telecopier:   (407) 841-2133

_____

Jeffrey L. Willian, P.C.
Illinois Bar No.: 6194119
jwillian@kirkland.com
Donna M. Welch, P.C.
Illinois Bar No.: 6226352
Leslie S. Garthwaite
Illinois Bar No.:  6299823
leslie.garthwaite@kirkland.com
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois  60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

*Attorneys for First American Defendants*

**CERTIFICATE OF SERVICE**

I, Douglas B. Brown , an attorney, certify that on this 15th day of September, 2016, I

caused a copy the attached Answer of First American Financial, First American Trust, FSB,

and First American Title Company to Class Action to be served via U.S. Mail, postage

prepaid, on the following counsel:

Christopher S. Polaszek
The Polaszek Law Firm, PLLC
3407 W. Kennedy Blvd.
Tampa, FL 33609
chris@polaszeklaw.com

Lucas A. Ferrara
Jeffrey M. Norton
Roger A. Sachar, Jr.
1250 Broadway, 27th Fl.
New York, NY 10001
lferrara@nfllp.com
jnorton@nfllp.com
rsachar@nfllp.com

Soomi Kim
2400 South College Drive
High Point, NC 27260
(336) 471-8769
soomiwork@gmail.com

                                           /s/ Douglas B. Brown
                                           Douglas B. Brown
                                           Florida Bar No. 0242527
                                           dbrown@rumberger.com (Primary)
                                           docketingorlando@rumberger.com and
                                           dbrownsecy@rumberger.com
                                           (Secondary)
                                           RUMBERGER, KIRK & CALDWELL,
                                           P.A.
                                           Post Office Box 1873
                                           Orlando, Florida  32802-1873
                                           Telephone:    (407) 872-7300
                                           Telecopier:    (407) 841-2133