## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

ANTHONY LENNEN, et al.,

                Plaintiffs,

      v.

MARRIOTT OWNERSHIP RESORTS, INC., et al.,

                Defendants.

CASE NO.: 6:16-cv-00855-CEM-TBS

**PLAINTIFFS' OMNIBUS MEMORANDUM OF LAW IN OPPOSITION TO THE MOTIONS TO DISMISS OF THE MARRIOTT DEFENDANTS, THE FIRST AMERICAN DEFENDANTS, AND THE MVC OWNERS ASSOCIATION DEFENDANT**

THE POLASZEK LAW FIRM, PLLC
Christopher S. Polaszek
3407 W. Kennedy Blvd.
Tampa, FL 33609
(813) 574-7678
chris@polaszeklaw.com

NEWMAN FERRARA LLP
Jeffrey M. Norton
1250 Broadway, 27th Fl.
New York, NY 10001
(212) 619-5400
jnorton@nfllp.com

Soomi Kim, Esq.
2400 South College Drive
High Point, NC  27260
(336) 471-8769
soomiwork@gmail.com

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................ iv

I.    SUMMARY OF THE CASE ................................................................................. 1

II.   SUMMARY OF THE FACTS ............................................................................. 4

III.  SUMMARY OF THE LAW ................................................................................ 9

      A.  The Form of the MVC Product Cannot be Reconciled with any
          Reasonable Interpretation of Florida Law ............................................. 9

      1.  Defendants' Arguments Offend Basic Principles of Statutory
          Construction ......................................................................................... 9

      2.  Defendants' Construction of Fla. Stat. § 721.05(34)(2010) Leads to
          Absurd Results as the MVC Product Does not Have a Single Attribute of
          a Timeshare Estate Under Florida Law ................................................ 9

      3.  Defendants' Argument That a "Trust" under Fla. Stat. § 721.05(34)
          Provides an Independent Basis for a "Timeshare Estate" Would Render
          Fla. Stat. § 721.57 Meaningless and the Statute Inconsistent ................ 12

      B.  The MVC Product Fails as a Timeshare Estate at Every Level ................ 14

          1.  Florida Law Applies Only to Florida Real Property ....................... 14

          2.  Because the MVC Product was Never Created as a Timeshare Estate
              (or Even as a Timeshare License) in any of the 44 Legacy
              Condominiums, it is not a Legal Timeshare Interest ........................ 15

          3.  BI is no More a Real Property Interest Than a Gym Membership ........ 17

          4.  Why 2010 Law Applies to This Case ............................................. 18

IV.   MOTION TO DISMISS STANDARD ................................................................ 20

V.    ARGUMENT ..................................................................................................... 21

      A.  Scope of Regulatory Approval ............................................................... 21

      B.  Each of Plaintiffs' Counts Withstands Scrutiny ..................................... 23

1. Counts I-IV Seek Declaratory Judgment on the Issue of Defective Title and the Triggering of Title Policy Coverage ...............................................23

   (a) Facts Relevant to Counts I-IV ................................................................... 23

   (b) Plaintiffs Sufficiently Allege That the MVC Trust Deeds are Void for Lack of a Legal Description (Count I) ........................................................... 23

      (i)  The MVC Consumer Deeds Lack a Sufficient Legal Description  ......... 24

      (ii) Marriott Lacks Legal Authority to Make Conveyances ........................... 26

   (c) The Title Policy Coverage is Triggered (Counts II-IV) ..................................... 28

      (i)  Count II ........................................................................................... 29

      (ii) Counts II and IV ................................................................................ 30

2. Fla. Stat. § 697.10 Gives Rise to an Independent Cause of Action (Count V) ........................................................................................................ 32

3. The MVC Owners Association is Sham Entity and Breached its Fiduciary Duties as a Managing Entity (Counts VII and Count XVII) .................. 33

   (a) Count VII ................................................................................................ 33

      (i)  Because the MVC Owners Association Lacks any Indicia of Independence, it is not a Valid Managing Entity with an Existence  Distinct from Marriott ............................................................. 33

      (ii) The MVC Owners Association is Powerless ........................................34

   (b) The MVC Owners Association  Breached its Fiduciary Duties by Acting Solely for the Benefit of Marriott (Count XVII) ..................................... 36

4. Marriott Disregards Requirements of Florida Condominium Act (Count VIII) ........................................................................................................ 36

5. Counts IX-XII Allege that Marriott and First American Intentionally Exploited Roles of Escrow Agent and Timeshare Trustee Pursuant to Fla. St. § 721.08 - Giving Rise to Liability Under Florida RICO (RICO Counts I and II) ........................................................................................ 37

   (a) Plaintiffs Sufficiently Allege That the MVC Trust is not a Trust Meeting Fla. Stat. § 721.08, Therefore Fla. Stat. § 721.57 Applies (Count  IX) ............................................................................................ 38

(b) First American's Multiple Roles in the MVC Product Scheme Violate the Requirement of Independence and Demonstrate how First American Breached its Statutory Duties (Counts X and XI)...................... 40

(c) First American's Function as a Land Trust Trustee Does not Meet the Requirements of a Timeshare Trustee ........................................................ 44

6. Plaintiffs Need not Allege That Nights Were Unavailable to Assert a One-to-One Rule Violation on Form (Count XIII) .................................................... 45

7. Count XIV Alleges That Marriott Failed to Properly add Property to a Multisite Timeshare Plan ............................................................................. 48

8. The Properties in the MVC Product Cannot Be Governed by the Legacy Condominium Association and the MVC Owners Association Simultaneously (Count XV) .................................................................. 48

9. Plaintiffs' Sufficiently Assert that the MVC Owners Association Breached its Fiduciary Duties by Failing to Appropriately Apportion Common Expenses (Count XVI) ........................................................ 49

10. Marriott was Required to Maintain a Separate Reservation System for the Legacy Owners (Count XVIII)................................................ 50

C. Marriott International is a Proper Party to This Action Because it was the Primary Architect of MVC Trust Timeshare Plan ........................................... 51

D. Plaintiffs Sufficiently Pleads Florida RICO Violations................................................... 53

E. Plaintiffs Sufficiently Pleads a Claim for Punitive Damages ................................... 55

F. Plaintiffs' Complaint Satisfies Federal Rules of Civil Procedure 8 and 10 ................... 56

VI. CONCLUSION............................................................................................60

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*2BBG Express, LLC v. Quality Distrib.*,
  No. 8:16-CV-758, 2016 WL 6211712 (M.D. Fla. Oct. 24, 2016) ............................................ 56

*Am. Home Assur. Co. v. Plaza Materials Corp.*,
  908 So. 2d 360 (Fla. 2005) ............................................................................................................9

*Anderson v. District Bd. Of Trustees of Cent. Fla. Community College*,
  77 F.3d 364 (11th Cir. 1996) ...................................................................................... 59

*ANZ Advanced Techs., LLC v. Bush Hog, LLC*,
  Civil Action No. 09-00228-KD-N, 2009 WL 3415650 (S.D. Ala. Oct 20, 2009).................... 58

*Archimbaud v. U.S. Bank Nat'l Assoc.*,
  2016 WL 3099398 (M.D. Fla. June 1, 2016) .............................................................. 31

*Aronson v. Aronson*,
  930 So. 2d 766 (Fla. Dist. Ct. App. 2006) .................................................................. 27

*Ashcroft v. Iqbal*,
  556 U.S. 662, (2009) ................................................................................................... 20

*Axtell v. Coons*,
  89 So. 419 (1921) ........................................................................................................ 27

*Bailey v. Leatherman,*
  615 So. 2d 810 (Fla. Dist. Ct. App. 1993) .................................................................. 33

*Beckwith v. Bellsouth Telecommunications Inc.*,
  146 F. App'x 368 (11th Cir. 2005) .............................................................................. 59

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007) .................................................................................................... 20

*Burns v. Consol. Am. Ins. Co.*,
  359 So. 2d 1203 (Fla. Dist. Ct. App. 1978) ............................................................... 31

*Chaparro v. Carnival Corp.*,
  693 F.3d 1333 (11th Cir. 2012) ............................................................ 20

*Chicago Title Ins. Co. v. Commonwealth Forest Investment, Inc.*,
  494 F. Supp. 2d 133 (M.D. Fla. 2007) ................................................... 28

*Cohen v. Office Depot, Inc.*,
  204. F.3d 1069 (11th Cir. 2000) ............................................................ 56

*Coquina Invs. v. Rothstein*,
  Case No. 10-60786, 2011 WL 2530945 (S.D. Fla. Jan. 20, 2011) ........... 55

*Corley v. United States*,
  556 U.S. 303, (2009) ............................................................................. 34

*Davis v. Hinson*,
  67 So. 3d 1107 (Fla. Dist. Ct. App. 2011) .............................................. 24

*Day v. Taylor*,
  400 F.3d 1272 (11th Cir. 2005) ............................................................. 20

*Delk v. Bank of Amer.*,
  2016 WL 70617 (M.D. Fla. Jan 6, 2016.) ............................................... 32

*Fabricant v. Kemper Indep. Ins. Co*,
  474 F. Supp. 2d 1328 (S.D. Fla. 2007) .................................................. 31

*Fayad v. Clarendon Nat. Ins. Co.*,
  899 So. 2d 1082 (Fla. 2005) .................................................................. 30

*Florida Software Systems v. Columbia HCA Healthcare*,
  46 F.Supp.2d 1276 (M.D. Fla. 1999) ..................................................... 53

*Flynn v. [MORI]*,
  165 F.Supp.3d 955 (D. Haw. Feb. 29, 2016) .................................... 46, 47

*Hechtman v. Nations Title Ins.*,
  840 So.2d 993 (Fla.2003) ........................................................................9

*Hess v. Walton*,
  898 So.2d 1046 (Fla. 2d DCA 2005) ....................................................................... 14

*In re Wells*,
  259 B.R. 776 (Bankr. M.D. Fla. 2001) .................................................................... 27

*Jackson v. Bellsouth Telecomms.*,
  372 F.3d 1250 (11th Cir. 2004) ............................................................................... 53

*Johnson Enterprises of Jacksonville, Inc. v. FPL Grp., Inc.*,
  162 F.3d 1290 (11th Cir. 1998) ............................................................................... 58

*Johnson v. State*,
  91 So. 2d 185 (Fla. 1956) ......................................................................................... 9

*Jones v. Moore*,
  Case No. 07-21154, 2008 WL 384557 (S.D. Fla. Feb. 11, 2008) ........................... 59

*La Costa Beach Club Resort Condo. Ass'n, v. Carioti*,
  37 So. 3d 303 (Fla. Dist. Ct. App. 2010) ................................................................ 33

*Lawyers Title Guaranty Fund v. Koch and Leavitt*,
  397 So. 2d 455 (1981) ............................................................................................. 44

*Lawyers Title Ins. Corp. v. D.S.C. of Newark Enterprises, Inc.*,
  544 So. 2d 1070 (Fla. Dist. Ct. App. 1989) ............................................................ 28

*Magluta v. Samples*,
  256 F.3d 1282 (11th Cir. 2001) ............................................................................... 58

*Matter of T & B Gen. Contracting, Inc.*,
  833 F.2d 1455 (11th Cir. 1987) ............................................................................... 31

*McDaniel v. Lawyers' Title Guaranty Fund*,
  327 So.2d 852 (Fla. 2d DCA 1976) ......................................................................... 29

*Med. Transp. Mgmt. Corp. v. Comm'r of IRS*,
  506 F.3d 1364 (11th Cir. 2007) ................................................................................. 9

*Mendelson v. Great W. Bank, F.S.B.*,
   712 So. 2d 1194 (Fla. Dist. Ct. App. 1998) ................................................................ 24

*Mitchell v. Thomas*,
   467 So. 2d 326 (Fla. Dist. Ct. App. 1985) ................................................................. 24

*Oce N. Am., Inc. v. Caputo*,
   416 F. Supp. 2d 1321 (S.D. Fla. 2006) ..................................................................... 31

*Ramjeawan v. Bank of Am. Corp.*,
   2010 WL 1882262 (S.D. Fla. May 11, 2010) ............................................................. 32

*Reid v. Barry*,
   112 So. 846 (1927) .................................................................................................... 27

*Reiser v. Marriott Vacations Worldwide Corp.*,
   2016 WL 1720741 (E.D. Cal. Apr. 29, 2016,) ....................................................... 46-47

*Republic of Pan. v. BCCI Holdings (Luxembourg) S.A.*,
   119 F.3d 935 (11th Cir. 1997) .................................................................................. 53

*Rice v. Rice*,
   499 F. Supp. 2d 1245 (M.D. Fla. 2007) ............................................................... 24, 25

*Shada v. Title & Trust Company of Florida*,
   457 So.2d 553 (Fla. 4th DCA 1984), *rev. denied*, 464 So.2d 556 (Fla.1985) .......................... 28

*Smith v. Boyd*,
   161 So. 381 (1935) .................................................................................................... 42

*Speaker v. U.S. Dep't of Health and Human Svcs Ctrs for Disease Cntl and Prev.*,
   623 F.3d 1371, 1380 (11th Cir. 2010) ...................................................................... 20

*Sprint Solutions, Inc. v. Cell Xchange, Inc.*,
   49 F. Supp. 3d 1074 (M.D. Fla. 2014) ...................................................................... 59

*State v. Bodden*,
   877 So. 2d 680 (Fla. 2004) ....................................................................................... 35

*State v. Goode,*
    830 So.2d 817 (Fla. 2002) .................................................................................. 9

*State v. Putnam County Devel. Auth.,*
    249 So.2d 6, 10 (Fla.1971) ................................................................................. 9

*United States v. Church,*
    955 F.2d 688 (11th Cir. 1992) .......................................................................... 53

*United States v. Crumb,*
    Civil Action 15-0655, 2016 WL 4480690 (S.D. Ala. Aug. 24, 2016) ....................... 58

*United States v. Kopituk,*
    690 F.2d 1289 (11th Cir.1982) ........................................................................ 53

*Unruh v. State,*
    669 So.2d 242 (Fla.1996) ................................................................................. 9

*Villarreal v. R.J. Reynolds Tobacco Co.,*
    2016 WL 5800001 (11th Cir. Oct. 5, 2016) .......................................................... 9

*Weiland v. Palm Beach County Sheriff's Office,*
    792 F.3d 1313 (11th Cir. 2015) ....................................................................... 59

*Zions First Nat. Bank v. Elibel, S.A. de C.V.,*
    No. 08-20382-CIV, 2009 WL 1360855 (S.D. Fla. May 14, 2009) .......................... 32

**Statutes**

Fed. R. Civ. P. 8(a)(2) ........................................................................................ 56

Fed. R. Civ. P. 10(b) ................................................................................... 56, 59

Fla. Stat. § 2.01 ................................................................................................ 14

Fla. Stat. § 627.784 ......................................................................................... 28

Fla. Stat. § 689.02(1) ....................................................................................... 24

Fla. Stat. § 689.02(2) ....................................................................................... 24

Fla. Stat. § 689.071(2)(d) ................................................................................. 26

Fla. Stat. § 689.071(2013) ................................................................................................... 19,43

Fla. Stat. § 689.071(3) (2010) ................................................................................................. 13

Fla. Stat. § 689.071(8)(f) (2010) ............................................................................................. 26

Fla. Stat. § 718(25) ................................................................................................................... 15

Fla. Stat. § 718.103 ................................................................................................................... 11

Fla. Stat. § 718.104(4)(0) ......................................................................................................... 16

Fla. Stat. § 718.104(4)(f) .......................................................................................................... 16

Fla. Stat. § 718.104(4)(g) ......................................................................................................... 16

Fla. Stat. § 721.03(2) ........................................................................................................... 14, 36

Fla. Stat. § 721.03(c)(3) ............................................................................................................ 22

Fla. Stat. § 721.05(10) ......................................................................................................... 51, 52

Fla. Stat. § 721.05(10)(b) ......................................................................................................... 52

Fla. Stat. § 721.05(10)(e) ......................................................................................................... 52

Fla. Stat. § 721.05(20)(d)(4) .................................................................................................... 42

Fla. Stat. § 721.05(25) ..................................................................................................... 16, 44, 45

Fla. Stat. § 721.05(34) ........................................................................................................ *passim*

Fla. Stat. § 721.05(34) (2010) ......................................................................................... 9, 10, 38

Fla. Stat. § 721.05(5)(a) ................................................................................................ 10, 22, 40, 41

Fla. Stat. § 721.08 .............................................................................................................. *passim*

Fla. Stat. § 721.08(10) .............................................................................................................. 37

Fla. Stat. § 721.08(2)(C)(1)(a)(B) ........................................................................................... 12

Fla. Stat. § 721.08(2)(C)(2)(C)(2010) ..................................................................................... 40

Fla. Stat. § 721.08(2)(C)(3)(C)(I) ........................................................................................... 12

Fla. Stat. § 721.08(2)(c)(4)(2010) ................................................................................. 13

Fla. Stat. § 721.08(2)(C)(a)(III)(2010) ........................................................................ 40

Fla. Stat. § 721.08(2)(c)4 ...................................................................................... 12, 37

Fla. Stat. § 721.08(2010) ...................................................................................... 13, 41

Fla. Stat. § 721.13 (1)(a) ............................................................................................ 32

Fla. Stat. § 721.13(13) ............................................................................................... 35

Fla. Stat. § 721.13(2)(a) ............................................................................................. 33

Fla. Stat. § 721.13(3) ................................................................................................. 34

Fla. Stat. § 721.13(c)(2) ............................................................................................. 35

Fla. Stat. § 721.13(c)(3) ............................................................................................. 35

Fla. Stat. § 721.15(a) ................................................................................................. 50

Fla. Stat. § 721.29 .................................................................................................... 15

Fla. Stat. § 721.52 ......................................................................................... 11, 14, 38

Fla. Stat. § 721.52 (2010) ............................................................................................ 3

Fla. Stat. § 721.57 (2010) ...................................................................................... 3, 13

Fla. Stat. § 721.57(2)(a) (2010) .................................................................................. 13

Fla. Stat. § 721.57(2)(a)(2010) ................................................................................... 13

Fla. Stat. § 721.57(2010) .................................................................................. 11, 19, 40

Fla. Stat. §721.13(3) .................................................................................................. 35

Fla. Stat. §721.55 ...................................................................................................... 14

## Other Authorities

8 Fla. Prac., Law of Trusts § 6:1 (2012 ed.) ................................................................ 34

Plaintiffs Anthony and Beth Lennen ("Plaintiffs" or the "Lennens") respectfully submit this omnibus memorandum of law in opposition to the motions to dismiss of: (1) Marriott International, Inc., Marriott Ownership Resorts, Inc., Marriott Vacations Worldwide Corporation (d/b/a Marriott Vacation Club), Marriott Resorts Travel Company, Inc. (d/b/a MVC Exchange Company), and Marriott Title Insurance (collectively, "Marriott" or the "Marriott Defendants") (Dkt. No. 77); (2) MVC Owners Association (Dkt. No. 75); and (3) First American Financial, First American Trust, FSB, and First American Title Company (collectively, "First American" or the "First American Defendants") (Dkt. No. 79).[1]

## I.      SUMMARY OF THE CASE

This case is about two of the largest names in the worlds of real estate and resorts conspiring to sell the MVC Product – a points-based program sold as a Florida timeshare estate.[2] In truth, the MVC Product is an illusory interest in real property, masked by a proprietary, multilevel, multijurisdictional, multi-statutory process. The underlying scheme, however, is rather simple and straightforward: Marriott is selling an unlimited inventory of membership rights as Florida land and First American is selling title policies on every purchase.

