## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA

ANTHONY LENNEN and BETH LENNEN, Individually and on behalf of all others similarly situated,

               Plaintiffs,

      v.

MARRIOTT OWNERSHIP RESORTS, INC., MARRIOTT RESORTS HOSPITALITY CORPORATION, MARRIOTT RESORTS, TRAVEL COMPANY, INC. (d/b/a MVC EXCHANGE COMPANY), MVC TRUST OWNERS ASSOCIATION, INC., MARRIOTT RESORTS TITLE COMPANY, INC., FIRST AMERICAN FINANCIAL CORPORATION, FIRST AMERICAN TRUST, FSB, FIRST AMERICAN TITLE INSURANCE COMPANY, and ORANGE COUNTY FLORIDA,

               Defendants.

CASE NO.: 6:16-cv-00855-CEM-TBS

**AMENDED CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

DATED: October 25, 2017

**NEWMAN FERRARA LLP**
1250 Broadway, 27th Fl.
New York, NY 10001

**THE POLASZEK LAW FIRM, PLLC**
3407 W. Kennedy Blvd.
Tampa, FL 33609

**SOOMI KIM, ESQ.**
2400 South College Drive
High Point, NC  27260

**TABLE OF CONTENTS**

*Page No.*

I.  INTRODUCTION ............................................................................1

II. SUMMARY OF THE ACTION .......................................................1

III. PARTIES ........................................................................................4

    A.  *Plaintiffs* ................................................................................4

    B.  *Defendants* .............................................................................6

IV. JURISDICTION AND VENUE .......................................................9

V.  STATEMENT OF FACTS .............................................................12

    A.  *Overview* ..............................................................................12

        *(i)   MVC Trust: A Scheme is Hatched* .............................12

        *(ii)  MVC Trust: Not Your Parents' Timeshare* ...............16

        *(iii) MVC Trust: The Spoils* ..............................................20

    B.  *Legacy Timeshare Condominiums, Legacy Timeshare Estates & Condo Declarations* ..........................................................21

    C.  *The MVC Trust Scheme* ......................................................22

    D.  *BI Defies Valuation as a Real Property Interest* .................27

    E.  *Marriott's Proxy: MVCTOA* ...............................................29

VI. APPLICABLE LAW .....................................................................32

VII. CAUSES OF ACTION ..................................................................35

    **COUNT I:** For Declaratory Relief: MVC Trust Consumer Deed is Void Because no Real Property Interest is Conveyed ..........................................35

    **COUNT II:** For Declaratory Relief : MVC Trust Consumer Deed is Void Because Marriott, as "Grantor," Lacks the Legal Capacity to Convey Trust Property ..........................................37

**COUNT III:** For Declaratory Relief: First American Title Policy
Coverage Triggered Due to Defects in Title, Encumbrances, and
Defective Right to Occupy MVC Trust Properties ................................................ 39

**COUNT IV:** For Negligence: Orange County Breached its Official
Duties by Improperly Recording and Indexing MVC Trust
Instruments and Collecting Transfer Tax ............................................................ 42

**COUNT V:** For Violating Fla. Stat. § 718: MVC Trust Fails to
Comply with Requirements of the Florida Condominium Act ............................. 47

**COUNT VI:** For Violating Fla. Stat. § 721.57: The MVC Trust is
Not a Valid Multisite Timeshare Estate .............................................................. 50

**PREAMBLE FOR COUNTS VII and VIII:** Marriott and First
American Violated Fla. Stat. § 721.08 (2010) by Intentionally
Exploiting the Roles of the Escrow Agent and Timeshare Trustee ..................... 52

**COUNT VII:** For Violating Fla. Stat. §§ 721.08 and 721.03(7) (2010):
First American Lacks Independence in its Roles as Timeshare Trustee
and Escrow Agent ................................................................................................ 54

**COUNT VIII:** For Violating Fla. Stat. § 721.08(2)(c)(4) (2010):
Marriott's Unlawful Efforts to Effect Transfer of Accommodations
and Facilities to the MVC Trust .......................................................................... 59

**COUNT IX:** For Violating Fla. Stat. § 721.03(10): MVC Trust Defies
Compliance with Statutory One-to-One Nightly-Use Ratio ................................ 60

**COUNT X:** For Violating Fla. Stat. § 721.552(3)(b): Adding Legacy
Timeshare Estates to the MVC Trust by NOA Violates the
Requirements of a Multistate Timeshare Plan ..................................................... 65

**COUNT XI:** For Violating Fla. Stat. § 721.13(1): As a Proxy for
Marriott, MVCTOA Lacks any Indicia of Independence, is an
Improper Managing Entity, and Breached its Fiduciary Duty to the
MVC Trust Owners ............................................................................................... 67

**COUNT XII:** For Violating Fla. Stat. § 721.15: Marriott and the
MVCTOA Unfairly Assess and Collect Common Expenses ................................ 72

**COUNT XIII:** For Violating Fla. Stat. § 721.56: Marriott Failed to
Provide and Maintain a Separate Reservation System for MVC Trust
Owners and Legacy Owners ................................................................................. 75

**PREAMBLE TO FLORIDA RICO CLAIMS** ..................................................77

**FLORIDA RICO COUNT I:** Marriott and First American Conspired to Unlawfully Withdraw Proceeds from Escrow ....................................................78

**FLORIDA RICO COUNT II:** Marriott and First American Conspired to Establish an Unlawful Trust ............................................................81

**CLAIM FOR PUNITIVE DAMAGES:** Entitlement to Punitive Damages Pursuant to Fla. Stat. § 721.21 and Fla. Stat. § 768.72 ............................... 83

**VIII.  CLASS ALLEGATIONS** ........................................................95

    *A.  Class Definition* ..................................................95

    *B.  Numerosity* ..........................................................97

    *C.  Existence and Predominance of Common Questions of Law and Fact* .................98

    *D.  Adequacy of Representation* .................................................100

    *E.  Superiority* ..........................................................100

    *F.  Manageability* .......................................................101

**IX.  PRAYER FOR RELIEF** ...........................................................102

**X.  DEMAND FOR JURY TRIAL** ....................................................104

**XI.  GLOSSARY OF DEFINED TERMS** ..............................................106

**XII.  LIST OF EXHIBITS** ...........................................................111

iii

## I.    __INTRODUCTION__

Plaintiffs Anthony Lennen and Beth Lennen ("Plaintiffs" or the "Lennens"), by their undersigned counsel, bring this Amended Class Action Complaint for violations of the Florida Vacation and Timeshare Act, Fla. Stat. § 721.01, *et seq.*, Florida Condominium Act, Fla. Stat. 718.01, *et seq.*, the Florida Racketeer Influenced and Corrupt Organization Act ("Florida RICO"), Fla. Stat. § 895.01, *et seq.,* for common law claims of negligence and breach of fiduciary duty, and for declaratory and injunctive relief.

Plaintiffs' claims are asserted against Marriott Ownership Resorts, Inc., Marriott Resorts Hospitality Corporation, Marriott Resorts, Travel Company, Inc. (d/b/a MVC Exchange Company), MVC Trust Owners Association, Inc., Marriott Resorts Title Company, Inc., First American Financial Corporation, First American Trust, FSB, First American Title Insurance Company, and Orange County Florida (collectively, "Defendants" unless identified individually or by later-defined grouping).

Plaintiffs' allegations are based upon knowledge as to their own acts, and upon information and belief as to all other matters.  Plaintiffs' information and belief is based upon, among other things, investigation undertaken by their attorneys, review of documents and information in their possession and documents and information available publicly.

## II.    __SUMMARY OF THE ACTION__

This action involves allegations that Marriott and First American, with the aid of other named Defendants, and through a series of patently-illegal transactions, created, sold, and continue to sell, a points-based timeshare product known as the "MVC Trust."[1]  In sum, the

---

[1]    For ease of reference, all defined terms appear in the Glossary of Defined Terms (the "Glossary"), at Section XII, *infra.* To the extent the definitions contained in the Glossary are more fulsome than those appearing in the body of the Amended Complaint, the Glossary definitions shall control and be deemed incorporated by reference.

MVC Trust scheme involves a series of intentionally-complex and unlawful transactions used to mask a rather simple construct; *i.e.*, create and sell an unlimited supply of contractual use-rights made to look like real property timeshares.

By deconstructing how the MVC Trust was created, marketed, sold, and administered, Plaintiffs can demonstrate that, despite being disguised cleverly with the trappings of a complex real estate transaction, the MVC Trust, in fact, conveys no real property interest whatsoever. At most, the MVC Trust amounts to a common membership awards program where points are currency for reserving certain Marriott-owned properties. Indeed, even the Internal Revenue Service has come to the obvious conclusion that the MVC Trust conveys an economic right, rather than real property ownership.

The cunning of packaging the MVC Trust as a real property timeshare transaction – as opposed to a membership awards program – allows Marriott to charge a hefty premium for the product and shift its own real property costs to purchasers. The MVC Trust scheme also makes it possible for Marriott to create and sell an unlimited supply of supposed timeshare interests, manipulate the value of those interests, and operate without any accountability or regard to statutorily-mandated inventory controls. The MVC Trust scheme also allows Marriott to retain 100% ownership and control of MVC Trust properties and creates massive profit-making opportunities for all Defendants that would not otherwise exist – including administrative fees, closing costs, recording fees, transfer taxes, maintenance, assessments, and title insurance premiums.

The linchpin of the MVC Trust scheme is the "MVC Trust Consumer Deed," the recorded instrument that purports to convey a deeded interest in real property from Marriott to MVC Trust purchasers ("MVC Trust Owners"). Plaintiffs will demonstrate, however, why the

MVC Consumer Deed is a worthless instrument for a number of reasons, including the fact that: (a) the deed is void as it lacks a legal description of any real property interest; and (b) Marriott lacks the capacity to convey legal title to properties held in a trust. While there are numerous claims asserted herein (any one of which invalidates the form of the MVC Trust), the fact remains that, once the MVC Trust Consumer Deed is shown to be null and void, not one element of the MVC Trust can withstand scrutiny.

While Defendants have profited greatly from sales of the MVC Trust, MVC Trust Owners and those owning traditional, week-based timeshare estates in various Marriott resorts around the country("Legacy Owners"), have suffered (and continue to suffer) harm. For one, while MVC Trust Owners never actually obtain the real property interests that are purportedly conveyed, they were (and continue to be) shouldered with all the financial burdens as if a real property conveyance had been made. Moreover, MVC Trust Owners continue to suffer harm as a result of owning an unmarketable use-right and remaining subject to Marriott's opaque and discretionary point-valuation process, which results in significant dilution and lacks any reliable metric for tracking their so-called beneficial interests. Additionally, Marriott's unfettered process of adding timeshare interests to the MVC Trust (while restricting access to many of those properties), increases costs for MVC Trust Owners without providing any corresponding benefit.

For their part, Legacy Owners suffer harm due to the fact that the MVC Trust is layered surreptitiously over their pre-existing (and *actual*) real property interests (*i.e.*, "Legacy Timeshare Estates"). Indeed, the MVC Trust contains tens of thousands of Marriott-owned Legacy Timeshare Estates, located in 44 resorts ("Legacy Timeshare Condominiums"), in eleven different states. These so-called "Component Sites" of the MVC Trust are all subject to different Condo Declarations, condominium associations, state laws, and Legacy Owner use-rights and

3

voting rights – all of which are scrubbed through the MVC Trust scheme. As a result, Legacy Owners are subject to diminution in property values, restriction of use in their home resort properties, usurpation of rights, infringement and dilution of ownership interests, and increased competition for reservations.

At bottom, the MVC Trust is a total and complete scam. While new parcels of real property can form as a result of major geologic events and land reclamation projects, ***real property does not arise from a membership point***. Nevertheless, that is precisely what Marriott has attempted to do through the MVC Trust. As alleged herein, from its inception to the present day, those involved in the creation and administration of the MVC Trust, as well as those who have enabled its ongoing operation, have violated numerous aspects of Florida statutory and common law and have caused (and continue to cause) significant harm to both MVC Trust Owners and Legacy Owners. This action seeks to dismantle the MVC Trust Program and remedy those violations.

### III.    PARTIES

#### A. *Plaintiffs*

1.      Plaintiffs Anthony Lennen and Beth Lennen are citizens of the State of Indiana, residing in Shelbyville, Indiana. The Lennens are both Legacy Owners and MVC Trust Owners.

2.      On January 24, 2008, the Lennens purchased from Marriott two Legacy Timeshare Estates in Crystal Shores – a Legacy Timeshare Condominium located in Marco Island, Florida.

3.      As part of the transaction, Marriott conveyed to the Lennens a deed legally describing the two weeks and two separate Crystal Shores Legacy Timeshare Estates. Their deed,

which is recorded and can be located in the official land records of Collier County, Florida,

describes the Legacy Timeshare Estates as follows:

> Unit 503/Week 34 and Unit 507/Week 21, in Crystal Shores Condominiums fee simple absolute in a condominium parcel and undivided interest in the common elements is subject to the Declaration of Condominium as recorded in Official Records Book 4246 at Page 3299 in the Public Records of Collier County, Florida.

*See* Lennens' Crystal Shores Legacy Timeshare Estate Deed, attached as Exhibit A.

4.      First American issued a title policy to the Lennens for two Legacy Timeshare

Estates in Crystal Shores which insured against any title defect in the property, legally described

as:

> Unit Week 34 & 507/21, , in Unit 503, of Crystal Shores Condominium, together with an undivided interest in the common elements appurtenant thereto, according to the Declaration of Condominium thereof recorded in Official Record Book 4246, Page 3299, Public Records of Collier County, Florida together with any amendments thereto.

*See* First American Title Policy on Lennens' Crystal Shores Legacy Timeshare Estates,

attached hereto as Exhibit B, Schedule A.

5.      On January 14, 2015, the Lennens purchased from Marriott four beneficial

interest ("BI") units of MVC Trust. Their deed, which is recorded in the official land records of

the Orange County, Florida, describes the interests as follows:

> 4 Interests (numbered for administrative purposes: H04815 & H04816 & H04817 & H04818 ) in the MVC Trust ("Trust") evidenced for administrative, assessment and ownership purposes by 1,000 Points (250 Points for each Interest), which Trust was created pursuant to and further described in that certain MVC Trust Agreement dated March 11, 2010, executed by and among First American Trust, FSB, a federal savings bank, solely as trustee of Land Trust No. 1082-0300-00, (a.k.a MVC Trust), Marriott Ownership Resorts, Inc., a Delaware corporation, and MVC Trust Owners Association, Inc., a Florida corporation not-for-profit, as such agreement may be amended and supplemented from time to time ("Trust Agreement"), a memorandum of which is recorded in Official Records Book 10015, Page 4176, Public Records of Orange County, Florida ("Trust Memorandum"). The Interests shall have a Use Year Commencement Date of January 01, 2016 (subject to Section 3.5 of the Trust Agreement).

5

*See* Lennens' MVC Trust Consumer Deed, attached as Exhibit C; *see also* MVC Trust Purchase Agreement, attached as Exhibit D, p. 1.

6.      In addition to the purchase price for four BI units in the MVC Trust, the Lennens paid closing costs, recording fees, and Florida transfer tax.

7.      In connection with their MVC Trust purchase, the Lennens purchased a title insurance policy from through Marriott Title and First American Title, which was underwritten and issued by First American Title. *See* First American Title Policy on Lennens' MVC Trust, attached hereto as Exhibit E.

8.      While the coverage date of the First American policy is indicated as February 10, 2015, First American did not actually deliver the Title Policy to the Lennens until May 11, 2015. The First American policy purports to cover the interests identified in the Lennens' MVC Trust Consumer Deed. *Id.*

### B. Defendants

9.      Defendant Marriott Ownership Resorts, Inc. ("MORI") is a Delaware corporation with its principal place of business located at 6649 Westwood Boulevard, Orlando, Florida 32821.

10.     MORI is chief architect of the MVC Trust, as well as the "developer," as that term is defined by Fla. Stat. § 721.05, a signatory to the MVC Trust Agreement, a beneficial/equitable owner of all MVC Trust property, and "Grantor" on all MVC Trust Consumer Deeds.

11.     Defendant Marriott Resorts Hospitality Corporation, Inc. ("Marriott Hospitality Co."), a wholly-owned subsidiary of MORI, is a South Carolina corporation with its principal place of business located at 6649 Westwood Boulevard, Orlando, Florida 32821.

6

12.     Marriott Hospitality Co. acted as an agent for MORI on all MVC Trust Consumer Deeds and performed the function of "management firm" for the MVC Trust as defined in Fla. Stat. § 721.13.

13.     Defendant Marriott Resorts, Travel Company, Inc. (d/b/a MVC Exchange Company) ("MVC Exchange Company"), a wholly-owned subsidiary of MORI, is a Delaware corporation with its principal place of business located at 6649 Westwood Boulevard, Orlando, Florida 32821.

14.     MVC Exchange Company performed the function of an "exchange company" for the MVC Trust as defined in Fla. Stat. § 721.05(15). MVC Exchange Company operates the MVC Exchange Program, a reservation system used by MVC Trust Owners, Legacy Owners, and others.

15.     Defendant Marriott Resorts Title Company, Inc. ("Marriott Title"), a wholly-owned subsidiary of MORI, is a Delaware corporation with its principal place of business located at 1200 Bartow Road, Suite 10, Lakeland, Florida 33801.

16.     Marriott Title prepared the MVC Trust Consumer Deeds, the MVC Trust Purchase Agreements, acted as the "authorized representative" of MORI to effect recording of MVC Trust Consumer Deeds, and sold title insurance policies, in conjunction with and underwritten by First American Title Insurance Company, to MVC Trust Owners.

17.     Unless identified separately, MORI, and its wholly-owned subsidiaries, Marriott Hospitality Co., MVC Exchange Company, and Marriott Title, are referred to collectively as "Marriott."

18.     Defendant MVC Trust Owners Association, Inc. ("MVCTOA") is a Florida not-for-profit corporation with its principal place of business located at 6649 Westwood Boulevard,

Orlando, Florida 32821. MVCTOA is the "managing entity" of the MVC Trust as defined in Fla. Stat. § 721.05(22). MVCTOA is a signatory to the MVC Trust Agreement.

19.     Defendant First American Financial Corporation ("First American Corp.") is a Delaware corporation with its principal place of business located at 1 First American Way, Santa Ana, California 92707.

20.     First American Corp. was the co-architect of the MVC Trust with Marriott. Directly and through its wholly-owned subsidiaries (Defendants First American Trust and First American Title), First American Corp. carried out the MVC Trust scheme with Marriott.

21.     First American Trust, FSB ("First American Trust"), a wholly-owned subsidiary of First American Corp., is a federal savings bank with its principal place of business located at 5 First American Way, Santa Ana, California 92707.

22.     First American Trust served (and serves) as the MVC Trust land trust trustee, timeshare trustee, and escrow agent on all MVC Trust purchases. First American Trust holds legal title to all properties in the MVC Trust and is a signatory to the MVC Trust Agreement.

23.     Defendant First American Title Company ("First American Title"), a wholly-owned subsidiary of First American Corp., is a Nebraska corporation with its principal place of business located at 1 First American Way, Santa Ana, California 92707.

24.     First American Title provides title insurance coverage for all MVC Trust Consumer Deeds, and, together with Marriott Title, sold (and continues to sell) title insurance policies to MVC Trust Owners. Additionally, First American Title provides title insurance coverage for most Legacy Timeshare deeds, and together with Marriott Title, sold (and continues to sell) title insurance policies to Legacy Owners.

25.     Unless identified separately, First American Corp., and its wholly-owned subsidiaries, First American Trust and First American Title, are referred to collectively as "First American."

26.     Defendant Orange County Florida ("Orange County") is a political subdivision of the State of Florida with its primary base of operations located in Orlando, Florida.

27.     As a governmental entity, Orange County is responsible for fulfilling the duties and obligations under the laws of Orange County and the laws of the State of Florida as they pertain to Orange County, including recording, indexing, and maintaining documents relating to real property in the public land records, and collecting taxes and fees related to real property transactions within Orange County.

28.     Directly and through its agencies, including the Office of the Orange County Comptroller and the Orange County Property Appraiser's Office, Orange County recorded and indexed MVC Trust instruments and collected transfer tax on MVC Trust purchases.

## IV.     <u>JURISDICTION AND VENUE</u>

29.     This Court has diversity subject-matter jurisdiction over this class action pursuant to the Class Action Fairness Act of 2005, Pub. L. No. 109-2 Stat. 4 ("CAFA"), which, *inter alia*, amended 28 U.S.C. § 1332, with new subsection (d), conferring federal jurisdiction over class actions where, as here: (a) there are 100 or more members in the proposed Class; (b) at least some members of the proposed Class have a different citizenship from the Defendants; and (c) the claims of the proposed Class members exceed the sum or value of five million dollars ($5,000,000) in the aggregate. *See* 28 U.S.C. § 1332(d)(2).

30.     This Court has personal jurisdiction over the Plaintiffs because they submit to the jurisdiction of the Court.

31.     This Court has personal jurisdiction over MORI, and its subsidiaries, Marriott Title, MVC Exchange, and Marriott Hospitality Co., because they are headquartered in the State of Florida, transact business within the State of Florida, and systematically and continually conduct business throughout the State of Florida.

32.     This Court has personal jurisdiction over MVCTOA because it is incorporated and headquartered in the State of Florida, and systematically and continually conducts business within the State of Florida.

33.     This Court has personal jurisdiction over First American Corp. and its subsidiaries, First American Trust and First American Title, because they have extensive business dealings and transactions within the State of Florida and in this district.

34.     Venue is proper under 28 U.S.C. §1391(b)(3), because a substantial part of the events giving rise to the claims against First American Corp. and its subsidiaries, First American Trust and First American Title, occurred in this district, and a substantial part of property that is the subject of the action (*i.e.*, the MVC Trust), is located in this district.

35.     Furthermore, First American Trust, MVCTOA, and MORI are parties to the MVC Trust Agreement and the amendments thereto which provide this Court as the exclusive venue for any actions to be brought in federal court pertaining to the subject-matter.

36.     As a municipality located in the State of Florida, this Court has personal jurisdiction over Orange County.

37.     Further, Plaintiffs have fully complied with the pre-suit notice provisions of Fla. Stat. § 768.28(6)(a) with regard to Orange County. In particular:

(a) on August 16, 2016, via email with subject line "Lennen, et al v. Marriott Ownership Resorts, Inc., et al: NOTICE OF CLAIM PURSUANT TO FL.

STAT. § 768.28(6)(a)," Plaintiffs, through counsel, notified the Florida Department of Financial Services ("DFS") about the nature of the action and claims against Orange County;

(b) by letter of August 25, 2016, Plaintiffs, through counsel, sent a "NOTICE Pursuant to Fla. Stat. 768.28(6)(a)," to Orange County, care of its legal counsel, Dean, Ringers, Morgan & Lawton, P.A.;

(c) on January 5, 2017, Plaintiffs' counsel followed up with DFS via electronic mail on the §768.28(6)(a) notice and confirming DFS's receipt of the same;

(d) on January 5, 2017, Plaintiffs' counsel received confirmation via electronic mail from DFS indicating that claim was received and that nothing further was needed from Plaintiffs;

(e) on January 5, 2017, Plaintiffs' counsel followed up with Orange County's counsel via electronic mail on the §768.28(6)(a) notice, inquiring "whether [Orange County] intend[s] to respond to the notice sent … on August 25, 2016" and whether "there is any reason [Orange County] deems [the] notice not to be in compliance with § 768.28 FS";

(f) on January 13, 2017, counsel for Orange County responded via electronic mail, stating "We do not intend to respond"; and

(g) assuming the January 13, 2017, electronic mail response was not a clear denial of claim from Orange County, because it has been more than six months since notice was given, denial shall be deemed to have occurred.