Plaintiffs' Complaint is comprehensive because it needs to be. Indeed, the scheme devised by Marriott and First American implicates multiple agents and subsidiaries, no less than three Florida Statutes (including dozens of provisions therein), laws of other states, and governing documents relating to 44 different Marriott condominiums (the "Legacy Condominiums") located in 11 different states, and thousands of transactions. At bottom, the MVC Product is a sum of its parts and in order

---

[1]      The moving defendants are referred to collectively as "Defendants," unless referred to specifically. Defendants have each adopted and incorporated each other's arguments and briefs into their own. Other defendants include Orange County Florida and the Orange County Comptroller whose motions to dismiss (Dkt. Nos. 50 and 60) were briefed separately.

[2]      The timeshare plan establishing the MVC Product is referred to herein as the "MVC Trust Timeshare Plan."

to demonstrate its foundational flaws (and there are many), Plaintiffs' Complaint[3] sets about the process of deconstruction and analysis.

A road map to this process is provided in the Complaint's Table of Contents which first lays out the facts in manageable and specifically-described sections, then, in a Count-by-Count fashion, explains how the MVC Product is a sham that fails to comply with Florida law from its foundation (*i.e.*, an invalid deed and lack of real property interest, Counts I-V)[4], to the illegitimacy of its structure (*i.e.*, parties, duties, and roles, Counts VII-X)[5], to its macro-level defects (*i.e.*, impossibility of operation as a lawful timeshare plan, Counts XI-XVIII).[6] Although Plaintiffs submit that success on Count I alone would invalidate the entire MVC Product scheme, the Complaint is structured in a way to reveal multiple ways that Marriott and First American intentionally exploit this fictional real property form to the detriment of the purchasers ("MVC Trust Owners') and the owners ("Legacy Owners") of pre-existing timeshare estates ("Legacy Timeshare Estates").

Critically, the Complaint includes claims under Florida's Racketeer Influenced and Corrupt Organization Act ("Florida RICO")[7] because timeshare scams of this nature are specifically delineated as racketeering activity.[8]   In this matter, the Plaintiffs' allegations lay out a clear conspiracy between Marriott and First American to violate specific statutory trustee and escrow duties under Fla. Stat. § 721.08. The Florida legislature has imposed such grave consequences for breaching these duties that it is not feasible for any developer in the State of Florida to run a

---

[3]   References to paragraphs in the Complaint are cited as: (Compl. ¶__).
[4]   Compl. ¶¶ 242-281.
[5]   Compl. ¶¶ 304-350.
[6]   Compl. ¶¶ 351-495.
[7]   RICO Counts I and II, Compl. ¶¶ 505-540.
[8]   *See* Fla. Stat. § 890.01.

timeshare scam without the full participation of the statutory fiduciary. In fact, an intentional breach while performing statutory fiduciary functions is automatically a crime, punishable as a felony.[9]

Defendants' real gripe about the Complaint is not that it is too long and complex, rather, it is that the Complaint's structure makes it too difficult for them to respond in a rational way without implicating themselves (or each other) on some other Count. As expected, Defendants attempt clumsily to recast the allegations as administrative compliance issues[10] to avoid exposure under Fla. Stat. § 721.08, or, they simply ignore claims entirely.[11] Total avoidance is impossible, however, and this is made clear by Defendants' knowing or inadvertent admissions (express and implicit), that the MVC Product is a fraud.[12]

Defendants' smoke-and-mirrors approach to seeking dismissal employs a confirmation-without-context methodology whereby cherry-picked sections from different statutes (and versions of those statutes) are applied to selected attributes of a timeshare interest and a Florida land trust to argue that the MVC Trust Timeshare Plan's anomalous form complies with Florida law. This is precisely the tactic that Defendants used to create the MVC Product in the first place.

According to Marriott, tens of thousands of pre-existing Legacy Timeshare Estates, from 44 different Legacy Condominiums, in 11 different states, are mixed together in a Florida land trust (the "MVC Trust"), scrubbed free of the effects of duly-recorded Condominium Declarations for the

---

[9]    Fla. Stat. § 721. 08(10); RICO Counts I and II, Compl. ¶¶ 505-540.
[10]    Despite Defendants' efforts to characterize this case as arising out of MVC Trust Timeshare Plan's alleged non-compliance with certain timeshare regulatory provisions (such that the Division could weigh in on dispositively, *see* Motion to Stay), Chapter 721 is not a stand-alone statute. As set forth both in the Complaint and herein, Chapter 721 incorporates condominium laws and general property law and its statutory provisions are designed specifically to be consistent with Florida law's treatment of other and similar property interests.
[11]    Suggesting they are inapplicable, Marriott refuses to address certain claims in any manner, including Counts 8, 9, and 12, and Florida RICO Counts 1 and 3 (Marriott Mem. at 12, fn. 14).
[12]    For instance Marriott never directly addresses Count XIV and First American never directly addresses Count XI. Marriott admits "points" are nothing more than "symbolic" units representing nothing more than "use-rights" (Marriott Mem. at 4, fn 7), and, by calling its product a "nonspecific" timeshare interest (Marriott Mem. at 16) tacitly concedes that it was never a timeshare estate by the express terms of Fla. Stat. §§ 721.52 (2010) and 721.57 (2010).

Legacy Condominiums ("Condo Declarations"), the use-rights for which can be subsequently sold in units of points as Marriott sees fit, and the ultimate sale (called "BI") conveys title to a new timeshare estate, free and clear of any encumbrances or defects. BI is not a fixed interest, rather, Marriott argues it "symbolically" represents a (continuously "recalibrating") fractional ownership of an ever-changing inventory of Legacy Timeshare Estates (to the extent Marriott has not designated them "restricted") submitted to the MVC Trust. Each allocation of 250 points is supposedly a parcel of Florida real property, conveyable by deed and recorded in Orange County Florida, and subject to recording fees, transfer tax, title insurance, and maintenance fees.

Defendants interpret Chapter 721 in a way that would render moot much of Florida's Timeshare Act, condominium law, general property law, and the Land Trust Act by providing a path to convert any conceivable interest that can be held in trust into a legally-recognized parcel of Florida real property. For Defendants to prevail, the Court will need to overlook the alchemy and legal contortions involved, ignore that fact that there is no parcel of land is conveyed, disregard the conflict of the land trust form, turn a blind eye the fact that the timeshare instruments expressly deny passage of legal and equitable title of trust properties to purchasers, and accept the fact that if the MVC Trust were to terminate tomorrow, MVC Owners would have title to nothing, while Marriott would continue to hold unencumbered title to all trust properties.  Respectfully, this cannot be the result.

## II.   SUMMARY OF THE FACTS

First American and Marriott's scam begins with series of complex inter-state transactions that form the basis for the MVC Product. The Complaint delineates each transaction, step-by-step, using recorded instruments as concrete examples to describe the process of how the MVC Product is created. (Compl. ¶¶ 94-96)   Defendants' factual accounts of the process are laid out in a more generalized way and avoid the minefields that defy rational explanation (*e.g.*, that trust property

consists of pre-existing timeshare estates). No matter how clearly the process is described, however, it is conceptually difficult to visualize the multidimensional transactions in a real property context without deconstructing it, as Plaintiffs' do both in the Complaint and herein. That said, there is a very simple exercise to test whether the purported real property conveyance in the MVC Product has any legal effect on the rights of the purchaser: eliminate the entire process used to create MVC Product (Compl. ¶ 96), leaving only the MVC Consumer Deed, and analyze what legal rights remain.

Specifically, if Marriott had never executed or recorded a single deed, never created the MVC Trust land trust and instruments like Notice of Addition ("NOA"), or the Memorandum of Trust Agreement ("MVC Trust Agreement"), would the legal rights of the grantee-MVC Owner be substantively different? The not-so-surprising answer is that there would be absolutely no legal effect whatsoever. Whether the convoluted process existed or not, the ownership right evidenced by the MVC Consumer Deed would be the same: zilch.

While this exercise confirms that there is no legitimate function for the complex transactions used to create the MVC Product, Defendants' motions (together with hundreds of pages of exhibits) argue that this process evidently serves some essential programmatic function. In truth, the process creates a sufficient level of legalistic confusion to obscure a fairly simple reality.  What the process does is allow Marriott to create and sell an unlimited supply of  BI/Points without any accountability and without regard to inventory constraints. (Compl. ¶¶ 110-113)  Every BI Marriott creates and sells not only generates tremendous profit but also opens the door to additional revenue streams for both Marriott and First American in the form of arbitrary fees and costs for things such as title policies, closing costs, maintenance fees, and other assessments. (Compl. ¶ 38)

A second, less obvious (albeit more nefarious) reason, is that MVC Trust Timeshare Plan's land trust form gives Defendants a plausible-sounding excuse to explain why none of the governing

documents of MVC Trust Timeshare Plan are recorded. (Compl. ¶¶ 96, 114, 266, 274, 364, 392) Evading the recording requirement for MVC Trust Timeshare Instrument is a critical aspect of the scam because it allowed Defendants to create separate timeshare instruments without incorporating them into the 44 Legacy Condominium Declarations. (Compl. ¶¶ 153-156)

Marriott's goal was not to bring some revolutionary product to the market that would provide great benefits for a new class of timeshare purchasers (after all, the same thing already existed as an awards program), rather, it was a way for Marriott to recycle its growing and stale inventory of Legacy Timeshare Estates, made up primarily of low-demand, hard-to-sell weeks. (Compl. ¶ 1-2) This plan was accomplished with the help of First American by sticking random intervals of pre-existing, Marriott-owned, Legacy Timeshare Estates located in 44 timeshare condominiums into a Florida land trust. (Compl. ¶¶ 4-6, 81-82)   These Legacy Timeshare Estates were still subject to the respective Condo Declarations recorded in the states and counties where the physical Legacy Timeshare units were located. (Compl. ¶¶ 81-82) Of course, Marriott avoided amending the respective Condo Declarations to accommodate the MVC Trust Timeshare Plan because it would have caused all kinds of problems, including triggering the other Legacy Owners' voting rights.[13] (Compl. ¶ 93)

Further, by exploiting unfamiliarity with the land trust form, Marriott got away with an invalid, albeit plausible-sounding, excuse that MVC Trust Timeshare Instruments *as a land trust agreement* need not be recorded. (Compl. ¶¶ 122-126)   This front allowed Marriott to ignore the Legacy Timeshare Condo Declarations while simultaneously using unrecorded timeshare instruments that purport to bind underlying Legacy Timeshare Estates. (Compl. ¶¶ 152-156)   This is evident from the fact that after Legacy Timeshare Estates are transferred to MVC Land Trust they are

---

[13]   Some Legacy Condominiums like Grand Chateau in Nevada requires 2/3 of Legacy Owners' votes to amend the condominium declarations to accommodate the MVC Trust Timeshare Plan.

subject to *only* the unrecorded MVC Trust Timeshare Instrument. (Compl. ¶ 364)   This is how Marriott was able to create and operate overlapping and conflicting timeshare plans out of the same 44 Legacy Condominiums (and in many cases the same condominium unit), without ever reconciling the two timeshare plans. (Compl. ¶¶ 546-551)

Legacy Timeshare Estates are subject to the use-rights and terms provided in their respective Condo Declarations and are governed by their respective Condominium Association. (Compl. ¶¶ 81-82)  However, this somehow changes when these same Legacy Timeshare Estates are submitted to MVC Trust by deed to the land trust trustee, First American. (Compl. ¶¶ 94-96)   Thereafter, the deeded Legacy Timeshare Estates are subject to the unrecorded MVC Timeshare Instruments and are governed by MVC Trust Owner's Association. (Compl. ¶¶ 94-96)

This is the basis for Plaintiffs' claims that Legacy Owners are directly and concretely injured even if they never purchased the MVC Product. (Compl. ¶¶ 225-229)   Legacy Owners have property ownership rights that run with the land pursuant to recorded terms of the Legacy Condominium Declarations. (Compl. ¶¶ 225-229)  These terms include their reservation rights and maintenance of one-to-one use-right to use-night requirement ratio ("One-to-One Rule"). (Compl. ¶¶ 352-380) Because the MVC Product has an unlimited, constantly-changing inventory and cannot possibly maintain a one-to-one ratio (Compl. ¶¶ 352-380), Legacy Owners (especially those with floating weeks) are forced to compete with MVC Owners in violation of the terms of their timeshare plan. (Compl. ¶¶ 352-380)

The form of the MVC Product also gives the timeshare plan's managing entity, MVC Owners Association, a plausible-sounding justification to operate outside the bounds of Florida's (and other states) condominium laws. (Compl. ¶ 564)  Moreover, the MVC Owners Association is a mere proxy for Marriott and has vastly broader scope of authority than any owners' associations in

the Legacy Timeshare condominiums. (Compl. ¶¶ 161-184, 305-312) Indeed, the Marriott-installed board of the MVC Owners Association (made up of two Marriott executives and a Marriott appointee) has the unchecked power to unilaterally change the terms of the MVC Trust Timeshare Instruments without even informing the purchasers. (Compl. ¶ 477)   In legitimate timeshare estates created in timeshare condominiums, making such vast revision to a timeshare plan would require in many cases require 2/3 of owners' votes, but with the configuration of the MVC Owners Association board, however, changes can be made without so much as a official meeting.[14] (Compl. ¶¶ 36, 172-173)

In sum, the MVC Product is nothing more than an elaborate scam that allows Marriott to unburden itself from languishing Legacy Timeshare Estates and profit from selling an unlimited supply of points disguised as a real property, and allows First American to share in the largess by being complicit in the process and profiting off the sale of thousands of worthless title policies. Both the MVC Owners and the Legacy Owners are harmed by the far-reaching effects of the scheme. While there are many more facts set forth in the Complaint, for the purpose of responding to Defendants' motions, Plaintiffs' submit that they are better explained within the context of the individual claims and discussion of law below.