38.    Venue is proper under 28 U.S.C. §1391 (b)(3) because Marriott, the MVC Trust Owners Association, and Orange County are residents of this judicial district.

11

V.   **STATEMENT OF FACTS**

A.  *Overview*

(i)   *MVC Trust: A Scheme is Hatched*

39.      With the real estate market collapse in 2008, Marriott found itself in possession of a rapidly increasing inventory of unsold and foreclosed Legacy Timeshare Estates held in Legacy Timeshare Condominiums throughout the country.

40.      Unfortunately for Marriott, most of its re-acquired inventory consisted of Legacy Timeshare Estates that came with use-rights to low demand weeks. Consumers had little interest in owning these timeshares and thus they had marginal resale value.  Similarly, the rental income from these properties was insufficient to cover the carrying costs (*i.e.*, maintenance costs and fees).

41.      By 2010, Marriott's timeshare division (MORI) had been steadily losing money. In an effort to reverse course, Marriott conceived of repackaging its corporately-held inventory of Legacy Timeshare Estates into a points-based, multisite timeshare program. This would allow Marriott to combine its use-rights for both low-demand and high-demand properties into a single plan and sell use-rights as collective points.

42.      While other timeshare companies have successfully launched points-based, multisite timeshare plans, from the outset, Marriott's plan was different and not at all feasible.

43.      First, because there was no legal way to force approximately 400,000 Legacy Owners to convert their ownership of single-site timeshare estates to points-based, multisite-timeshare estates, Marriott would need to devise a timeshare plan that would overlap but operate separately and independently from the pre-existing Legacy Timeshare Condominiums where the Marriott's Legacy Timeshare Estates were physically located.

12

44.     Second, because each of those Legacy Timeshare Estates and Legacy Timeshare Condominiums were already subject to separate governing Condo Declarations (which would each need to be amended with Legacy Owner approval in order to account for a conflicting, points-based, multisite timeshare plan), Marriott would need to devise a way to circumvent the Condo Declarations and subvert Legacy Owner consent.

45.     In order to further the scheme, Marriott tapped its long-time business partner First American. Together, they devised a plan that would allow them to overcome the glaring (indeed, insurmountable) legal obstacles, obscure the truth, and avoid legal scrutiny. Essentially, the scheme involved selectively borrowing attributes from both Florida timeshare law and Florida land trust law to create a sufficiently-complex and facially-plausible latticework. The product: a new points-based, multisite timeshare product, marketed as a Florida land trust interest and a Florida timeshare estate.

46.     The MVC Trust would use a Florida land trust construct whereby Marriott would deed legal title to its corporately-held Legacy Timeshare Estates to First American, as trustee (regardless of whether they were Florida properties or out-of-state properties), and Marriott would maintain beneficial ownership and control of the Legacy Timeshare Estates while selling off use-rights to those properties as separate timeshare estates.

47.     In actuality, the MVC Trust is neither a timeshare estate nor a beneficiary interest in a land trust. But that was beside the point. The land trust form provided ideal cover for the MVC Trust scheme.

48.     Indeed, the land trust form was critical because the entire purpose of a land trust is to conceal the true property ownership interests by only requiring recorded deeds to identify the holder of legal title (*i.e.*, that which is held by the trustee). Unrecorded beneficial interests in a

land trust are considered personal property rights, subject to unrecorded contractual agreements between the trustee and the beneficiary and/or among the beneficiaries.[2]

49.   The secrecy of the land trust form thus allowed Marriott and First American to: (a) sidestep the need to amend and reconcile the respective Condo Declarations in the 44 Component Sites – each one of which prohibits partition of ownership interests without amendment; (b) circumvent an event that would trigger Legacy Owners' voting rights in each of the Component Sites; (c) scrub the Legacy Timeshare Estates in the MVC Trust of the encumbrances (*i.e.*, the Component Site Condo Declarations) and claims of interestholders (*i.e.*, Legacy Owners) in the use-rights and accommodations in the MVC Trust; and (d) conceal conflicts and lack of compliance with the property, timeshare, and condominium laws of 11 different states.

50.   The land trust form was a nearly-ideal vehicle for concealing Marriott's and First American's racketeering scheme. Under Florida RICO, any type of collusion between a timeshare trustee and a timeshare developer to pass defective title of a timeshare interest to a purchaser is deemed *per se* racketeering activity. In fact, Florida RICO specifically incorporates Fla. Stat. § 721.08 by reference and defines it a felonious act.

51.   In this case, Marriott attempted to conflate First American's role as a land trust trustee and timeshare trustee in order to avoid the strict requirements (and penalties) associated with a timeshare trustee under Fla. Stat. 721.08. However, these roles cannot function interchangeably as difference between them is significant.

---

[2]   For an interesting exposition on land trusts, one need look no further than First American's General Counsel, John Murray, who, in 2010 when the MVC Trust came to be, published a practitioner's guide on land trusts, entitled "The Use of Land Trusts and Business Trusts in Real Estate Transactions." *See* Exhibit F. Therein, Mr. Murray makes the point that "[t]he land trust has attained its popularity and wide use because of the practical elements that the beneficial interest provides [including that] the interests of the beneficiaries will not be disclosed without order of court[,] the interests are not subject to partition[, and] ***the beneficial interest is personal property***." *Id.* (Sec. III(A)) (emphasis added).

52.     Whereas a timeshare trustee essentially serves a regulatory function of independent oversight for the protection of the timeshare's purchasers, a land trust trustee is required only to follow the direction of the land trust beneficiary. By generally identifying First American a trustee, Marriott endeavored to evade the strict requirements (and severe penalties) of Fla. Stat. § 721.08.

53.     Marriott also used First American's function as land trust trustee to eliminate the independent oversight function of an escrow agent required under Fla. Stat. § 721.08.

54.     Without the mandatory oversight of an independent trustee and/or escrow agent to ensure that valid title is passed to purchasers, there was nothing to prevent Marriott from selling phony deeded interests to MVC Trust purchasers.

55.     Marriott and First American's scam also relied on the willingness (or indifference) of Orange County to completely disregard the recording laws or any of its internal policies. In this sense, Orange County was instrumental in creating and perpetuating the MVC Trust scheme because it would blindly record and index whatever instrument Marriott presented and do so in the manner Marriott directed.

56.     For instance, since its inception in 2010, Marriott has deeded tens of thousands of its corporately-owned, Legacy Timeshare Estates to the MVC Trust, and memorialized the transfer using a dubious instrument called a "Notice of Addition" ("NOA").

57.     NOAs are instruments that identify properties Marriott has deeded to the MVC Trust and purport to summarize the point value that Marriott has assigned to those properties. Orange County accepts these instruments for recording and indexing despite the fact that they are a Marriott creation, made specifically for the MVC Trust, and are not recognized instruments under Florida law. *See* sample NOA, dated August 16, 2017, attached as Exhibit G.

15

58.     Critically, properties included in NOAs are *not* made available to MVC Trust Owners and remain "restricted use" (meaning they remain unavailable to MVC Trust Owners) until such time as Marriott, in its discretion, decides to make them available by delivering a Notice of Use Right ("NOU") to the MVC Trust managing entity, MVCTOA (a Marriott-controlled construct), and the land trust trustee, First American Trust. *See* sample NOU, dated July 16. 2016, attached as Exhibit H.

59.     The NOUs are *not* recorded in the public land records of Orange County and *not* made available in any public filing.

60.     Orange County also accepts for recording the MVC Trust Consumer Deeds despite the fact that the instruments contain no legal description of any parcel of real property (let alone any real property located in Orange County), and purport a conveyance of MVC Trust property that Marriott cannot legally convey by deed as a trust beneficiary – a fact which is readily apparent from the equally improperly recorded "Trust Memorandum." *See* Trust Memorandum, attached as Exhibit I.

61.     The Trust Memorandum is a recorded document which purports to summarize the material terms of the formal (but unrecorded) MVC Trust Agreement, does not provide any reference or description of deeded BI codes, and refers to other unrecorded timeshare instruments for the MVC Trust that can neither be searched nor located in any public database.

### *(ii)    MVC Trust: Not Your Parents' Timeshare*

62.     With traditional timeshares (*e.g.*, Legacy Timeshare Estates), purchasers are conveyed a deeded, fractional ownership interest in a condominium unit partitioned by weeks in a year (*e.g.*, 1/52), coupled with a use-license in the accommodations of the resort where the condominium is located. This is called a single-site timeshare estate.

63.     In the recent years, multisite timeshare estates gained in popularity. In timeshare plans involving multisite timeshare estates, a developer conveys a fractional ownership interest in a single timeshare unit but with a right to use multiple timeshare condominiums. In these multisite timeshare plans, the use-license is represented by points. *See* sample deed for multisite timeshare estate, created pursuant to Fla. Stat. § 721, offered by Disney Vacation Development, Inc., attached as Exhibit J.

64.     Of course, there are other types of points-based programs that are used in connection with reserving resort accommodations which are neither tethered to real property interests nor subject to terms of use that run with the land.  However, these are contractual use rights as opposed to timeshare estates. Awards membership programs, for example, fall within this category. In fact, these types of awards programs are not regulated by the Florida Timeshare Act (Fla. Stat. § 721) at all.

65.     The MVC Trust is different in that it attempts to transform what is clearly a contractual use right into a deeded real property timeshare estate. However, by any reading of the provisions of Fla Stat. § 721, the interests conveyed in the MVC Trust are not a timeshare estates.

66.     Among other things, a timeshare estate (of any kind) must restrict the use-rights of a timeshare unit to 365 days for each calendar year. A timeshare plan that fails to comply with this requirement is not a valid timeshare estate. The MVC Trust does not (nor can it feasibly) restrict use-rights of MVC Trust properties to 365 days a year.

67.     Despite conveying nothing more than contractual use rights, the MVC Trust is disguised as property interest through the meaningless execution of instruments that mimic a real property transaction.

68.     For instance, although MVC Trust purchasers obtain a "deed" (*i.e.*, the "MVC Trust Consumer Deed") from Marriot, which is then recorded in the public land records of Orange County, Florida, the deeds are, in fact, a ruse to further the illusion of a real property transaction. For a number of reasons, the MVC Trust Consumer Deeds are worthless, facially defective, and void. *See* Exhibit C.

69.     First, the MVC Trust Consumer Deeds lack any legal description identifying a parcel of real property anywhere in Orange County, the State of Florida, or any other state or location on the planet. Valid real property deeds require a legal description of a traceable parcel of real property; *i.e.*, property that can be located by a surveyor or title searcher. *Id.*

70.     Despite purporting to convey a beneficial interest in real property contained in a land trust, the MVC Consumer Deeds do not identify any particular interest or parcel in the MVC Trust. Instead, where a legal description should appear in the MVC Consumer Deed, Marriott inserts a proprietary alphanumeric code (or codes) representing a unitized allotment of points (*i.e.*, "BI"). However, BI:

(a) is a term made up by Marriott that has no legal significance;

(b) like an awards program, serves as nothing more than contractual currency to reserve certain Marriott-owned accommodations in the MVC Trust;

(c) can be created and sold by Marriott in a unlimited supply;

(d) is subject to discretionary valuation by Marriott;

(e) can be terminated at the will of Marriott;

(f) does not represent any specific or proportional interest in the MVC Trust properties;

(g) defies any rational means of valuation or ascertainment of proportional ownership; and

(h) cannot be surveyed, searched, or found in any public land record. *Id.*

71.     If the MVC Trust were to cease to exist, the contractual rights embodied in the MVC Trust Consumer Deeds would simply evaporate while the Legacy Timeshare Estates therein would revert to Marriott ownership. This fact alone eviscerates the "real property" premise of the MVC Trust.

72.     Because points unitized as BI are not a real property interest, the MVC Trust Consumer Deed serves no legal purpose other than to trick the grantee into believing real property has been conveyed.

73.     Furthermore, because the MVC Trust is based on a land trust construct, all legal title in the land trust property is vested in the trustee (*i.e.,* First American) while equitable ownership lies with the beneficiary (*i.e.*, Marriott). Therefore, if MVC Trust Owners were, in fact, obtaining some portion of Marriott's beneficial interest in the MVC Trust, it would be a personal property right, subject to a private contract – not a recorded deed.[3]

74.     And, even if there was a real property interest to convey through a deed (and there is not), the MVC Trust Consumer Deeds would nonetheless be void because they are issued by the land trust beneficiary, Marriott, rather than the holder of legal title, First American. By law, Marriott is without authority to convey any real property interest in the MVC Trust.

75.     Moreover, if MVC Trust property was actually deeded to anyone, it would necessarily come out of the MVC Trust because: (a) the trustee (First American Trust) would be required to make the conveyance; and (b) once the conveyance was made, the trustee would no longer hold legal title to the property.

---

[3]     *See* fn 2, *surpa*.

76. To date, Marriott has sold (and continues to sell) the MVC Trust product to hundreds of thousands of purchasers, including the Plaintiffs.

77. Purportedly, the more points MVC Trust Owners have, the greater access they have to reserve units at Legacy Timeshare Condominiums (including units in their own home resort that became inaccessible when Marriott put them in the MVC Trust). For this reason, Marriott markets the MVC Trust to not just unaffiliated consumers but also to Legacy Owners, like the Plaintiffs, who supposedly can use the points in conjunction with their existing Legacy Timeshare Estates to maximize exchange and upgrade options in their own Legacy Timeshare Condominiums and elsewhere.

### (iii)  MVC Trust: The Spoils

78. Marriott and First American's goal in creating the MVC Trust was not to bring some revolutionary product to the market that would provide great benefits for a new class of timeshare purchasers (after all, the same thing already exists in the form of the Marriott Rewards program), rather, it was a way for Marriott to unburden itself of a growing and stale inventory of Legacy Timeshare Estates, made up primarily of low-demand, hard-to-sell weeks, and provide it and First American with new revenue streams.

79. For Marriott, the losses and carrying costs it experienced with corporately-held Legacy Timeshare Estates could be recouped through sales of MVC Trust and passing along its carrying costs to MVC Trust Owners. In addition, Marriott would earn additional revenue through various fees, closing costs, maintenance, and assessments.

80. While First American was rewarded for its collusion with Marriott by earning substantial trustee fees and having an indemnity agreement, the golden goose came in the form of the title insurance policies it would sell to all MVC Trust Owners.

81.     Indeed, these First American Title Policies are significantly more profitable than legitimate title policies because they require virtually no effort to issue and carry no risk. For instance, by insuring title to a unitized conveyance of points that do not exist as parcels of real property (and are identified only by alphanumeric code on the MVC Trust Consumer Deeds), First American earned substantial premiums while avoiding the business expense of conducting actual title searches (a task that literally would be impossible to undertake) and preparing unique documents (as opposed to the virtually identical policies produced for MVC Trust purchases). Furthermore, because there can be no superior title claims to real property that does not exist, First American assumed zero risk of paying out any claims in the normal course.

82.     For Orange County, acquiescence has been a fiscal boon. By recording and indexing whatever MVC Trust instruments Marriott and First American present (regardless of their non-conformity or facial validity), Orange County has generated tremendous revenue in the form of recording fees and transfer taxes.

83.     Together, Marriott, First American, and Orange County have earned billions of dollars in fees and ill-gotten profits as a result of the MVC Trust scheme.

### B. Legacy Timeshare Condominiums, Legacy Timeshare Estates & Condo Declarations

84.     All Legacy Timeshare Condominiums share the same essential characteristics; *i.e.*, a resort property where divided fractional ownership interests (*i.e.,* Legacy Timeshare Estates) are sold to purchasers. Each Legacy Timeshare Condominium (and each Legacy Timeshare Estate associated therewith) is subject to a specific Condo Declaration. *See* sample Condo Declaration, attached as Exhibit K.

85.     Condo Declarations are an essential part of timeshares because ownership rights and covenants run with the land. For this reason, deeds conveying title to timeshare estates

21

expressly incorporate the Condo Declaration by reference. The purpose of this is clear: the recorded Condo Declaration provides a legal description of the parcel of real property (*i.e.*, the resort property) and the fractional interests created therein before being sold. *Id.*

86.     As described in the Condo Declarations, these fractional interests also include indivisible appurtenant beneficial interests and use-rights in the total accommodations and facilities – interests that cannot be partitioned further without amending the Condo Declaration. *Id.*

87.     In addition, the Condo Declaration provides for:

(a) Legacy Owner access to a 7-day reservation use-license that is indivisible;

(b) strict reservation procedures designed to reconcile and coordinate scheduling among a pre-defined pool of Legacy Owners according to the use-license in each Legacy Timeshare Estate; and

(c) a mandatory owners' association that requires representation by Legacy Owners according to the voting interest appurtenant to each Legacy Timeshare Estate (after Marriott sells off a certain portion thereof).

*Id.*

### C.  The MVC Trust Scheme

88.     On March 11, 2010, Marriot filed the formal offering statement for the MVC Trust. *See* MVC Trust Public Offering Statement attached as Exhibit L.

89.     The first offering of MVC Trust occurred when sales commenced in June, 2010.

90.     MVC Trust is billed as a points-based product in a multisite timeshare plan. The MVC Trust purports to be a Florida timeshare estate that conveys a beneficiary interest in a Florida land trust.

91.     Specifically, the MVC Trust is marketed as a program that allows purchasers to use any available Marriott-owned unit in the 44 Legacy Timeshare Condominiums that are physically located in eleven different states (*i.e.*, Component Sites).

92.     For the MVC Trust, the timeshare instruments consist of the following documents (in order of priority):[4]

(a) MVC Trust Agreement (attached as Exhibit M);

(b) MVCTOA Bylaws (attached as Exhibit N);

(c) Trust Reservation System (attached as Exhibit O); and

(d) MVC Trust Rules and Regulations (attached as Exhibit P).

93.     It is equal parts creative and criminal how Marriott and First American devised a scheme to create a timeshare program that would simultaneously:

(a) allow Marriott to maintain ownership and control of a growing inventory of Legacy Timeshare Estates in Legacy Timeshare Condominiums while recouping its costs and generating revenue; and

(b) appear to convey real property interests despite the fact that, if true, such conveyances would overlap preexisting timeshare plans, interfere with Legacy Owners' real property interests and use rights, would require amendment of Condo Declarations in every Component Site, and would trigger Legacy Owner voting rights.

94.     Marriott's and First American's MVC Trust scheme required opaqueness, complexity, retention of absolute control, and the critical appearance of legitimacy. It also required use of subsidiary entities and the compliance (or somnolence) of Orange County.

---

[4] *See* Exhibit N, p. 36 (Art. XXII, Priorities in Case of Conflict).

Blending these attributes would bring about an alchemic reaction – transforming a mere membership awards program into something that looked like a real property transaction.

95.    The scheme involves six steps:

(a) **Step 1 – CREATE AN INVENTORY**: Establish a program based on Marriott-owned interests, consisting of unsold, foreclosed, and repurchased Legacy Timeshare Estates from 44 Legacy Timeshare Condominiums in 11 states;

(b) **Step 2 – HIDE IT IN A LAND TRUST**: Using a Florida land trust construct, deed Marriott-owned Legacy Timeshare Estates to First American (the land trust trustee) so that all agreements and decisions pertaining to those properties can be kept from public disclosure (*see* sample MVC Trust land trust deed, attached as Exhibit Q);

(c) **Step 3 – A LITTLE HOCUS POCUS**:  First, purport to convert all of the out-of-state Legacy Timeshare Estates into Florida "real property" by including a declaration on the land trust deed providing that "[e]ach interest constitutes a Florida timeshare estate under Chapter 721, Florida statutes, and thereby is considered a Florida real property interest" (*see* sample out-of-state MVC Trust land trust deed, attached as Exhibit R), and, second, purport to free all Legacy Timeshare Estates from their governing Condo Declarations, making them subject instead to the unrecorded MVC Trust Agreement;

(d) **Step 4 – CREATE AN UNLIMITED SALEABLE INTEREST**: Using an undisclosed, discretionary process, Marriott assigns point values to the Legacy Timeshare Estates added to the MVC Trust. Those points are then unitized in tranches of 250 points that are called "BI." BI is considered a "symbolic"

24

representation of beneficial interest in the MVC Trust and all BI is deemed to immediately vest in Marriott. Marriott records NOAs in the public land records of Orange County (*see* Exhibit G) that identify the properties added and purport to summarize the points and BI ascribed to all the newly-deeded Legacy Timeshare Estates added to the MVC Trust. BI serves as both the saleable, unitized product of the MVC Trust, and the contractual currency to make reservations at MVC Trust properties. Marriott can create as much BI as it wishes;

**(e) <u>Step 5 – CONTROL THE PRODUCT</u>**: At all times, Marriott maintains full beneficial ownership and control over all trust properties, control and discretion over the value and assignment of points and BI, control over MVCTOA, control over all reservation procedures, and control over what Legacy Timeshare Estates will be made available to MVC Trust Owners. Indeed, even the properties added to the trust are not made automatically available to MVC Trust Owners. All properties remain "restricted use" (meaning they are unavailable to MVC Trust Owners) until such time as Marriott, in its discretion, delivers a unrecorded NOU to MVCTOA and First American (*see* Exhibit H). Additionally, Marriott's use of the land trust form provides legal cover for not recording key MVC Trust timeshare instruments. As a result, the only recorded documents pertaining to the MVC Trust are land trust deeds, a summary document, called a "Trust Memorandum" (*see* Exhibit I), NOAs, which list the properties added summarize the points and value ascribed to those properties, and MVC Trust Consumer Deeds;

25

**(f)** **Step 6 – SELL IT TO THE MASSES**: Using purchase agreements and MVC Trust Consumer Deeds, Marriott sells units of BI to consumers (including many Legacy Owners who are essentially repurchasing access to what they already own). Each unit of BI is sold as a Florida timeshare estate and beneficial interest in real property. The MVC Trust Consumer Deeds memorializing the conveyance are recorded in the public land records of Orange County, and contain nothing more than Marriott-generated, alphanumeric codes that purportedly represent the units of BI conveyed. The codes are purely "administrative" and cannot be found in any public record or traced to any parcel of real property. Notwithstanding, First American sells newly-minted MVC Trust Owners title policies insuring clean title.

96.     In a process akin to money laundering, the six step process described above is intended to scrub the Legacy Timeshare Estates in the MVC Trust of the governing Condo Declarations and owners' associations inexorably tied therewith and convert them to something new, and subject to *unrecorded* MVC Trust timeshare instruments.

97.     Between May 11, 2010, and the present date, hundreds of NOAs have been recorded in the public land records of Orange County, summarizing the submission of tens of thousands of Legacy Timeshare Estates to the MVC Trust.