---

[14]   The MVC Owners Association does not only affect MVC Trust Owners because, through that entity, Marriott has the power to exercise all the votes that rightfully belong to MVC Owners to vote as a block on matters pertaining to the Legacy Condominiums, including election of board members in the condominiums associations. (Compl. ¶¶ 637-638) Among other things, this paves the way for Marriott to influence or control the negotiation of management contracts with itself rather than with a board made up of Legacy Owners' representatives. (Compl. ¶¶ 637-638)

## III.   SUMMARY OF THE LAW

### A.   The Form of the MVC Product Cannot be Reconciled with Any Reasonable Interpretation of Florida Law

#### 1.   Defendants' Arguments Offend Basic Principles of Statutory Construction

Statutory provisions are not meant to be read in a vacuum without regard to other related and qualifying provisions.  Fla. Stat. § 721.01 is no exception.  Indeed, "[i]t is an elementary principle of statutory construction that significance and effect must be given to every word, phrase, sentence, and part of the statute if possible, and words in a statute should not be construed as mere surplusage." *Am. Home Assur. Co. v. Plaza Materials Corp.*, 908 So. 2d 360, 365 (Fla. 2005) (quoting *Hechtman v. Nations Title Ins.*, 840 So.2d 993, 996 (Fla.2003)). Courts must avoid interpretations "that would render part of a statute meaningless" (*State v. Goode*, 830 So.2d 817, 824 (Fla. 2002)), or that are inconsistent with other provisions of the statute (*State v. Putnam County Devel. Auth.*, 249 So.2d 6, 10 (Fla.1971)), or that fail to "give effect and meaning to the entirety of the legislative enactment at issue" (*Am. Home Assur. Co.*, 908 So. 2d at 366, *citing Unruh v. State*, 669 So.2d 242, 245 (Fla.1996)), or that permit "absurd results" (*Johnson v. State*, 91 So. 2d 185, 191 (Fla. 1956)). Finally, statutory language is only ambiguous "if it is susceptible to more than one *reasonable* interpretation," *Villarreal v. R.J. Reynolds Tobacco Co.*, 2016 WL 5800001, at *8 (11th Cir. Oct. 5, 2016) (quoting *Med. Transp. Mgmt. Corp. v. Comm'r of IRS*, 506 F.3d 1364, 1368 (11th Cir. 2007)) (emphasis added). "Forced meaning does not create ambiguity." *Id.*

#### 2.   Defendants' Construction of Fla. Stat. § 721.05(34)(2010) Leads to Absurd Results as the MVC Product Does Not Have A Single Attribute of a Timeshare Estate Under Florida Law

Defendants construe Fla. Stat. § 721.05(34) (2010) to mean that any type of interest in a trust that meets the requirement of a Fla. Stat. § 721.08 is a "timeshare estate," and hence, a parcel of real property under Florida law.  Setting aside, for the moment, that the MVC Trust is <u>not</u> a trust that

meets the requirements of Fla. Stat. § 721.088, Defendants' circular reasoning leads to the position that because a closing on timeshare estate requires the delivery and recording of a deed to convey legal title (Fla. Stat. § 721.05(5)(a)), then even a contract-based interest in a trust can be deemed a timeshare estate subject to the delivery and recording of a deed. Indeed, Defendants use this faulty premise to circumvent the fact that the MVC Consumer Deed fails to meet any of the legal requirements for a deed under Florida law; namely, that it must relate to, and describe, a specific and definable interest in a parcel of land.

Defendants' interpretation of Fla. Stat. § 721.05(34) (2010) and Fla. Stat. § 721.05(5)(a) deviates substantially from virtually every known rule of statutory construction. Fla. Stat. § 721.05(34) (2010) provides that "Timeshare Estate" means:

> a right to occupy a timeshare unit, coupled with a freehold estate or an estate for years with a future interest in a timeshare property or a specified portion thereof. The term shall also mean an interest in a condominium unit pursuant to s. 718.103, an interest in a cooperative unit pursuant to s. 719.103, or an interest in a trust that complies in all respects with the provisions of s. 721.08(2)(c)4., provided that the trust does not contain any personal property timeshare interests. ***A timeshare estate is a parcel of real property under the laws of this state.***

(Emphasis added). Although its verbiage is somewhat awkward, this statutory provision's import is unambiguous, especially when read within the context of the statutory scheme as a whole. All timeshare estates must: (i) be a singular piece of real property; (ii) create a fee simple or estate for years in a timeshare property with fractional ownership delineated; and  (iii) include a right to occupy a timeshare unit pursuant to the terms of a recorded condominium declaration where the property is located.

### i.   *It must be a singular parcel of real property*

Once a timeshare estate is created pursuant to the applicable property law, fractional ownership is not held as tenancy in common of the timeshare unit but as a separate parcel of real

property.   Partition of a timeshare estate as a distinct parcel allows each timeshare estate to be

conveyed in a separate deed and liens and mortgage to be recorded against this separate parcel, which

is not possible if held in tenancy in common of the underlying timeshare unit. For instance, instead of

having 52 tenants in common owning 1/52 of a timeshare unit, the timeshare unit, like a

condominium unit, is divided into 52 separate parcel of land.

### ii. *It must create a fee simple or estate for years in a timeshare property with fractional ownership delineated*

This is sometimes referred to as beneficial interest to a timeshare estate represented by a

specific percentage either delineated in the deed itself or in the particular Condo Declaration. For

example, the Lennens' Special Warranty Deed related to their purchase of two weeks at the Crystal

Shores Condominium, conveys this interest:

> over in fee simple absolute, as a tenant in common with the other owners of all the
> timeshare estates in the hereinafter described condominium parcel *in that percentage
> interest* determined and established by the Declaration of Condominium for the
> following described real estate located in Collier County, State of Florida.[15]

### iii. *It must include a right to occupy a timeshare unit pursuant to the terms of the condominium declaration where the timeshare estate is physically located*

If a timeshare estate is created in a Florida condominium, it must meet the requirements of

Fla. Stat. § 718.103, or, if the interest is created in a Florida coop unit, it must meet the requirements

of Fla. Stat. § 719.103.  If a timeshare estate is created in a multisite real property timeshare plan, but

fails to meet the requirements of Fla. Stat. § 721.57(2010), it must either be an interest in a trust that

complies in all respects with the provisions of Fla. Stat. § 721.08(2)(c)4(2010), <u>or</u>, it will be deemed

a timeshare license rather than a timeshare estate. A timeshare estate in a condominium located in a

state outside the State of Florida must comply with the respective laws of the component state.

---

[15]    (Emphasis added). *See* Norton Decl., Ex. B, Crystal Shores Special Warranty Deed.

Pursuant to Fla. Stat. § 721.52, applicable law means the law of the jurisdiction where the accommodations and facilities referred to are physically located.

There is no reasonable interpretation of Fla. Stat. § 721.05(34) that would operate to transform an intangible, non-specific, contract-based, use right in an ever-changing collection of Legacy Timeshares interests submitted to a land trust, into Florida real property. If Defendants were correct, it would lead to the most absurd of results whereby anything imaginable could be transformed into Florida real property (including imagination itself). One could create timeshare estates in Farmville properties, or planetary systems, or dreams, or lamps, or litters of puppies, for example. The possibilities are endless.

### 3. Defendants' Argument That a "Trust" under Fla. Stat. § 721.05(34) Provides an Independent Basis for a "Timeshare Estate" Would Render Fla. Stat. § 721.57 Meaningless and the Statute Inconsistent

When the MVC Product was created, Florida law provided for three types of timeshare interests; *i.e.,* timeshare estates[16], personal property timeshare interests[17], or timeshare licenses.[18] One major difference between timeshare estates and personal property timeshare interests is that purchaser of a timeshare estate is conveyed title to a singular parcel of real property. Although Defendants maintain that a trust meeting the requirements of Fla. Stat. § 721.08(2)(c)4 provides an independent basis for a timeshare estate, there is nothing in that provision that sets out a special designation or defines timeshare estate. To the contrary, it speaks of timeshare interests generally covered by Fla. Stat. § 721.08, including timeshare licenses and personal property timeshare interests. *See* Fla. Stat. § 721.08(2)(C)(1)(a)(B) ("If the timeshare plan is one in which timeshare

---

[16] Fla. Stat. § 721.05(34)(2010), defined *supra.*

[17] Fla. Stat. 721.05(28) defines "Personal property timeshare interest" as "a right to occupy an accommodation located on or in or comprised of personal property that is not permanently affixed to real property, whether or not coupled with a beneficial or ownership interest in the accommodations or personal property."

[18] Fla. Stat. 721.05(37) defines "Timeshare license" as "a right to occupy a timeshare unit, which right is not a personal property timeshare interest or a timeshare estate."

licenses are to be sold …"); *see also* Fla. Stat. § 721.08(2)(C)(3)(C)(I) ("If the timeshare plan is one in which personal property timeshare interests are to be sold …"). Fla. Stat. § 721.08(2)(c)4 merely imposes procedural safeguards for a timeshare trustee to oversee and ensure that a timeshare developer is conveying clear title to the specific timeshare interest conveyed and that the right to occupy the timeshare accommodations is free from any previous or future encumbrances.

Under Fla. Stat. § 721.57(2)(a)(2010), if a timeshare interest is conveyed in a multisite timeshare plan in a manner that fails to meet the requirements of that provision, it must meet the requirements of Fla. Stat. § 721.08(2010) or it will be deemed "an offering of a timeshare license." Because Fla. Stat. § 721.57(2)(a) (2010) requires that a purchaser receive a specific timeshare estate in one of the component sites of a multisite timeshare, together with use rights therein, the MVC Product does not qualify as a multisite timeshare. Therefore, unless the Fla. Stat. § 721.08(2010) requirements are met, then, by definition, the MVC Product it is not a timeshare estate. The legislative intent is clear that Fla. Stat. § 721.57 (2010) must be read in conjunction with Fla. Stat. § 721.08(2)(c)(4)(2010), and the definition of timeshare estate under Fla. Stat. § 721.05(34).

Again, Defendants' interpretation would result in absurd and inconsistent results. Here, Marriott chose a Florida land trust form as an interest in a trust.[19] Under the Florida Land Trust Act, Fla. Stat. § 689.071(3)(2010), the underlying trust property is not limited to real property and may consist of a mortgage or a lease assignment rather than fee ownership in any real property. Similarly, other types of revocable trusts may contain property interests like mineral rights, or easements, or contract-based use rights. Under Marriott's interpretation, however, any of these interests could constitute a "timeshare estate" and transform miraculously into parcels of real property. Finally, Marriott's interpretation would eliminate a fundamental aspect of every timeshare interest – the right

---

[19] Notably, Fla. Stat. § 721.08 does not incorporate the Florida Land Trust Act by reference or otherwise. Rather, it speaks to trusts generally, so long as the trust meets the statutory requirements.

to occupy a timeshare unit. Under Florida law, all three types of timeshare interests must include a right to occupy the timeshare unit. The MVC Product does not.

### B. The MVC Product Fails as a Timeshare Estate at Every Level

Multi-jurisdictional, multisite timeshare plans convey use-rights in properties located in different states but convey title only to single timeshare estate in one site in one state. Fla. Stat. §721.55. This does not remotely describe the configuration of the MVC Product. To the contrary, the MVC Product is sold as a Florida timeshare estate but purports to convey a fractional ownership in tens of thousands of Legacy Timeshare Estates in 44 Legacy Condominiums located in 11 states. And, the fractional ownership remains in a state of constant of flux (something Marriott refers to euphemistically as "recalibration") as new Legacy Timeshare Estates are added to the MVC Trust. This form literally is impossible to reconcile with any statutory interpretation of a timeshare estate.

### 1. Florida Law Applies Only to Florida Real Property

Florida's Timeshare Act expressly incorporates Florida's Condominium Act. Fla. Stat. § 721.03(2) provides that a timeshare plan must meet the requirements of both chapters 718 and 719 unless it is exempted by chapter 721. Where there is a conflict, the statute provides that chapter 721 shall supersede.[20] *Id.* Similarly, general property statutes like Fla. Stat. §§ 689.01 - 689.045 and Fla. Stat. § 685.01 apply to this case unless superseded by chapters 718 and 721. Finally, Fla. Stat. § 2.01 provides that, "the common and statute laws of England which are of a general and not a local nature, with the exception hereinafter mentioned, down to the 4th day of July, 1776, are declared to be of force in this state…" As one would expect, a great deal of real property matters remain subject to common law due to the absence of express superseding statutory authority.

In a multisite timeshare plan, Fla. Stat. § 721.52 expressly defines applicable law to mean the

---

[20]    General and special statutes should be read together and if possible harmonized but, in event of a conflict, the special statute will prevail in absence of a clear legislative intent to the contrary. *See Hess v. Walton*, 898 So.2d 1046, 1049 (Fla. 2d DCA 2005).

law of the jurisdiction where the accommodations and facilities are located. But this incorporation is hardly necessary. Each state has its own laws governing timeshares, condominiums, and property physically located in within its borders. Indeed, each of the Legacy Timeshares Estates, located in the 44 Legacy Condominiums, were created under timeshare plans that had to comply with the laws of the 11 respective states.  As such, there is absolutely no basis (or authority) for applying the Florida Timeshare Act, or the Florida Land Trust Act, or the Florida Condominium Law to Legacy Condominiums located in other states. The only possible exception to this rule is Fla. Stat. § 721.29, which carves out an exception if the respective state does not have recording laws to protect the interests of the purchaser.[21]

### 2. Because the MVC Product was Never Created as a Timeshare Estate (or Even as a Timeshare License) in any of the 44 Legacy Condominiums, it is Not a Legal Timeshare Interest

Like any parcel of real property, a timeshare estate must be created before it is sold. By the same token, there can be no timeshare estate created in a condominium that is not clearly identifiable in a condominium declaration. For this reason, all Legacy Timeshare Estates are identifiable in the respective Condo Declarations.[22] And, all 44 Legacy Timeshare Plans' timeshare instruments (including the Condo Declarations) are duly recorded in the county clerk's office where the timeshare property is physically located.

Fla. Stat. § 718(25) requires that timeshare estates created in condominiums conform with chapter 721. Like a timeshare estate, the terms of the use-right in a condominium must be described and clearly delineated in the recorded condominium declaration. Fla. Stat. § 718.109 provides that:

**Legal description of condominium parcels.**--Following the recording of the

---

[21]   Fla. Stat. § 721.29 provides that, "[i]f any timeshare plan accommodations or facilities are located in any jurisdiction that does not have recording laws or will not record any document or instrument required to be recorded pursuant to this chapter, the division shall have the discretion to accept an alternative method of protecting purchasers' rights that will be effective under the laws of that other jurisdiction."

[22]   *See* Compl. ¶63, for complete list of 44 Legacy Condominiums and the respective states.

> declaration, a description of a condominium parcel by the number or other designation by which the unit is identified in the declaration, together with the recording data identifying the declaration, shall be a sufficient legal description for all purposes. The description includes all appurtenances to the unit concerned, whether or not separately described, including, but not limited to, the undivided share in the common elements appurtenant thereto.

Timeshare estates are simply micro condominium units and subject to parallel requirements.[23] Just as a developer could not sell 200 condominium units in a condominium with only 150 units, each parcel of a timeshare must be partitioned as timeshare estate to maintain "one-to-one use right to use night requirement ratio" pursuant to Fla. Stat. § 721.05(25).[24]

Despite these requirements, not one of the 44 Legacy Timeshare Condo Declarations mentions or recognizes the MVC Product, the MVC Trust Timeshare Plan, or any of the interests that MVC Owners purportedly have title to in those Legacy Timeshares. Instead, Marriott over-rode the effects of recorded Legacy Condominium Declarations with the use of unrecorded MVC Trust Timeshare Instruments, through a proprietary scheme conceived in conjunction with First American (the Complaint details this Condominium Declaration-scrubbing process at ¶ 96). Therefore, MVC Product is not a timeshare estate or even a timeshare license. Timeshare license must be first created to maintain one-to-one use right to use night requirement ratio and other requirements of both chapter 721 and 718 of the Florida Statutes. MVC Trust Instrument are unrecorded and the terms of the use-rights of MVC Trust Timeshare Plan do not run with the land.

---

[23]  *See* Fla. Stat. § 718.104(4)(f), Fla. Stat. § 718.104(4)(g). *See also* Fla. Stat. § 718.104(4)(0).

[24]  Every Legacy Timeshare Condo Declaration contains a description of the timeshare estates in the Legacy Condominium which are defined as fraction of a whole (*i.e.*, one unit has 52 weekly timeshare estates, or 104 weekly timeshare estates where there are alternating year use-rights). The Lennens' two Legacy Timeshare Estates in the Crystal Shores Condominium is no different (*i.e.*, clearly identified as Unit 34 Week 34 and Unit 507 Week 2, with clearly proportioned beneficial interests, voting interests, and use-rights that are appurtenant). *See* Crystal Shores Condominium Declaration, annexed to Norton Decl. as Exhibit B.

### 3.  BI is No More Real Property Interest Than a Gym Membership

BI has no independent function outside the MVC Product.  Indeed, BI can be completely eliminated from the MVC Trust Timeshare Plan without having a single legal effect to the MVC Product purchasers. Conversely, in a legitimate Timeshare Estate, if a beneficial interest is eliminated, the purchasers would lose fractional ownership of the underlying condominium and be left with only a timeshare license. Beneficial interest has an independent function from the appurtenant use-right. As shown in the case of Grand Chateau Legacy Deed[25], beneficial interest appurtenant to the timeshare estate is an indivisible .013656% the entire condominium.  If this beneficial interest is eliminated from the deed, the purchaser would be left with a timeshare license.

Under the terms of MVC Trust Timeshare Instrument, when the MVC Trust Timeshare Plan or MVC Land Trust is terminated, purchasers never gain title to the underlying Legacy Timeshare Estates or have any type of ownership rights to determine the sales process. (Compl. ¶ 131)  Instead, MVC Owners obtain a nominal refund based on a Marriott-conceived formula despite the fact they paid maintenance fees as owners. (Compl. ¶ 131)   Further, Marriott will continue to maintain title to the underlying Legacy Timeshare interests, unencumbered by any MVC Owner interest.