98.     The NOA process makes it impossible to obtain comprehensive data to track valuation of points and whether Marriott has increased points attributed to same category of Legacy Timeshare Estates submitted previously to the MVC Trust.

99.     In 2012, total BI attributed to Legacy Timeshare Estates in the MVC Trust was 259,381BI/5,005,250 Points.   As of August 16, 2017, that total grew to 1,793,680 BI/ 448,420,000 Points. *See* Exhibit G, p. 3.

### D.  BI Defies Valuation as a Real Property Interest

100.    While pre-existing fractional interests in Legacy Timeshare Condominiums cannot be further divided without amending the applicable Condo Declaration, none of the Condo Declarations (or the MVC Trust timeshare instruments for that matter), provide a formula or explanation of the beneficial interest (represented in either percentages or specified proportion) of fractional ownership therein.

101.    The reason Marriott fails to disclose any valuation metrics is because it would be impossible to create a non-diluting formula that would maintain proportionate ownership of all the Legacy Timeshare Estates submitted to the MVC Trust because:

> (a) Marriott has never disclosed in any document (recorded or unrecorded) how it assigns points to Legacy Timeshare Estates and Legacy Timeshare Condominiums;
>
> (b) the valuation of those properties would vary dramatically based on location, date, and availability; and
>
> (c) Marriott continuously submits NOAs for the Legacy Timeshare Estates which means the inventory is constantly in flux.

102.    It thus appears that Marriott, in its sole discretion, has the unfettered authority to value the points in any manner it deems appropriate (or rather financially advantageous).

103.   While the MVC Trust timeshare instruments do not contain any formula for maintaining proportional beneficial interest, Marriott purports to employ a methodology called "recalibration" that has multiple, unknown variables.

104.   The MVC Trust Agreement describes "recalibration" as:

AS ADDITIONAL PROPERTY IS SUBMITTED TO THE TRUST, EACH BENEFICIARY'S UNDIVIDED INTEREST IN THE TRUST WILL BE RECALIBERATED BASED UPON THE FORMULA SET FORTH IN THE BYLAWS.

For example, assuming that **Trust Property for which a Notice of Use Right has been delivered** consists of property that is valued at 20,000 Notice of Use by Developer, then a Beneficiary owning a base Interest (in this case, 6 interests or 1500 points), will have seven and a half % interest in the Trust (1,500/20,000). If Developer subsequently delivers to the Association a Notice of Use Rights for property with a value of 10,000 points for sale, then the total points for sale of the trust will be 30,000 points and the beneficiary's base interest will have 5% interest in the trust.

*See* Exhibit M, p. 13 (Art. V, Sec. 5.2) (emphasis added).

105.   While Marriott cannot change the point value attributed to previously-submitted Legacy Timeshare Estates in the MVC Trust, Marriott can (and does) periodically increase the point value for new Legacy Timeshare Estates added to the MVC Trust for properties in the same category.

106.   This undisclosed valuation process allows Marriott to manipulate (*i.e.*, increase) the inventory of points (and thus, BI) available without proportionately increasing inventory of Legacy Timeshare Estates.

107.   While BI can be expressed as a fraction, it is meaningless when the value of the denominator (*i.e.*, points) cannot be ascertained.

108.   Thus, Marriott's recalibration process (which has occurred more than 60,000 times since June of 2010) is not a methodology that can be used to gauge or maintain a specific proportional interest in the MVC Trust.

28

109.    The valuation/recalibration process is also fatally flawed as a result of the NOA/NOU inventory control mechanism employed by Marriott. Specifically, MVC Trust Owners are said to have no beneficial interest in MVC Trust properties added by NOA until Marriott decides, in its discretion, to deliver (but not record) an NOU.

110.    Marriott has no time limits or criteria for when NOU are delivered. This means that Marriott retains the sole discretion as to when and if it will make the properties *already in the MVC Trust* available to MVC Trust Owners. It also means that the total BI/points reflected in the (recorded) NOAs have no relationship to the calculation of relative beneficial interest as described in the MVC Trust Agreement. *See* Exhibit M.

### E.  Marriott's Proxy: MVCTOA

111.    In 2010, Marriott designated MVCTOA as the managing entity for the MVC Trust. *See* Exhibit M, p. 24 (Art. IX, Sec. 9.1).

112.    MVCTOA is represented in the MVC Trust timeshare instruments as a Florida not-for-profit corporation that is completely independent from Marriott. In reality, MVCTOA has no separate existence from Marriott and operates exclusively out of Marriott's headquarters in Orlando, Florida.

113.    Furthermore, MVCTOA does not have any staff independent of Marriott's (*i.e.*, Marriott employees serve as MVTOA representatives), does not maintain its own listed phone number, and does not have a designated website.

114.    In fact, in 2012, the MVCTOA Annual Report, which required certification by signature of a director or officer of MVCTOA, was signed by Lana J. Cullum, an employee of Marriott (who was neither a director nor officer of MVCTOA).

115.   Since the interim MVCTOA board was appointed by Marriott in 2010, the board composition – of three directors who also act as the three officers of MVCTOA – has remained unchanged.

116.   Marriott has continued to make unilateral appointments to the MVCTOA board, which consists of two Marriott employees and another Marriott designee.

117.   For instance, in 2013, Marriott appointed Nick Rossi, Barbara Ryan, and Orlando Figueroa to the MVCTOA board. Mr. Rossi, who also served as MVCTOA President, was the Senior Vice President of Global Inventory and Revenue for all Marriott Vacations Worldwide brands, and Ms. Ryan, who served as MVCTOA Treasurer and Secretary, was the Senior Director of Strategic Planning for Marriott Vacations Worldwide.  At that time, both Mr. Rossi and Ms. Ryan worked out of Marriott's headquarters.

118.   Currently, the MVCTOA board includes Marriott appointees, Jeff Comfort, Stacey Jackson-Rauso, and Daniel Craig.  Mr. Comfort, who serves as MVCTOA President, is currently the Vice President of Asset and Brand Management of Marriott Vacations Worldwide, and Ms. Jackson-Rauso, who serves as MVCTOA Treasurer and Secretary, is currently the Senior Director of Asset Management at Marriott Vacation Club International.   Both Mr. Comfort and Ms. Jackson-Rauso currently work out of Marriott's headquarters.

119.   Although an amendment to the MVCTOA Bylaws provides that only the one member who is not an employee of Marriott may be paid for serving on the board, the amendment was nothing more than a pretense of independence as the two board members, *that are also Marriott executives*, are paid employees of Marriott. *See* Exhibit N (Second Amendment p.2, ¶3).

120.    Except for the decision to file for bankruptcy or to terminate the timeshare plan, all MVCTOA decisions require only majority of votes of board of directors without consent or notification to the MVC Trust Owners. Since there are only three board members, two votes constitute majority votes. Therefore, Marriott's two employees are in a position to make all decisions for the MVC Trust Owners. *Id.* p. 9, Sec. 9.

121.    At all meetings of the board, a majority of directors constitute a quorum. Therefore, only two board members are required to establish a quorum for a meeting. However, no meetings are required for the two current employees of Marriott to make routine decisions on behalf of all MVC Trust Owners. Therefore, for all financial, budgetary, and operational decisions that MVCTOA makes on behalf MVC Trust Owners, there are no minutes tracking the decision-making process of the MVCTOA board. *Id.*

122.    MVC Trust Owners have never been given the opportunity to vote for the appointees to the MVCTOA board.

123.    Year after year, Marriott continues unilaterally to appoint MVCTOA directors without seeking the approval of MVC Trust Owners.

124.    In fact, under the MVC Trust timeshare instruments, MVC Trust Owners *will never* have the right to vote for the MVCTOA board regardless of the proportionate ownership. Indeed, even if MVC Trust Owners owned 100% of the BI embodied in the MVC Trust, Marriott would retain the sole right to appoint all three directors to the MVCTOA board. *Id.* at p. 14, Sec. 18.

125.    Even if an MVC Trust Owner could discern his or her voting rights from the convoluted and complex process described in the MVCTOA Bylaws, it would only confirm that the purported "right" is entirely illusory because, before MVC Trust Owners could avail

31

themselves of their voting rights, Marriott must first cease selling the MVC Trust for a period of no less than two years (an event that has not occurred and likely will not occur for the foreseeable future). *Id.* at p. 14, Sec. 18(a).

126.    Even in the unlikely event that the precondition of Marriott having ceased selling the MVC Trust for at least two years comes to pass, Marriott could simply acquire a single Legacy Timeshare Estate from the secondary market or from foreclosure at least once every four years, and transfer that interest to First American in order to maintain exclusive control over the MVCTOA board. Therefore, in effect, Marriott remains in a position to never surrender complete and unfettered dominion and control over MVCTOA.

127.    The purpose and function of MVCTOA is to act in the best interests of MVC Trust Owners. Indeed, under Florida law, it is vested with the fiduciary responsibilities of a trustee – whether or not those interests conflict with Marriott's pecuniary interests.

128.    Because Marriott retains complete and total operational control over MVCTOA, and because MVCTOA does not represent or serve the interests of MVC Trust Owners, it is evident that MVCTOA serves no function as an independent owners' association.

## VI.    **APPLICABLE LAW**

129.    The MVC Trust timeshare instruments provide that the 2010 versions of Fla. Stat. §§ 689.010 and 721 apply to the creation and the operation of the MVC Trust.

130.    Specifically, the MVCTOA Bylaws provide that: "The Interests and the interest of the Beneficiaries in the Trust Property are Florida real property interests and may be transferred as such and only transferred pursuant to the provisions of the Trust Agreement, Section 689.071, *Florida Statutes* (2010), and Chapter 721." *See* Exhibit N, p. 41 (Art. XXIX., Sec. 5).

131.   Similarly, the MVC Trust Agreement makes clear that Marriott intends to establish a land trust pursuant to Fla. Stat. § 721.071 (2010), providing "Witnesseth: Whereas, Developer desires to establish a land trust (as further defined in Article II below, the "Trust"), as settlor of the Trust pursuant to Section 689.071, *Florida Statutes* (2010)." *See* Exhibit M, p. 1.

132.   The MVC Trust Agreement provides further that, as of the Effective Date, there is established a trust in accordance with Fla. Stat. § 689.071 (2010).  *Id.* at p. 6 (Art III, Sec. 3.1).

133.   The beneficial interest of the MVC Trust is described in the MVC Trust Agreement as: "the Interests will each be deemed to be Florida real property interests and may be transferred as such and only transferred pursuant to the provision of this Trust Agreement, Section 689.071, *Florida statutes* (2010), and Chapter 721." *Id.* at  p. 9 (Art. IV, Sec. 4.1 (b)).

134.   Interest, as provided in the definition section of the MVC Trust Agreement, "means a beneficial interest in the Trust created pursuant to this Trust Agreement, Section 689.071, *Florida Statutes* (2010), and Chapter 721. Each Interest entitles the owner of such Interest to reserve, use, and occupy the Trust Property in accordance with the Trust Plan Documents.  Each Interest shall constitute a 'timeshare estate' as that term is defined by Section 721.05, *Florida statutes*." *Id.* at p. 4 (Art. II, Sec. 2.30).

135.   Under the MVC Trust Agreement, the "Trust Plan means Marriott Vacation Club Destinations, the vacation ownership plan established by Developer pursuant to this Trust Agreement and in accordance with Chapter 721." Therefore, the Trust Plan is synonymous with the MVC Trust.  *Id.* at p. 6 (Art. II, Sec. 2.50).

136.   "Chapter 721" is defined in the MVC Trust Agreement to mean, "the provisions of the Chapter 721, *Florida Statutes*, as the same is constituted on the Effective Date of this

Trust Agreement except to the extent that the applicability of future amendments to Chapter 721 is mandatory or unless otherwise stated in this Trust Agreement." *Id.* at p. 2 (Art. II, Sec. 2.13).

137.    Specifically excepted from Fla Stat. § 721 (2010), the MVC Trust Agreement addresses substitutions – which is the only provision of the MVC Trust Agreement that provides for automatic application of non-mandatory amendment to Fla. Stat. § 721 (2010):

> **Substitutions:**
> Substitution of Trust Property is not currently permitted by applicable law. However, if substitution of other property is allowed by law or applicable law is amended subsequent to the Effective Date to permit the substitution of other property for the then existing Trust Property, Developer may, from time to time, in its sole and absolute discretion, perform such substitution subject to the following (unless applicable law is subsequently amended to permit more flexible standards and procedures for the substitution of Trust Property, in which case such applicable law will govern at the option of Developer and Developer may unilaterally amend this Trust Agreement to provide for such standards and procedure.)

*Id.* at p. 15 (Art. V., Sec. 5.3 (b)).

138.    Therefore, under the MVC Trust timeshare instruments, Fla Stat. § 689.071 (2010) applies without exception.

139.    Under the MVC Trust timeshare instruments, Fla. Stat. § 721 (2010) applies unless the subsequent statutory amendment is mandatory as such regulatory provisions or such amendment pertains to "Substitution" of "Trust Property." *Id.*

140.    Fla. Stat. § 721.52(1) (2010) defined applicable law to mean the jurisdiction where the accommodations and facilities referred are located. The 2010 version of the statute applies that is expressly incorporated by Fla. Stat. § 689.071 or § 721 (such as § 718 or the applicable condominium and timeshare laws of the component jurisdiction).

## VII.    CAUSES OF ACTION

### COUNT I

**For Declaratory Relief**

**MVC Trust Consumer Deed is Void
Because no Real Property Interest is Conveyed**

*(Against MORI, Marriott Hospitality Co., and Marriott Title,
on behalf of the Plaintiffs and the MVC Trust Owners Subclass)*

141.    Plaintiffs specifically incorporate by reference ¶¶ 1, 5, 6, 9-12, 15-17, 45-49, 55-61, 65-75, 88-110, 129-140, *supra,* and ¶¶ 460-462, *infra.*

142.    Under Florida law, a deed that does not sufficiently describe a parcel of real property is void.

143.    At a minimum, a deed must contain sufficient information such that parol evidence would enable one to pinpoint the location of the deeded parcel without altering the substance of the deed.

144.    A deed which contains a description so vague that a surveyor would not be able to locate the land is a nullity and fails to convey legal title.

145.    Fla. Stat. § 689.02(1) provides a form of a warranty deed that expressly requires the description of the land conveyed.

146.    Fla. Stat. § 689.02(2) further provides that even governmentally-assigned "parcel identification number[s] [are] not a part of the legal description of the property otherwise set forth in the deed and may not be used as a substitute for the legal description of the property being conveyed."

147.    Similar to other members of the MVC Trust Owners Subclass, the Lennens' MVC Trust Consumer Deed provides only Marriott-generated, proprietary, alphanumeric codes (*i.e.,*

35

H04815, H04816, H04817, and H04818), rather than a legal description of a parcel of real property being conveyed. *See* Exhibit C.

148.    Nothing in the MVC Trust Consumer Deeds provide information about the city, county, or state where the purportedly deeded property is located, and the deeds lack any geographical description, whatsoever, as required by Florida law.

149.    The alphanumeric codes contained in the MVC Trust Consumer Deeds purport to represent symbolic allocations of points, which, in turn, purport to represent non-specific, use-rights in an ever-changing collection of properties that make up the MVC Trust (a large percentage of which are restricted from use pursuant to *unrecorded* NOUs).

150.    The codes appear in no other public records, are not referenced in the recorded Trust Memorandum (or in the unrecorded MVC Trust Agreement), or in the NOAs, or in the land records of the states where the component properties are physically located.

151.    Further, the codes do not correspond to any parcel of real property located in Orange County, Florida, the State of Florida, or in any other county, state, country, or physical location on the planet.

152.    The MVC Trust Consumer Deeds lack even a parcel identification number which would have indicated that the Orange County Property Appraiser's Office had previously inventoried the property as Orange County real property.

153.    By virtue of the foregoing, a real property closing has not been effectuated and the MVC Trust Consumer Deeds, including the Plaintiffs', are void under Florida law.

154.    Accordingly, Plaintiffs and members of the MVC Trust Owners Subclass are entitled to: (a) a declaration that the MVC Trust Consumer Deed is void; and (b) a refund of all monies paid in connection with the MVC Trust purchase, including the MVC Trust purchase

price, closing fees and costs, recording fees, pre- and post-judgment interest, and attorney's fees, costs and expenses.

## COUNT II

### For Declaratory Relief

**MVC Trust Consumer Deed is Void Because Marriott, as "Grantor,"
Lacks the Legal Capacity to Convey Trust Property**

*(Against MORI, Marriott Hospitality Co., Marriott Title, First American Corp., and First American Trust, on behalf of the Plaintiffs and the MVC Trust Owners Subclass)*

155.     Plaintiffs specifically incorporate by reference ¶¶ 1, 5, 6, 9-12, 15-17, 19-22, 25, 45-61, 73-75, 88-96, 129-140, *supra,* and ¶¶ 460-462, *infra.*

156.     The Florida Land Trust Act provides that a land trust must vest full equitable and legal title to trust property in the trustee. Fla. Stat. § 689.071(2)(d) and (e) (2010).  Fla. Stat. § 689.071(3) (2010), provides that:

> OWNERSHIP VESTS IN TRUSTEE.—Every conveyance, deed, mortgage, lease assignment, or other instrument heretofore or hereafter made, hereinafter referred to as the "recorded instrument," transferring any interest in real property in this state, … in which recorded instrument the person, corporation, bank, trust company, or other entity is designated "trustee" or "as trustee," … is hereby declared to have vested, in such trustee both legal and equitable title, and full rights of ownership, over the real property or interest therein, with full power and authority as granted and provided in the recorded instrument to deal in and with the property or interest therein or any part thereof; provided, the recorded instrument confers on the trustee the power and authority to protect, to conserve, to sell, to lease, to encumber, or otherwise to manage and dispose of the real property described in the recorded instrument.

157.     Fla. Stat. § 689.071(8)(f) (2010), provides, in relevant part, that:

> An unrecorded trust agreement giving rise to a recorded instrument for a land trust may provide that one or more persons or entities have the power to direct the trustee to convey property or interests, execute a mortgage, distribute proceeds of a sale or financing, and execute documents incidental to administration of the land trust.

158.     In order to comply with the Land Trust Act, a land trust **must** transfer full rights of ownership over the real property described in the deed to the trustee, together with full power

as granted in the recorded deed, whether or not reference is made in the recorded deed to an unrecorded trust instrument.

159.    Further, the Land Trust Act requires that the deed must be recorded and it must give to the trustee full, non-delegable power and authority either to protect, conserve, sell, lease, encumber, or otherwise to manage and dispose of the real property described in the deed.

160.    As a matter of common law, it is axiomatic that one cannot convey legal title when one does not hold legal title.

161.    Each MVC Trust Consumer Deed prepared by Marriott Title, lists MORI as "Grantor," the MVC Trust purchaser as "Grantee," and Marriott Hospitality as designated agent. *See* Exhibit C.

162.    Because Marriott conveyed legal title to MVC Trust properties to First American, Marriott relinquished its legal authority to convey title to MVC Trust property. Thus, as a matter of law, the MVC Trust Consumer Deed conveyance is null and void.

163.    If MORI purports to be the actual or constructive MVC Trust land trust trustee (with First American Trust a mere proxy), then everything related to the MVC Trust is *void ab initio* under the doctrine of merger, because a trust cannot exist when the legal and equitable interests of the trust are vested in one entity.

164.    By virtue of the foregoing, because no real property closings have been effectuated using the MVC Trust Consumer Deeds, all MVC Trust Consumer Deeds are null and void under Florida law.

165.    Accordingly, Plaintiffs and members of the MVC Trust Owners Subclass are entitled to: (a) a declaration that the MVC Trust Consumer Deed is void; and (b) a refund of all monies paid in connection with the MVC Trust purchase, including the MVC Trust purchase

price, closing fees and costs, recording fees, pre- and post-judgment interest, and attorney's fees, costs and expenses.

## COUNT III

### For Declaratory Relief

### First American Title Policy Coverage Triggered Due to Defects in Title, Encumbrances, and Defective Right to Occupy MVC Trust Properties

*(Against First American Corp., First American Title, MORI, and Marriott Title on behalf of the Plaintiffs and MVC Trust Owners Subclass)*

166.    Plaintiffs specifically incorporate by reference ¶¶ 1, 5, 7-10, 15-17, 19-20, 23-25, 43-75, 80-81, 84-110, 129-140, 142-153, 156-164, *supra,* and ¶¶ 460-462, *infra.*

167.    Under Florida law, a title company is required to make a thorough and competent search of the record title.

168.    Fla. Stat. § 627.784, provides that "[a] title insurance policy or guarantee of title may not be issued without regard to the possible existence of adverse matters or defects of title."

169.    A breach of duty under Fla. Stat. § 627.784 triggers policy coverage.

170.    Fla. Stat. § 627.784 provides further that a title insurer may not issue a title insurance binder, commitment, endorsement, title insurance policy, or guarantee of title until it has conducted a reasonable search and examination of the title and of such other information as may be necessary.

171.    Like every other First American Title Policy insuring title in the MVC Trust, the Lennens' policy purports to cover legal title to a Florida timeshare estate, legally described as an alphanumeric code (*e.g.*, H04815, H04816, H04817 and H04818).  *See* Exhibit E (Schedule A, Ex. A).

172.     Under the Covered Risk provision, the Lennens' First American Title Policy insures,

*inter alia*, "[t]itle being vested other than as stated in Schedule A." *Id.* at p.1 of Owner's Policy.

173.     Schedule A provides that the estate or interest in Land subject to coverage is:

A timeshare estate as defined by section 721.05, Florida Statutes more fully described as:

**4** Interests (numbered for administrative purposes: **H04815 & H04816 & H04817 & H04818** ) in the MVC Trust ("Trust") evidenced for administrative, assessment and ownership purposes by **1,000** Points (250 Points for each Interest), which Trust was created pursuant to and further described in that certain MVC Trust Agreement dated March 11, 2010, executed by and among First American Trust, FSB, a federal savings bank, solely as trustee of Land Trust No. 1082-0300-00, (a.k.a MVC Trust), Marriott Ownership Resorts, Inc., a Delaware corporation, and MVC Trust Owners Association, Inc., a Florida corporation not-for-profit, as such agreement may be amended and supplemented from time to time ("Trust Agreement"), a memorandum of which is recorded in Official Records Book 10015, Page 4176, Public Records of Orange County, Florida ("Trust Memorandum"). The Interests shall have a Use Year Commencement Date of **January 01, 2016** (subject to Section 3.5 of the Trust Agreement).

*Id.* at Schedule A, Ex. A.

174.     The First American Title Policy also purports to cover any "defect" in title caused

by, *inter alia*: "failure of any person or Entity to have authorized a transfer or conveyance"; "a

document affecting Title not properly created, executed, witnessed, sealed, acknowledged,

notarized, or delivered"; and "a document not properly filed, recorded, or indexed in the Public

Records." Further, the First American Policy covers "Unmarketable Title." *Id.* at p.1 of Owner's

Policy.