Marriott contends that each BI is a timeshare estate. (Marriott Mem. at 12)  Because the Lennens have four units of BI, this would mean that Marriott conveyed title to four timeshare estates. Each unit of BI = 250 points. (Compl. ¶ 94)  Thus, any time that BI is referenced in MVC Trust Timeshare Instrument, it can be simply replaced with 250 points.  Unlike points in a legitimate multisite timeshare plan, which are configured to signify actual use-rights with limited inventory of 365 days a year in a recorded condominium declarations, points in the MVC Trust Timeshare Plan

---

[25]  Norton Decl., Ex. C.

are nothing more than contract-based use rights, akin to a gym membership.[26]   Marriott has the power to create as many points as it wants, without any limitation and without any fixed inventory (other than the one it creates artificially and has unfettered discretion to modify) (Compl. ¶ 633) Accordingly, BI is not a real property interest or a timeshare estate.

BI is not a "beneficial interest" in a land trust or a timeshare estate as the term suggests. And, the MVC Consumer Deed is not a "deed" but a membership certificate conveying contract-based use-rights as points. Indeed, the MVC Trust Agreement specifically refers to a "point" as a "symbolic unit." (Marriott Mem. at 4 fn. 7) Marriott just as easily could have created units called "RPOs" (real property ownership) or "FSIs" (fee simple interests), however, just because it has a real-property-ish name, does not mean its conveyance is any more legitimate. Furthermore, other than its title (*i.e.*, "Florida Special Warranty Deed"), the MVC Consumer Deed has no attribute of a legitimate deed. Recording a membership certificate called a "deed" has no effect other than subject MVC Owners to erroneous Florida transfer tax and recording fee.

### 4.   Why 2010 Law Applies to This Case

The claims in this case arise out of defects created by Marriott's development of the MVC Trust Timeshare Plan before the first sale of the MVC Product in June of 2010. (Compl. ¶ ¶ 86-88) As evidenced by the approval letter of the Florida Division of Condominiums, Timeshares and Mobile Homes (the "Division") submitted by Marriott (*see* Ex. A to the Greene Decl.) (the "Division Approval Letter"), the MVC Trust Timeshare Plan was issued an approval based on its deemed compliance with the 2010 versions of Chapter 721 and Chapter 718 (Florida's Condominium Act). (Compl. ¶ 230-241)   Under the terms of MVC Trust Agreement, Marriott expressly carved out exception for the application of a subsequent amendment for mandatory regulatory provisions and

---

[26]   *See* Disney Deed example, Norton Decl., Ex. D. Indeed, the MVC Trust Agreement specifically refers to a "point" as a "symbolic unit."

for any amendment that allows developers to substitute timeshare properties. (Compl. ¶ 238) Although subsequent amendments to Florida Statutes do not validate the MVC Product as a timeshare estate or even a timeshare license, the application of versions of statutes that are different that the ones the MVC Product was created under, is improper. The MVC Trust Timeshare Instruments were drafted specifically based on the options that were available under 2010 versions of Florida Statutes. (Compl. ¶ 233-235)

Marriott does not to dispute that the 2010 version of Florida law applies to this case. (Marriott Mem. at 16, 31-32). Rather, Marriott simply resorts to the application of the most helpful version of Florida Statutes without regard to applicability or sufficient legal basis.[27] Then, on pages 14-15 of Marriott's brief, it provides two pages of footnotes that piece together random bill committee reports to argue for the application of some "grandfathering" effect of Fla. Stat. § 689.071(2013) with regard to the MVC Trust Timeshare Plan.

Marriott clearly misconstrues the concept of grandfathering – which applies to situations where conduct had been compliant under a previous version of a statute and is allowed to continue under a new statutory scheme after the law has changed. Grandfathering does not operate to legalize retroactively fraudulent documents and blatant violations, three years hence. Moreover, even if there was a clearly-expressed legislative intent to allow retroactive remedial effect, it would still not supersede the clear terms of the MVC Trust Timeshare Instrument that binds the timeshare plan to Fla. Stat. § 689.071(2010). (Compl. ¶¶ 230-241) Certainly, as a sophisticated, regulated, and contract-driven entity, Marriott is well aware that timeshare instruments must comprehensively meet

---

[27] For example, on page 16 of Marriott's brief, Marriott *cited* Fla. Stat. § 721.57(2010) but then slipped in language from the Fla. Stat. § 721.57(2015) in its actual analysis. Similarly, in footnote 19, Marriott quoted from Fla. Stat. § 689.071(2013) (Marriott Mem at 18).

all aspects of the laws that are in effect at the time an instrument is executed.[28]  All of Marriott's 44

Legacy Timeshare Instruments are all bound by laws that were in effect when the instruments were

executed  -- other than mandatory regulatory provisions, some which are bound by statutes as they

existed in the1980s. The same is true for the MVC Trust Timeshare Plan.

## IV.   MOTION TO DISMISS STANDARD

When reviewing a motion to dismiss, courts must limit their consideration to the well-

pleaded allegations, documents central to or referred to in the complaint, and matters judicially

noticed. *Day v. Taylor*, 400 F.3d 1272, 1276 (11th Cir. 2005).  Further, as a general rule, reviewing

courts must accept all factual allegations as true and evaluate all plausible inferences derived from

those facts in favor of the plaintiff.  *Chaparro v. Carnival Corp.*, 693 F.3d 1333 (11th Cir. 2012). In

sum, in order to "survive a motion to dismiss, a complaint must contain sufficient factual matter,

accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S.

662, (2009)( quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544,570 (2007)). "A claim has facial

plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable

inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at

556).  Further, as the Eleventh Circuit has recognized, *Twombly/Iqbal* principles require only that a

complaint's allegations be "enough to raise a right to relief above the speculative level."  *Speaker v.*

*U.S. Dep't of Health and Human Services Centers for Disease Control and Prevention*, 623 F.3d

1371, 1380 (11th Cir. 2010) (citations omitted).

---

[28]   In 2013, Marriott and First American effectuated vast legislative changes to Fla. Stat. § 689.071 in
order to overcome regulatory hurdle in securitizing the mortgage on the MVC Product in an effort to
avoid committing securities fraud. (Compl. ¶ 591-596)

## V.    ARGUMENT

### A.  Scope of Regulatory Approval

Contrary to Marriott's representations in both its Motion to Stay and in its Motion to Dismiss, no timeshare agencies have ever conducted a comprehensive review of the MVC Trust Timeshare Plan's real property form and approved of the same. (Marriott Mem. at 1, fn 2, 3, fn 5). Nevertheless, Marriott repeatedly urges the Court to defer to the Division's Approval Letter and previous determinations. *Id.* However, the Division's Approval Letter actually contradicts Marriott's position as it expressly provides a list of documents that Division reviewed to issue its approval and, conspicuously absent from that list are instruments that would be *absolutely critical* to conduct the most cursory review of the MVC Trust Timeshare Plan's real property form.

For instance, the Division did not review the 44 Legacy Condo Declarations that encumber the underlying Legacy Timeshare Estates submitted to the MVC Trust as accommodations but were not amended to include the terms of MVC Trust Timeshare Plan or evidence the MVC Product as an overlapping timeshare estate. Similarly, the Division did not review the Sample Florida deed (or sample deeds from any other state) that would transfer legal and equitable title of Legacy Timeshare Estates to First American who would serve as the Florida Land Trust Trustee, the Timeshare Trustee, the escrow agent, and would sell title insurance policies to MVC Product purchasers. The Division did not review the sample deed (*i.e*, the MVC Consumer Deed) that that would purport to convey BI/Points as a fractional ownership of tens of thousands of Legacy Timeshare Estates. The Division did not review the sample mortgages that are secured against the MVC Consumer Deeds. The Division did not review First American's title policy purporting to insure title to MVC Product. And, the Division did not review the sample Notice of Addition ("NOA") that would be recorded or the sample Notice of Use ("NOUs") that would remain unrecorded. Likewise, the timeshare agencies in

- 21 -

the other 10 states having jurisdiction over Legacy Timeshares Estates did not review the MVC Trust Timeshare Plan's real property form. This is evident from the fact that those 10 states approved the MVC Product as a Florida timeshare estate based on the fact it fell under the Division's sole jurisdiction.[29]

Conveniently, Florida's legislature has relieved the Division from the responsibility of reviewing a Florida timeshare plan's compliance to the laws of other states. Fla. Stat. § 721.03(c)(3). Yet, if the Division is expected to defer to the determinations of other states' agencies and other states' agencies defer to the determination of the Division, this leaves a massive regulatory gap. This is the blind spot that Marriott and First American exploited for the purpose of carrying out the MVC Product scheme.[30]

Finally, Marriott neglects to address the fact that the Internal Revenue Service ("IRS") made a specific determination that MVC Trust Product is an "economic right" rather than property ownership sometimes *before* June of 2010. (Compl. ¶¶ 582-585) Marriott never contested this designation and in fact made it an express condition of sale that MVC Trust Owners must never to contest IRS's classification. *Id.*

---

[29]   *See e.g.*, Legal Disclosures, Norton Decl. Ex. E.  This is demonstrated clearly by California's state disclosure which provides:

> WARNING: THE CALIFORNIA DEPARTMENT OF REAL ESTATE HAS NOT EXAMINED THIS OFFERING, INCLUDING, BUT NOT LIMITED TO, THE **CONDITION OF TITLE**, THE STATUS OF BLANKET LIENS ON THE PROJECT (IF ANY), ARRANGEMENTS TO ASSURE PROJECT COMPLETION, ESCROW PRACTICES, CONTROL OVER PROJECT MANAGEMENT…CONTROL OVER ANNUAL ASSESSMENTS (IF ANY)…IT MAY BE ADVISABLE FOR YOU TO CONSULT AN ATTORNEY OR OTHER KNOWLEDGEABLE PROFESSIONAL WHO IS FAMILIAR WITH **REAL ESTATE** AND **DEVELOPMENT LAW** IN THE COUNTRY WHERE THIS SUBDIVISION IS SITUATED. (Emphasis added)

[30]   No other court or governmental agency has evaluated and validated the real property form of the MVC Trust Timeshare Plan or provided any legal analysis of the same. In fact, Marriott's legal opinions submitted by its previous attorneys to both the Division and to the SEC conflicted with the legal analysis Marriott is advancing on this motion. (compare with Compl. ¶¶ 573-581)

**B.  Each of Plaintiffs' Counts Withstand Scrutiny**

**1.  Counts I-IV Seek Declaratory Judgment on the Issue of Defective Title and the Triggering of Title Policy Coverage**

**(a)  Facts Relevant to Counts I-IV**

On December 3, 2014, in conjunction with their MVC Product purchase, the Lennens purchased a title policy through Marriott Title (the "Title Policy"). (Compl. ¶ 142)  On February 10, 2015, Marriott submitted the Lennens' MVC Consumer Deed to the Orange County Comptroller's Office for recording, thereby passing title to the Lennens pursuant to Fla. Stat. § 721.05(5)(a). (Compl. ¶ 143) However, while the Title Policy's coverage date is February 10, 2015, First American did not actually deliver the Title Policy to the Lennens until May 11, 2015. (*See* Ex. H to the Greene Decl.)

The Lennens' MVC Consumer Deed purports to convey title to "4 Interests (numbered for administrative purposes: H04815 & H04816 & H04817 & H04818) in the MVC Trust ("Trust") evidenced for administrative, assessment and ownership purposes by 1000 Points (250 Points for each Interest)." *See* Norton Decl., Ex. A; (Compl., ¶¶ 12, 13, 100, 101, 146, 247, 248).  Marriott and First American have not disputed the fact that H04815 & H04816 & H04817 & H04818 have no existence in any recorded or unrecorded instruments. Therefore, there is no difference between the BIs owned by the Lennens and the BI owned by other MVC Trust Owners.

**(b)  Plaintiffs Sufficiently Allege That the MVC Trust Deeds are Void for Lack of a Legal Description (Count I)**

In Count I (Compl. ¶¶ 242-250), Plaintiffs seek a declaration that, as a matter of law, the MVC Consumer Deeds issued by Marriott to Plaintiffs and others are void by virtue of the fact that they do not convey any interest in real property as they purport to do.  There is no dispute that the Marriott-owned, Legacy Timeshare interests deeded to First American are parcels of real property.  It is the alchemy stripping those complex interests of all legal rights, obligations, and encumbrances,

converting them into something entirely new, and selling them off as timeshare estates that reveals the fatal flaw of the MVC Product: there is no real property interest being conveyed.

There are two reasons a determination on Count I can be made as a matter of law. First, the MVC Consumer Deeds lack (and, in fact, could never provide) a sufficient legal description which is required under Florida law for the conveyance of any real property.  Second, because First American, as the land trust trustee, holds legal and equitable title to properties in the land trust, Marriott, as a land trust beneficiary, lacks the legal authority to make conveyances.   In either case, the MVC Consumer Deeds are void.

### (i)   The MVC Consumer Deeds Lack a Sufficient Legal Description

Under Florida law, a deed that does not sufficiently describe a parcel of real property is void. *Davis v. Hinson*, 67 So. 3d 1107, 1111 (Fla. Dist. Ct. App. 2011). At a minimum, a deed must contain sufficient information such that parol evidence would enable one to "pinpoint the location of the parcels without altering the substance of the deed."  *Rice v. Rice*, 499 F. Supp. 2d 1245, 1249 (M.D. Fla. 2007). *See also Mendelson v. Great W. Bank, F.S.B.*, 712 So. 2d 1194, 1196 (Fla. Dist. Ct. App. 1998) ("[t]o effect a valid conveyance of real property, a deed or other instrument must describe the property such that it is evident that a particular parcel, and not a different or unspecified one, is to be conveyed"); *Mitchell v. Thomas*, 467 So. 2d 326, 328 (Fla. Dist. Ct. App. 1985) (a deed which contains a description so vague that a surveyor would not be able to locate the land is considered a nullity); *Davis v. Hinson*, 67 So. 3d 1107, 1111 (Fla. Dist. Ct. App. 2011) (where deed lacked adequate legal description at the time of signing, it must be considered null and deemed not to have conveyed legal title). There are no statutory exceptions for this legal description requirement. Fla. Stat. § 689.02(1) provides a form of a warranty deed that expressly requires the description of the land conveyed. Fla. Stat. § 689.02(2) further provides that even governmentally-assigned "parcel identification number[s] [are] not a part of the legal description of the property otherwise set forth in

the deed and may not be used as a substitute for the legal description of the property being conveyed."

The Plaintiffs' MVC Consumer Deed purports to convey title to nothing more than arbitrary codes. Nothing in the MVC Consumer Deeds provide information about the city, county, or state where the purportedly deeded property is located and, in fact, the deeds lack any geographical description, whatsoever, as required by Florida law.  Rather, they are proprietary codes, generated by Marriott, which purport to represent "symbolic" allocations of Points, which, in turn, purport to represent non-specific, "use-rights" in an ever-changing collection of properties that make up the MVC Trust (a large percentage of which are restricted from use pursuant to *unrecorded* NOUs). The codes appear in no other public records, are not referenced in the recorded MVC Trust Memorandum (or in the unrecorded MVC Trust Agreement), or in the NOAs, or in the land records of the states where the component properties are physically located. Further, the codes do not correspond to any parcel of real property located in Orange County, Florida, the State of Florida, or in any other county, state, country, or physical location on the planet. The MVC Consumer Deeds even lack a parcel identification number which would have indicated that the Orange County Property Appraiser's Office had previously inventoried the property as Orange County real property.[31]

Defendants argues that the MVC Consumer Deeds have enough information to lead a title searcher to the MVC Trust Memorandum and then to the NOAs which identify properties continually being added to the MVC Trust. (Marriott Mem. at 18, First Amer. Mem at 11-12).  This is not true, and, it is not the law.  First, much of the MVC Trust property is restricted by unrecorded NOUs that a title searcher could never locate. Moreover, it is irrelevant whether real property exists in a general sense if a title search cannot "pinpoint" the grantee's specifically-deeded interest either

---

[31]   Notably, while the Marriott Defendants continue to argue that BI is a valid real property interest located in Orange County, the Orange County Appraiser's office has opted to not assign parcel identification number to timeshare estates.

through the actual legal description or through extrinsic evidence. *Rice*, 499 F. Supp. 2d at 1249. Here, a title search would be utterly meaningless (not to mention impossible) because the conveyed codes cannot be traced to any other publicly-available document, have no chain of title, and are incapable of being tracked for the various purposes a title search would be conducted.[32]

Whatever "use-right" is being conveyed by Marriott, it is not an interest that can be conveyed via Special Warranty Deed.[33] A surveyor's role in conducting a title search does not include figuring out what types of contractual rights are granted as to the real property. Thus, because the MVC Consumer Deed lacks the very cornerstone of a lawful deed (*i.e,* a description of real property), it is null and void.

### (ii) Marriott Lacks Legal Authority to Make Conveyances

The Florida Land Trust Act provides that a land trust must vest full equitable and legal title to trust property in the trustee. Fla. Stat. § 689.071(2)(d) and (e) (2010).  Fla. Stat. § 689.071(3) (2010), provides that:

> OWNERSHIP VESTS IN TRUSTEE.—Every conveyance, deed, mortgage, lease assignment, or other instrument heretofore or hereafter made, hereinafter referred to as the "recorded instrument," transferring any interest in real property in this state, … in which recorded instrument the person, corporation, bank, trust company, or other entity is designated "trustee" or "as trustee," … is hereby declared to have vested, in such trustee both legal and equitable title, and full rights of ownership, over the real property or interest therein, with full power and authority as granted and provided in the recorded instrument to deal in and with the property or interest therein or any part thereof; provided, the recorded instrument confers on the trustee the power and authority to protect, to conserve, to sell, to lease, to encumber, or otherwise to manage and dispose of the real property described in the recorded instrument.