175.     Based on the allegations herein, specifically those in Counts I and Count II, First

American Title could not possibly have undertaken a comprehensive title search on the property

identified on Schedule A because: (a) there was no real property conveyed; (b) there was no legal

description of real property; (c) the alphanumeric codes could not be traced to any parcel of real

property; (d) MORI legal lacked capacity to convey title to any MVC Trust property; and (e) the

MVC Trust instruments were not properly filed, recorded, or indexed in the public land records of Orange County.

176.     First American (via First American Trust), as the land trust trustee, timeshare trustee, and party to the scheme alleged herein, had (and has) actual knowledge that MVC Trust purchases suffer from numerous title defects.

177.     Further, the First American Title Policies fail to disclose known encumbrances to MVC Trust Owners' occupancy rights, including with regard to the restricted-use properties in the NOA, and the governing authority of the Condo Declarations over MVC Trust properties.

178.     Despite the fact that the "Exceptions" in Schedule B of the First American Title Policy list the *possibility* of unknown encumbrances related to these matters, as the land trust trustee, recipient of the land trust deeds, and signatory to the unrecorded NOUs that create the encumbrances, First American had (and has) actual knowledge thereof.

179.     And, as a recipient of the NOUs, First American had (and has) actual knowledge that the legal right to occupy MVC Trust properties would be restricted. This is a covered, albeit undisclosed, risk under the First American Title Policy. *Id.* at pp. 1-2 of Owner's Policy.

180.     Under Florida law, when a title insurer fails to disclose known title defects, the policy holder may recover under the policy, irrespective of whether the policy holder knew or should have known of the defect.

181.     Because neither the Lennens nor any other MVC Trust Owner acquired marketable title to any real property, coverage is triggered under the First American Title Policy.

182.     Accordingly, Plaintiffs and members of the MVC Trust Owners Subclass are entitled to full coverage payment on the First American Title Policies, pre- and post-judgment interest, and attorney's fees, costs and expenses.

41

183.     Alternatively, if the MVC Trust is deemed void *ab initio*, such that the First American Title Policy is also deemed void *ab initio*, the Lennens and members of the MVC Trust Owners Subclass are entitled to a full refund of the title insurance premiums, pre- and post-judgment interest, and attorney's fees, costs and expenses.

## COUNT IV

### For Negligence

### Orange County Breached its Official Duties by Improperly Recording and Indexing MVC Trust Instruments and Collecting Transfer Tax

#### (*Against Orange County on behalf of the Plaintiffs and the MVC Trust Owners Subclass*)

184.     Plaintiffs specifically incorporate by reference ¶¶ 1, 5-6, 26-28, 37, 46-49, 55-61, 68-75, 82, 88-110, 142-153, 156-164, *supra,* and ¶¶ 429, 435, 439-444, 460-462, *infra.*

185.     Fla. Stat. § 28.222(3) requires instruments to be recorded and indexed against real property or personal property in a uniform manner that gives clear notice to the public and interested parties. Negligent performance of those duties gives rise to a claim for negligence.

186.     Because the "entire Florida legal scheme regarding interests in land is predicated on the recording of documents relating to claims of interests in land" those charged with effectuating the recording law must ensure than every conveyance, transfer, or mortgage of real property is properly recorded and that claims against real are properly indexed thereto. *First American Title Ins.*, 603 So. 2d. at 564.

187.     Fla. Stat. § 28.222(1) provides that "[t]he clerk of the circuit court shall be the recorder of all instruments that he or she may be required or authorized by law to record in the county where he or she is clerk."

42

188.    Orange County is authorized to record instruments that relate to real property located only within the boundaries of Orange County, Florida.

189.    Orange County's own policies reflect its geographical limitations. In particular, Orange County's "Notice of Unrecordable Documents or Instruments" provides that "[t]he Orange County Comptroller cannot accept documents or instruments for recording in the Official Records which are not authorized by Florida State Statutes." Any instruments that fail to conform require the filer to provide specific "legal authority that requires or authorizes recording in the Official Records." *See* Notice of Unrecordable Documents or Instruments, attached as Exhibit S.

190.    Attorney General's advisory opinions ("AGO") interpreting Fla. Stat. § 28.222 also demonstrate that a county is prohibited from recording instruments that are not specifically required or authorized to record by law. *See* Fla. AGO-90-69 and Fla. AGO-2005-17.

191.    Because Orange County is authorized to record instruments against real property located only in Orange County, Florida, it is improper for Orange County to record instruments relating to and affecting properties located entirely outside of Orange County, Florida.

192.    Here, Orange County improperly records and indexes instruments relating to the MVC Trust that it clearly is not authorized to do.

193.    For instance, Orange County records MVC Trust Consumer Deeds which, *on their face*, lacks any type of recognizable property description or other information that could be construed as a conveyance of real property – let alone real property located in Orange County, Florida. *See* Exhibit C.

194.    The MVC Trust Consumer Deeds lack any information about the city, county, or state where the purportedly deeded property is located, lack any geographical description, and

lack even a Parcel Identification Number (which would have indicated that Orange County's Property Appraiser's Office had previously inventoried the particular parcel as Orange County real property). *Id.*

195.    Further, Fla. Stat. § 695.22 requires Orange County to provide the Orange County Property Appraiser's Office with a daily schedule of deeds filed. In this daily report, Orange County is required to list the grantor, grantee and the description of land as specified in each deed recorded. The Orange County Property Appraiser's Office must keep a complete inventory of every single timeshare estate created in Orange County.

196.    Once a timeshare estate is created from a condominium unit as a separate parcel of real property, the Orange County Property Appraiser's Office must inventory each timeshare estate and assess separate tax value pursuant to Fla. Stat. § 192.037.

197.    Since MVC Trust Consumer Deed purportedly conveys an already created timeshare estate, the Orange County Property Appraisal's Office was required to keep track of each MVC Trust purchase (*i.e.*, BI) for both tax and inventory purposes.

198.    Accordingly, the Orange County Property Appraiser's Office either neglected to catch the error in making its daily reports, or Orange County was alerted to the error and nonetheless continued to record facially defective MVC Trust Consumer Deeds. In either event, Orange County was improperly recording MVC Trust Consumer Deeds which purport to convey interest against real properties located outside of Orange County, Florida.

199.    Similarly, Orange County improperly recorded and indexed other instruments, such as the Trust Memorandum, mortgages on MVC Trust purchases, and NOAs containing out-of-state properties – documents Orange County was specifically prohibited from recording because the instruments failed to identify property located within Orange County, Florida.

200.    With regard to the Trust Memorandum, Fla. Stat. § 696.01 strictly proscribed Orange County from recording and indexing an instrument purportedly summarizing an *unrecorded* contract (*i.e.*, the MVC Trust Agreement) relating to a real property transaction.

201.    In particular, Fla. Stat. § 696.01, provides that:

> No contract, agreement, or other instrument purporting to contain an agreement to purchase or sell real estate shall be recorded in the public records of any county in the state, unless such contract, agreement or other instrument is acknowledged by the vendor in the manner provided by law for the acknowledgment of deeds; and where there is no acknowledgment on the part of the vendor, **the recording officers in the various counties of this state shall refuse to accept such instrument for record**.

(Emphasis added).

202.    Fla. Stat. § 696.03, provides that:

> No assignment of any contract, agreement, or other instrument purporting to contain an agreement to purchase or sell real estate shall be recorded in any of the public records of this state, **unless the contract, agreement or other instrument sought to be assigned shall have been recorded**.

(Emphasis added).

203.    Orange County failed to follow the law by recording the Trust Memorandum in 2010 – despite the fact that, at that time, it was not a valid land trust instrument under Fla. Stat. § 689.071 (2010).

204.    On its face, the very form of the Trust Memorandum violates Florida law as it purports only to summarize the unrecorded MVC Trust Agreement. *See* Exhibit I.

205.    Because there was no mechanism whereby the Trust Memorandum could be recorded and indexed in the official land records of Orange County, Orange County was unauthorized to record it and unauthorized to index any other instruments against it.

206.    Similarly, Orange County was not authorized to record and index NOAs. *See* Exhibit G.

207.     Since 2010, hundreds of NOAs, representing tens of thousands of Marriott-owned Legacy Timeshare Interests, have been recorded and indexed against the Trust Memorandum notwithstanding the fact that NOAs are a Marriott creation and not among the recordable instruments enumerated by Fla. Stat. § Stat. § 28.222 (or under any other provisions of the Florida Statutes, for that matter).

208.     Despite being called notices, NOAs are proprietary instruments intended to serve a specific legal function of giving terrestrial life to BI. However, BI is not an identifiable real property interest and no instrument exits that demonstrates otherwise.  *Id.*

209.     The recording and indexing of NOAs against the Trust Memorandum not only violates Fla. Stat. § 28.222 but is so utterly arbitrary that it demonstrates either a total lack of internal controls or, worse, that special accommodations were made for Marriott and First American to effectuate the MVC Trust product.

210.     In addition, Orange County directly caused MVC Trust Owners to incur Florida Transfer Tax on transfer of title of an interest that is not real property, let alone a parcel of Florida real property.

211.     Since 2010, Orange County has recorded and indexed tens of thousands of MVC Trust Consumer deeds, mortgages, and liens, as well as NOAs and other instruments relating to the MVC Trust without uniform policies and procedures.

212.     As a result of Orange County's breach of its duty to act as the official custodian of land records in Orange County, Florida, which enabled Marriott and First American's scheme to sell nonexistent real property, Plaintiffs and members of the MVC Trust Owners Subclass suffered harm.

213.     Accordingly, Plaintiffs and members of the MVC Trust Owners Subclass are entitled to: (a) refund of recording fees; (b) refund of improper transfer tax payments; and (c) pre- and post-judgment interest, attorney's fees, costs and expenses.

## COUNT V

### For Violating Fla. Stat. § 718

### MVC Trust Fails to Comply with
### Requirements of the Florida Condominium Act

**(*Against MORI, MVCTOA, First American Corp., and First American Trust
on behalf of the Plaintiffs and the MVC Trust Owners Subclass*)**

214.     Plaintiffs specifically incorporate by reference, ¶¶ 1, 5, 6, 9-10, 17-22, 25, 42-81, 84-140, *supra*, and ¶¶ 460-462, *infra*.

215.     Fla. Stat. § 721.03(2), provides that "[w]hen a timeshare plan is subject to both the provisions of this chapter and the provisions of chapter 718 or chapter 719, the plan shall meet the requirements of both chapters unless exempted as provided in this section." This applies to every Component Site located within the State of Florida; there are presently eleven (11).

216.     Under Fla. Stat. § 718, timeshare estates are partitioned units of condominium parcels.  Like a condominium parcel, a timeshare is a parcel of real property, and, once created, the timeshare estate is indivisible and the appurtenant interests are indivisible.

217.     A condominium parcel is comprised of two elements: (1) a unit, which is "a part of the condominium property which is subject to exclusive ownership" (Fla. Stat. § 718.103(27)), together with; (2) an undivided share in common elements appurtenant to the units (Fla. Stat. § 718.103(12)).

218.    Fla. Stat. § 718.104(4)(d) provides that a condominium parcel is created by recording a condominium declaration which must contain an identification of each condominium parcel and its legal description of the land and the appurtenant interests.

219.    Fla. Stat. § 718.106 provides the following appurtenance, possession and enjoyment of a condominium parcel:

(1)    A condominium parcel created by the declaration is a separate parcel of real property, even though the condominium is created on a leasehold.

(2)    There shall pass with a unit, as appurtenances thereto:

(a)  An undivided share in the common elements and common surplus.

(b)  The exclusive right to use such portion of the common elements as may be provided by the declaration, including the right to transfer such right to other units or unit owners to the extent authorized by the declaration as originally recorded, or amendments to the declaration adopted pursuant to the provisions contained therein. Amendments to declarations of condominium providing for the transfer of use rights with respect to limited common elements are not amendments that materially modify unit appurtenances as described in s. 718.110(4).

220.    Fla. Stat. § 718.109 provides how each condominium shall be legally described:

Following the recording of the declaration, a description of a condominium parcel by the number or other designation by which the unit is identified in the declaration, together with the recording data identifying the declaration, shall be a sufficient legal description for all purposes. The description includes all appurtenances to the unit concerned, whether or not separately described, including, but not limited to, the undivided share in the common elements appurtenant thereto.

221.    Fla. Stat. § 721.03(10) provides that a developer may partition a condominium parcel into as many timeshare estates it wants so long as no single condominium unit counts as providing more than 365 use nights, and the appurtenant percentage of beneficial interests as to the condominium add up to a whole. *See also* Fla. Stat § 721.05(25) ("No individual timeshare unit may be counted as providing more than 365 use nights per 12-month period.").

48

222. Pursuant to Fla. Stat. § 718.104, a timeshare estate may be created from a condominium parcel only if there are specific provisions in the Condo Declaration allowing the creation of timeshare estates. These requirements include: delineation of degree, quantity, nature, and extent of the timeshare estate that will or may be created; a statement of the minimum duration of the recurring periods of rights of use, possession, or occupancy that may be created with respect to any unit; the proportionate fractional ownership of the condominium parcels for each timeshare estate; and the nature of the use-licenses.

223. Once created, a timeshare estate is an undivided real property parcel where ownership is divided into percentages of ownership of the condominium and its common elements as provided in the recorded timeshare Condo Declaration. *See* Exhibit K.

224. Like a condominium parcel, the legal description of each timeshare estate must be identifiable in the recorded Condo Declaration. *Id.*

225. The MVC Trust purports to convey some interest in Legacy Timeshare Condominiums in the State of Florida. If that is true, then the MVC Trust is required to have a recorded Condo Declaration detailing the specific parcel being conveyed by unit, including a proper legal description and explanation of appurtenant beneficial interests.

226. There is no Condo Declaration for the MVC Trust, recorded or otherwise.

227. Furthermore, not one of the Condo Declarations in the Component Sites mentions or recognizes the MVC Trust or interests created therein.

228. Accordingly, the purported interests in Florida timeshare estates that Marriot sold to the Plaintiffs, and other MVC Trust Owners, having not been created in compliance with Fla. Stat. § 718 and Fla. Stat. § 721.03(2), are illusory and do not exist.

229.    Accordingly, Plaintiffs and members of the MVC Trust Owners Subclass are entitled to: (a) refund of the purchase price, plus interest from the date of purchase; (b) refund of all closing costs, title insurance premiums, and fees; and (c) pre- and post-judgment interest, and attorney's fees, costs and expenses.

## COUNT VI

### For Violating Fla. Stat. § 721.57

### The MVC Trust is Not a Valid Multisite Timeshare Estate

### (*Against MORI, MVCTOA, First American Corp., and First American Trust on behalf of the Plaintiffs and the MVC Trust Owners Subclass*)

230.    Plaintiffs specifically incorporate by reference ¶¶ 1, 5, 6, 9-10, 17-22, 25, 42-81, 84-140, *supra*, and ¶¶ 460-462, *infra*.

231.    Fla. Stat. § 721.05(34) (2010) defines a "Timeshare estate" as:

a right to occupy a timeshare unit, coupled with a freehold estate or an estate for years with a future interest in a timeshare property or a specified portion thereof. The term shall also mean an interest in a condominium unit pursuant to s. 718.103, an interest in a cooperative unit pursuant to s. 719.103, or an interest in a trust that complies in all respects with the provisions of s. 721.08(2)(c)4, ***provided that the trust does not contain any personal property timeshare interests. A timeshare estate is a parcel of real property under the laws of this state.***

(Emphasis added).

232.    Marriott represents the MVC Trust to be a "timeshare estate." However, simply identifying a product as a "timeshare estate" does not make it so – nor does it make it an interest in real property (as Marriott represents BI to be). Whether something is actually a timeshare estate (multisite or otherwise), must be determined statutorily and contextually.

233.    Specifically, Marriott identifies the "Interest" in the MVC Trust as a timeshare estate in a multisite timeshare plan pursuant to Fla. Stat. § 721.05. *See* Exhibit L, p. 3.

50

234.    Fla. Stat. § 721.52 (2010) provides that "[t]imeshare estates *may only* be offered in a multisite timeshare plan pursuant to [Fla. Stat. §] 721.57." (Emphasis added). However, plans sold as *nonspecific* multisite timeshares fall outside the definition of "timeshare estate" because interests are deemed "licenses" or "personal property":

> "Nonspecific multisite timeshare plan" means a multisite timeshare plan *containing timeshare licenses or personal property timeshare interests* … but no specific right to use any particular accommodations and facilities.

(Emphasis added).

235.    ***Marriott previously represented in this action that the MVC Trust is a "nonspecific" multisite timeshare.*** *See* D.E. No. 77, Memorandum of Law, p. 16 ("[t]he MVC Plan is a 'nonspecific multisite timeshare plan,' under which purchasers receive 'no specific right to use any particular accommodations and facilities'"). Based on this admission alone, the MVC Trust cannot be a timeshare estate and it cannot be real property. At most, the MVC Trust would convey a contractual use right or a personal property interest.

236.    Notwithstanding, even relying solely on the "multisite" designation in the MVC Trust timeshare instruments, the MVC Trust still fails under Florida law because it cannot meet the requirements of Fla. Stat. § 721.57 (2010).

237.    Fla. Stat. § 721.57 (2010), provides, in relevant part, that:

(1) In addition to meeting all the requirements of part I, timeshare estates offered in a multisite timeshare plan must meet the requirements of subsection (2). Any offering of timeshare estates in a multisite timeshare plan *that does not comply* with these requirements *shall be deemed to be an offering of a timeshare license.*

(2) The timeshare instrument of a multisite timeshare plan in which timeshare estates are offered, *other than a trust meeting the requirements of s. 721.08*, must contain or provide for all of the following matters:

(a) The *purchaser will receive a timeshare estate as defined in s. 721.05 in one of the component sites of the multisite timeshare plan*. The use rights in the other component sites of the multisite timeshare plan shall be

made available to the purchaser through the reservation system pursuant
to the timeshare instrument.

(Emphasis added).

238.    Because MVC Trust Owners do not receive a timeshare estate in any Component Site, in order for the MVC Trust to comply with Fla. Stat. § 721.57 (2010), it must be a trust that satisfies the requirements of Fla. Stat. § 721.08 (2010).

239.    As alleged in COUNTS VII and VIII (¶¶ 242-250, 252-274, and 279-282), *infra* (and specifically incorporated here by reference), the MVC Trust does not meet the requirements of Fla. Stat. § 721.08 (2010).

240.    By virtue of the fact that the MVC Trust is not a valid multisite timeshare estate meeting the requirements of Fla. Stat. § 721.57 (2010), it is legally invalid and void.

241.    Accordingly, Plaintiffs and the MVC Trust Owners Subclass are entitled to: (a) an order declaring that the MVC Trust is not a valid multisite timeshare estate under Florida law; (b) refund of the purchase price, plus interest from the date of purchase; (c) refund of all closing costs, title insurance premiums, and fees; and (d) pre- and post-judgment interest, and attorney's fees, costs and expenses.

## PREAMBLE FOR COUNTS VII and VIII

### Marriott and First American Violated Fla. Stat. § 721.08 (2010) by Intentionally Exploiting the Roles of Escrow Agent and Timeshare Trustee

242.    Marriott represents the MVC Trust as one meeting the very strict fiduciary requirements of Fla. Stat. § 721.08 (2010).

243.    Marriott has designated First American to serve both as the escrow agent and the timeshare trustee for the MVC Trust.

244.   Pursuant to Fla. Stat. § 721.08 (2010), both the escrow agent and the timeshare trustee act as fiduciaries for purchasers of a timeshare and are required to be independent from the timeshare developer.

245.   Independence means free from conflicts of interest, self-dealing, and financial entanglements.

246.   For timeshare trustees, the fiduciary requirement is so paramount to the transaction that Florida law mandates an express acceptance of *personal* liability for breaches of duty to the timeshare purchasers *See* Fla. Stat. § 721.08(2)(c)4(b) (2010) ("No transfer pursuant to this subparagraph shall become effective until the trustee accepts such transfer and the responsibilities set forth herein."). In fact, a timeshare trustee's breach "is prima facie evidence of an intentional and purposeful violation of this act." *See* Fla. Stat. § 721.08(2)(c)4(b)(I), Fla. Stat. § 721.05(20), and  Fla. Stat § 721.03(7).

247.   For escrow agents too, the duty is so critical that an intentional violation can lead to a felony conviction. *See* Fla. Stat. § 721.08(10).

248.   In fact, as addressed more fully in RICO COUNTS I and II, *infra,* Florida law expressly defines criminal violation of Fla. Stat. § 721.08 (as described in Fla. Stat. § 721.08(10)) as a racketeering activity under Florida RICO. Fla. Stat. § 895.02(1)(a)(21). Therefore, the timeshare developer, escrow agent, or the timeshare trustee are not only liable for punitive damages but also treble damages under Florida RICO's civil remedies, in addition to such measures as revocation of license to sell insurance or real property, revocation of right to act as a trust, dissolution, divesting of title to real property, and reorganization of business entities. *See* Fla. Stat. § 895.05(1).

249.     Despite the fact that the Florida Legislature has made it abundantly clear that fiduciary functions are of enormous importance – particularly in the timeshare marketplace as provided in Fla. Stat. § 721.08 – Marriott and First American have disregarded those duties to an alarming degree in the context of the MVC Trust.

250.     COUNTS VII and VIII, *infra*, address Marriott's and First American's breaches and non-compliance with Fla. Stat. § 721.08 (2010).

## COUNT VII

### For Violating Fla. Stat. § 721.08 and Fla. Stat. § 721.03(7) (2010)

### First American Lacks Independence in its Roles
### as Timeshare Trustee and Escrow Agent

***(Against MORI, MVCTOA, First American Corp., and First American Trust
on behalf of the Plaintiffs, the Class, and the Subclasses)***

251.     Plaintiffs specifically incorporate by reference ¶¶ 1-5, 9-10, 17-22, 25, 39-81, 83, 88-110, 129-140, 242-249, *supra*, and ¶¶ 370-375, 377-394, 397-404, 411-458, 460-462, *infra*.

252.     Fla. Stat. § 721.05(20)(b) provides that that escrow agents **and** timeshare trustees must be independent, which requires that:

> ***There is no financial relationship, other than the payment of fiduciary fees*** or as otherwise provided in this subsection, between the escrow agent *or* trustee and the developer, seller, or managing entity, or any officer, director, affiliate, or subsidiary thereof.

(Emphasis added).

253.     The relationship between Marriott and First American lacks any indicia of independence, and it is clear that First American exercises no independent judgment in its capacities as timeshare trustee or escrow agent for the MVC Trust.

254.     Among other things, First American's financial entanglements with Marriott and the degree of its self-dealing transactions are mindboggling. First American helped Marriott develop the

MVC Trust, its First American Trust arm serves as land trust trustee, timeshare trustee, escrow agent, and its First American Title arm works in tandem with Marriott's title arm to underwrite title insurance policies on every MVC Trust purchase. For every one of these functions, First American receives considerable financial benefits.  This is a far cry from the simple fiduciary fee contemplated by the statute.

255.    The timeshare trustee can serve two purposes: first, it can act in lieu of an escrow agent's verification of clear title to the subject accommodations and facilities (Fla. Stat. § 721.08(2)(c)(2)(c)(III) (2010)); and, second, it can take conveyance of timeshare estates in a multisite timeshare plan pursuant to Fla. Stat. § 721.57 (2010). Marriott uses First American Trust to fulfill both purposes.