---

[32]   For instance, it would be impossible to track BI subsequent to any *lis pendens* actions against other units of BI.  *See* Norton Decl., Ex. F, sample of *lis pendens* recorded against BI.

[33]   Other than perpetuating the façade of a real estate deal and allowing First American to underwrite thousands of title policies, there is no justifiable reason (or legal purpose) to convey an interest in a land trust via Special Warranty Deed. The whole purpose of a land trust is to relieve the trust beneficiaries of the formalities of real property interests and conveyances. Because legal and equitable title vests entirely in the land trust trustee, conveyances by beneficiaries within the trust are contractual matters. In fact, the Trust Agreement, § 4.1(c) No Legal or Equitable Title, specifically states that beneficiaries "shall not have any right, title, or interest in or to any portion of the legal and equitable title to the Trust Property."

Fla. Stat. § 689.071(8)(f) (2010), provides, in relevant part, that:

> An unrecorded trust agreement giving rise to a recorded instrument for a land trust may provide that one or more persons or entities have the power to direct the trustee to convey property or interests, execute a mortgage, distribute proceeds of a sale or financing, and execute documents incidental to administration of the land trust.

In order to comply with the Land Trust Act, a land trust must transfer full rights of ownership over the real property described in the deed to the trustee, together with full power as granted in the recorded deed, whether or not reference is made in the recorded deed to an unrecorded trust instrument. Further, the deed must be recorded and must give to the trustee full power and authority either to protect, conserve and to sell or to lease, or to encumber or otherwise to manage and dispose of the real property described in the deed. *Id.*[34]

It is axiomatic that one cannot convey legal title when one does not hold legal title. In the case of land trusts, once a settlor establishes the trust and conveys legal and equitable title to the trustee, the settlor relinquishes the legal authority to convey the trust property. *See Aronson v. Aronson*, 930 So. 2d 766, 769 (Fla. Dist. Ct. App. 2006). Here, Marriott is doing just that as the MVC Consumer Deeds purport to convey title from Marriott, as "Grantor," to the MVC Owners, as "Grantees." However, Marriott already conveyed legal title to First American, and in doing so Marriott relinquished its rights to convey title to any MVC Trust property.[35] Thus, as a matter of law, the MVC Consumer Deed conveyance is null and void.

---

[34] Despite the unambiguous language of the Florida Land Trust Act requiring a deed to specify that a trustee has a non-delegable authority to convey trust property, the MVC Trust Deed (from Marriott to First American) contains no such language. Further, Sec. 3.4 (b) of the MVC Trust Agreement purports to vest such authority in Marriott by providing that "[i]t shall not be required that Trustee execute, join, or otherwise consent to any mortgage with respect to any Interest or any deed of an Interest to a Beneficiary." This is an improper and unlawful provision.

[35] Alternatively, if Marriott is the actual or constructive MVC Trust trustee (with First American a mere proxy), then the MVC Trust was *void ab initio* under the doctrine of merger. The law is firmly established in Florida that a trust cannot exist where the legal and equitable interests of the trust are vested in one entity. *See Reid v. Barry*, 93 Fla. 849, 112 So. 846 (1927); *Axtell v. Coons*, 82 Fla. 158, 89 So. 419 (1921). The merger doctrine is applicable where either the entire beneficial interest passes to the trustee or

Defendants confuse the arguments by stating the MVC Product is a valid, nonspecific, multisite timeshare plan. Setting aside, for the moment, that the MVC Product is <u>not</u> a valid nonspecific multisite timeshare plan (or even a valid multisite plan), this has nothing to do with the issue of whether selling the product as a real property interest and conveying beneficial interests in a land trust by deed is legal and appropriate. It is akin to arguing that because there is a legal right to sell automobiles (as a general proposition), one can legally sell a vehicle it possesses subject to a lease (*i.e.*, a beneficial interest without title). Of course, a lessee could feasibly sell a use-right to a leased vehicle but the conveyance would give no greater interest than that held by the lessor. In essence, this is what Marriott is doing – conveying use-licenses to MVC Owners for properties for which Marriott holds the beneficial interest but disguising it as a transfer of title to real property.

For these reasons, Plaintiffs sufficiently allege that the MVC Consumer Deeds are void.

### (c) The Title Policy Coverage is Triggered (Counts II-IV)

In Counts II-IV (Compl. ¶¶ 251- 277), Plaintiffs seek a declaration that the Title Policy's coverage provisions are triggered by virtue of the fact that: (a) the MVC Consumer Deed is void; and (b) that title is encumbered by restricted use properties that are part of the MVC Trust but withheld from access by Marriott and by the Condo Declarations that the MVC Trust properties remain subject to. Fla. Stat. § 627.784 provides that "[a] title insurance policy or guarantee of title may not be issued without regard to the possible existence of adverse matters or defects of title." "As a matter of public policy a duty is imposed upon the title company to make a thorough and competent search of the record title." *Lawyers Title Ins. Corp. v. D.S.C. of Newark Enterprises, Inc.*, 544 So. 2d 1070,

---

where the legal title passes to a sole beneficiary. *See Contella v. Contella*, 559 So.2d 1217, 1218-19 (Fla. 5th DCA 1990). "The merger doctrine applies to all types of trusts, including land trusts." *In re Wells*, 259 B.R. 776, 779 (Bankr. M.D. Fla. 2001) (citing *In re Saber*, 233 B.R. at 554 (Bankr. S.D. Fla. 1999) (trustee and sole beneficiary of Florida land trust held both legal and equitable interest in land trust, and thus legal and equitable interests merged, resulting in termination of the trust under the merger doctrine, and the holder of both interests possesses fee simple ownership to the property)).

1072 (Fla. Dist. Ct. App. 1989) (citing *Shada v. Title & Trust Company of Florida*, 457 So.2d 553, 557 (Fla. 4th DCA 1984), *rev. denied*, 464 So.2d 556 (Fla.1985); *McDaniel v. Lawyers' Title Guaranty Fund*, 327 So.2d 852, 855 (Fla. 2d DCA 1976)). *See also Chicago Title Ins. Co. v. Commonwealth Forest Investment, Inc.,* 494 F. Supp. 2d 133 (M.D. Fla. 2007) (breach of duty under Fla. Stat. § 627.784 triggers policy). Declaratory relief is therefore appropriate because the specific title defects alleged in each count are covered risks under the Title Policy and the Lennens are entitled to recover the full coverage and costs.

### (i)  Count II

Under the Covered Risk provision, the Title Policy insures, *inter alia,* "[t]itle being vested other than as stated in Schedule A" Schedule A provides that the estate or interest in Land subject to coverage is:

> A timeshare estate as defined by section 721.05, Florida Statutes more fully described as:
>
> **4** Interests (numbered for administrative purposes: **H04815 & H04816 & H04817 & H04818** ) in the MVC Trust ("Trust") evidenced for administrative, assessment and ownership purposes by **1,000** Points (250 Points for each Interest), which Trust was created pursuant to and further described in that certain MVC Trust Agreement dated March 11, 2010, executed by and among First American Trust, FSB, a federal savings bank, solely as trustee of Land Trust No. 1082-0300-00, (a.k.a MVC Trust), Marriott Ownership Resorts, Inc., a Delaware corporation, and MVC Trust Owners Association, Inc., a Florida corporation not-for-profit, as such agreement may be amended and supplemented from time to time ("Trust Agreement"), a memorandum of which is recorded in Official Records Book 10015, Page 4176, Public Records of Orange County, Florida ("Trust Memorandum"). The Interests shall have a Use Year Commencement Date of **January 01, 2016** (subject to Section 3.5 of the Trust Agreement).

The First American Policy also purports to cover any "defect" in title caused by, *inter alia*: "failure of any person or Entity to have authorized a transfer or conveyance"; a document affecting Title not properly created, executed, witnessed, sealed, acknowledged, notarized, or delivered"; and "a

document not properly filed, recorded, or indexed in the Public Records." Further, the First American

Policy covers "Unmarketable Title,"

As noted above, (Count I), First American could not possibly have undertaken a

comprehensive title search on the property identified on Schedule A because: (a) there is no legal

description of real property; (b) the codes cannot be traced to any parcel of real property; and (c) no

real property exists in the interests conveyed. Of course, First American, as a party to the schem,

knew this to be the case. Further, at the time the Title Policy was issued, First American knew that

there existed a defect in title in that: (a) Marriott did not have legal title or the legal authority as

grantor; (b) the MVC Trust instruments were not properly created or executed; and (c) the MVC

Trust instruments were not properly filed, recorded, or indexed the public records. Finally, First

American was aware at the time of issuing the Title Policy that the Lennens (like every other MVC

Owner) did not acquire marketable title to any real estate.  For these reasons, coverage is triggered

under the Title Policy.

### (ii) Counts III and IV

Marriott and First American assert that the Title Policy contains exceptions for restricted use

properties (*i.e.*, properties Lennens own but cannot occupy) and the condominium declarations.

(Marriott Mem. at18-21; First Amer. Mem. at 13-17) What Marriott and First American ignore is

that the restricted use property and condominium declaration exceptions were known to Marriott and

First American but not disclosed to the Lennens at the time of closing. (Compl. ¶ 264-277) The

Lennens purchased the Title Policy on December 3, 2014, it went into effect on February 10, 2015,

and it was not delivered until May 11, 2015.

First American acknowledges it had actual knowledge of the restricted use properties but

argues that the Lennens should have known of the title defect when the Title Policy went into effect.

However, an insured's constructive knowledge is not the correct standard under the Florida law. In fact, it is the insurer's burden to "clearly set[] forth what damages are excluded from coverage under the terms of the policy." *Fayad v. Clarendon Nat. Ins. Co.*, 899 So. 2d 1082, 1086 (Fla. 2005).  "[A]n insurer may be liable for coverage not included in a written contract if its agent failed to provide it or to notify the insured that such coverage was excluded from the policy issued." *Burns v. Consol. Am. Ins. Co.*, 359 So. 2d 1203, 1207 (Fla. Dist. Ct. App. 1978).  Thus, to avoid liability for undisclosed but known title defect, the insurer has the burden of proof to show that insured had actual, express knowledge of the title defect. Constructive knowledge is not sufficient.

Under Florida law, insurance policies are "treated like a contract, and therefore ordinary contract principles govern the interpretation and construction of such a policy." *Fabricant v. Kemper Indep. Ins. Co.*, 474 F. Supp. 2d 1328, 1330 (S.D. Fla. 2007).  In Florida, "mutual assent is a prerequisite for the formation of any contract." *Kolodziej v. Mason*, 774 F.3d 736, 741 (11th Cir. 2014).  In order for a contract to be binding and enforceable, there must be "mutual assent to certain and definite contractual terms.  Without a meeting of the minds on all essential terms, no enforceable contract arises." *Matter of T & B Gen. Contracting, Inc.*, 833 F.2d 1455, 1459 (11th Cir. 1987).

Without having the opportunity to read specific terms of a contract, a plaintiff cannot be found to have had knowledge of and assented to those terms. *See Oce N. Am., Inc. v. Caputo*, 416 F. Supp. 2d 1321, 1327 (S.D. Fla. 2006). Here, the Lennens did not have the opportunity to read the insurance policy, especially the exclusions, at the time of agreeing to the contract, because they had not even received it. Because Plaintiffs were not notified in any form of the terms of the insurance contract, most notably the exclusions, Plaintiffs cannot be found to have assented to those terms.

## 2.   Fla. Stat. § 697.10 Gives Rise to an Independent Cause of Action (Count V)

In Count V (Compl. ¶¶ 278-281), Plaintiffs seek costs for bringing this action pursuant to Fla. Stat. § 697.10. This statute provides that "if the court shall find that any person has prepared an instrument which due to an inaccurate or improper legal description impairs another person's title to real property," the court may award costs, such as attorney's fees. Marriott seeks to dismiss Count V, positing that it creates no cause of action. (Marriott Mem. at 17)

Marriott cites two cases in support of its argument, *Archimbaud v. U.S. Bank Nat'l Assoc.*, 2016 WL 3099398 (M.D. Fla. June 1, 2016), and *Delk v. Bank of Amer.*, 2016 WL 70617 (M.D. Fla. Jan 6, 2016.), neither of which are particularly instructive. In *Archimbaud*, the plaintiff asserted a count under § 697.10, and then dismissed it, a factor the court notes in passing. *Id.* at \*1. In *Delk*, the court questioned whether § 697.10 imposed a duty on a foreclosing bank to correctly list a legal description when foreclosing, and, if so, whether that was *prima facie* evidence of negligence. *Id.* at \*3. The court stated it was "not yet prepared to rule as a matter law" on the question. Here, Plaintiffs assert that Fla. Stat. § 697.10 provides for an independent count, similar to a count for punitive damages, or a count for attorneys' fees, both of which are permissible. *See e.g. Ramjeawan v. Bank of Am. Corp.*, 2010 WL 1882262, at \*1, 3 (S.D. Fla. May 11, 2010) (allowing amendment to complaint to insert "counts of gross negligence and punitive damages"); *Zions First Nat. Bank v. Elibel, S.A. de C.V.*, No. 08-20382-CIV, 2009 WL 1360855, at \*3 (S.D. Fla. May 14, 2009) (supporting a claim for attorney's fees where there was a statutory basis for same). For these reasons, Count V should be sustained.

### 3.   The MVC Owners Association is Sham Entity and Breached its Fiduciary Duties as a Managing Entity (Counts VII and Count XVII)

In Count VII (Compl. ¶¶ 304-312), Plaintiffs seek declaratory relief for a determination that the MVC Trust Owner's Association is an instrumentality for Marriott to unilaterally change the terms of the timeshare plan under the auspices of independent not for profit entity. In Count XVII (Compl. ¶¶ 467-497), Plaintiffs plead that as a managing entity, the MVC Owners Association has breached its fiduciary duties.

#### (a)  Count VII

##### (i)   Because the MVC Owners Association Lacks any Indicia of Independence, it is not a Valid Managing Entity With an Existence Distinct from Marriott

Fla. Stat. § 721.13 (1)(a) permits the developer to act as a managing entity or to establish a separate entity (*e.g.*, an owners' association) to fulfill that role. However the position is constituted, Fla. Stat. § 721.13(2)(a) provides that "[t]he managing entity shall act in the capacity of a fiduciary to the purchasers of the timeshare plan." As a fiduciary, a managing entity is bound by the duty of loyalty and impartiality and must act in the best interest of beneficiaries. *See* 18 Fla. Prac., Law of Trusts § 6:1 (2012 ed.); *see also La Costa Beach Club Resort Condo. Ass'n, Inc. v. Carioti*, 37 So. 3d 303, 308 (Fla. Dist. Ct. App. 2010) (managing entities are liable for a breach of their fiduciary duties). Because the MVC Owners Association is a mere proxy, installed by Marriott to effectuate its purposes and shield itself from fiduciary liability, it must be deemed unqualified as a managing entity under Fla. Stat. § 721.13(2)(a). *See Bailey v. Leatherman,* 615 So. 2d 810, 811 (Fla. Dist. Ct. App. 1993) (fiduciary was prevented from overseeing transaction between trust and a corporate entity because the fiduciary was also the chief executive officer and substantial stockholder of the corporate entity).

Marriott correctly states that a managing entity may be a developer-operated entity and that there is no requirement for managing entity to be independent.   However, in the MVC Trust Timeshare Instruments and Public Offering Statement, there are numerous references to the rights of the MVC Owners to vote for the board of MVC Owners Association. (Compl. ¶¶ 171-184) However, the condition precedent that must be met before MVC Trust Owners are allowed to vote will never occur. (Compl. ¶¶ 171-184)

Because MVC Trust Timeshare Instruments are an illusory contract, the MVC Owners Association has vastly broader authority than any timeshare plan's managing entity or owners' association.   Here, it is clear that the MVC Owners Association has no existence separate from Marriott. As alleged in the Complaint, the MVC Owners Association operates within Marriott and shares the same principle place of business, lacks staff independent of Marriott, and had its 2012 Annual Report certified by an employee of Marriott (although it's required to be a director or officer of the MVC Owners Association). (Compl. ¶¶ 163-65) Moreover, Marriott  unilaterally makes appointments to the MVC Owners Association board which consistently include two Marriott executives and a Marriott-designee. (Compl. ¶ 168)   Further, because only two out the three members of the board is a quorum, the two Marriott executives have *de facto* power to make all decisions for MVC Owners. (Compl. ¶¶ 172-73)  It is clear from the MVC Trust Instruments that the MVC Owners Association's sole duty is to preserve Marriott's right to sell more points. Accordingly, the MVC Owners Association does not, and cannot, reasonably act as a fiduciary solely on behalf of the MVC Owners.