256.    As an escrow agent, First American Trust is required to hold 100% of Marriott's proceeds from the sale of MVC Trust *until* two things occur: (1) First American Trust obtains an affidavit from MORI attesting to the fact ***valid title*** of a timeshare estate was transferred to a purchaser by a duly recorded deed (s*ee* Fla. Stat. § 721.08(2)(c)(4)(b)); and (2) First American Trust independently verifies that the timeshare plan's condominium units, common areas, and appurtenant use-rights are subject to the recorded timeshare instrument and are free and clear of encumbrances (*see* Fla. Stat. § 721.08(2)(c)(a)(III) (2010); Fla. Stat. § 721.08(2)(c)(2)(c) (2010); Fla. Stat. § 721.05(5)(a)).

257.    If an escrow agent intentionally releases funds without these verifications, then the escrow agent is guilty of a felony pursuant to Fla. Stat. § 721.08 (2010).

258.    First American violates these requirements with every single sale of MVC Trust.

259.    First, pursuant to Fla. Stat. § 721.08(2)(c)(2)(d)(I) (2010), First American had a duty obtain adequate evidence that the specific timeshare estate that was sold was "[f]ree and

clear of the claims of any interestholders, other than the claims of interestholders that, through a recorded instrument, are irrevocably made subject to the timeshare instrument and the use rights of purchasers made available through the instrument."

260.    First American did not (and could not) verify that timeshare estate was free and clear of the claims of any interestholders because no interestholder, through a recorded instrument, is irrevocably made subject to the MVC Trust timeshare instruments and use rights of the MVC Trust Owners.

261.    In fact, not even the MVC Trust Owners are bound by the terms of MVC timeshare instruments through a recorded document. Rather, MVC Trust Owners are contractually bound only by the terms of the unrecorded MVC Trust Agreement.

262.    Accordingly, MVC Trust Owners' right to use the Legacy Timeshare Estates in the MVC Trust are not binding on anyone that is not contractually bound by the MVC Trust timeshare instruments (*i.e.*, Legacy Owners).

263.    As interestholders, Legacy Owners cannot be held irrevocably subject to the MVC Trust timeshare instruments or the use-rights contained therein.

264.    Second, First American has not obtained (and cannot obtain) the second required verification under Fla. Stat. § 721.08(2)(c)(2)(d)(II) (2010), which requires adequate evidence that the specific timeshare estate sold to the MVC Trust Owner was: "subject to a recorded nondisturbance and notice to creditor instrument that complies with subsection (3) and s. 721.17."

265.    The requirements under Fla. Stat. § 721.08(2)(c)(2)(d)(I) (2010) could not be met because subsection (3) provides that each interestholder must execute a nondisturbance instrument. And, because Legacy Owners (as interestholders) never executed nondisturbance

instruments to subordinate their interest to MVC Trust Owners, First American did not comply with this requirement.

266.    Furthermore, because the subject accommodations and facilities are in a condominium, the nondisturbance instrument must be recorded in public records of the county where the Legacy Timeshare Condominiums are physically located in order to amend or become incorporated into the specific Condo Declaration. Neither Marriott nor any Legacy Owner has recorded a nondisturbance instrument to bind any Legacy Timeshare Estate or Legacy Timeshare Condominium.

267.    Of course, as a practical matter, because the specific timeshare estates sold to MVC Trust Owners do not actually exist, they cannot be subject to a recorded nondisturbance instrument.

268.    Accordingly, First American has not fulfilled its function or duty as an escrow agent.

269.    As the timeshare trustee, First American's lack of independence and failure to fulfill its duties is manifest in the fact that it: (a) does not audit Marriott's sale of the MVC Trust; (b) does not audit Marriott's operation and administration of the MVC Trust; (c) takes no steps to verify that the statutory one-to-one ratio is being maintained in the MVC Trust; and (d) fails to verify that BI sold to MVC Trust Owners represents actual real property that is free and clear from encumbrances and claims of interestholders.

270.    Compounding matters further, Marriott (via its proxy MVCTOA) has agreed illegally to fully indemnify First American for its acts as trustee. *See* Exhibit M, p. 23 ("To the extent permitted by law, the Trustee, Trustee's parents, subsidiaries and affiliates … shall be indemnified … by the Association").

271.    The Florida Trust Code specifically provides that: "[a] term of a trust relieving a trustee of liability for breach of trust is unenforceable to the extent that the term [… r]elieves the trustee of liability for breach of trust committed in bad faith or with reckless indifference to the purposes of the trust or the interests of the beneficiaries." *See* Fla. Stat. § 736.1011(1).

272.    Because Legacy Owners are the owners of the Legacy Timeshare Condominiums that contain subject accommodations in the MVC Trust timeshare plan, they have suffered injuries directly as a result First American's violation of its duties as an escrow agent.

273.    Marriott's failure to create a legitimate timeshare estate before selling MVC Trust allowed Marriott to over-sell use-licenses appurtenant to the Legacy Timeshare Condominiums. That action directly prevented Legacy Owners from using the Legacy Timeshare Condominium units according to the specific Condo Declarations.

274.    The harm to MVC Trust Owners resulting from First American's violation of its statutory duties pursuant to Fla. Stat. § 721.8(1) is self-evident: First American's failure to verify that the specific timeshare estates that they purchased from Marriott actually existed and were free and clear from the claims of any interestholders, prevented them from obtaining clear title.

275.    By virtue of the foregoing, Plaintiffs and the Legacy Owners Subclass are entitled to damages arising out of artificially depreciated sales prices for interests in Legacy Timeshare Estates that have been sold since June 25, 2010, pre- and post-judgment interest, and attorney's fees, costs and expenses.

276.    By virtue of the foregoing, Plaintiffs and the MVC Trust Owners Subclass are entitled to damages, including: (a) refund of the purchase price, plus interest from the date of purchase; (b) refund of all closing costs, title insurance premiums, and fees; (d) mortgage interests and costs; (e) any loss resulting from unlawful foreclosure of nonexistent timeshare

estate; (f) punitive damages; and (g) pre- and post-judgment interest, attorney's fees, costs and expenses.

277.    The Class is further entitled to declaratory relief in the form of an order finding that that First American violated Fla. Stat. § 721.08 (2010).

## COUNT VIII

### For Violating Fla. Stat. §721.08(2)(c)(4) (2010)

### Marriott's Unlawful Efforts to Effect Transfer of Accommodations and Facilities to the MVC Trust

*(Against MORI, MVCTOA, First American Corp. and First American Trust, on behalf of the Plaintiffs, the Class, and the Subclasses)*

278.    Plaintiffs specifically incorporate by reference ¶¶ 1-5, 9-10, 17-22, 25, 39-81, 83, 88-110, 129-140, 242-249, 252-274, *supra*, and ¶¶ 370-375, 377-394, 397-404, 411-458, 460-462, *infra.*

279.    In lieu of following the requirements under Fla. Stat. § 721.08(2)(c)(2)(c) (2010), which would permit Marriott to withdraw proceeds from the sale of MVC Trust, Marriott purported instead to transfer all accommodations and facilities to a "trust" meeting the requirements of Fla. Stat. § 721.08(2)(c)(4) (2010).

280.    However, because MORI did not (and could not) provide First American Trust with evidence that it transferred facilities and accommodations to the MVC Trust that were free and clear from the claims of interestholders (*i.e.*, Legacy Owners), the requirements of Fla. Stat. § 721.08(2)(c)(4) (2010) were not met.

281.    Further, by failing to make valid transfer to First American Trust, pursuant to Fla. Stat. § 721.08(2)(c)(4) (2010), Marriott unlawfully withdrew proceeds from sales of the MVC Trust from escrow.

282.     Marriott's violation of Fla. Stat. § 721.08(2)(c)(4) (2010) caused harm to Legacy Owners, as interestholders of the Component Sites' accommodations, as well as the MVC Trust Owners, who purportedly were sold use-rights that are subject to interestholder claims by Legacy Owners.

283.     By virtue of the foregoing, Plaintiffs and the Legacy Owners Subclass are entitled to damages arising out of artificially depreciated sales prices for interests in Legacy Timeshare Estates that have been sold since June 25, 2010, pre- and post-judgment interest,  and attorney's fees, costs and expenses.

284.     By virtue of the foregoing, Plaintiffs and the MVC Trust Owners Subclass are entitled to damages, including: (a) refund of the purchase price, plus interest from the date of purchase; (b) refund of all closing costs, title insurance premiums, and fees; (d) mortgage interests and costs; (e) any loss resulting from unlawful foreclosure of nonexistent timeshare estate; (f) punitive damages; and (g) pre- and post-judgment interest, attorney's fees, costs and expenses.

285.     The Class is further entitled to declaratory relief in the form of an order finding that that First American violated Fla. Stat. § 721.08 (2010).

## COUNT IX

### For Violating Fla. Stat. § 721.03(10)

### MVC Trust Defies Compliance with Statutory One-to-One Nightly-Use Ratio

*(Against MORI and MVCTOA on behalf of
the Plaintiffs, the Class, and the Subclasses)*

286.     Plaintiffs specifically incorporate by reference ¶¶ 1-5, 9-10, 17-18, 39-77, 84-110, 129-140, *supra*, and ¶¶ 460-462, *infra*.

287.    Timeshare property, by its very definition, must be subject to one timeshare instrument. Fla. Stat. § 721.05(40), defines Timeshare property as: "one or more timeshare units **subject to the same timeshare instrument**, together with any other property or rights to property appurtenant to those timeshare units." (Emphasis added).

288.    Each Legacy Timeshare Estate is subject to <u>one</u> timeshare instrument pursuant to its respective Condo Declaration.

289.    Unrecorded timeshare instruments (like the MVC Trust Agreement) cannot legally bind Component Sites or Legacy Timeshare Estates included in the MVC Trust.

290.    Fla. Stat. § 721.03(10), provides that:

A developer or seller may not offer any number of timeshare interests that would cause the total number of timeshare interests offered to exceed a one-to-one use right to use night requirement ratio.

291.    Every Condo Declaration in every Component Site guarantees that each condominium unit shall maintain a one-to-one nightly-use ratio. This requirement applies whether the timeshare interest being offered for sale is a timeshare estate, personal property timeshare interest, or a timeshare license. *See* Fla. Stat.§ 721.03(10).

292.    The MVC Trust does not have any of its own accommodations and facilities. Rather, it is made up of Legacy Timeshare Estates from 44 different Component Sites – each with its own governing Condo Declaration setting forth, *inter alia*, its rules, restrictions, fractional makeup, use-rights, and, critically, its mechanism for compliance with its one-to-one nightly-use requirement ratio.

293.    One-to-one nightly-use ratio does not mean the *approximate* ratio of available use-licenses in a particular timeshare plan to use-licenses being sold. Rather, as defined in Fla. Stat. § 721.05(25), one-to-one nightly-use ratio means:

that the sum of the nights that owners are entitled to use in a given 12-month period shall not exceed the number of nights available for use by those owners during the same 12-month period. No individual timeshare unit may be counted as providing more than 365 use nights per 12-month period or more than 366 use nights per 12-month period that includes February 29. The use rights of each owner shall be counted without regard to whether the owner's use rights have been suspended for failure to pay assessments or otherwise.

294.    Marriott may only add accommodations and facilities to a timeshare plan if a one-to-one nightly-use ratio is maintained at all times for each condominium unit. Therefore, no matter how many BI are added to the MVC Trust, each fractional interest must add up to a Legacy Timeshare Condominium unit that only has 365 use nights (or 366 use nights in a leap year).

295.    Responsibility for ensuring that the MVC Trust adheres to the one-to-one nightly-use ratio, falls on Marriott's proxy, MVCTOA.

296.    Because it is an impossible task, however, MVCTOA has not and will not ever fulfill this duty.

297.    Setting aside (for the sake of this claim), that the MVC Trust is sold as a timeshare estate in preexisting Legacy Timeshare Estates and Legacy Timeshare Condominiums, BI purports to represent a beneficial interest in the accommodations of Component Sites, including units and use-rights therein.

298.    However, because Marriott could not (and did not) make the MVC Trust part of the Component Sites before commencing sales of the product, the configuration of the overlapping MVC Trust necessarily violates Fla. Stat. § 721.03(2) (which requires compliance with the Florida Condominium Act for any timeshare estate created in a condominium) (*see* Count V, *supra*).

299.   If a timeshare license or timeshare estate had been legally created in each Component Site, it is conceivable (as least technically) that the one-to-one nightly-use ratio could automatically be maintained because each timeshare interest has pre-determined use rights.

300.   However, because MVC Trust was never created as a timeshare estate in the subject Legacy Timeshare Estates, the total use-rights of timeshare estates can never be pre-determined and can never be automatically maintained.

301.   Furthermore, the MVC Trust timeshare instruments do not (and cannot) contain any type of methodology to maintain a one-to-one nightly-use ratio.

302.   Marriott's methodology for valuing and assigning BI to Legacy Timeshare Estates added to MVC Trust is an undisclosed and proprietary process.  This gives Marriott unfettered discretion to change the formula for assigning value to BI/points as it sees fit with every NOA recorded – even for Legacy Timeshare Estates of the same category.

303.   While the MVC Trust Agreement purports to allow Marriott to unilaterally change the BI assigned to later-added Legacy Timeshare Estates so as long as "Points for Sale" do not exceed total "Points for Use," this rule is utterly meaningless in terms of calculating a one-to-one nightly-use ratio of the Legacy Timeshare Estates that constitute the accommodations in the MVC Trust.

304.   As alleged in ¶¶ 100-110, the Points for Use are summarized in each NOA, and include points assigned to restricted-use properties for which no NOU has been delivered.  Thus, overall Points for Use neither represents the total use-rights of MVC Trust nor does it have any relevance to MVC Trust Owners' use-rights as to accommodations and facilities in the MVC Trust.

305.     As a result, there exists an unavoidable discrepancy between the point value ascribed to properties in the MVC Trust that are available to MVC Trust Owners and the total points allotted to all properties in the MVC Trust.

306.     Thus, if the BI units sold to MVC Trust Owners are equal to Points for Sale, it is mathematically impossible to achieve anything resembling a one-to-one nightly-use ratio.

307.     MVC Trust Owners have a right to a timeshare plan that maintains a one-to-one nightly-use ratio. Marriott and MVCTOA failed to provide such a plan and likewise failed to ensure compliance.

308.     Moreover, because Legacy Owners' rights to use the Legacy Timeshare Estates include both contractual rights and property ownership rights that run with the land, Marriott's failure to comply with the one-to-one nightly-use ratio with regard to MVC Trust properties also interferes with Legacy Owners' ability to use the Legacy Timeshare Condominium units according to the respective terms of the applicable Condo Declarations, including the one-to-one nightly-use ratio being maintained pursuant thereto.

309.     By virtue of the foregoing, Plaintiffs and the MVC Trust Owners Subclass are entitled to damages, including: (a) refund of the purchase price, plus interest from the date of purchase; (b) refund of all closing costs, title insurance premiums, and fees; (d) and pre- and post-judgment interest, attorney's fees, costs and expenses.

310.     By virtue of the foregoing, Plaintiffs and the Legacy Owners Subclass are entitled to damages arising out of artificially depreciated sales prices for interests in Legacy Timeshare Estates, pre- and post-judgment interest, and attorney's fees, costs and expenses.

311.     The Class is further entitled to declaratory relief in the form of an order finding that Marriott and MVCTOA failed to maintain the one-to-one nightly-use ratio required under Fla. Stat. § 721.03(10) with regard to the MVC Trust.

## COUNT X

### For Violating Fla. Stat. § 721.552(3)(b)

### Adding Legacy Timeshare Estates to the MVC Trust by NOA
### Violates the Requirements of a Multistate Timeshare Plan

**(*Against MORI, MVCTOA, First American Corp., and First American Trust,
on behalf of the Plaintiffs and the MVC Trust Owners Subclass*)**

312.     Plaintiffs specifically incorporate by reference ¶¶ 1-5, 9-10, 17-22, 25, 39-77, 84-110, 129-140, *supra*, and ¶¶ 460-462, *infra*.

313.     Under Fla Stat. § 721.552(1)(b), Marriott owes a fiduciary duty to MVC Trust Owners when adding accommodations to the MVC Timeshare Plan. Specifically, that section provides that:

> Any person who is authorized by the timeshare instrument to make additions to the multisite **timeshare plan** pursuant to this subsection shall act as a fiduciary in such capacity in the best interests of the purchasers of the plan as a whole and shall adhere to the demand balancing standard set forth in s. 721.56(6) in connection with such additions. Additions that are otherwise permitted may be made only so long as a one-to-one use right to use night requirement ratio is maintained at all times. (Emphasis added).

314.     Under the MVC Trust Agreement, Marriott has the sole discretion to add accommodations and facilities to the MVC Trust. Specifically:

> Developer may, from time to time, in its sole and absolute discretion, cause additional Submission Property to be transferred into the trust or otherwise made available to the Beneficiaries and the Trust without the consent of the Beneficiaries, the Associations, or the Trustee.

*See* Exhibit M, p. 14 (Art. V, Sec. 5.3).

315.     However, Marriott's addition of Legacy Timeshare Estates to the MVC Trust by land trust deed and NOA does *not* constitute a valid addition under Fla Stat. § 721.552(1)(b).

316.     When Marriott adds Legacy Timeshare Estates to the MVC Trust, the properties remain restricted-use property (meaning MVC Trust Owners have no access to them) until Marriott, in its sole discretion, decides to deliver an NOU to MVCTOA and First American.

317.     That procedure, which follows no guidelines, allows Marriott to add Legacy Timeshare Estates to the MVC Trust (which MVC Trust Owners ostensibly are beneficiaries of) while preventing the MVC Trust Owners access to those Legacy Timeshare Estates via the reservation procedures, until Marriott, in its sole discretion, decides to make them available (if at all).

318.     A review of the restricted-use properties that Marriott holds back from MVC Trust Owners appear to consist of many high-demand Legacy Timeshare Estates in comparison to the properties to which Marriott has delivered NOUs on and permits access to via the reservation procedures.  Whether Marriott rents out these high-demand restricted-use properties through other channels is unknown, but it is reasonable to assume that Marriott is not letting valuable Legacy Timeshare Estates at its disposal remain vacant. In fact, many of the identical properties that are listed as MVC Trust properties, but are invariably unavailable to MVC Trust Owners, are simultaneously listed as available on the separate Marriott Rewards website as available to the public.

319.     Restricting access to any Legacy Timeshare Estates in the MVC Trust unfairly and unreasonably increases competition among MVC Trust Owners. Indeed, while demand rises with the sale of BI (and by extension an increase in MVC Trust Owners), there is a proportional

decrease in the availability of MVC Trust properties. The existence of restricted-use properties compounds this problem.

320.    By virtue of the foregoing, Plaintiffs and the MVC Trust Owners Subclass are entitled to damages, including: (a) refund of the purchase price, plus interest from the date of purchase; (b) refund of all closing costs, title insurance premiums, and fees; (d) and pre- and post-judgment interest, attorney's fees, costs and expenses.

321.    The Plaintiffs and the MVC Trust Owners Subclass is further entitled to declaratory relief in the form of an order finding that that Marriott addition of (and manipulation of) properties in the MVC Trust violates of Fla Stat. § 721.552(1)(b).

## COUNT XI

### For Violating Fla. Stat. § 721.13(1)

### As a Proxy for Marriott, MVCTOA Lacks any Indicia of Independence, is an Improper Managing Entity, and Breached its Fiduciary Duty to the MVC Trust

#### (*Against MORI and MVCTOA on behalf of the Plaintiffs, the Class, and the Subclasses*)

322.    Plaintiffs specifically incorporate by reference ¶¶ 1-5, 9-10, 17-18, 39-81, 84-140, *supra*, and ¶¶ 460-462, *infra.*

323.    Under Fla. Stat. § 721.13(1)(a), Marriott was required to provide a managing entity for the MVC Trust which could be either "the developer, a separate manager or managing firm, or an owners' association."

324.    Fla. Stat. § 721.13(2)(a), provides that the "[t]he managing entity shall act in the capacity of a fiduciary to the purchasers of the timeshare plan."

325.    Marriott established MVCTOA to fill the role of managing entity for the MVC Trust. However, because MVCTOA is merely a proxy for Marriott, it is necessarily incapable

from functioning as a fiduciary for MVC Trust Owners. Among other things (specifically identified in ¶¶ 111-128, *supra*, and incorporated herein by reference), MVCTOA:

(a) operates out of Marriott's headquarters;

(b) is staffed by Marriott employees;

(c) is required to delegate virtually all operational and managerial functions to Marriott;

(d) maintains a board consisting of only three members – two Marriott executives and a third Marriott designee;

(e) lacks voting and representative rights for MVC Trust Owners; and

(f) is prohibited by the MVC Trust Agreement from taking any actions on behalf of the MVC Trust Owners that would interfere with Marriott's ability to sell the MVC Trust so as long as Marriott holds at lease a single unit of BI.

326.    Based on the foregoing, it is clear that MVCTOA is not an independent managing entity. Nevertheless, under a pretext of independence, Marriott has used, and continues to use MVCTOA as a fiduciary shield to circumvent multiple provisions of the Fla. Stat. § 721 and to misrepresent the terms of the timeshare instruments created pursuant to that law.

327.    Fla. Stat. § 721.13(1)(b) provides that:

(1) With respect to a timeshare plan which is also regulated under chapter 718 or chapter 719, or which contains a mandatory owners' association, the board of administration of the owners' association shall be considered the managing entity of the timeshare plan.

\*\*\*\*

(3) An owners' association which is the managing entity of a timeshare plan that includes condominium units or cooperative units shall not be considered a condominium association pursuant to the provisions of chapter 718 or a cooperative association pursuant to the provisions of chapter 719, unless such owners' association also operates the entire

condominium pursuant to s. 718.111 or the entire cooperative pursuant to s. 719.104.

328.     The MVC Trust is sold as a Florida timeshare estate in pre-existing Legacy Timeshare Condominiums – only some of which are actually located in the State of Florida (and therefore regulated by Fla. Stat. § 718).  For Florida-based properties, Fla. Stat. § 718 requires that the "managing entity" be the owners' association.

329.     To the extent the MVC Trust is sold as a Florida timeshare estate in Legacy Timeshare Condominiums located outside the State of Florida, the managing entity must be the owners' association if the same is mandatory under the "applicable law." Applicable law is defined under Fla. Stat. § 721.52(1) as "the law of the jurisdiction where the accommodations and facilities referred to are located."

330.     Further, Fla. Stat. § 721.13(1)(a) requires that "[a]ny owners' association shall be created prior to the first closing of the sale of a timeshare interest."

331.     Thus, even assuming, *arguendo*, the MVC Trust was a legitimate Florida timeshare estate (it is not) and that it provided MVC Trust Owners with real beneficial interest in the Legacy Timeshare Estates and the related ownership interests in the Legacy Timeshare Condominiums where they are located (it does not), the structure would still violate the managing entity and owners' association requirements of Fla. Stat. § 721.13(1).