### (ii) The MVC Owners Association is Powerless

Marriott argues that because Fla. Stat. § 721.13(1)(a) permits a developer to serve as a managing entity, the MVC Owners Association's independence from Marriott is irrelevant. (Marriott Mem. at 23)  However, what Marriot neglects to consider is that if independence was not required of

an owners association, then the statute's provision allowing the developer to appoint an entity other than itself to be the managing entity (and thereby shifting fiduciary liability), would render the statute meaningless.[36]   Florida law, like most jurisdictions, provides that "words in a statute are not to be construed as superfluous if a reasonable construction exists that gives effect to all words." *State v. Bodden*, 877 So. 2d 680, 686 (Fla. 2004); *Corley v. United States*, 556 U.S. 303, 314 (2009) ("'[a] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant ....'").

Contrary to Marriott's position, it is clear from the statute that the appointment of a managing entity, separate from the developer, triggers specific duties and responsibilities and is not a meaningless gesture. For example, Fla. Stat. § 721.13(3) demonstrates that owners' associations, as compared with developers, acting as managing entities have unique requirements by providing that "reserves may be waived or reduced by a majority vote of those voting interests that are present, in person or by proxy, at a duly called meeting of the owners association." This provision demonstrates that when an owners' association is nominated as the managing entity, the owners gain statutory rights. *Id.* The statute has a plethora of provisions applicable solely when the managing entity is an owners association. *See* Fla. Stat. §§ 721.13(1)(a), 721.13(3), 721.13(c)(2), 721.13(c)(3), and 721.13(13). Marriott establish the MVC Owners Association as managing entity without acknowledging the implicit independence requirement that come into being with that appointment.

What is clear is that Marriott installed the MVC Owners Association to effect its own purposes to and act as a shield from fiduciary liability. However, because the MVC Owners Association delegates all of its authority to Marriott and is prevented from taking any action antagonistic to Marriott's interests, its existence is meaningless (but not for the reasons Marriott argues). (Compl. ¶ 307). In other words, by appointing the MVC Owners Association as managing

---

[36]   Managing entity has fiduciary duty to the purchaser, which by definition does not include developer.

entity, the association assumes all liabilities that arise from the breach of a fiduciary duty, but Marriott still retains all of the discretionary authority typically delegated to the managing entity. This dynamic renders the MVC Owners Association a sham entity.

### (b) The MVC Owners Association Breached its Fiduciary Duties by Acting Solely for the Benefit of Marriott (Count XVII)

Even assuming the MVC Owners Association had an existence separate from Marriott, as a managing entity, it is abundantly clear that it breached its duties under Fla. Stat. § 721.13. First, it operates at the behest of Marriott and delegates all authority to Marriott. (Compl. ¶ 473). Further, the MVC Owners Association contracted with MVC Exchange Company, a subsidiary of Marriott, requiring MVC Owners to pay arbitrary fees on transfers of BI/Points (*i.e.*, $500 per BI with $3000.00 minimum), thereby enriching Marriott, discouraging resales (and conversely encouraging Marriott sales), and causing an artificial depreciation in the sale price. (Compl. ¶ 474)  Moreover, the MVC Owners Association enters into contracts with Marriott that allow Marriott to double dip on maintenance fees. (Compl. ¶ 475) The MVC Owners Association also provides no transparency into the method or means by which expenses are calculated on Restricted Use Properties, thereby permitting Marriott to determine its own costs. (Compl. ¶ 476) Finally, there is no transparency for or representation by MVC Owners on board decisions such that self-dealing contracts are entered into routinely without any notice or process. (Compl. ¶ 477) Thus, even assuming MVC Owners Association was a valid managing entity, it has breached (and continues to breach) its fiduciary duties on a daily basis.

### 4. Marriott Disregards Requirements of Florida Condominium Act (Count VIII)

In Count VIII (Compl. ¶¶ 313-329), Plaintiffs allege the MVC Product does not comply with the Florida Condominium Act, Chapter 718. This is a prime example of a claim that Marriott has no rational defense to so, rather than construct some nonsensical argument, opts to brush off in a

footnote without analysis. (Marriott Mem. at 12, fn14). The fact is, Florida's Timeshare Act expressly incorporates Florida's Condominium Act. *See* Fla. Stat. § 721.03(2). Under Chapter 718, Marriott was required to have a recorded condominium declaration detailing the specific parcel being conveyed by unit, including a proper legal description and explanation of appurtenant beneficial interests. However, as noted herein, the MVC Product has no recorded condominium declaration and not one of the 44 Legacy Condominium Declarations mentions or recognizes the MVC Product, the MVC Trust Timeshare Plan, or any of the interests that MVC Owners purportedly have title to in the respective Legacy Timeshares. Marriott has no defense to this claim.

> **5. Counts IX-XII Allege that Marriott and First American Intentionally Exploited Roles of Escrow Agent and Timeshare Trustee Pursuant to Fla. St. § 721.08 - Giving Rise to Liability Under Florida RICO (RICO Counts I and II)**

Under Fla. Stat. § 721.08(2010), both escrow agent and the Timeshare Trustee act as fiduciaries for purchasers of a timeshare plan.[37] Both the Timeshare Trustee and escrow agent must be independent from the timeshare developer and cannot have any financial relationship with a timeshare developer other than receiving routine transactional fees in very limited contexts. The Timeshare Trustee is required to expressly accept substantial *personal* liability for any liability arising out of the breach of fiduciary duties to the purchasers *See* Fla. Stat. 721.08(2)(c)4(b)(2010) ("No transfer pursuant to this subparagraph shall become effective until the trustee accepts such transfer and the responsibilities set forth herein.") An intentional violation of the escrow agent or the Timeshare Trustee's fiduciary function to the purchaser is "is guilty of a felony of the third degree." Fla. Stat. § 721. 08(10).  Moreover, Florida legislature has proactively removed material barrier to prosecuting many white-collar crimes – proving criminal intent beyond a reasonable doubt- by

---

[37]    Fla. Stat. § 721.05(30) defines a purchaser as any person, **other than a developer,** who by means of a voluntary transfer acquires a legal or equitable interest in a timeshare plan other than as security for an obligation. Emphasis added. Legacy Owners are Interestholders as defined in Fla. Stat. § 721.05(21). On the contrary, in the MVC Trust Agreement, beneficiary includes both developer and purchasers.

providing that Timeshare Trustee's breach "is prima facie evidence of an intentional and purposeful violation of this act." *See* Fla. Stat. § 721.08(2)(c)4(b)(I), Fla. Stat. § 721.05(20) and  Fla. Stat § 721.03(7).

Finally, the Florida law expressly defines criminal violation of Fla. Stat. § 721.08 (as described in Fla. Stat. § 721.08(10)) as a racketeering activity under Florida RICO. Fla. Stat. § 895.02(1)(a)(21). Therefore, the timeshare developer, escrow agent, or the Timeshare Trustee are not only liable for punitive damages but also treble damages under Florida RICO's civil remedies, in addition to such measures as revocation of license to sell insurance or real property, revocation of right to act as a trust, dissolution, divesting of title to real property, and reorganization of business entities.[38] Based on the above, it is clear that the Florida legislature had considered those fiduciary functions to have enormous importance.

### (a) Plaintiffs Sufficiently Allege That the MVC Trust is Not a Trust Meeting Fla. Stat. § 721.08, Therefore Fla. Stat. § 721.57 Applies (Count IX)

In Count IX (Compl. ¶¶ 330-340), Plaintiffs allege that because the MVC Trust does not meet the statutory requirements of a Fla. Stat. § 721.08 trust, thus Fla. Stat. § 721.57 applies, and that Marriott failed to meet the requirement of that statute. Fla. Stat. § 721.05(34) (2010) defines a "Timeshare estate" as:

> a right to occupy a timeshare unit, coupled with a freehold estate or an estate for years with a future interest in a timeshare property or a specified portion thereof. The term shall also mean an interest in a condominium unit pursuant to s. 718.103, an interest in a cooperative unit pursuant to s. 719.103, or an interest in a trust that complies in all respects with the provisions of s. 721.08(2)(c)4., ***provided that the trust does not contain any personal property timeshare interests. A timeshare estate is a parcel of real property under the laws of this state.***

(Emphasis added). For plans sold as "multisite" timeshares, Fla. Stat. § 721.52 (2010) provides that "[t]imeshare estates **may only** be offered in a multisite timeshare plan pursuant to [Fla. Stat. §]

---

[38]   *See* Fla. Stat. § 895.05(1).

721.57." However, plans sold as **nonspecific** multisite timeshares fall outside the definition of

"timeshare estate" because interests are deemed "licenses" or "personal property":

> "Nonspecific multisite timeshare plan" means a multisite timeshare plan *containing timeshare licenses or personal property timeshare interests* … but no specific right to use any particular accommodations and facilities.

Fla. Stat. § 721.52 (2010) (emphasis added). Therefore, a multisite timeshare plan sold as a "real

property" timeshare estate, must meet the requirements for a multisite timeshare plan under Fla. Stat.

§ 721.57 (2010), which provides, in relevant part, that:

> (1) In addition to meeting all the requirements of part I, timeshare estates offered in a multisite timeshare plan must meet the requirements of subsection (2). Any offering of timeshare estates in a multisite timeshare plan *that does not comply* with these requirements *shall be deemed to be an offering of a timeshare license.*
>
> (2) The timeshare instrument of a multisite timeshare plan in which timeshare estates are offered, *other than a trust meeting the requirements of s. 721.08*, must contain or provide for all of the following matters:
>
> (a) The *purchaser will receive a timeshare estate as defined in s. 721.05 in one of the component sites of the multisite timeshare plan*. The use rights in the other component sites of the multisite timeshare plan shall be made available to the purchaser through the reservation system pursuant to the timeshare instrument.

Marriott sold the MVC Product as multisite timeshare pursuant to its "Multisite Public

Offering Statement." (*See* Norton Decl. Ex. G). For the reasons stated in the Complaint and below, it

is clear that the MVC Product does not meet the requirements for a trust under Fla. Stat. § 721.08

(namely, because Marriott and First American have violated their escrow and Timeshare Trustee

statutory duties with reckless abandon). Therefore, it must meet the requirements under Fla. Stat. §

721.57 (2010) – something it cannot do. Marriott now argues (Marriott Mem. at 16) that the MVC

Product is a "nonspecific" multisite timeshare (something that appears nowhere in any of the

initiating MVC Product timeshare instruments), but, by doing so, it both concedes that the MVC

Product is not a timeshare estate under Fla. Stat. § 721.57 (2010), and that MVC Owners acquire *at most* a "license" or "personal property" interest. Plaintiffs submit that MVC Owners did not even get this much.

### (b) First American's Multiple Roles in the MVC Product Scheme Violate the Requirement of Independence and Demonstrate how First American Breached its Statutory Duties (Counts X and XI)

In Count X (Compl. ¶¶ 341-350), Plaintiffs assert a violation of Fla. Stat. § 721.03(7)(2010), because First American is not an independent trustee. In Count XI (Compl. ¶¶ 351-380), Plaintiffs assert that First American, as trustee, breached its statutory duties under Fla. Stat. § 721.08.

Fla. Stat. § 721.05(20)(b) provides that that escrow agents *and* timeshare trustees must be independent, which is defined, in part, as:

> ***There is no financial relationship, other than the payment of fiduciary fees*** or as otherwise provided in this subsection, between the escrow agent *or* trustee and the developer, seller, or managing entity, or any officer, director, affiliate, or subsidiary thereof.

(Emphasis added).

The Timeshare Trustee is used as substitute for two things. First, the Timeshare Trustee is used in lieu of escrow agent's verification of clear title to the subject accommodations and facilities. Fla. Stat. § 721.08(2)(C)(2)(C)(III)(2010). Second, the Timeshare Trustee is used as an alternative to conveying a timeshare estate in a multisite timeshare plan pursuant to Fla. Stat. § 721.57(2010). Here, Marriott used First American as substitute for <u>both</u> requirements.[39]

An escrow agents holds 100% of the developer's proceeds from the sale of a timeshare estate *until* the escrow agent independently verifies three things. First, the escrow agent must verify that a developer has transferred valid title to a timeshare estate to the purchaser by accepting an affidavit

---

[39] In its motion (Marriott Mem. at 16), Marriott argues this point by citing to Fla. Stat. § 721.57(2010) but erroneously provides analysis of Fla. Stat. § 721.57(2015) (which does not apply). Therefore, Marriott does not rebut this claim.

that a deed was duly recorded. *See* Fla. Stat. § 721.08(2)(c)4(b). Second, the escrow agent must verify that the timeshare plan's condominium units[40] and also common areas like swimming pools are subject to the recorded timeshare instrument and are free and clear of encumbrances. *See* Fla. Stat. § 721.08(2)(C)(a)(III)(2010); Fla. Stat. § 721.08(2)(C)(2)(C)(2010); *see also*, Fla. Stat. § 721.05(5)(a). Finally, the escrow agent must verify that the specific timeshare estate has appurtenant use-rights that subject to timeshare instruments and free of encumbrances. *Id.* If the escrow agent intentionally releases the funds without these three verifications, then the escrow agent is guilty of a felony pursuant to Fla. Stat. § 721.08(2010), and, like here, liable for claims under Florida RICO.

First American does not perform any of the functions required of a Timeshare Trustee under Fla. Stat. § 721.08(2)(C)(4)(b)(IV). (Compl. ¶ 211-220, 326-346) This is no surprise considering First American's multiple roles and financial entanglements with Marriott. As alleged in the Complaint, First American exercises no independent judgment as a Timeshare Trustee, does not audit Marriott's sale of the MVC Product or Marriott's operation of the MVC Timeshare Plan, takes no steps to verify that the one-to-one ratio is being maintained, and makes no effort to verify that the specific timeshare estates purchased from Marriott actually exist and are free and clear from claims of interestholders. (Compl. ¶¶ 211-220, 342-345) Further, despite the absence of any real property interest, facially void deeds and defective title, and the lack of conformity with any of the requirements of a valid timeshare estate, First American engaged in self-dealing by continuing to write thousands of Title Policies (together with Marriott Title) on every MVC Product transaction. (Compl. ¶¶ 207, ) Similarly, as escrow agent, First American has acted criminally by allowing Marriott to withdraw the proceeds from sales of the MVC Product without requiring Marriott to submit the affidavit that closing has been completed as specifically mandated by Fla. Stat. §

---

[40]  *See* Fla. Stat. § 721.05(1), definition of accommodation includes other types of units but all accommodations of the MVC Trust Timeshare Plan are condominium units.

721.05(5)(a). (Compl. ¶¶ 357-359) These failures are only exacerbated by the fact that First American (in its capacity as title insurer) knew that the underlying sales were based on invalid conveyance and defective title. (Compl. ¶¶ 16, 258, 275, 562)

Making matters worse, Marriott (via the MVC Owners Association)agrees to indemnify First American for its acts. (Compl. ¶ 509-512) In addition to § 721.08 and Florida RICO, the Florida Trust Code specifically provides that "(1) A term of a trust relieving a trustee of liability for breach of trust is unenforceable to the extent that the term: "(a) Relieves the trustee of liability for breach of trust committed in bad faith or with reckless indifference to the purposes of the trust or the interests of the beneficiaries." Fla. Stat. § 736.1011. Florida courts have upheld exculpatory clauses, like indemnification clauses, but will not in situations where fiduciary duties have been breached. *See e.g.*, *Smith v. Boyd*, 119 Fla. 481, 161 So. 381 (1935). First American is not just recklessly, but intentionally and *criminally* taking a position antagonistic to the interests of the beneficiaries and breaching multiple statutory duties of a Timeshare Trustee.

First American argues that its multiple roles and financial dealings with Marriott do not compromise its independence and, as authority, points to Fla. Stat. § 721.05(20)(d)(4)721.13(1). (First Amer. Mem. at 17) However, Fla. Stat. § 721.05(20)(d)(4) provides that a trustee will not be deemed to lack independence "*solely*" because the "trustee performs closings for the developer or seller or issues owner's or lender's title insurance commitments or policies in connection with such closings." As alleged in the Complaint, First American acts as escrow agent *and* trustee for the MVC Product *and* as trustee for the MVC Trust, *and* partners with Marriott Title to sell title insurance on every single MVC Product sale. (Compl. ¶¶ 342-350) As an added benefit, Marriott will indemnify First American for any breaches in its role as Trustee. (Compl. ¶¶ 219-223) Based on this, it is clear

that First American's multiple roles rise to a far more sinister and complicit financial relationship in violation of the statute.

As for its escrow breaches, First American argues that Plaintiffs' claim should be dismissed because Plaintiffs do not allege that First American also failed to comply with Fla Stat. § 721.08(5), which provides an alternative means for First American to comply with escrow requirement; *i.e.*, through submitting other assurances to the Division, such as a surety bond or an irrevocable letter of credit. (First Amer. Mem at 19-21) First American is <u>wrong</u>. The plain language of Fla. Stat. § 721.08(2)(c)(2) is unambiguous in its strict escrow requirements and, as noted above failure to abide by these requirements is deemed a criminal offense. There is no alternative means to lawfully release escrow funds.