332.     First, the pre-existing Legacy Timeshare Estates that are included in the MVC Trust are already included in timeshare plans where the "first closing" of a timeshare interest occurred well *before* the creation of the MVC Trust.  Because MVCTOA was created *after* the first closing on those Legacy Timeshare Estates, it does not comply with Fla. Stat. § 721.13(1)(a).

333.     Second, under Fla. Stat. § 718, timeshare estates can only be subject to a single owners' association where the property is physically located. The pre-existing Legacy Timeshare

Estates that are included in the MVC Trust are already managed by the owners' associations that were created as part of the respective timeshare plans at the respective Component Sites. Thus, MVCTOA serves no additional function not already legally served by those owners' associations.

334.   And, third, because MVCTOA lacks operating authority over "the entire condominium," it fails to comply with Fla. Stat. § 721.13(1)(b). Even though title to the tens of thousands of Legacy Timeshare Estates, physically located in 44 Legacy Timeshare Condominiums in eleven states, was transferred to the MVC Trust, those properties remain outside the authority of MVCTOA.

335.   Finally, even assuming MVCTOA was a legitimate and independent managing entity (it is not), it has breached its fiduciary duties to MVC Trust Owners in numerous ways.

336.   For instance, Fla. Stat. § 721.13(3) demonstrates that owners' associations acting as managing entities, as opposed to developers, have unique requirements, including providing owners with statutory rights of representation. Indeed, there are a plethora of provisions applicable solely when the managing entity is an owners association. *See* Fla. Stat. §§ 721.13(1)(a), 721.13(3), 721.13(c)(2), 721.13(c)(3), and 721.13(13). MVCTOA fulfills none of these obligations.

337.   Other breaches include MVCTOA: (a) collecting arbitrary exchange fees on transfers of BI; (b) allowing Marriott to pass through costs for restricted-use Legacy Timeshare Estates to MVC Trust Owners; (c) lacking of transparency with regard to accounting for and calculating fees and assessments; (d) entering into self-dealing, double-dipping transactions with Marriott Hospitality Co. for management services; (e) collecting Trust Reservation System fees that were already included in maintenance fees covering MVC Exchange Company; (f) collecting maintenance and operating fees for maintaining Component Site properties; and (g) using an

70

undisclosed, different, and more advantageous formula for assessing expenses attributable to Marriott-owned, restricted-use properties in the MVC Trust that it uses for annual expenses assessed to MVC Trust Owners.

338.    MVCTOA and MORI are jointly and severally liable for violations of Fla. Stat. § 721.13(2).

339.    Marriott's establishment and control of the MVCTOA, as well as MVCTOA's continued violations of Fla. Stat. § 721.13(2), harm both MVC Trust Owners and Legacy Owners.

340.    With regard to MVC Trust Owners, they are subject to an illegitimate owners' association that does not protect their interests and are burdened with the fees and costs associated with MVCTOA.

341.    With regard to Legacy Owners, they have enforceable property ownership rights under the terms of their respective Condo Declarations which delineate the governing and operation of the owners' association at their particular Legacy Timeshare Condominium.  As a result, MVCTOA infringes on their rights of proportional voting and representation, rights to be governed by a representative owners' association, and rights appurtenant to their fractional ownership interests in the Legacy Timeshare Condominiums.

342.    Plaintiffs and the MVC Trust Owners Subclass are entitled to damages arising out of the unlawful acts of Marriott and MVCTOA including, but not limited to refund of all annual maintenance fees, costs assessed, all exchange fees, pre- and post-judgment interest, and attorney's fees, costs and expenses.

343.    Plaintiffs and the Legacy Owners Subclass are entitled to damages arising out of any impairment of rights or costs incurred as a result of MVCTOA infringing on their rights

enumerated in the applicable Condo Declarations, pre- and post-judgment interest, and attorney's fees, costs and expenses.

344.    Additionally, the Plaintiffs and the Class are entitled to injunctive relief in the form of an order invalidating MVCTOA as an owners' association and reversing any decision or determination made in its capacity as an owners' association.

## COUNT XII

### For Violating Fla. Stat. § 721.15

### Marriott and MVCTOA Unfairly Assess and Collect Common Expenses

*(Against MORI and MVCTOA on behalf of the*
*Plaintiffs and the MVC Trust Owners Subclass)*

345.    Plaintiffs specifically incorporate by reference ¶¶ 1-5, 9-10, 17-18, 39-81, 84-140, *supra*, and ¶¶ 460-462, *infra.*

346.    Fla. Stat. § 721.15(1)(a), provides that:

The timeshare instrument shall provide for the allocation of common expenses among all timeshare units or timeshare interests on a reasonable basis, including timeshare interests owned or not yet sold by the developer … The timeshare instrument shall allocate common expenses to timeshare interests owned or not yet sold by the developer on the same basis that common expenses are allocated to similar or equivalent timeshare interests sold to purchasers.

347.    In order to comply with the statute, Marriott and/or MVCTOA must ensure that Marriott's portion of the annual common expenses as to unsold property is calculated using the same formula that applies uniformly to other MVC Trust Owners.

348.    The MVC Trust timeshare instrument appears to provide an objective formula to calculate proportionate amount of common expenses that apply uniformly for all MVC Trust Owners except for restricted-use properties owned by Marriot.

349.    According to the MVCTOA Bylaws, the formula assessed for all MVC Trust Owners is:

$$M = \{A \text{ X } Y/X\} + E$$

Where:

M  =  Beneficiary's share of the Common Expenses to be determined

A  =  The total amount of the Common Expenses (other than the expenses related to Owner Services (as described below)).

Y =  The number of Points that are associated with all of the particular Beneficiary's Interests.

X =  The then current total number of Points for Sale in the Trust attributable to Trust Property for which a Notice of Use Rights has been delivered.

E =  The amount of Exchange Company Dues charged to the Association for the Beneficiary Pursuant to the Exchange Company Documents.

*See* Exhibit N, p. 19 (Art. VII, Sec. 1, Ex. A).

350.    Every year, MVC Trust Owners share of the common expenses have been calculated according to the same formula and increased incrementally as summarized below:

- 2011 - $100.00 Per BI + E
- 2012 - $107.50 Per BI + E
- 2013 - $109.25 Per BI + E
- 2014 - $112.50 Per BI + E
- 2015 - $118.75 Per BI + $175 Per Owner
- 2016 - $125.62 Per BI + $185 Per Owner
- 2017 - $138.25 Per BI + $195 Per Owner

351.    Under the MVCTOA Bylaws, there is an exception carved out for calculating the common expenses associated with restricted-use property which are excluded from the formula:

None of the points associated with Restricted Use Property shall be included in determining the Developer's share of the Common Expenses, until the effective date of a Notice of Use Rights been delivered by Developer to the Association and Trustee with respect to such Restricted Use Property.

*Id.*

352.    As noted herein, restricted-use means properties to which Marriott, *in its discretion,* has not delivered an NOU to MVCTOA and First American. It is a euphemistic way of disguising the fact that the formula used to calculate common expenses for Marriott's ownership interests in the MVC Trust is not the same formula applied to MVC Trust Owners.

353.    Not surprisingly, according to the MVCTOA Bylaws, restricted-use property expenses are determined solely by MVCTOA using an entirely discretionary, undisclosed process:

> It is expressly understood that there is ***not a precise formula*** for allocating the Restricted Use Property Expenses incurred with respect to each Restricted Property; however, the Association will use commercially reasonable method for making such allocation as determined to be equitable by the Association in the Association's sole discretion.

*Id.* at p. 10 (Art. IV, Sec. 16(g)(i)) (emphasis added).

354.    Based on the foregoing determination of what is "reasonable," Marriott can avoid paying the inflated common expenses that are passed along and assessed against the MVC Trust Owners.

355.    Because MVCTOA owes a statutory fiduciary duty to MVC Trust Owners, it obligated to use the same equitable, commercially reasonable calculation for both MVC Trust Owners and Marriott. Instead, Plaintiffs and other MVC Trust Owners were assessed and paid the rate of common expenses different from Marriott that increased each year under the formula provided in the MVCTOA Bylaws.

356.    By virtue of the foregoing, Plaintiffs and the MVC Trust Owners Subclass are entitled to damages, including a refund all of all common expenses and exchange fees paid since the first offering of MVC Timeshare Plan or the difference between amounts paid and what

would have been appropriate based on a reassessment of the common expenses that includes and reflects any amount Marriott contributed to common expenses on restricted-use properties.

## COUNT XIII

### For Violating Fla. Stat. § 721.56

### Marriott Failed to Provide and Maintain a Separate Reservation System for MVC Trust Owners and Legacy Owners

#### (*Against MORI, MVC Exchange Company, and MVCTOA on behalf of the Plaintiffs, the Class, and the Subclasses*)

357.    Plaintiffs specifically incorporate by reference, ¶¶ 1-5, 9-10, 13-14, 17-18, 39-77, 84-99, 111-140, *supra*, and ¶¶ 460-462, *infra*.

358.    Fla. Stat. § 721.52(6) requires that multisite timeshares have specific and distinct reservation system procedures that allow owners to occupy any accommodation or facility of the multisite timeshare plan. Further, the reservation procedures must provide a method to compete with other purchasers of the same timeshare plan.

359.    In establishing the reservation system for the multisite timeshare plan, pursuant to Fla. Stat. § 721.52(6), "developer is required to use its best efforts, in good faith based upon all reasonably available evidence under the circumstance to further the best interests of the purchasers of the plan as a whole with respect to their opportunity to use and enjoy the accommodations and facilities of the plan."

360.    The MVC Trust's reservation procedure (the "Trust Reservation System") is incorporated into the MVC Trust Agreement. *See* Exhibit O.

361.    Because MVC Timeshare Plan is (at most) a non-specific, multisite timeshare plan that is not affixed to any real property (and thus considered a "use license" under Florida law), the MVC Trust can become virtually unusable without a strictly-managed reservation

system. Indeed, MVC Trust Owners have a statutory right to a multisite reservation system that allows them to only compete with other MVC Trust Owners to reserve the accommodations and facilities in the MVC Trust.

362.     Notwithstanding, in 2012, MVCTOA entered into a contract with MVC Exchange Company to merge its reservation system into the MVC Exchange Program.

363.     The MVC Exchange Program combines three distinct timeshare plans under a single reservation program without regard to the reservation procedure provided in the respective timeshare instruments. This includes Legacy Owners that voluntary enroll in the Marriott Destinations program on annual basis and deposit points assigned to their Legacy Timeshare Estates, Ritz Carlton Legacy Owners that enroll in the exchange program, and MVC Trust Owners who have the Trust Reservation System.

364.     After MVCTOA allowed the Trust Reservation System to be subsumed into the MVC Exchange Program, MVC Trust Owners were neither notified nor given an opportunity to object despite the fact that a fundamental aspect of the MVC Trust had been altered in a material and significant way.

365.     As a result of the merger of reservation systems into the MVC Exchange Program, MVC Trust Owners, Legacy Owners, and Ritz Carlton Legacy Owners[5] all compete for the same properties.

366.     Additionally, since 2010, MVC Trust Owners have been charged fees for the Trust Reservation System. After the 2012 merger into the MVC Exchange Program, MVC Trust Owners took on additional maintenance fees related to the merged reservation system but continued to pay the underlying Trust Reservation System fees. Consequently, MVC Trust Owners are now being double charged for the same service.

---

[5]     Marriott acquired Ritz Carlton properties in 1998.

76

367.    As a result of the foregoing, Plaintiffs and members of the Subclasses are entitled to damages in the form of refunds of all exchange dues, loss attributed to three years of diminished ability to reserve the MVC Trust's accommodations and facilities, disgorgement of profits realized from manipulating reservation procedures among three different timeshare interests, pre- and post-judgment interest, attorneys' fees, costs and expenses.

368.    In addition, Plaintiffs and the Class are entitled to injunctive relief in the form of an order requiring Marriott to maintain appropriate reservation procedures for the separate programs.

369.    Finally, Plaintiffs and the MVC Trust Owners Subclass are entitled to injunctive relief in the form of an order requiring Marriott to make available all the accommodations in the MVC Trust available to MVC Trust Owners, including presently restricted-use properties.

## PREAMBLE TO FLORIDA RICO CLAIMS
### Fla. Stat. §§ 895.03 and 895.05

370.    Pursuant to Fla. Stat. § 895.03(1):

[i]t is unlawful for any person who has with criminal intent received any proceeds derived directly or indirectly, from a pattern of racketeering activity or through the collection of an unlawful debt to use or invest, whether directly or indirectly, any part of such proceeds, or the proceeds derived from the investment or use thereof, in the acquisition of any title to, or any right, interest, or equity in, real property or in the establishment or operation of any enterprise.

371.    Under Fla. Stat. § 895.02(5), an "Enterprise" means:

any individual, sole proprietorship, partnership, corporation, business trust, union chartered under the laws of this state, or other legal entity, or any unchartered union, association, or group of individuals associated in fact although not a legal entity; and it includes illicit as well as licit enterprises and governmental, as well as other, entities. A criminal gang, as defined in s. 874.03, constitutes an enterprise.

372.    Under Fla. Stat. § 895.02(7), the "Pattern of racketeering activity" means:

engaging in at least two incidents of racketeering conduct that have the same or similar intents, results, accomplices, victims, or methods of commission or that

otherwise are interrelated by distinguishing characteristics and are not isolated incidents, provided at least one of such incidents occurred after the effective date of this act and that the last of such incidents occurred within 5 years after a prior incident of racketeering conduct. 898.03(1)(a), Fla. Stat.

373.    Fla. Stat. § 895.02(8) provides a list of the activities that that may constitute "Racketeering activity" under Florida RICO. Among those, Fla. Stat. § 895.02(8)(a)(21) specifically includes unlawful acts under Fla. Stat. § 721.08, "relating to real estate timeshare plans."

374.    Defendants Marriott and First American are part of a RICO Enterprise organized both formally and informally through business dealings and contractual relationships.

375.    As alleged below, the RICO Defendants, through a pattern of various racketeering activities, conspired to and did violate Fla. Stat. § 721.08.

## FLORIDA RICO COUNT I

### Marriott and First American Conspired to
### Unlawfully Withdraw Proceeds from Escrow

### (*Against Marriott and First American on behalf*
### *of the Plaintiffs, the Class, and the Subclasses*)

376.    Plaintiffs specifically incorporate by reference ¶¶ 1-25, 39-140, 242-249, 252-275, 279-282, 370-375, *supra*, and ¶¶ 397-404, 411-458, 460-462, *infra*.

377.    Where, as here, Marriott and First American conspired to violate Fla. Stat. § 721.08 by allowing Marriott to unlawfully withdrawal MVC Trust sale proceeds from escrow, they are liable under Florida RICO.

378.    As alleged herein, Marriott and First American, repeated and continue to repeat this conduct thousands of times in connection with each MVC Trust sale. This open-ended racketeering activity thereby establishes a pattern.  This pattern of racketeering is the enterprise's regular way of doing business and threatens repetition in the future.

78

379. Marriott and First American created a RICO criminal enterprise for, *inter alia:* (a) the purpose of allowing Marriott to make withdrawals from the escrow account in violation of Fla. Stat. § 721.08 in connection with sales of invalid timeshare estates to MVC Trust Owners; and (b) providing First American with a robust revenue stream of escrow fees and title insurance premiums despite the absence of title.

380. To initiate this process, Marriott (*via* MORI) submitted fraudulent affidavits to First American Trust attesting to the fact that a closing was completed pursuant to Fla. Stat. § 721.05(5)(a).

381. Although Marriott did deliver MVC Trust Consumer Deeds to MVC Trust Owners and went through the artifice of recording the MVC Trust Consumer Deeds to satisfy the recording requirement of Fla. Stat. § 721.05(5)(a), Marriott and First American knew that no legal title to any legitimate timeshare estate passed to MVC Trust Owners.

382. First American (ostensibly a foremost expert in what constitutes legal title) knowingly accepted Marriott's fraudulent affidavit even though it knew in its capacity as the title insurer (*via* First American Title) that MVC Trust Consumer Deeds lacked any cognizable description of real property sufficient to transfer lawful title.

383. First American also knew that the MVC Trust Consumer Deeds were recorded only in the Orange County Comptroller's office, which knowingly failed to comply with any known recording law.

384. Furthermore, First American knew in its capacity as trustee of the MVC Trust (*via* First American Trust) that the legal or equitable title of the trust property could only pass from First American Trust to MVC Trust Owners rather than from MORI, which relinquished legal title to the trust properties upon submission to the MVC Trust.

385.     Therefore, First American knowingly accepted fraudulent affidavits from MORI attesting to the fact that the closing had been completed pursuant to Fla. Stat. § 721.05(a).

386.     Under Fla. Stat. § 721.08, upon receiving the affidavit from MORI that a legally compliant closing was completed, First American had further duty to independently verify that the specific timeshare estate conveyed, as well as the accommodations and the facilities, were free from competing claims of an interestholder.

387.     First American, as a long-time and preeminent player in the title insurance industry, and as a federal savings bank well-versed in lawful trust management, undoubtedly knew that timeshare estates created in condominiums must be located in the specific Condo Declaration.

388.     First American, as the title insurer of the MVC Trust, also knew that a valid timeshare estate and real property interest did not exist. In fact, First American did not (and could not) locate any MVC Trust deeded interest (identified in the MVC Trust Consumer Deeds) in any Component Site Condo Declaration (or in any other public land record).

389.     Further, in its capacity as the land trust trustee, First American had actual knowledge that it accepted title to properties submitted to MVC Trust that were subject to (and encumbered by) the respective Component Site Condo Declarations. Therefore, First American knew that the accommodations and facilities of the MVC Trust were and remain subject to superior claims of interestholders (*i.e.*, Legacy Owners) that have property ownership rights to enforce the terms of the respective Condo Declarations.

390.     Thus, there is clear and convincing evidence that First American purposefully, knowingly, and intentionally agreed to and allowed Marriott to withdraw proceeds from the sale of the MVC Trust from the escrow account in violation of Fla. Stat. § 721.08.

391.    While Fla. Stat. § 895.02(4) requires only two violations in a five-year period, Marriott and First American have committed this violation tens of thousands of times since June of 2010.

392.    And, since the first sale of the MVC Trust in 2010, First American has been the exclusive escrow agent for the MVC Trust. So long as Marriott continuously sells the MVC Trust, First American, as its exclusive escrow agent, continues to violate Fla. Stat. § 721.08(10)(a) – thus constituting a continuing pattern of racketeering activity violative of Florida RICO.

393.    Marriott and First American function as a continuing unit of a criminal enterprise. Without First American's full participation and cooperation as the escrow agent and trustee, Marriott would be unable to continue to profit from the MVC Trust scheme, because, among other things, the proceeds from the unlawful sales would never be released from escrow.

394.    Both Legacy Owners and MVC Trust Owners have met their burden to show that they were injured by reason of Marriott and First American's violation of Florida RICO.

395.    Therefore, under Fla. Stat. §§ 895.05(7)(b) and 772.104, the Plaintiffs, the Class, and Subclasses are entitled to recover damages threefold of the actual damages sustained for the aforementioned violations of Fla. Stat. § 721.08, plus court costs and the costs of investigation and prosecution incurred.

## **FLORIDA RICO COUNT II**

### **Marriott and First American Conspired to to Establish an Unlawful Trust**

#### (*Against Marriott and First American on behalf of the Plaintiffs, the Class, and the Subclasses*)

396.    Plaintiffs specifically incorporate by reference ¶¶ 1-25, 39-140, 242-249, 252-275, 279-282, 370-375, *supra*, and ¶¶ 377-394, 411-458, 460-462, *infra*.

397.     Under Fla. Stat. § 721.08(10)(b), an individual or entity is guilty of a felony of the third degree if, as a developer, he, she, or it intentionally fails to comply with the provisions of Fla. Stat. § 721.08 concerning the establishment of a trust.

398.     Unlike the criminal penalties imposed for escrow violations under Fla. Stat. § 721.08(10)(a), intent is not an element that Plaintiffs must establish for a violation of the trust requirements under Fla. Stat. § 721.08(10)(b).

399.     Indeed, Fla. Stat. § 721.08(10)(b) provides that the failure to transfer property into the trust meeting the requirements of Fla. Stat. § 721.08(2)(C)(4) is "is prima facie evidence of an intentional and purposeful violation of this section."

400.     In order to circumvent other requirements pursuant to Fla. Stat. § 721.08(2)(c)(2)(c) (2010) and Fla. Stat. § 721.57 (2010), Marriott, with the knowledge, assistance, and cooperation of First American, purported to transfer each of the accommodations and facilities of the MVC Trust to a trust meeting the requirements of Fla. Stat. § 721.08(2)(c)(4).

401.     To effectuate the transfer, Marriott executed tens and thousands of deeds purporting to transfer its corporate-owned Legacy Timeshare Estates from MORI to First American Trust as the MVC Trust land trust trustee.

402.     However, because the transfer of Legacy Timeshare Estates to the MVC Trust does not constitute a valid transfer to a trust under Fla. Stat. § 721.08(2)(c)(4), Marriott and First American violated Fla. Stat. § 721.08(2)(c)(2)(c) (2010) and Fla. Stat. § 721.57 (2010).

403.     The foregoing conduct amounts to hundreds of thousands of violations since 2010.

404.     By conspiring to commit an indictable crime in violation of Fla. Stat. § 721.08, Marriott and First American engaged in continuous racketeering act to further the objective of a

82

criminal enterprise to sell use-rights and real property in excess of inventory, sell fraudulent title policies and mortgages, and impose other improper fees.

405.    Therefore, under Fla. Stat. §§ 895.05(7)(b) and 772.104, the Plaintiffs, the Class, and Subclasses are entitled to recover damages threefold of the actual damages sustained for the aforementioned violations of Fla. Stat. § 721.08, plus court costs and the costs of investigation and prosecution incurred.

## CLAIM FOR PUNITIVE DAMAGES

### Entitlement to Punitive Damages Pursuant to Fla. Stat. § 721.21 and Fla. Stat. § 768.72

*(Against Marriott and First American on behalf of the Plaintiffs, the Class, and the Subclasses)*

406.    Plaintiffs specifically incorporate by reference, ¶¶ 1-25, 39-140, 242-249, 252-275, 279-282, *supra*, and ¶¶ 460-462, *infra*.

407.    Fla. Stat. § 721.21 specifically states that "[r]elief under this section does not exclude other remedies provided by law."

408.    Fla. Stat. § 768.72(2) provides that punitive damages are available where a defendant "was personally guilty of intentional misconduct or gross negligence."

409.    Fla. Stat. § 768.72(2)(a) provides that "Intentional misconduct" is when "the defendant had actual knowledge of the wrongfulness of the conduct and the high probability that injury or damage to the claimant would result and, despite that knowledge, intentionally pursued that course of conduct, resulting in injury or damage."

410.    Fla. Stat. § 768.72(2)(b) provides that "Gross negligence" is when "the defendant's conduct was so reckless or wanting in care that it constituted a conscious disregard or indifference to the life, safety, or rights of persons exposed to such conduct."