The provision that First American cites as an "alternative" is actually an entirely distinct provision relating to the *Division's* discretionary authority. Under that section, the developer (not First American) would first need make an application and the Division can determine whether the alternative approach complies sufficiently with escrow duties. It is not Plaintiffs' burden to demonstrate that Marriott did not make such an application or that the Division did not exercise its discretion. Moreover, even if those events occurred, Plaintiffs are not in a position to know whether First American submitted the assurances the Division found acceptable. This is not a matter of public record. Without discovery, there would be no way to determine what, if anything, First American presented to the Division. And, if the Division did, in fact, provide Marriott and First American with a statutory exemption, then First American should have included evidence of that with its motion to dismiss. It did not.

### (c) First American's Function as a Land Trust Trustee Does not Meet the Requirements of a Timeshare Trustee

The MVC Trust Timeshare Instrument is a non-compliant hybrid form of timeshare instruments and land trust instruments. A land trust is a specific type of trust and is only recognized in handful of states. Unlike other revocable trusts that may contain real property from other states, the Florida land trust form is not binding on the properties located in other states.[41]

Defendants attempt to obscure the significant difference between a land trust trustee and a Timeshare Trustee. First American acted as both.  As land trust trustee, First American took  title to tens of thousands of Legacy Timeshare Estates that were subject to the 44 Legacy Condominium Condo Declarations. (Compl. ¶ 546) Unlike a Timeshare Trustee that must be independent and is subject to stringent liabilities, a land trust trustee performs ministerial functions as an agent for the beneficiary, does not have to be independent, and is subject to only minimal liability. In fact land trust trustee and the beneficiary may be the same person, provided there are additional beneficiaries.[42]

Further, land trust agreements are not recorded.  Therefore, although the land trust _form_ is binding to the third parties, the terms contained in the trust agreement are only binding on the parties to the agreement.[43] Therefore, while timeshare estate once created may be transferred to a land trust,

---

[41]   Marriott confuses a land trust trustee analysis with Timeshare Trustee. (Marriott Mem. at 14) Fla. Stat. § 689.071(3) (2010) expressly provided that a Florida land trust may only contain Florida property, and allows only "transferring any interest in real property in this state." As a result of Marriott lobbying efforts, Fla. Stat. § 689.071(2013) removed the language enabling Marriott to securitize mortgages on MVC Trust Product. Notwithstanding, even in its present form, Fla. Stat. § 689.071 does not bind other states' real properties (nor could it).

[42]   A circumstance that could raise issues of merger. _See Contella,_ 559 So.2d at 1218-19.

[43]   _See Lawyers Title Guaranty Fund v. Koch and Leavitt_, 397 so. 2d 455 (1981) where the court held that terms of the unrecorded trust agreement are only binding to the parties to the agreements. Therefore, court found that to subject third parties to the terms, the entire trust agreement must be recorded and then incorporating the trust agreement in the recorded mortgage.

timeshare instruments cannot be created with unrecorded land trust instruments to meet the requirements of Chapter 721

### 6. Plaintiffs Need not Allege That Nights Were Unavailable to Assert a One-to-One Rule Violation on Form (Count XIII)

In Count XIII (Compl. ¶¶ 388-422), Plaintiffs allege that the MVC Product violates the One-to-One Rule codified by Fla. Stat. § 721.03(10).[44]  That section provides that "[a] developer or seller may not offer any number of timeshare interests that would cause the total number of timeshare interests offered to exceed a one-to-one use right to use night requirement ratio." *Id.* Fla. Stat. § 721.05(25), explains that the One-to-One Rule means:

> that the sum of the nights that owners are entitled to use in a given 12-month period shall not exceed the number of nights available for use by those owners during the same 12-month period. No individual timeshare unit may be counted as providing more than 365 use nights per 12-month period or more than 366 use nights per 12-month period that includes February 29. The use rights of each owner shall be counted without regard to whether the owner's use rights have been suspended for failure to pay assessments or otherwise.

Simply put, the One-to-One Rule protects consumers from timeshare developers such, as Marriott, from selling more timeshare interests than are actually available, and is a requirement of every timeshare interest.

As described in considerable detail in the Complaint, through the process of deeding interests and recording NOAs, the MVC Trust is made of up an ever-changing inventory of thousands of Legacy Timeshare Estates (each of which is subject to another Condo Declaration and subject to a separate set of one-to-one ratio requirements) (Compl. ¶¶ 96, 389-422). Of course not all of the properties in the MVC Trust are available to MVC Owners – a large percentage remain "restricted" from  use -- only those for which NOU have been delivered to the MVC Owners Association. (Compl. ¶¶ 426-435). MVC Owners, in turn, are deeded BI/Points representing fractional interest in

---

[44]    As described more fully below, Marriott impermissibly attempts to lump Count XIII and Count XIV together.

that corpus of non-restricted MVC Trust properties – an interest that remains in a constant state of "recalibration" as properties are added, NOU delivered, BI/Points are added, and as MVC Ownership numbers go up (or down). (Compl. ¶¶ 24-25, 107-113).

Marriott argues that its "Recalibration" formula adequately achieves the one-to-one ratio described in Fla. Stat. § 721.05(25). (Marriott Mem. at 7-8) However, Marriott cites no authority for this premise and the statute is unambiguous as to the precision necessary for calculating the unit limitations to prevent overselling – it is not an aspirational requirement. Based on the MVC Product's configuration, because the supply can never be determined or maintained in any comprehensible manner and because the one-to-one ratio can never be reconciled with the overlapping Legacy Timeshare Estates (and their coextensive one-to-one ratio requirements, the MVC Product could never and will never meet the requirements of Fla. Stat. § 721.05(25).

Marriott argues erroneously that in order to state claim arising out of a One-to-One Rule violation, Plaintiffs must "allege one instance where his/her timeshare interest could not be used pursuant to the terms of his/her purchase contract." (Marriott Mem. at 28) In support of this position, Marriott cites to *Abramson v. Marriott Ownership Resorts, Inc.*, 155 F.Supp. 3d 1056 (C.D. Cal. Jan 4, 2016); *Reiser v. Marriott Vacations Worldwide Corp.*, 2016 WL 1720741 (E.D. Cal. Apr. 29, 2016,) and *Flynn v. [MORI]*, 165 F.Supp.3d 955 (D. Haw. Feb. 29, 2016).  However, each of these cases in inapposite.

In *Abramson,* the court criticized Plaintiffs for alleging only that "their right to reserve was 'impaired,'" and that Marriott's point system left them with "units that were not the quality they requested." *Id.* at 155 F. Supp. 1065. Contrary to Marriott's assertion, the court did not hold that a plaintiff was required to assert he was unable to reserve a unit; rather, the language Marriott points to comes from the defendants briefing in *Abramson. Id.* ("Defendants state the problem succinctly. 'The

One-to-One Rule does not address the quality of units; it prohibits selling more units than are available…[T]he SAC…fails to identify a single instance where Plaintiffs tried to reserve a unit during their designated times but were unable to do so.").

Moreover, both *Abramson* and *Reiser* dealt with violations of California's One-to-One Rule – not Florida. The California rule requires that plaintiffs allege that "the total number of purchasers eligible to use the accommodations of a timeshare plan during a given calendar year [exceeded] the total number of accommodations available for use." *Reiser* at *7, *citing* Cal. Bus. & Prof. Code § 11250. California's One-to-One Rule is *ex post facto*, only coming into effect once units are purchased that exceed the number of accommodations available. In that situation, a plaintiff would likely need to allege that a unit is unavailable in order to state a valid claim.

Florida's One-to-One Rule is different. It states that "[a] developer or seller **may not offer** any number of timeshare interests that would cause the total number of timeshare interest offered to exceed a one-to-one use right to use night requirement ratio. Fla. Stat. § 721.03(10) (emphasis added), The Florida Rule is *ex-ante*, and focuses on when the timeshare units go on sale, not when they are purchased. As Plaintiffs describe above, the MVC Product could not and can never meet that requirement.

*Flynn* is similarly unhelpful. There, the court noted that the plaintiffs were only able to assert difficulty in reserving nights, and that they alleged only a difficulty in reserving a room. *Id.* at 976-977. The court required the plaintiffs in that action to provide more support, and held that it was "possible for Plaintiffs to Amend the Complaint to cure this defect."[45] *Id.* Here, as described above, Plaintiffs have been able to meet the Florida statute's facial requirement that Marriott offered for sale timeshare interests that necessarily exceed the one-to-one ratio.

---

[45] From the docket in that action, it appears that the Plaintiffs later dismissed their action with prejudice, before an amended complaint was ruled on by the court.

Finally, the MVC Owners Association's claim that Plaintiffs' allegations within Count XIII are insufficient to hold it liable, fails to address Fla. Stat. § 721.13(2), which provides for joint and several liability for a managing entity and a managing company to the purchaser of a timeshare plan for breaches of fiduciary duty. The together with Marriott, the MVC Owners Association was required to ensure compliance with the One-to-One Rule. Accordingly, Count XIII should not be dismissed.

### 7. Count XIV Alleges That Marriott Failed to Properly add Property to a Multisite Timeshare Plan

In Count XIV (Compl. ¶¶ 423-435), Plaintiffs allege that failed to fulfill its statutory duty to avoid adding properties to a timeshare plan in a way that would harm the interests of purchasers. Fla. Stat. § 721.552(1)(b). the procedure employed by Marriott's to add Legacy Timeshare Estates to the MVC Trust (*i.e.*, through NOA with restricted use properties held back until an unrecorded NOU is provided to the MVC Owners Association at when Marriott so decides it wants to) does not comply with this duty.  Restricting access to any Legacy Timeshare Estates in the MVC Product unfairly and unreasonably increases competition among MVC Owners. Indeed, while the proportion of BI/Points (and thereby MVC Owners) increases as Marriott adds Legacy Timeshare Estates (including restricted-use properties) to the MVC Product, availability of unrestricted properties decreases as more MVC Owners vie for reservations for those units. It appears Marriott has no defense for this claim but it elected not to address it. Therefore, Count VIX should be sustained.

### 8. The Properties in the MVC Product Cannot Be Governed by the Legacy Condominium Association and the MVC Owners Association Simultaneously (Count XV)

In Count XV (Compl. ¶¶ 436-453) Plaintiffs allege that the MVC Owners Association was improperly designated as the managing entity of the timeshare plan. Fla. Stat. § 721.13(1)(a) provides that:

For each timeshare plan, the developer shall provide for a managing entity, which shall be either the developer, a separate manager or management firm, or an owners' association. ***Any owners' association shall be created prior to the first closing of the sale of a timeshare interest.***

As described in the Complaint, there are 44 Legacy Timeshare Estates that have placed units in the MVC Product. (Comp. ¶ 446) These condominiums were created before the creation of the MVC Product and are governed by owners' associations that were created as part of the timeshare plans when they were first established. (Compl. ¶¶ 444-446)

Now, the MVC Owners Association purports to govern the interests of ten of thousands of Legacy Timeshare Estates that were previously (and continue to be) governed by their respective owners' associations.  For this reason, the MVC Owners Association cannot legally exercise any dominion over the Legacy Timeshare Estates in the MVC Trust. Not only does this appoint violate the statute but it harms Legacy Owners whose interests are being interfered with.

As described in the Complaint (Compl. ¶ 450), Legacy Owners have enforceable property ownership rights to under the terms of the respective Condo Declarations which delineate the governing and operation of the owner's association at their particular Legacy Condominium.  As a result, the MVC Owners Association infringes on their rights of proportional voting and representation, rights to be governed by a representative owners' association, and rights appurtenant to their fractional ownership interests in the Legacy Condominiums.

### 9. Plaintiffs' Sufficiently Assert that the MVC Owners Association Breached its Fiduciary Duties by Failing to Appropriately Apportion Common Expenses (Count XVI)

In Count XVI (Compl. ¶¶ 454-466), Plaintiffs assert that the MVC Owners Association incorrectly apportioned common expenses between Marriott and the MVC Trust Owners, and seeks a refund of excess fees following an accounting.  Fla. Stat. § 721.15(a) requires that the MVC Owners Association must calculate the annual common expenses using the same formula for unsold

property as it applies to MVC Product Owners. As described in the MVC Trust Agreement, common expenses charged to the MVC Product Owners, do not exclude expenses attributable to the restricted use properties in the MVC Trust. *See* MVC Trust Agreement, Ex. B, § 2.15, Norton Decl., Ex. H.

The MVC Owners Association calculates the total common expenses owed for the entirety of the properties within the MVC Product, and then determines as part of an opaque and never-disclosed process how much it will apply to the restricted use properties, which Marriott then purportedly covers, and which are not included in the common expenses apportioned to the MVC Product Owners. Facially, this is suspect, for as described above, the MVC Owners Association is not an independent entity, but is totally beholden to Marriott and Marriott's pecuniary interests. In addition, the MVC Owners Association itself confirms that instead of a "precise formula" for calculating the Restricted Properties portion of common expenses, it is only able to use "a commercially reasonable method for making such allocations as determined to be equitable by the [MVC Owners Association] and in the [MVC Owners Association]'s sole discretion." *Id.* This does not comply with Fla. Stat. § 721.15(a). If the MVC Owners Association is able to use a precise formula to determine the MVC Owner's portion of the common expenses, it is required to use the same expense formula on all properties within the MVC Product (both restricted and unrestricted).

### 10. Marriott was Required to Maintain a Separate Reservation System for the Legacy Owners (Count XVIII)

In Count XVIII (Compl. ¶¶ 480-495), Plaintiffs assert that Marriott and the MVC Owners Association have put in place a reservation system that requires Legacy Owners and MVC Owners to compete with each other and owners of various Marriott properties, in violation of Florida law. Fla. Stat. § 721.56 requires Marriott to provide a distinct reservation that allows Plaintiffs and Legacy Owners "to use and enjoy the accommodations and facilities of the plan."     As described in the complaint, the reservation system that existed in 2012 was subsumed within a larger reservation

system, known as the MVC Exchange Program, run by one of Marriott's subsidiaries that combined three distinct timeshare plans within a single reservation program. (Compl. ¶¶486-487)  The MVC Owners Association may very well be correct when it states that "the Trust Reservation System and the MVC Exchange Program operate concurrently" (TOA Mem. at 15), but this is beside the point. Plaintiffs claim is that they now have to compete, in a purportedly "voluntary" system, that requires them to compete for reservations with other owners of various Marriott products, such as Ritz Carleton Legacy owners.[46]

### C. Marriott International is a Proper Party to This Action Because it was the Primary Architect of MVC Trust Timeshare Plan

Marriott argues for dismissal of claims against Marriott International (Marriott Mem. at 34-35), yet it provided no conceivable basis to do so, especially those causes of action that arose out of the creation of MVC Trust Timeshare Plan.  Marriott's entire basis for dismissing Marriott International is that a parent company is not liable for the actions of its fully-owned subsidiaries without piercing its corporate veil. (Marriott Mem. at 34-35)  However, Marriott did not make the same argument to request dismissing the actions against the parent company, Marriott Vacations. In any event, Marriott's argument is not responsive to the allegations in Complaint that assert direct claims against Marriott International for its role as creating developer pursuant to Fla. Stat. § 721.05(10).

As detailed in punitive damages allegations in the Complaint, Marriott International took proactive steps to create MVC Trust Timeshare Plan. (Compl. ¶¶ 542-599) Marriott International effectuated legislative appropriate changes in 2008, obtained declaratory statements from both federal and state tax authorities, acquired resale Legacy Timeshare Estates, drafted MVC Trust

---

[46]   The MVC Owners Association, on behalf of the Plaintiffs and the Subclass, "voluntarily" transferred them into the Exchange Program.

Timeshare Instruments, created the structure of the MVC Trust Timeshare Plan in collaboration with First American, obtained approval of timeshare agencies in 50 states and obtained the cooperation from Orange County Comptroller's Office to record and index tens of thousands of fraudulent property instruments. (Compl. ¶¶ 542-599) Marriott International fully implemented every aspect of the MVC Trust Timeshare Plan for two full years prior to its September 2012 spin-off of its timeshare division to Marriott Vacations. (Compl. ¶¶ 542-599).

By first committing fraud by running an elaborate scam and subsequently spinning off its subsidiaries, Marriott International was able to shed its perpetually money-losing timeshare division while generating new source of revenue from lucrative licensing agreement with Marriott Vacations and profits from hotel rentals exchanged for destination points. However, under Fla. Stat. § 721.05(10), there are no legitimate grounds for Marriott International to now to seek immunity for injuries that directly arose out of its fraudulent conduct regardless of the terms of the spin-off agreement.

Neither the Lennens nor any other MVC Owners were parties to the spin-off agreement. Therefore, corporate agreements or use of corporate form does not supersede Fla. Stat. § 721.05(10)(e) that clearly expresses legislative intent to prevent a timeshare developer from using corporate devises to evade liability. Under Fla. Stat. § 721.05(10)(e), any transfer that is effectuated to intentionally defraud the purchaser is a fraudulent transfer. Marriott International is liable for long-standing obligations owed to Legacy Owners to operate its timeshare plan according to the original terms and the injuries caused to MVC Owners for running a scam to sell nonexistent real property parcel.

As alleged in Complaint, Marriott International and its subsidiaries is a creating developer under Fla. Stat. § 721.05(10)(a) and Marriott Vacations and its subsidiaries is a successor developer

under Fla. Stat. § 721.05(10)(b). Therefore, Marriott Vacations are only liable for their actions

subsequent to the 2012 spin-off under Fla. Stat. § 721.05(10)(e), which provides that:

> A successor or concurrent developer shall be exempt from any liability inuring to a
> predecessor or concurrent developer of the same timeshare plan, except as provided
> in s. 721.15(7)

Accordingly, Marriott International is the predecessor developer would be only liable for the actions

of its own subsidiaries that occurred prior to 2012 spin-off.