411.    In addition to the facts previously alleged and incorporated herein by reference, the following allegations provide specific facts demonstrating that Marriott and First American acted intentionally and/or with willful disregard of the rights of MVC Trust Owners and Legacy Owners.

412.    First, it is incontrovertible that, outside of Marriott and First American, no entity or governmental agency had full and accurate knowledge of the actual structure of the MVC Trust or has ever validated its legal form.

413.    In fact, Marriott has never, in any of the required SEC filings, accurately represented the actual form of the MVC Trust.

414.    The only two entities that had the opportunity to review the legal form of the MVC Trust did not support Marriott's representation of the MVC Trust as a valid Florida real property interest.

415.    In 2011, Marriott's counsel, Foley & Lardner LLP ("Foley"), which personally handled the registration of the MVC Timeshare Plan, submitted a legal opinion letter as an exhibit to the SEC disclosure in connection with the credit agreement between Marriott and its lenders. The lenders included several banks as Marriott was borrowing $200 million in order to finance mortgages for the MVC Trust.  Therein, Foley submitted a legal opinion letter that did not support Marriott and First American's contention that the MVC Trust is only subject to Fla. Stat. § 689.071 and Fla. Stat. § 721. *See* Foley Letter, dated October 24, 2011, attached as Exhibit T.

416.    In particular, the Foley legal opinion letter states that the MVC Trust must meet the laws of the state in which the timeshare parcel is physically located, stating:

> In rendering this opinion letter, we have relied as to factual matters upon the Certificate and assumed, without any independent investigation, that the

statements made therein are accurate and complete. Additionally, we have examined and relied on certain closing and conveyance documents for the Timeshare Interests, and have relied upon the Certificate and assumed, without any independent review or examination, that the statements made therein are accurate and complete. We have reviewed the Mortgage.

We have also relied, with your permission, on opinions of counsel from each state in which real property held by the MVC Trust is located providing that, among other things, the property conveyed to the MVC Trust (the "Trust Property") constitutes real property pursuant to the laws of the state in which such property is located and that the conveyance of the real property to the MVC Trust constitutes the conveyance of real property pursuant to the laws of the state in which such property is located.

*Id.* at Ex.G-3, p. 2.

417.     The Foley legal opinion that mortgages are perfected and enforceable against the

MVC Trust is followed by long list of assumptions and qualifications, most notably that the legal

descriptions of the real property and personal property appearing in the mortgage are accurate

and correctly identify the real or personal property with respect to which such legal descriptions

are intended to apply:

We express no opinion as to the ownership or existence of or the title to any of the underlying Timeshare Interests and we assume that at the time of offering Timeshare Interests, (i) MORI as the developer of the MVC Trust was the owner of the Timeshare Interests, and (ii) that the Timeshare Interests and the Trust Property are free and clear of all liens, encumbrances, and claims of other interest holders, other than the Mortgage.

*Id.* at Ex. G-3, p. 8.

418.     In addition, Foley's letter includes the qualifications that:

We express no opinion as to the legal or other description of or title to any of the "Mortgaged Property," as such term is defined in the Mortgage that MORI has provided to us. In giving the opinions set forth herein, we have made no investigation as to, and do not purport to opine with respect to, the status of title to any of the real or personal property constituting such Mortgaged Property, or the priority of any mortgage, lien, security interest or other encumbrance. We express no opinion as to the perfection of any security interest in any portion of the Mortgaged Property except for a security interest which may be perfected solely by recording and/or filing a mortgage in the proper office in the State of Florida.

No legal or other conclusion is expressed herein with respect to the validity, enforceability, or priority, by MORI

*Id.* at Ex. G-3, p. 6.

419.    While Foley's legal opinion expressed a view that the security interest of the MVC Trust is legally enforceable and valid, that short statement is qualified by approximately 6 pages of assumptions which it expressly states were not independently verified.  *Id.* at Ex. G-3, pp. 4-9.

420.    Notably, Foley states that its conclusions can be relied upon only if the following assumptions are true: (a) that the conveyance of property in MVC Trust constitutes the conveyance of "real property" pursuant to laws of all 11 states where the Legacy Timeshare Condominiums are located; (b) that the legal description provided in the mortgage is correct; and (c) that the legal description of the MVC Trust is correct. *Id.* at pp. 1, 6, 8.

421.    However, because the MVC Trust does not constitute conveyance of real property outside the State of Florida, and because both the mortgages and the MVC Trust lack legal descriptions, the assumptions relied by Foley were baseless.

422.    Therefore, Foley's legal opinion actually supports the opposite conclusion; *i.e.*, that the security interest on mortgages on the MVC Trust is not perfected and does not comply with the Florida law.

423.    Most telling is the fact that Foley made it a point to disclaim any direct knowledge of the approval of registration of the MVC Trust by the State of Florida despite the fact that the approval for the registration of the MVC Trust was sent directly to Foley. *Id.* at p. 2.

424.    Furthermore, the IRS made a determination that the MVC Trust is an economic right rather than real property ownership. This is disclosed expressly in the public offering statement delivered to MVC Trust Owners:

> For income tax purposes only, the transfer of an Interest by the Developer to a Beneficiary will be characterized by the Developer and the Trust as the transfer by the Developer to such Beneficiary of: (1) the rights to use (in accordance with the Trust Plan Documents) all Trust Property held or to be held in the Trust for which a Notice of Use Rights has been or is delivered; and (2) an economic interest in the Trust ("**Economic Rights**"). The Economic Rights consist primarily of the right to receive cash distributions from the Trust in the unlikely event that any Trust Property (other than Restricted Use Property) held by the Trust is sold and the sales proceeds are not fully reinvested in other Trust Property for which a Notice of Use Rights has been or is delivered, as more particularly provided in the Trust Plan Documents. The purchase price paid by the Beneficiary to the Developer will be allocated between the use rights and the Economic Rights in such proportions as determined by the Developer. This allocation of purchase price will be used to determine the Beneficiary's initial tax basis in her or his use rights and the Beneficiary's initial tax basis in her or his Economic Rights.

*See* Exhibit L, p. 29 (emphasis in original).

425.    Due to the IRS determination that ownership of the MVC Trust is an "economic right" rather than real property ownership, mortgage interest and property expenses are not tax deductible as they are for legitimate timeshare estate ownership.

426.    In order to avoid further public scrutiny of the defective MVC Trust from potential challenge of tax election, Marriott made it an express requirement for the MVC Trust Owners to delegate the right to designate tax election to MVCTOA. This provision was an express condition for accepting the delivery of the MVC Trust Consumer Deeds pursuant to the MVC Trust public offering statement:

> By accepting a deed to a Beneficial Interest, the Beneficiaries are acknowledging and agreeing that the Board will have the sole discretion and authority to make or revoke any tax elections on behalf of the Trust, and that for U.S. federal and state income tax purposes the **<u>Beneficiaries will not take any position with respect to the classification of the Trust or the treatment of the transfer of an Interest by the Developer to a Beneficiary that is inconsistent with the positions that have been communicated to them by the Board.</u>**

> The foregoing statements in this discussion are based upon current provisions of the Internal Revenue Code of 1986, as amended from time to time, existing and currently proposed Treasury Regulations, and existing administrative rulings and

judicial decisions, all of which are subject to change, and such statements are only a general summary of certain federal income tax considerations that may be relevant to a prospective Beneficiary. The effect of existing federal income tax laws and the income tax laws of any applicable state or local taxing authority will vary with the particular circumstances of each Beneficiary.

*Id.* at pp. 29-30. (emphasis added).

427.    Since MVCTOA is dominated and controlled by Marriott, this ensures that MVC Trust Owners cannot dispute the IRS designation of tax election of the MVC Trust as an economic right rather than real property ownership.

428.    Further, in 2009, before the MVC Trust was first sold, Marriott proactively obtained an advisory opinion from the Florida Department of Revenue as to whether a conveyance of the MVC Trust was subject to Florida transfer tax. However, in seeking the advisory opinion, Marriott was careful and selective in the facts it provided so that it could obtain a desired result which would allow Marriott to evade further scrutiny as to irregularity of the MVC Trust as an interest in real properties outside the State of Florida. *See* Florida Dept. of Revenue Advisory Opinion, attached as Exhibit U.

429.    In fact, Marriott omitted many material facts from its request to the Florida Department of Revenue, including the fact that:

(a)    the MVC Trust contained (and would contain) real property that was located primarily outside the State of Florida;

(b)    the MVC Trust Consumer Deeds would be conveyed by Marriott (who lacked legal title), would lack any legal descriptions of real property conveyed, and that interests conveyed (*i.e.*, BI) would be described solely by proprietary, alphanumeric codes;

    (c) BI and points were units that had no conversion value to MVC Trust land trust property;

    (d) while Marriott recorded MVC Trust Consumer Deeds and other instruments only in Orange County, it actually redacted the identity of Orange County in its application in order to avoid additional scrutiny. Indeed, in Florida, as in other states, deeds must be recorded in the county where real property is physically located. In 2008, the Florida Legislature enacted legislation to eliminate the DR-219 form being used by Florida's county recorder's offices. Without the legislative enactment, DR-219 would have required the Orange County Comptroller to identify the property address to which transfer taxes are collected when MVC Trust Consumer Deeds are located. The Florida Department of Revenue was not made aware that Marriott and First American had collaborated with the Orange County Comptroller to record all MVC Trust Consumer Deeds.

430.    In 2013, Marriott encountered its first and only regulatory obstacle as it was attempting to securitize the mortgages secured on the MVC Trust as mortgage-backed securities. However, unlike previous regulatory reviews in different contexts, the securitization process of a new investment product required much more extensive legal review due to the stringent securities regulations involved.

431.    During the securitization process, Marriott and First American were no longer able to hide the fact that their proprietary procedure in executing instruments to create, convey the MVC Trust, and perfecting security interests in the MVC Trust, deviated substantially from the Florida Land Trust Act, codified in Fla. Stat. § 689.071 (2010).

432.    Faced with significant exposure, and well aware that the manner in which the MVC Trust was created, marketed, and sold violated the Florida Land Trust Act, Marriott and First American set about trying to make their illegal conduct legal by having the rule makers change the rules.

433.    Consequently, in early 2013, Marriott and First American proposed specific statutory amendments and lobbied the Florida Legislature to give statutory recognition to the form of the MVC Trust Agreement as a valid land trust instrument.

434.    Marriott and First American's efforts proved a total success.  In July 2013, the Florida Legislature amended Fla. Stat. § 689.071 which, *inter alia*, validated the recording of mortgages secured on land trust interests, rather than perfection of security interests pursuant to the Uniform Commercial Code, as personal property interest. The "2013 Amendment" also removed the requirement for land trust properties to be located in the state of Florida.

435.    As is evidenced by the legislative history of the 2013 Amendment, (www.flsenate.gov/Session/Bill/2013/1172/Analyses/2013s1172.pre.ju.PDF), the changes to the Florida Land Trust Act were enacted specifically to accommodate the needs of First American and Marriott in securitizing mortgages secured by the MVC Trust, thereby validating the noncompliant perfection of security interests in the MVC Trust:

> The Florida Vacation Plan and Timeshare Act authorizes the creation and marketing of timeshare estates through trusts. Because timeshare estates are defined as real property the purchasers of Florida timeshare estates typically finance their purchase with a mortgage recorded against the timeshare estate. However, if the timeshare estate is created as a beneficial interest in a timeshare trust a land trust is created. As a result, two different statutes prescribe two different methods of perfection, causing possible confusion in the mechanics of perfecting the lien.
>
> As noted above in the discussion of timeshare interests, current statutes authorize the use of trusts for the creation and marketing of timeshare estates and specify similar requirements for using trusts for multi-site vacation clubs. These statutes

specify that certain provisions of the Florida Trust Code govern the liability of the trustees of such qualifying trusts and these provisions are usually recited in the trust agreements. If such an existing timeshare trust were created as a land trust, however, then the trust agreement would contain provisions stating that the trust is a land trust (making it a land trust) and would also refer to governance.

436.    Not coincidentally, on August 9, 2013, Marriott announced that securitization of mortgages on the MVC Trust had been completed, stating:

> [T]he completion of a securitization of a pool of approximately $263 million of vacation ownership loans, $237 million of which were purchased on August 8, 2013 by the MVC Trust Owner Trust 2013-1 (the "Trust") and up to $26 million of which will be purchased by the Trust within the next three months, and the issuance by the Trust of approximately $250 million of notes (the "Notes"). The Notes were offered in a private placement within the United States to qualified institutional buyers pursuant to Rule 144A and outside the United States in accordance with Regulation S under the Securities Act of 1933, as amended.

*See* Marriott press release, dated August 9, 2013 available online at:

http://www.marriottvacationsworldwide.com/news/2013/08/Marriott-Vacations-Worldwide-Completes-Securitization-of-Vacation-Ownership-Loans.shtml.shtml.

437.    Unfortunately for Marriott and First American, the 2013 Amendment may have given cosmetic cover to recording of unsecuritized mortgages, paving the way for Marriott to complete the securitization process, but it did nothing to validate the form or the substance of the MVC Trust as a beneficiary interest in a Florida land trust.

438.    First, the 2013 Amendment did not validate MVC Trust Consumer Deeds issued by Marriott when: (a) Marriott lacked the legal capacity convey property; and (b) when those deeds lacked any legal description of real property.  Indeed, no statute or common law could validate MVC Trust Consumer Deeds as an instrument to convey any type of property ownership.

439.    Additionally, the 2013 Amendment did not permit Orange County to record MVC Trust Consumer Deeds which purported to convey beneficial interests in real property located outside of Orange County (and the State of Florida). The amended recording procedure in the

91

2013 Amendment to Fla. Stat. § 689.071 only affected deeds of trust, which are mortgages rather than deeds that convey real property.

440.    Fla. Stat. § 689.071 (8)(2)(c) (2013) provides that:

> If a beneficial interest in a land trust is determined to be real property as provided in sub(6), then to perfect a lien or security interest against that beneficial interest, the mortgage, ***deed of trust***, security agreement, or other similar security document must be recorded in the public records of the county that is specified for such security documents in the recorded instrument or in a declaration of trust or memorandum of such declaration of trust recorded in the public records of the same county as the recorded instrument. If no county is so specified for recording such security documents, the proper county for recording such a security document against a beneficiary's interest in any trust property is the county where the trust property is located.

(Emphasis added).

441.    Furthermore, most of the Legacy Timeshare Estates that were submitted to the MVC Trust are located outside the State of Florida.  As a result, Fla. Stat. § 689.071 has no application or enforceability as to real property physically located outside the State of Florida.

442.    Most importantly, the 2013 Amendment to Fla. Stat. § 689.071 had no substantive effect on validating the MVC Trust as a beneficial interest in a land trust because the parties are unambiguously bound by the 2010 version of Fla. Stat. § 689.071.

443.    Thus, with the exception of the recording procedure of mortgages which has retroactive effect, the 2013 Amendment had no effect on the MVC Trust because no statutory change can render the MVC Trust a real property interest unless the entire definition of real property includes intangible contract-based interest.

444.    As a practical matter, the purpose of land trust cannot be achieved unless the beneficiary interest in the land trust is a personal property interest. However, Marriott and First American lobbied to have the Florida Land Trust Act retroactively render the MVC Trust a real property interest rather than a personal property interest in a land trust:

> In all cases in which the recorded instrument or the trust agreement, as hereinabove provided, contains a provision defining and declaring the interests of beneficiaries of a land trust to be personal property only, such provision is controlling for all purposes when such determination becomes an issue under the laws or in the courts of this state. ***If no such personal property designation appears in the recorded instrument or in the trust agreement, the interests of the land trust beneficiaries are real property.***

*See* Fla. Stat. § 689.071 (emphasis added).

445.    Notwithstanding the fact that the MVC Trust is sold as a real property timeshare estate, a precept that conflicts directly with a beneficial, personal property interest in a land trust, in actuality, it is immaterial because a determination as to the validity of a timeshare estate encompasses a far broader scope of Florida law than the Florida Landtrust Act and it is clear the MVC Trust does not qualify as a valid timeshare estate.

446.    Marriott and First American's effort to retroactively change the law to suit its purposes with regard to the MVC Trust did not end with the 2013 Amendment. In fact, on February 9, 2017, shortly after the parties to this action completed briefing on motions to dismiss the original complaint, SB 818 was introduced to the Florida Senate.

447.    SB 818 proposed an amendment to Fla. Stat. § 721.05(21) in order to "clarify" that the term "interestholder," for the purposes of a "multisite timeshare plan," was intended to exclude:

> … an owner of the underlying fee or owner of the underlying personal property; a mortgagee, judgment creditor, or other lienor; or any other person having an interest in or lien or encumbrance against a timeshare interest in such single-site timeshare plan, or an interest in or lien or encumbrance against a timeshare unit or other unit in such condominium or property regime. ***This paragraph is intended only as a clarification of existing law.***

(Emphasis added).

448.    SB 818 also prosed adding subsection (11) to Section 721.08 in order to "clarify" that the term "encumbrance" was intended to exclude:

A timeshare instrument, declaration of condominium, or other instrument establishing or governing a component site property regime is not an encumbrance for purposes of this chapter and does not create a requirement for a nondisturbance and notice to creditors instrument for purposes of this section [721.08] or a subordination and notice to creditors instrument for purposes of s.721.53 from the managing entity, owners' association, or any other person. ***This subsection is intended only as a clarification of existing law.***

(Emphasis added).

449.    Three months to the day later, SB 818 was presented to Governor Scott for signature. And, on May 23, 2017, SB 818 was enacted into law (the "2017 Amendment").

450.    Because the 2017 Amendment is so narrowly and obviously tailored to the claims of this lawsuit, it compels the inescapable conclusion Marriott and First American were forced to resort to crafting and pushing through legislation in order to defend against claims relating to conduct that began back in 2010.

451.    Stated another way, it seems obvious that because Marriott and First American could not justify the legality of their conduct under existing law, they endeavored to change the rules.

452.    The 2017 Amendment is tantamount to an admission that the allegations in this action, and specifically those relating to Legacy Owners being interestholders in and the Component Site Condo Declarations being encumbrances on the MVC Trust properties, are correct and that Marriott and First American have willfully violated Florida law since 2010.

453.    The admission notwithstanding, the 2017 Amendment (despite being creatively called a "clarification") does not and cannot retroactively make illegal conduct legal.

454.    First, the 2017 Amendment constitutes a substantive change in the law that cannot be applied retroactively.

455.    Second, any amendment that constitutes a substantive change in law and purports to clarify what the Florida Legislature intended some two decades earlier, is neither valid nor constitutional.

456.    Finally, despite the effort, the 2017 Amendment does not and would not materially impact the claims in this action.

457.    Among other reasons, even if the MVC Trust complied with every aspect of Fla. Stat. § 721.08(2)(c)(4) (and it does not), such compliance would not magically render an intangible, undefinable, unsearchable, and totally illusory interest – like BI – a parcel of real property. Once this inescapable fact is recognized by the trier of fact, the entire MVC Trust collapses. The 2017 Amendment rests on the fiction that the MVC Trust conveys a real property interest.

458.    Like the rest of the conduct described above, the 2017 Amendment demonstrates the extremes to which Marriott and First American will go to in order to cover up and further the illegal scheme that is the MVC Trust.

459.    For these reasons, Plaintiffs and members of the Class and Subclasses are entitled to an award of punitive damages against Marriott and First American.

## VIII.   CLASS ALLEGATIONS

### A.  Class Definition

460.    Plaintiffs bring this class action on their own behalf and on the behalf of all similarly situated current and former owners of timeshare interests in the MVC Trust and Component Sites of the MVC Trust from June 15, 2010, to the present (the "Class").

461.    The Class is divided into two proposed "Subclasses," defined as follows:

(a)    "MVC Trust Owners Subclass," consisting of all purchasers of the MVC Trust (*i.e.*, MVC Trust Owners) from its inception in June 15, 2010, through and including the present; and

(b)    "Legacy Owners Subclass," consisting of all purchasers of Legacy Timeshare Estates (*i.e.*, Legacy Owners) that own or have owned Legacy Timeshare Estates in anytime between June 15, 2010, and the present in one of the MVC Trust Component Sites, including the following:

| **Name** | **Component Site Location** |
| --- | --- |
| Barony Beach Club | South Carolina |
| BeachPlace Towers | Florida |
| Canyon Villas | Arizona |
| Crystal Shores | Florida |
| Cypress Harbour | Florida |
| Desert Springs I | California |
| Desert Springs II | California |
| Fairway Villas | New Jersey |
| Frenchman's Cove | US Virgin Islands |
| Grand Chateau | Nevada |
| Grande Ocean | South Carolina |
| Grande Vista | South Carolina |
| Harbour Club | South Carolina |
| Harbour Lake | Florida |
| Harbour Pointe | South Carolina |
| Heritage Club | South Carolina |
| Imperial Palms | Florida |
| Kalanipu'u | Hawaii |
| Kauai Beach Club | Hawaii |
| Ko'Olina | Hawaii |
| Lakeshore Reserve | Florida |
| Legends Edge | Florida |
| Manor Club Sequel | Virginia |
| Manor Club | Virginia |
| Maui Ocean Club Sequel | Hawaii |
| Maui Ocean Club | Hawaii |
| Monarch at Sea Pines | South Carolina |
| Mountain Side | Utah |
| Mountain Valley Lodge | Colorado |
| Newport Coast | California |
| Ocean Pointe | Florida |

| | |
|---|---|
| Ocean Watch | South Carolina |
| Oceana Palms | Florida |
| Royal Palms | Florida |
| Sabal Palms | Florida |
| Shadow Ridge | California |
| Streamside | Colorado |
| Summit Watch | Utah |
| Sunset Pointe | South Carolina |
| SurfWatch | South Carolina |
| Timber Lodge | California |
| Villas at Doral | Florida |
| Waiohai | Hawaii |

Excluded from the Legacy Owner Subclass are Legacy Owners that purchased Legacy Timeshare Estates in Legacy Timeshare Condominiums that are not Component Sites of the MVC Trust.

462.    Plaintiffs, by virtue of their status as MVC Trust Owners and Legacy Owners, are representatives of both the Class and the respective Subclasses.

463.    Class certification is appropriate in that: (a) the Class and Subclasses are so numerous that joinder of all members is impracticable; (b) there are questions of law or fact common to each Class and respective Subclass member which predominate over any questions affecting only individual members; (c) the Plaintiffs will fairly and adequately protect the interests of the Class and Subclasses; and (d) a class action is an appropriate method for the fair and efficient adjudication of this controversy.

### B. Numerosity

464.    Plaintiffs are informed and believe that each of the Subclasses contains thousands of similarly situated persons. The true number and identity of class members is known only by the Defendants such that the number and identity of these individuals can be easily determined from the records maintained by the Defendants and/or their agents.

465.    The disposition of their claims in a class action will be of benefit to the parties and to the Court.

466.    Under any circumstances, the Subclasses are so numerous and so geographically diverse that joinder of all members would be impracticable.