In the alternative, Marriott international's transfer of MVC Trust Timeshare Plan to Marriott

Vacations is fraudulent under Fla. Stat. § 721.05(10)(e)(1) for defrauding the purchasers or is a

fraudulent transfer if Marriott Vacations is an insider pursuant to Fla. Stat. 726.102. *See* Fla. Stat. §

721.05(10)(e)(2).

### D.  Plaintiffs Sufficiently Pleads Florida RICO Violations

Florida RICO was patterned after the Federal RICO Act and Florida courts often look to

Federal RICO decisions for guidance in interpreting and applying the Act. *See Florida Software

Systems, Inc. v. Columbia HCA Healthcare Corp.*, 46 F.Supp.2d 1276 (M.D. Fla. 1999). The analysis

applied to claims under the Federal RICO Act is equally applicable to claims under Florida's RICO

statute. *Jackson v. Bellsouth Telecomms.*, 372 F.3d 1250 (11th Cir. 2004).

A plaintiff can establish a RICO conspiracy claim in one of two ways: (1) by showing that

the defendant agreed to the overall objective of the conspiracy; or (2) by showing that the defendant

agreed to commit two predicate acts. *United States v. Church,* 955 F.2d 688, 694 (11th Cir. 1992)

(internal quotations and citations omitted), *cert. denied,* 506 U.S. 881 (1992); *United States v.

Kopituk,* 690 F.2d 1289, 1323 (11th Cir.1982) (noting that it is sufficient that defendant knows the

"essential nature of the plan") (citations omitted), *cert. denied,* 461 U.S. 928 (1983).

Plaintiffs sufficiently allege facts allowing for the reasonable inference that Defendants

Marriott and First American had an agreement to commit the predicate acts described below.  Stated

differently, Plaintiffs sufficiently allege facts to demonstrate (or at the very least infer) that First American and Marriott were willing participants in the alleged conspiracy. Nothing more is required. *See e.g., Republic of Pan. v. BCCI Holdings (Luxembourg) S.A.*, 119 F.3d 935, 950-951 (11th Cir. 1997) (recognizing that allegations that "defendants were aware of the 'essential nature of the plan'" would be sufficient for purposes of alleging that defendants knowingly agreed to participate in the RICO conspiracy). Finally, a party may be liable for a RICO conspiracy even if it is not liable for the substantive RICO offense. *See, e.g., Salinas v. United States*, 522 U.S. 52, 62-64 (1997); *United States v. Shenberg*, 89 F.3d 1461, 1479 (11th Cir. 1996).

Defendants argue that dismissal of Plaintiffs' Florida RICO claims is warranted because: (1) Plaintiffs allege no facts from which an agreement between them to act "in the manner described in the Complaint could be inferred"; and (2) Plaintiffs have failed to sufficiently allege the RICO Defendants "improperly released escrow funds or improperly transferred property to a trust" in violation of § 721.08, and therefore Plaintiffs' RICO claims fail because Plaintiffs "have not (and cannot) validly allege any predicate crime."[47]  (Marriott Mem. at 33-34; First Amer. Mem. at 24-25)

---

[47]  In passing, Defendant First American raises a red herring that Plaintiffs' allegations regarding '"fraudulent affidavits" implicates, but cannot satisfy Rule 9(b)'s heightened pleading standard." First American's argument fails for three reasons.  First, it fails to articulate precisely how and why (other than through "implication") Plaintiffs' RICO Count 1 should be subject to Rule 9(b)'s heightened pleading requirement.  Second, First American fails to argue (or even articulate) how Rule 9(b) has not been satisfied by Plaintiffs.  Naked reference to Rule 9(b) certainly cannot be sufficient to warrant dismissal.  However, even if it was, Plaintiffs have sufficiently described the nature of Defendants' offenses to survive 9(b) scrutiny, which is intended to simply alert the defendants to the precise misconduct with which they are charged.  And finally, Rule 9(b) pleading standards to not apply to claims of RICO conspiracy.  *Angermeir v. Cohen*, 14 F. Supp. 3d 134, 145 (S.D.N.Y. 2014) ("Rule 9(b), notably, does not govern allegations of . . . RICO conspiracy, which [is] subject only to the more liberal notice-pleading requirements of Rule 8."); *Rose v. Bartle*, 871 F.2d 331, 366 (3d Cir. 1989) ("Allegations of conspiracy are not measured under the . . . . [Fed. R. Civ. P.] 9(b) standard, which requires greater particularity of allegation of fraud, but are measured under the more liberal . . . [Fed. R. Civ. P. 8(a)] pleading standard"); *Planned Parenthood v. Am. Coalition of Life Activists*, 945 F. Supp. 1355, 1385  (D. Or. 1996) ("Plaintiffs have met their initial pleading burden by providing fair notice to Defendants of their RICO conspiracy against Defendants.")

Defendants' attacks on the sufficiency of Plaintiffs' allegations should be swiftly rejected. Plaintiffs have described in great detail the conspiracy, the identity of the co-conspirators, the object and purpose of the conspiracy, the manner in which the conspiracy was carried out, the date the conspiratorial agreement began, and quantify the tens of thousands of times that the predicate acts were committed over the course of several years.  (Compl.  ¶¶ 86-141, 161-223, 506-528, 531-539).

Further, as fully explained herein, Plaintiffs have sufficiently alleged how First American and Marriott violated, Fla. Stat. § 721.08 (*i.e.*, committed the requisite predicate acts) tens of thousands of times over and that First American and Marriott either had improper intent when committing the predicate acts outlined in the complaint or, at a minimum, knew that the money involved in these transactions was derived from unlawful activity. At this stage of this proceeding, nothing more is required of Plaintiffs to sufficiently allege viable RICO conspiracy claims and therefore First American's and Marriott's motions to dismiss those counts must be denied.  *See e.g., Coquina Invs. v. Rothstein*, Case No. 10-60786, 2011 WL 2530945 *15-16, (S.D. Fla. Jan. 20, 2011) (denying motion to dismiss RICO conspiracy claims after inferring the existence of RICO conspiracy in light of specific allegations of two fraudulent letters and other evidence that defendants either agreed to the overall objective of the conspiracy, or at least agreed to commit two predicate acts); *Florida Software* at 1284 (M.D. Fla. 1999) (denying motion to dismiss claim of RICO conspiracy after finding that the complaint sets forth facts, that, if proven, demonstrate that the defendant agreed to the overall objective (to defraud) and that he agreed to commit at least two predicate acts).

### E.  Plaintiffs Sufficiently Pleads a Claim for Punitive Damages

Although Plaintiffs' claim for punitive damages is incorrectly fashioned as a RICO count, they are entitled to punitive damages for their claims under Fla. Stat. § 721.08, in addition to treble

damages under Florida RICO. There is nothing that would prohibit Plaintiffs from seeking, pleading entitlement to, or obtaining both types of damages in this case should they prevail on the merits.

First, Fla. Stat. § 721.21 specifically states that "[r]elief under this section does not exclude other remedies provided by law." Second, Fla. Stat. § 768.721(1) provides an independent basis for Plaintiffs to seek an award of punitive damages here upon a "reasonable showing by evidence in the record or proffered." Third, Defendants have not cited a statute or decision (because none exists) that would prohibit Plaintiffs here from obtaining: (1) an award of treble damages pursuant to the alleged Florida RICO violations and; (2) an independent award of punitive damages founded on and pursuant to Fla. Stat. §§ 721.08, 721.21, and 768.721.[48]  Finally, Chapter 768, Florida Statutes merely requires a "reasonable showing" that demonstrates a "reasonable basis for recovery of such damages." § 768.72(1) Fla. Stat.; *see also 2BBG Express, LLC v. Quality Distrib.*, No. 8:16-CV-758, 2016 WL 6211712, *8 (M.D. Fla. Oct. 24, 2016) (recognizing that the "Eleventh Circuit has unequivocally held that the pleading requirements of Section 768.72 do not apply in diversity actions, due to a conflict with Rule 8(a)(3) of the Federal Rules of Civil Procedure."), citing *Cohen v. Office Depot, Inc.*, 204. F.3d 1069, 1072 (11th Cir. 2000). Accordingly, there is no basis to dismiss Plaintiffs' claim for punitive (and treble) damages.

## F. Plaintiffs' Complaint Satisfies Federal Rules of Civil Procedure 8 and 10

Rule 8(a)(2) of the Federal Rules of Civil Procedure requires "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Rule 10(b) merely requires that Plaintiffs state their claims in numbered paragraphs, "each limited as far as practicable to a single set of circumstances." Fed. R. Civ. P. 10(b). These pleading requirements are not

---

[48]  In order to eliminate any confusion on Defendants' part regarding the nature, basis, or statutory justification for Plaintiffs' request for an award of both punitive and treble damages in this matter, "Florida RICO Count III" can simply be renamed as "Claim for Punitive and Treble Damages." An amendment for this ministerial measure seems unnecessary.

demanding, are not intended to impose insurmountable pleading hurdles on litigants, and do not impose page and paragraph limitations.   Rather, the overarching goal of the notice pleading requirements embodied in these Rules of Civil Procedure is to simply provide defendants with adequate notice of the nature of the claims against them and the grounds upon which each claim rests.   Quite simply, these rules are designed to prevent defendants from being ambushed into defending allegations and claims that mask the real relief sought by plaintiffs by ensuring that defendants are adequately apprised of the charges that have been levied against them and the facts supporting such allegations.

Defendants improperly invoke Rules 8 and 10 and attack the complaint as being an impermissible "shotgun pleading."   Truth be told, Defendants' real argument is that the Complaint is too long, accuses them of too many wrongs, and impermissibly incorporates preceding allegations. Complaints spanning 100 pages or more are certainly not uncommon in complex class actions. Regrettably, this case is far from typical.   Indeed, this case does not involve a garden-variety breach of contract action or a simple tort.   On the contrary, Defendants orchestrated a complex scheme (over a number of years), which relied on a series of "convoluted and patently illegal transactions" that caused Defendants to reap millions of dollars of revenues and profits at the expense of thousands of innocent consumers.

The complaint is long, and contains 21 Counts asserted against multiple parties, because Defendants' improper course of conduct was intricate, complex, took place over a number of years, and violated numerous duties, statutes, and common law principles along the way.   If anything, Defendants have only themselves to blame for the length of the Complaint as it is not the result of overzealous pleading, but a reflection of the complex, multi-faceted scheme orchestrated and implemented by them.

And so, charged with the task of illustrating Defendants' improprieties, Plaintiffs filed a complaint that:   (1) is organized into discrete sections; (2) contains consecutively numbered paragraphs and a table of contents to direct the reader; (3) is replete with informative headings preceding the discrete sections; (4) cites the applicable statutory sections Defendants ignored or violated; and (5) lists the separate and distinct counts upon which they are seeking relief. Consequently, Defendants' hollow cry of impermissible "shotgun pleading" must be rejected.  *See ANZ Advanced Techs., LLC v. Bush Hog, LLC*, Civil Action No. 09-00228-KD-N, 2009 WL 3415650 (S.D. Ala. Oct 20, 2009) (Finding that "[d]espite Defendants' protestations to the contrary, Plaintiffs' Second Amended Complaint is not a 'shotgun' complaint defying efforts to formulate a reasonable response. Plaintiffs have adequately set forth each 'discrete claim' in a 'separate count' as required by Rule 10(b). There is no question which plaintiff is bringing which claim against which defendant. Nor can it be said that any one of the factual allegations is irrelevant to any of Plaintiffs' specific claims."); *United States v. Crumb*, Civil Action 15-0655, 2016 WL 4480690 *28, 29 (S.D. Ala. Aug. 24, 2016) (Rejecting claim of "shotgun pleading" after recognizing that a "complaint's incorporation by reference in each count of all preceding paragraphs may be a disfavored drafting technique; however, for better or worse, it is also an altogether commonplace convention in pleadings filed in federal court. . . If the mere utilization of such an unwelcome-but-pervasive pleading device mandated that a complaint be jettisoned as a shotgun pleading, then precious few civil pleadings would survive").

Defendants refer to, and rely on, inapposite decisions that do nothing to further their cause. *See e.g., Magluta v. Samples*, 256 F.3d 1282, 1284 (11th Cir. 2001) (ordering repleading as the complaint was "replete with allegations that 'the defendants' engaged in certain conduct, making no distinction among the fourteen defendants charged, though geographic and temporal realities make

plain that all of the defendants could not have participated in every act complained of" and filled with "innumerable pages of rambling irrelevancies"); *Jones v. Moore*, Case No. 07-21154, 2008 WL 384557 (S.D. Fla. Feb. 11, 2008) (dismissing complaint and allowing leave to amend after finding that pro se plaintiff asserting civil rights claims composed a complaint with allegations that "[n]o competent lawyer, whether skilled in § 1983 claims or not, could compose an answer to" and raised "approximately 450 distinct civil rights violations", presented "scores of allegations regardless of their relevance, and reiterates them in their entirety into several counts asserting discrete claims for relief, each of which contains references to haphazardly described constitutional 'rights'"); *Johnson Enterprises of Jacksonville, Inc. v. FPL Grp., Inc.*, 162 F.3d 1290, 1333 (11th Cir. 1998) (finding complaint in case described by the trial court as a "simple little breach of contract case [that has become] a monumental federal litigation" led to a 15 claim lawsuit "alleging violations of federal and state criminal statutes and Florida tort law, in addition to breach of contract"); *Sprint Solutions, Inc. v. Cell Xchange, Inc.*, 49 F. Supp. 3d 1074 (M.D. Fla. 2014) (Opinion by Magistrate Judge Porcelli denying defendants' motion for protective order and temporary stay of discovery).

Further, Defendants fail to inform the Court that the Eleventh Circuit has stated repeatedly that a dismissal under Rules 8(a)(2) and 10(b) is warranted if "it is <u>virtually impossible</u> to know which allegations of fact are intended to support which claim(s) for relief." *Weiland v. Palm Beach County Sheriff's Office*, 792 F.3d 1313, 1326 (11th Cir. 2015) (finding the District Court abused its discretion when it dismissed counts on the grounds that they did not comply with Rules 8(a)(2) and 10(b)), citing *Anderson v. District Bd. Of Trustees of Cent. Fla. Community College*, 77 F.3d 364, (366 (11th Cir. 1996); *Beckwith v. Bellsouth Telecommunications Inc.*, 146 F. App'x 368, 372 (11th Cir. 2005) (A pleading fails to conform to the federal pleading standard when "it is virtually

impossible to ascertain what factual allegations correspond with each claim and which claim is directed at which defendant.")

Despite Defendants' protests of impermissible "shotgun pleading", Plaintiffs' Complaint complies with Rules 8 and 10, sufficiently puts Defendants on notice as to the nature of their claims and the grounds upon which each claim rests, and easily passes the pleading standards set forth by the Eleventh Circuit.[49]

## VI.  CONCLUSION

For the foregoing reasons, the motions to dismiss of the Marriott Defendants, the First American Defendants, and the MVC Owners Association should be denied. If the Court, if the Court deems Plaintiffs' allegations, as to any of all of these Defendants, deficient in whole or in part, Plaintiffs respectfully seek leave to amend.

DATED: November 10, 2016

Respectfully submitted,

**NEWMAN FERRARA LLP**

By:   */s/ Jeffrey M. Norton*
Jeffrey M. Norton, *Pro Hac Vice*
1250 Broadway, 27th Fl.
New York, NY 10001
(212) 619-5400
jnorton@nfllp.com

---

[49]   Defendant MVC Owners Association asserts that the drastic remedy of dismissal of the Complaint is warranted because of a claimed "inconsistency" in Plaintiffs' definition of "Marriott" found in the introduction of the complaint and paragraph 45.   MVC Owners Association argues that it "cannot properly respond to those Counts without knowing how 'Marriott' is being defined."   Initially, it is important to note that Defendant Marriott did not find Plaintiffs' definition and use of "Marriott" to be problematic.  Further, the use of "Marriott" and "MVC Owners Association" throughout the Complaint, and in particular in paragraphs 44 – 49 should have provided the MVC Owners Association with the definitional guidance it seeks and should have informed MVC Owners Association that Defendant Marriott Vacations Worldwide, Inc. was referred throughout the complaint as "MVC."  All told, the MVC Owners Association's argument that dismissal of the Complaint is warranted because of Plaintiffs' failure to insert "MVC" after "Defendant Marriott Vacations Worldwide, Inc." should be swiftly rejected.

**THE POLASZEK LAW FIRM, PLLC**
Christopher S. Polaszek
3407 W. Kennedy Blvd.
Tampa, FL 33609
(813) 574-7678
chris@polaszeklaw.com

**Soomi Kim, Esq.**
Soomi Kim, *Pro Hac Vice*
2400 South College Drive,
High Point, NC  27260
soomiwork@gmail.com

*Counsel for Plaintiffs*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on November 10, 2016, I electronically filed the foregoing with the Clerk

of the Court by using the CM/ECF system.

<u>  */s/ Jeffrey M. Norton*  </u>
Jeffrey M. Norton

- 61 -