### C.  Existence and Predominance of Common Questions of Law and Fact

467.    Common questions of law or fact exist as to all members of the Class and Subclasses and such questions predominate over questions affecting only individual Class and Subclass members. The common legal and factual questions arise over the Defendants' uniform course of conduct towards the Class and Subclass members, and include but are not limited to, the following, whether:

(a)    the MVC Trust violates Florida timeshare law;

(b)    the MVC Trust conveys an interest in real property;

(c)    the MVC Trust Consumer Deed is facially defective and/or void;

(d)    First American Title Policy coverage is triggered due to defects in title, encumbrances, and defective right to occupy MVC Trust properties;

(e)    Orange County breached its official duties by improperly recording and indexing MVC Trust instruments;

(f)    Orange County breached its official duties by collecting transfer taxes on non-existent real properly transactions and/or real property located outside Orange County, Florida;

(g)    the MVC Trust Fails to comply with requirements of the Florida Condominium Act;

(h)    the MVC Trust is a valid multisite timeshare estate under Florida law;

98

(i)     Marriott and First American violated Fla. Stat. § 721.08 (2010) by intentionally exploiting the roles of the escrow agent and timeshare trustee;

(j)     Marriott and First American violated Fla. Stat. § 721.08 by failing to properly designate an appropriate trustee for the MVC Trust;

(k)     First American lacks independence and violated its escrow duties under Fla. Stat. §§ 721.08 and 721.03 (7) (2010);

(l)     Marriot and First American failed to properly effect transfer of property to the MVC Trust in violation of Fla. Stat. § 721.552(3)(b);

(m)     MORI and MVCTOA failed to comply with the one-to-one nightly-use ratio in the MVC Trust codified in Fla. Stat. §721.03(10);

(n)     adding Legacy Timeshare Estates to the MVC Trust by NOA violates the requirements of a multistate timeshare plan;

(o)     MVCTOA, as proxy for Marriott, is a proper managing entity for the MVC Trust and whether it fulfills its statutory duties;

(p)     MVCTOA improperly and unfairly calculated and collected common expenses from the MVC Trust Owners Subclass in violation of Fla. Stat. § 721.15;

(q)     MORI, MVCTOA, and Marriott Exchange Company violated Fla. Stat. § 721.56 by failing to provide a statutorily compliant reservation system;

(r)     Marriott and First American (the "RICO Defendants") violated Florida RICO, Fla. Stat. §§ 895.05(6), 895.02(1)(a)(21);

(s)     the RICO Defendants constituted an "Enterprise" under Fla. Stat. § 895.02(3);

(t)     the RICO Defendants engaged in a pattern of "Racketeering" activity under Fla. Stat. § 895.02(4);

99

(u)   the RICO Defendants conspired to violate Fla. Stat. § 721.08;

(v)   Plaintiffs and members of the Class and Subclasses are entitled to declaratory and injunctive relief;

(w)   Plaintiffs and members of the Class and Subclasses have been damaged by the Defendants' conduct and the proper measure of damages; and

(x)   Plaintiffs and members of the Class and Subclasses are entitled to punitive damages.

### D.  Adequacy of Representation

468.   Plaintiffs will fairly and adequately protect the interests of the members of the Class and the Subclasses.

469.   Plaintiffs' claims are typical of the claims of the members of the Class and Subclasses because they arise from the same practices and course of conduct that gave rise to the claims of the Class and Subclasses and are based upon the same legal theories.

470.   Plaintiffs have retained counsel experienced in complex class action litigation, and Plaintiffs' intend to prosecute this action vigorously.

471.   The Plaintiffs have no interests adverse or antagonistic to those of the Class and Subclasses.

### E.  Superiority

472.   A class action is superior to all other available means for the fair and efficient adjudication of this controversy. The damages or other financial detriment suffered by individual members of the Class and Subclasses are relatively small compared to the burden and expense occasioned by individual litigation of the claims of the Class and Subclasses.

473.    Indeed, due to the statutory nature of the claims, it would thus be virtually impossible for the members of the Class and Subclasses, on an individual basis, to obtain effective redress for the wrongs done to them without affecting the rights of other members of the Class and Subclasses.

474.    Furthermore, even if members of the Class or Subclasses could afford individualized litigation, the judicial system could not. Individualized claims brought by members of the Class and Subclasses would create the danger of inconsistent or contradictory judgments arising from the same set of facts. Individualized litigation would also increase the delay, expense, and burdens to all parties and the court system from the issues raised by this action.

### F.  Manageability

475.    In contrast to other methods of adjudication, the class action device provides the benefits of determining these issues in a single proceeding, including economies of scale, streamlined and efficient discovery and motion practice, and comprehensive supervision by a single court.

476.    Further, this case presents no unusual management difficulties. The issues of law and documents and agreements at issue are the same or so similar as to be legally and factually indistinguishable in all material respects and Florida law applies to all claims.  As a result, it will not be difficult for the Court or the jury to determine whether the Defendants have violated the Florida Vacation and Timeshare Act, the Florida Condominium Act, Florida RICO, and Florida common law.

477.    This Court is an appropriate forum for this dispute.

## IX.    PRAYER FOR RELIEF

WHEREFORE, and for the foregoing reasons, Plaintiffs pray this Court enter judgment on their behalf and on behalf of the Class and Subclasses herein, adjudging and decreeing that:

A.   This action may proceed as a class action pursuant to Rule 23(b)(3), with Plaintiffs designated Class representatives and the representatives of the Subclasses, as described above, and their chosen counsel designated Class Counsel;

B.  An order declaring that the MVC Trust Consumer Deeds are void for failure to convey a real property interest;

C.  An order declaring that the MVC Trust Consumer Deeds are void because Marriott lacks legal capacity as grantor;

D.  An order declaring that coverage is triggered under the First American Title Policies issued to Plaintiffs and other MVC Trust Owners due to defects in title, encumbrances, and defective right to occupy MVC Trust properties;

E.  An order finding that Orange County breached its official duties by improperly recording and indexing MVC Trust instruments and collecting transfer tax;

F.  An order declaring that the MVC Trust fails to comply with the Florida Condominium Act;

G.  An order declaring that the MVC Trust is not a valid multisite timeshare;

H.  An order finding that First American has breached the duty of an escrow agent;

I.  An order finding that Marriott has engaged in an improper transfer of accommodations and facilities to a trust;

J.   An order finding that the MVC Trust fails to comply with the statutory one-to-one nightly-use ratio;

K. An order declaring that Marriott has improperly added property to a multistate timeshare plan;

L. An order finding that MVCTOA is not independent and has breached its fiduciary duty to the MVC Trust;

M. An order finding that MVC Trust Owners have been subject to the improper collection of common expenses;

N. An order finding that MVC Trust Owners and Legacy Owners were denied separate reservation systems;

O. Pursuant to Florida RICO, Fla. Stat. §§ 895.05(1) (a)-(e), an order:

   i. requiring Marriott and First American to divest **_all_** real property submitted to MVC Trust since May 2010, including the restricted-use properties and other properties separately maintained. And, the transfer of title to all MVC Trust properties to a newly-formed owners' association meeting the requirements of Fla. Stat. § 721.08(2)(c)(5) to act as the managing entity;

   ii. permanently restricting First American from acting as an escrow agent, trustee, timeshare trustee, or title insurer for the MVC Trust or any Legacy Timeshare Estate;

   iii. dissolving and restructuring any of the entities that are instrumentation of the criminal enterprise, including, the MVC Trust and MVCTOA;

   iv. temporarily suspending Marriott's license to sell title insurance and real property until review by an appropriate licensing agency; and

103

    v.  temporarily suspending First American's license to sell title insurance, act as escrow agent, land trust trustee, or timeshare trustee until review by an appropriate licensing agency.

P.  An award of treble damages for Florida RICO violations pursuant to Fla. Stat. §§ 895.05(7)(b) and 772.104;

Q.  An award of punitive damages pursuant to Fla. Stat. § 721.21 and Fla. Stat. § 768.72;

R.  An award of attorney's fees and costs;

S.  An award of pre-judgment interest; and

T.  Any other relief this Court deems just and equitable.

## X.  **DEMAND FOR JURY TRIAL**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a trial by jury on all issues so triable.

DATED: October 25, 2017

                     Respectfully submitted,

                     **NEWMAN FERRARA LLP**

               By:  */s/ Jeffrey M. Norton*
                     Jeffrey M. Norton, *Pro Hac Vice*
                     1250 Broadway, 27th Fl.
                     New York, NY 10001
                     (212) 619-5400
                     jnorton@nfllp.com

                     **THE POLASZEK LAW FIRM, PLLC**
                     Christopher S. Polaszek
                     3407 W. Kennedy Blvd.
                     Tampa, FL 33609
                     (813) 574-7678
                     chris@polaszeklaw.com

**SOOMI KIM, ESQ.**
Soomi Kim, *Pro Hac Vice*
2400 South College Drive,
High Point, NC  27260
soomiwork@gmail.com

*Counsel for Plaintiffs*

## XI.     GLOSSARY OF DEFINED TERMS

**"Amended Class Action Complaint"** refers to this complaint, the operative and superseding pleading in this action filed on behalf of the Plaintiffs and the proposed Class and Subclasses against Defendants for violations of the Florida Vacation and Timeshare Act, Fla. Stat. § 721.01, *et seq.*, Florida Condominium Act, Fla. Stat. 718.01, *et seq.*, the Florida Racketeer Influenced and Corrupt Organization Act ("Florida RICO"), Fla. Stat. § 895.01, *et seq.,* for common law claims of negligence and breach of fiduciary duty, and for declaratory and injunctive relief.

**"BI"** means the purported beneficial interest units created and sold by Marriott in the MVC Trust. After Marriott assigns point values to Legacy Timeshare Estates added to the MVC Trust, the "Points for Sale" are unitized in tranches of 250 points. Each tranche is called a BI unit (*i.e.*, 250 points = 1 BI unit). In the MVC Trust Consumer Deeds which purport to convey title to an undefined interest in the MVC Trust, each unit of BI is represented by an alphanumeric code.

**"Class"** means the proposed class of all similarly situated current and former owners of timeshare interests in the MVC Trust and Component Sites of the MVC Trust during the applicable statute of limitations. The Class is divided into two proposed "Subclasses," defined as follows:

(a) "**MVC Trust Owners Subclass**," consisting of all purchasers of the MVC Trust (*i.e.*, MVC Trust Owners) from its inception in June 15, 2010, through and including the present; and

(b) "**Legacy Owners Subclass**," consisting of all purchasers of Legacy Timeshare Estates (*i.e.*, Legacy Owners) that own or have owned Legacy Timeshare Estates in anytime between June 15, 2010, and the present in one of the MVC Trust Component Sites.

**"Component Site"** means any Legacy Timeshare Condominium where at least one Marriott-owned Legacy Timeshare Estate that has been deeded to the MVC Trust is physically located. At present, there are more than 44 Component Sites in 11 different states. Each Component Site is subject to its own Condo Declaration and the use rights of Legacy Owners, has its own condominium association, and is governed by the state law of the state where it situated.

**"Condo Declaration"** means the governing document of each Legacy Timeshare Condominium. The Condo Declaration is a recorded instrument in the county where the Legacy Timeshare Condominium is located. Among other things, the Condo Declaration provides a legal description of the parcel of real property (*i.e.*, the resort property), details the fractional interests created therein before being sold (*i.e.*, Legacy Timeshare Estates), and for these fractional interests, describes the indivisible appurtenant beneficial interests and use-license in the total accommodations and facilities of the Legacy Timeshare Condominium, and sets forth the reservation procedures. Fractional interests described in the Condo Declaration cannot be partitioned without amending the Condo Declaration. *See* Exhibit K.

**"Defendants"** means the defendant parties named in this action; specifically, Marriott Ownership Resorts, Inc. ("MORI"), Marriott Resorts Hospitality Corporation ("Marriott

106

Hospitality"), Marriott Resorts, Travel Company, Inc. (d/b/a MVC Exchange Company) ("MVC Exchange Company"), MVC Trust Owners Association, Inc. ("MVCTOA"), Marriott Resorts Title Company, Inc. ("Marriott Title"), First American Financial Corporation ("First American"), First American Trust, FSB ("First American Trust"), First American Title Insurance Company ("First American Title"), and Orange County Florida ("Orange County").

**"First American"** is a term used to refer collectively to named defendants First American Corp. and its wholly-owned subsidiaries (also named defendants), First American Trust and First American Title. First American was the co-architect of the MVC Trust scheme and, directly and through its subsidiaries, carried out acts alleged herein – both individually and in concert with Marriott.

**"First American Corp."** means named defendant First American Financial Corporation., a Delaware corporation with its principal place of business located at 1 First American Way, Santa Ana, California 92707. First American Corp. is the parent company of named defendants First American Trust and First American Title.

**"First American Trust"** means First American Trust, FSB, a federal savings bank with its principal place of business located at 5 First American Way, Santa Ana, California 92707. First American Trust is a wholly-owned subsidiary of First American Corp. First American Trust served as the MVC Trust land trust trustee, timeshare trustee, and escrow agent on all MVC Trust purchases. First American Trust holds legal title to all properties in the MVC Trust and is a signatory to the MVC Trust Agreement.

**"First American Title"** means named defendants First American Title Insurance Company, a Nebraska corporation with its principal place of business located at 1 First American Way, Santa Ana, California 92707. First American Title is a wholly-owned subsidiary of First American Corp. First American Title provides title insurance coverage for all MVC Trust Consumer Deeds, and, together with Marriott Title, sold title insurance policies to MVC Trust Owners. Additionally, First American Title provides title insurance coverage for most Legacy Timeshare deeds, and together with Marriott Title, sold title insurance policies to Legacy Owners.

**"Legacy Timeshare Condominium"** means the physical resort and accommodations where Legacy Timeshare Estates make up the fractional ownership and use-license interests. The terms Component Site and Legacy Timeshare Condominium are synonymous to the extent the Legacy Timeshare Condominium has Legacy Timeshare Estates that are included in the MVC Trust. Legacy Timeshare Condominiums that do not have Legacy Timeshare Estates included in the MVC Trust are not Component Sites.

**"Legacy Timeshare Estate"** means a fractional ownership and use-license interest in a Legacy Timeshare Condominium. Legacy Timeshare Estates are real property interest and reflect the traditional timeshare model whereby purchasers are conveyed a deeded, fractional interest in a condominium unit partitioned by weeks in a year (*e.g.*, 1/52) coupled with an interest in the accommodations of the resort where the condominium is located. The Legacy Timeshare Estates in the MVC Trust are all corporately-held by Marriott.

**"Legacy Owner"** means an owner of a Legacy Timeshare Estate in a Legacy Timeshare Condominium other than Marriott.

**"Marriott"** is a term used to refer collectively to named defendants MORI and its wholly-owned subsidiaries (also named defendants), Marriott Hospitality Co., MVC Exchange Company, and Marriott Title. Marriott was the co-architect of the MVC Trust scheme and, directly and through its subsidiaries, carried out acts alleged herein – both individually and in concert with First American.

**"Marriott Hospitality Co."** means named defendant, Marriott Resorts Hospitality Corporation, a South Carolina corporation with its principal place of business located at 6649 Westwood Boulevard, Orlando, Florida 32821. Marriot Hospitality Co., is a wholly-owned subsidiary of MORI.. Marriott Hospitality Co. acted agent for MORI on all MVC Trust Consumer Deeds and performed the function of "management firm" for the MVC Trust pursuant to Fla. Stat. § 721.13.

**"Marriott Title"** means named defendant Marriott Resorts Title Company, Inc., a Delaware corporation with its principle place of business located at 1200 Bartow Road, Suite 10, Lakeland, Florida 33801. Marriott Title is a wholly-owned subsidiary of MORI. Marriott Title prepared the MVC Trust Consumer Deeds, the MVC Trust Purchase Agreements, acted as the "authorized representative" of MORI to effect recording of MVC Trust Consumer Deeds, and sold title insurance policies, in conjunction with and underwritten by First American Title Insurance Company, to MVC Trust Owners.

**"MORI"** means named defendant, Marriott Ownership Resorts, Inc., a Delaware corporation with its principal place of business located at 6649 Westwood Boulevard, Orlando, Florida 32821. MORI is chief architect of the MVC Trust, as well as the "developer," as that term is defined by Fla. Stat. § 721.05, a signatory to the MVC Trust Agreement, beneficial/equitable owner of all MVC Trust property, and "Grantor" on all MVC Trust Consumer Deeds.

**"MVC Exchange Company"** means named defendant Marriott Resorts, Travel Company, Inc. (d/b/a MVC Exchange Company),  a Delaware corporation with its principal place of business located at 6649 Westwood Boulevard, Orlando, Florida 32821. Marriott Exchange Company is a wholly-owned subsidiary of MORI and performed the function of an "exchange company" for the MVC Trust as defined in Fla. Stat. § 721.05(15). MVC Exchange Company operates the MVC Exchange Program, a reservation system used by MVC Trust Owners, Legacy Owners, and Others.

**"MVC Trust"** means the timeshare product created by Marriott, purported to be a multisite timeshare plan. MVC Trust means the product itself, the timeshare plan it is based upon, and the Florida land trust that holds the Marriott-owned Legacy Timeshare Estates made available to MVC Trust Owners.

**"MVC Trust Agreement"** means the *unrecorded* controlling timeshare instrument of the MVC Trust. The MVC Trust Agreement was entered into on March 11, 2010, and executed by MORI, First American Trust, and MVCTOA. Although not recorded in the public land records of

Orange County, a summary of the MVC Trust Agreement, called the Trust Memorandum, recorded. *See* Exhibit M.

**"MVC Trust Consumer Deed"** means the recorded MVC Trust instrument purporting to convey beneficial interest (*i.e.*, BI units) in the MVC Trust. MVC Trust Consumer Deeds are prepared by Marriott Title, represent MORI as the "Grantor" and the MVC Trust purchaser (*i.e.*, MVC Trust Owner) as the "Grantee." In lieu of a legal property description, the MVC Trust Consumer Deeds provide an alphanumeric code representing each unit of BI purchased. The MVC Consumer Deeds are recorded in the public land records of Orange County. *See* Exhibit C.

**"MVC Trust Owner"** means a purchaser of the MVC Trust who received an MVC Trust Consumer Deed and an MVC Purchase Agreement memorializing the sale.

**"MVC Trust Purchase Agreement"** means the purchase agreement memorializing the a sale of the MVC Trust to an MVC Trust Owner. *See* Exhibit D.

**"MVC Trust Rules and Regulations"** means the unrecorded MVC Trust instrument purporting to lay out the rules and regulations for MVC Trust Owners and their reservation and use of MVC Trust properties. *See* Exhibit P.

**"MVCTOA"** means named defendant MVC Trust Owners Association, Inc., a Florida not-for-profit corporation with its principal place of business located at 6649 Westwood Boulevard, Orlando, Florida 32821.  MVCTOA is the "managing entity" of the MVC Trust as defined in Fla. Stat. § 721.05(22). MVCTOA is a signatory to the MVC Trust Agreement.

**"MVCTOA Bylaws"** mean the bylaws of MVCTOA. The MVTOA Bylaws are one of the unrecorded MVC Trust timeshare plan instruments and purport to lay out the duties and obligations of MVCTOA. *See* Exhibit N.

**"NOA"** means Notice of Addition. The NOA is one of the MVC Trust instruments that Marriott records periodically in the public land records of Orange County. An NOA purports to identify the tranches of Marriott-owned Legacy Timeshare Estates that have been deeded to the MVC Trust, summarize the overall Points for Use value assigned to the properties added, and the Points for Sale associated with the aggregate conveyance. All properties added to the MVC Trust by NOA are deemed "restricted use" (meaning MVC Trust Owners have no access to them) until such time Marriott, in its sole discretion, decides to deliver an NOU to MVCTOA and First American. *See* Exhibit G.

**"NOU"** means Notice of Use Right. The NOU is an *unrecorded* MVC Trust instrument that Marriott delivers periodically to MVCTOA and First American purporting to identify which MVC Trust properties Marriott, in its discretion, has decided to make available to MVC Trust Owners. There is neither a timeframe nor criteria for when Marriott must deliver NOU and make MVC Trust properties available to MVC Trust Owners. *See* Exhibit H.

**"Orange County"** means named defendant Orange County Florida, a political subdivision of the State of Florida with its primary based of operations located in Orlando, Florida. As governmental entity, Orange County is responsible for fulfilling the duties and obligations under

the laws of Orange County and the laws of the State of Florida as they pertain to Orange County, including recording, indexing, and maintaining documents relating to real property in the public land records, and collecting taxes and fees related to real property transactions within Orange County. Orange County operates through its agencies, including the Orange County Comptroller's Office and the Orange County Property Assessor's Officer.

**"Plaintiffs"** or **"Lennens"** means Anthony and Beth Lennen, the named plaintiffs and prosed representatives of the Class, the MVC Trust Owners Subclass, and the Legacy Owners Subclass.

**"Points for Sale"** means the overall points ascribed to properties in MVC Trust. Points for Sale, however, does not mean the exact figure of points available for purchase but rather the points that *may* be available once NOUs are delivered for those properties.

**"Points for Use"** means the number of points that are required to reserve a particular accommodation in the MVC Trust. Points for Use are attributed to all properties in an NOA. However, because that includes restricted-use property for which no NOU has been delivered, Points for Use does not represent the total use-rights of properties in MVC Trust.

**"RICO Defendants"** means Marriott and First American (as those parties are defined herein).

**"Trust Memorandum"** means the recorded MVC Trust instrument purporting to summarize the material terms of the *unrecorded* MVC Trust Agreement. *See* Exhibit I.

**"Trust Reservation System"** is described in reservation procedures of the MVC Trust Agreement and serves as the reservation system purportedly made available to MVC Trust Owners to reserve the non-restricted use accommodations in the MVC Trust. In 2012, the Trust Reservation System was merged into the MVC Exchange Program, a reservation system shared by Legacy Owners and others. *See* Exhibit O.

## XII.   <u>EXHIBIT LIST</u>

*Exhibit No.*

**A:**     The Lennens' Crystal Shores Legacy Timeshare Estate Deed

**B:**     First American Title Policy on Lennens' Crystal Shores Legacy Timeshare Estates

**C:**     The Lennens' MVC Trust Consumer Deed

**D:**     The Lennens' MVC Trust Purchase Agreement

**E:**     First American Title Policy on Lennens' MVC Trust

**F:**     *The Use of Land Trusts and Business Trusts in Real Estate Transactions*, by John Murray, General Counsel, First American Corp. (2010)

**G:**     Sample MVC Trust Notice of Addition ("NOA"), dated August 16, 2017

**H:**     Sample Notice of Use Right ("NOU"), dated July 16, 2016

**I:**     Trust Memorandum

**J:**     Sample Disney Vacation Development, Inc. Deed for Multisite timeshare estate

**K:**     Sample Condo Declaration

**L:**     MVC Trust Public Offering Statement

**M:**     MVC Trust Agreement

**N:**     MVCTOA Bylaws

**O:**     Trust Reservation System

**P:**     MVC Trust Rules and Regulations

**Q:**     Sample MVC Trust land trust deed

**R:**     Sample out-of-state MVC Trust land trust deed

**S:**     Orange County Notice of Unrecordable Documents or Instruments

**T:**     Foley & Lardner Letter to Marriott, dated October 24, 2011

**U:**     Florida Department of Revenue Advisory Opinion