# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

ANTHONY LENNEN, et al.,

                         Plaintiffs,

          v.

MARRIOTT OWNERSHIP RESORTS, INC., et al.,

                        Defendants.

CASE NO.: 6:16-cv-00855-CEM-TBS

---

## PLAINTIFFS' OMNIBUS MEMORANDUM OF LAW IN OPPOSITION TO THE MOTIONS TO DISMISS OF THE MARRIOTT DEFENDANTS, THE FIRST AMERICAN DEFENDANTS, AND THE MVC TRUST OWNERS ASSOCIATION DEFENDANT

THE POLASZEK LAW FIRM, PLLC
Christopher S. Polaszek
3407 W. Kennedy Blvd.
Tampa, FL 33609
(813) 574-7678
chris@polaszeklaw.com

NEWMAN FERRARA LLP
Jeffrey M. Norton
1250 Broadway, 27th Fl.
New York, NY 10001
(212) 619-5400
jnorton@nfllp.com

Soomi Kim, Esq.
2400 South College Drive
High Point, NC 27260
(336) 471-8769
soomiwork@gmail.com

# TABLE OF CONTENTS

I.     INTRODUCTION .................................................................................................1

II.    SUMMARY OF THE FACTS AND RELEVANT LAW ....................................4

   A.    The MVC Trust ........................................................................................4

   B.    The MVC Trust Timeshare Instruments ..................................................5

   C.    Overview of Applicable Florida Law .......................................................6

      1.    2010 Law Applies............................................................................6

      2.    Florida Timeshare Act ....................................................................6

      3.    Florida Land Trust Act ...................................................................8

   D.    What Marriott Purports to Convey ...........................................................9

   E.    Marriott's Lobbying Efforts ...................................................................12

III.   ARGUMENT ....................................................................................................13

   A.    Motion to Dismiss Standard....................................................................13

   B.    Plaintiffs' Amended Complaint Complies with Rules 8 and 10........................14

   C.    The MVC Trust Consumer Deed is Void
       Because no Real Property is Conveyed (Count I) ....................................16

      1.    The MVC Trust Consumer Deed is Required to
         Have an Adequate Legal Description Even if it Conveys
         a Title to a Timeshare Estate in a Multisite Timeshare Plan .........................16

      2.    The Legal Description of the MVC Trust Consumer Deed
         is Inadequate Because a Title Searcher Cannot
         Locate BI Using Public Records ...................................................18

      3.    Even if the MVC Trust Consumer Deed Conveys
         an Interest in a Trust Compliant with Fla. Stat. § 721.08(2)(c)(4)
         that Contains no Personal Interest, the MVC TrustWould
         Still not Convey a Timeshare Estate (i.e., a "parcel of real
         property") ..................................................................................20

   D.    Marriott Lacks the Legal Capacity to Convey Title
       to MVC Trust Property (Count II) ..........................................................23

   E.    First American Title Policy Coverage is Triggered
       Due to Defects in Title (Count III) .........................................................26

   F.    The MVC Trust is Subject to and in
       Violation of the Condominium Act (Count V)................................................31

G.  MVC Trust is Not a Valid Timeshare Estate
    in a Multisite Plan (Count VI) ............................................................32

H.  The MVC Trust is Not a Trust That
    Complies with Fla. Stat. § 721.08........................................................35

    1.  First American Lacks Independence From Marriott
        in Violation of 721.08 (Count VII) ...............................................35

    2.  Marriott and First American Knowingly Violated Fla. Stat. §
        721.08(2)(c)4 by Failing to Properly Transfer Accommodations
        and Facilities to the MVC Trust (Count VIII) ..............................39

J.  The MVC Trust Fails to Comply with the Statutory One-to-One
    Nightly-Use Ratio Requirement (Count IX).........................................40

K.  Adding Legacy Timeshare Estates to the MVC Trust by NOA is a
    Violation of Fla. Stat. § 721.552(1)(b) (Count X) .............................45

L.  The MVCTOA Violates Fla. Stat. § 721.13 (Count XI)......................46

    1.  The MVCTOA is Manager-operated Managing Entity not a
        Legitimate Owner's Association.....................................................46

    2.  The MVCTOA Breached its Fiduciary Duty to MVC Trust
        Owners in Violation of Fla. Stat. § 721.13 ..................................48

    3.  Marriott Violated the Condominium Act and Condo Declarations
        to Establish MVCTOA.....................................................................50

M.  Marriott and the MVCTOA Unfairly Assess and Collect Common
    Expenses (Count XII) ............................................................................50

N.  Marriott Failed to Provide and Maintain a Separate Reservation
    System for MVC Trust Owners and Legacy Owners (Count XIII)....................53

    1.  Marriott Cannot Combine Reservation Systems............................53

    2.  The MVC Exchange Program's Encroachment Upon Purchasers'
        Ability to Access Timeshare Properties is a Breach of Marriott's
        Fiduciary Duty .................................................................................56

O.  Plaintiffs State a Claim Under the Florida RICO ACT (Florida
    RICO Counts I and II).............................................................................57

P.  Plaintiffs are Entitled To Punitive Damages.........................................59

IV.  CONCLUSION ............................................................................................61

TABLE OF AUTHORITIES

**Cases**

*Abramson v. Marriott,*
   155 F.Supp. 3d 1056 (C.D. Cal. Jan 4, 2016) ......................................... 42

*Am Dental Assn'n v. Cigna Corp.,*
   605 F.3d 1283 (11th Cir. 2010) ......................................................... 56

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009) ..................................................................... 12

*Bell Atlantic Corp. v. Twombly,*
   550 U.S. 544 (2007) ..................................................................... 12

*Burns v. Consol. Am. Ins. Co.,*
   359 So. 2d 1203 (Fla. Dist. Ct. App. 1978) ............................................. 29

*Chaparro v. Carnival Corp.,*
   693 F.3d 1333 (11th Cir. 2012) ......................................................... 12

*Davis v. Hinson,*
   67 So. 3d 1107 (Fla. Dist. Ct. App. 2011) .............................................. 15

*Day v. Taylor,*
   400 F.3d 1272 (11th Cir. 2005) ......................................................... 12

*Energy Reserves Grp., Inc. v. Kansas Power & Light Co.,*
   459 U.S. 400 (1983) ................................................................. 27, 28

*Fabricant v. Kemper Indep. Ins. Co.,*
   474 F. Supp. 2d 1328 (S.D. Fla. 2007) .................................................. 29

*Fayad v. Clarendon Nat. Ins. Co.,*
   899 So. 2d 1082 (Fla. 2005) ............................................................ 29

*Goldman v. Mandell,*
   403 So. 2d 511 (Fla. Dist. Ct. App. 1981) ............................................... 8

*Graham v. Lloyd's Underwriters at London,*
   964 So. 2d 269 (Fla. Dist. Ct. App. 2007) .............................................. 36

iii

*Hutchinson Island Realty, Inc. v. Babcock Ventures, Inc.*,
   867 So.2d 528 (Fla. Ct. App. 2004) ........................................................................... 17

*In re Garfinkle*,
   577 F.2d 906 (5th Cir. 1978) ...................................................................................... 8

*In re Saber*,
   233 B.R. 547 (Bankr. S.D. Fla. 1999)................................................................. 8, 24

*Johnson v. EZX, LLC*,
   2017 WL 1386810 (M.D. Fla. Apr. 18, 2017)........................................................ 13

*Kolodziej v. Mason*,
   774 F.3d 736 (11th Cir. 2014)................................................................................. 29

*Matter of T & B Gen. Contracting, Inc.*,
   833 F.2d 1455 (11th Cir. 1987)............................................................................... 29

*Mendelson v. Great W. Bank, F.S.B.*,
   712 So. 2d 1194 (Fla. Dist. Ct. App. 1998) ........................................................... 15

*Mitchell v. Thomas*,
   467 So. 2d 326 (Fla. Dist. Ct. App. 1985) ............................................................. 15

*Oce N. Am., Inc. v. Caputo*,
   416 F. Supp. 2d 1321 (S.D. Fla. 2006).................................................................... 29

*Rice v. Rice*,
   499 F. Supp. 2d 1245 (M.D. Fla. 2007)................................................................... 16

*Simon Prop. Grp., Inc. v. Lauria*,
   2012 WL 1934405 (M.D. Fla. May 29, 2012)........................................................ 14

*Speaker v. U.S. Dep't of Health and Human Services Centers for Disease Control and Prevention*,
   623 F.3d 1371 (11th Cir. 2010)................................................................................ 13

*State Farm Mut. Auto. Ins. Co. v. Laforet*,
   658 So. 2d 55 (Fla. 1995)........................................................................................ 27

*Twin City Fire Ins. Co. v. Hartman, Simons & Wood, LLP,*
  609 F. App'x 972 (11th Cir. 2015) ........................................................... 26

*U.S. Fid. & Guar. Co. v. Dep't of Ins.,*
  453 So. 2d 1355 (Fla. 1984) ................................................................... 27

*United States v. Gupta,*
  463 F.3d 1182 (11th Cir. 2006) ............................................................. 24

*Weiland v. Palm Beach Cty. Sheriff's Office,*
  792 F.3d 1313 (11th Cir. 2015) ............................................................. 14

**Statutes and Rules**

Fed R. Civ. P. 8 ........................................................................................ 14

Fed. R. Civ. P. 10 ...................................................................................... 14

Fed R. Civ. P. 12 ...................................................................................... 14

Fla. Stat. § 627.784 .................................................................................. 25

Fla. Stat.  § 689.02 ................................................................................... 16

Fla. Stat. § 689.071 ........................................................................... 2, 7, 17

Fla. Stat. § 718.104 .................................................................................. 31

Fla. Stat. § 721.03 ............................................................................... 35, 39

Fla. Stat. § 721.05 ............................................................................. *passim*

Fla. Stat. § 721.08 ............................................................................. *passim*

Fla. Stat. § 721.13 .................................................................................... 47

Fla. Stat. § 721.15 ........................................................................... 49, 50, 51

Fla. Stat. § 721.52 ................................................................................. 6, 10

Fla. Stat. § 721.56 ............................................................................... 54, 56

Fla. Stat. § 721.57 ................................................................................................ *passim*

Fla. Stat. § 768.72 ...................................................................................................... 58

Fla. Stat. § 895.02 ...................................................................................................... 34

## Other Authorities

Black's Law Dictionary (10th ed. 2014)........................................................ 10, 15, 51

Plaintiffs Anthony and Beth Lennen ("Plaintiffs" or the "Lennens") respectfully submit this omnibus memorandum of law in opposition to the motions to dismiss the Amended Class Action Complaint ("Amended Complaint")[1] (Dkt. No. 124) of: (1) Marriott Ownership Resorts, Inc. ("MORI"), Marriott Resorts Hospitality Corporation ("Marriott Hospitality"), Marriott Resorts Travel Company, Inc. ("MVC Exchange Company"), and Marriott Resorts Title Company, Inc. ("Marriott Title") (collectively, "Marriott" or the "Marriott Defendants")[2] (Dkt. No. 134); (2) MVC Trust Owners Association, Inc. ("MVCTOA")[3] (Dkt. No. 135); and (3) First American Trust, FSB, First American Title Co., and First American Financial Corporation (collectively, "First American" or the "First American Defendants")[4] (Dkt. No. 136).[5]

## I.    INTRODUCTION

In describing the lessons he learned during the Vietnam War era, John F. Kennedy's Secretary of Defense, Robert McNamara, famously quipped, "Don't answer the question you were asked. Answer the question you *wish* you were asked." Such appears to be the maxim guiding Defendants' motions to dismiss. In count after count, Defendants never truly or directly address the allegations or applicable law. Rather, they employ the artful dodge, resorting to a handful of selectively-parsed statutory provisions and legal principles that, when cobbled together and taken out of context, give the appearance of legal compliance.

---

[1]    References to paragraphs in and exhibits to the Amended Complaint are cited as "AC ¶ __" and "AC, Exhibit __," respectively.

[2]    References to Marriott's Memorandum of Law in Support of its Motion to Dismiss are cited as "Marriott Mem. at __."

[3]    References to MVCTOA's Memorandum of Law in Support of its Motion to Dismiss are cited as "MVCTOA Mem. at __."

[4]    References to First American's Memorandum of Law in Support of its Motion to Dismiss are cited as "First American Mem. at __."

[5]    The moving defendants are referred to collectively as "Defendants," unless referred to specifically. Defendants have each adopted and incorporated each other's arguments and briefs into their own. Defendant Orange County Florida, which has yet to file a response to the Amended Complaint, is not included in the definition of Defendants.

For example, in Count II, Plaintiffs allege that Marriott, as a beneficiary of the MVC Trust[6], lacks the capacity to execute a warranty deed conveying legal title to trust property. AC ¶¶ 155-65. In response, Marriott argues that "Plaintiffs cannot plausibly allege that MORI lacks the legal capacity to convey BIs" (Marriott Mem. at 13), and First American argues that there is "no authority … that prevents a beneficiary from transferring is beneficial interest in a land trust" (First Amer. Mem. at 11). Remarkably, neither Marriott nor First American addresses the legal capacity of a trust beneficiary (*i.e.*, MORI) to execute a real property deed (*i.e.*, the MVC Trust Consumer Deed) purporting to convey *legal title* to a *beneficial interest* in a land trust. Instead, both Defendants argue the undisputed proposition that a trust beneficiary may lawfully assign its beneficial interests in a trust. While Plaintiffs' agree a beneficiary may assign its beneficial interest in a trust, that is not the nature of Count II (and, with regard to an interest in the MVC Trust, Marriott conveys nothing at all).

Defendants chalk this action up to a fantastic misunderstanding and misinterpretation of Florida law. Plaintiffs agree that Florida the law has been grossly misconstrued – *by Defendants*. Whereas Plaintiffs allege and clearly walk through: (a) the requirements for a valid timeshare estate under Florida law; (b) what constitutes a valid conveyance of real property under Florida law; and (c) how the MVC Trust conveys neither a timeshare estate nor real property, Defendants ignore multiple unambiguous and interrelated statutory requirements, cite wrong versions of statutes, and advance implausible statutory interpretations which, if adopted, would render numerous sections of Florida Statutes a nullity. And, as noted above, where Defendants are unable to defend one of Plaintiffs' claims, they mischaracterize the claim in order to manufacture a plausible defense.

---

[6] Unless defined separately, defined terms herein are the same as in the Amended Complaint. *See* Glossary of Defined Terms at pp. 106-110 of the Amended Complaint.

At bottom, Defendants' entire defense to this action centers around the proposition that Fla. Stat. § 721.05(34) (definition of "timeshare estate"), together with Fla. Stat. § 689.071 (Florida Land Trust Act), and Fla. Stat. § 721.08(2)(c)4 (requirements for a trust containing timeshare interests), operate to magically transform an intangible interest (*e.g.*, contractual use points) into a parcel of real property. However, if Defendants were correct (and they are not), the distinctions between various timeshare interests (including personal property timeshare interests, timeshare licenses, timeshare estates, and vacation clubs) would depend not on statutory mandates but on the label a developer chooses to give it.

The truth is, the MVC Trust is a total and complete sham. Despite being packaged as a legitimate real estate transaction, purchasers of the MVC Trust product receive no real property interests whatsoever and no timeshare estates. Distilled to its essence, the MVC Trust scheme is a means to create and sell an unlimited supply of contractual use-rights (literally, "points") to reserve time at certain Marriott-owned properties that are already bound to pre-existing timeshare plans. If this sounds like a common membership rewards program its because that is precisely what it is. Of course, presenting it as a real property transaction, allows Marriott to charge a hefty premium for the product, assess various costs and fees on an annual basis, and shift its own real property costs to purchasers while continuing to generate profit on the underlying interests. For First American, the MVC Trust partnership with Marriott is virtually 100% profit with virtually zero risk as it earns fees for its various trustee roles, premiums for claim-proof title insurance policies on every sale, and the protection of full indemnity from Marriott for any violations of law related to its participation in the scheme.

Plaintiffs' Amended Complaint demonstrates not just the plausibility of the MVC Trust scheme but the certainty of it. Accordingly, on the strength of the pleadings and for the reasons set forth herein, Defendants' motions to dismiss should be denied.

## II.   SUMMARY OF THE FACTS AND RELEVANT LAW

### A.  The MVC Trust

In 2010, Marriott's timeshare division, MORI, devised a scheme to repackage its corporately-held inventory of Legacy Timeshare Estates into a points-based, multisite timeshare program known as the "MVC Trust." AC ¶¶ 41, 46. The MVC Trust scheme, created in tandem with First American, was based on Florida land trust construct whereby Marriott conveyed legal and equitable title to its corporately-held Legacy Timeshare interests to First American (as trustee) and retained beneficial ownership of the trust property. AC ¶ 46. Marriott then assigned point values to the trust properties and sold points (which were purported to represent beneficial interests in the MVC Trust but not trust property) as "timeshare estates." AC ¶¶ 45-46. To memorialize the transaction, purchasers were given a purchase agreement and issued a warranty deed for the amount of points conveyed. AC ¶¶ 5, 95. First American then sold purchasers a title policy insuring these points. AC ¶¶ 7, 16, 24, 80.

Along with being the land trust trustee and title insurer on MVC Trust points purchases, First American serves as timeshare trustee. AC ¶ 22, 46. This is significant because while timeshare trustees have a fiduciary duty to timeshare purchasers to independently oversee the timeshare plan's operation, land trust trustees are merely required to follow the direction of the land trust beneficiary. AC ¶ 52. In the context of the MVC Trust, this conflagration of trustee roles is critical because Marriott uses it to obscure the independence and oversight function required of a timeshare trustee. AC ¶ 53.

### B. The MVC Trust Timeshare Instruments

The MVC Trust's legal existence arises out of the MVC Trust Agreement. The MVC Trust Agreement is an unrecorded document which outlines the legal structure of the MVC Trust and the rights and responsibilities of the trustee and the beneficiaries. *See* AC, Exhibit M. While the MVC Trust Agreement is not recorded, a Memorandum of Trust is. AC, Exhibit I. The Memorandum of Trust is a two-page document purportedly summarizing the material terms of the MVC Trust Agreement. AC ¶ 60.

After Marriott deeds Legacy Timeshare Estates to First American, as trustee, it records an instrument called a Notice of Addition ("NOA"). AC ¶ 56, Exhibit G. The NOA lists each property added to the MVC Trust and provides an aggregate number of points that Marriott has assigned to the properties listed. AC ¶ 57. Properties listed on the NOA, however, are not automatically made available to MVC Trust Owners. Rather, properties listed in the NOA are deemed "Restricted Use Properties" until Marriott delivers an unrecorded document, called a Notice of Use Right ("NOU"), to the MVC Trust Managing entity, the MVCTOA, and First American. AC ¶ 58, Exhibit H. Restricted Use Properties are defined as trust property that is for Marriott's sole use and not available for use by MVC Trust Owners. *See* AC, MVC Trust Agreement, § 2.43, Exhibit M. NOUs contain no point-value designations, but rather, merely list properties Marriott has agreed to make available for MVC Trust Owners to reserve. *Id.*

Once point values are deemed added to the properties in the MVC Trust by NOA, Marriott sells tranches of 250 points called "BI." AC ¶ 68. Each unit of "BI" is supposed to represent a purchaser's beneficial interest in the MVC Trust. AC ¶ 5. Points also serve as the contractual currency to reserve certain Marriott-owned accommodations in the MVC Trust. AC ¶ 70. BI can be created and sold by Marriott in unlimited supply, is subject to discretionary valuation by Marriott, can be terminated at the will of Marriott, and does not represent a

proportional interest in the MVC Trust. AC ¶¶ 70-72. BI is sold and conveyed to consumers through the MVC Trust Consumer Deed, which is recorded in the public land records of Orange County, Florida. AC ¶ 5, Exhibit C. The MVC Trust Consumer Deeds list MORI as the "Grantor" and describe the conveyance of BI in the form of Marriott-generated, alphanumeric codes. *Id.* The codes are for "administrative" purposes only, do not correspond to any parcel of real property or any proportional interest in the MVC Trust, and cannot be found in any other publicly-available document. AC ¶ 95.

## C. Overview of Applicable Florida Law

### 1. 2010 Law Applies

As discussed herein, the Florida statutory regime in 2010 governs the claims in this matter because that was the controlling authority at the time the MVC Trust was created and that was the law specifically provided for in the MVC Trust timeshare instruments. AC ¶¶ 129-40. Defendants do not dispute that the 2010 version of Florida Statutes apply – they instead argue erroneously that subsequent amendments to the relevant Florida Statutes were clarifying rather than substantive. *See* First Amer. Mem. at 16; Marriott Mem. at 15 n. 19, 21 n. 25, 35 n. 34. As described in the Amended Complaint, intervening amendments to Florida Statutes were indeed substantive but, because Marriott specifically provided that 2010 versions control in the MVC Trust timeshare instruments, that fact is largely irrelevant. AC ¶¶ 129-40. Moreover, as discussed below, the illegality of the MVC Trust scheme is even more blatant given the revisions to Florida's Timeshare Act and Land Trust Act.

### 2. Florida Timeshare Act

Florida law contemplates three different types of timeshare interests: timeshare estates, timeshare licenses, and personal property timeshare interests. *See* Fla. Stat. § 721.05(36) (2010).

A timeshare estate is a parcel of real property over which a purchaser has direct fee simple ownership or is a beneficial interest in a trust comprised of timeshare component sites. Fla. Stat. § 721.05(34). Under Florida law, timeshare estates can *only* be offered in particular types of timeshare plans: single-site timeshare plans (*e.g.,* Legacy Timeshare Condominiums), where the purchaser owns a unit with use-rights at a single property, and multisite timeshare plans (*i.e.*, a timeshare plan consisting of two or more component sites) where the purchaser receives a specific unit in one of the component sites and use rights to the component sites. *See* Fla. Stat. § 721.52; Fla. Stat. § 721.57(2)(a). Timeshare estates in which a purchaser has direct fee simple ownership are conveyed by deed. *See* Fla. Stat. § 721.05(5)(a); *see, e.g.*, Lennens' Legacy Deed, AC, Ex. A. Timeshare estates in which a purchaser receives a beneficial interest in a trust are conveyed not by deed, but by another instrument such as a contract of assignment. *See* Fla. Stat. § 721.05(5)(a).

Multisite timeshare plans take several forms and the law has changed during the time the MVC Trust has been in existence. In 2010, there were three types of multisite timeshare plans: nonspecific multisite timeshare plans (Fla. Stat. § 721.52(5) (2010)), specific multisite timeshare plans (Fla. Stat. § 721.52(7) (2010)), and multisite timeshare plans pursuant to Fla. Sta. § 721.57 (Fla. Stat. § 721.52(4)(b) (2010)). Currently, the law provides for only two types of multisite timeshare plans: nonspecific multisite timeshare plans and specific multisite timeshare plans. *See* Fla. Stat. § 721.52 (2017); Fla. Stat. § 721.552(2)(a) (2017). In 2010 and today, the law provides that timeshare estates can *only* be offered in multisite timeshare plans pursuant to Fla. Stat. § 721.57. *Compare* Fla. Stat. § 721.52(4)(b) (2010); Fla. Stat. § 721.52(4)(b) (2017).

In 2010, Fla. Stat. § 721.57 provided for a multisite timeshare in which purchasers received a timeshare estate in one unit of the component sites of the plan and use rights both to

the component site where the timeshare estate was located and to the other component sites in the multisite timeshare plan. Fla. Stat. § 721.57 (2010). In 2010, Fla. Stat. § 721.57 had a carve-out for multisite plans offered in a trust complying with Fla. Stat. § 721.08. As of 2015, Fla. Stat. § 721.57 no longer has a carve-out for multisite plans in trusts compliant with Fla. Stat. § 721.08. Fla. Stat. § 721.57 (2017). Thus, in 2010, a timeshare estate could ***only*** be offered in a multisite timeshare plan in which a purchaser received a timeshare estate in one of the component sites or in a multisite timeshare plan in a trust compliant with Fla. Stat. § 721.08. *See* Fla. Stat. § 721.57 (2010). Today, however, timeshare estates can ***only*** be offered in specific multisite timeshare plans where a purchaser receives a timeshare estate in one of the component sites. *See* Fla. Stat. § 721.57 (2017).

### 3. Florida Land Trust Act

A land trust is a vehicle in which legal and equitable title over property is transferred to a trustee while beneficiaries receive beneficial interest in the trust property. *See* Fla. Stat. § 689.071 (2010). As the holder of legal and equitable title, a trustee has "the power and authority to protect, to conserve, to sell, to lease, to encumber, or otherwise to manage and dispose of the real property described in the recorded instrument." *Id.* On the other hand, as the holder of beneficial title, beneficiaries have "the power of direction […] for the use and benefit of all holders of any beneficial interest in the land trust. In the absence of a provision in the land trust agreement to the contrary, the power of direction shall be in accordance with the percentage of individual ownership." *Id.* As expanded upon in the 2013 amendments to Fla. Stat. § 689.071, the "power of direction" is the authority "to direct the trustee of a land trust to convey property or interests, execute a lease or mortgage, distribute proceeds of a sale or financing, and execute documents incidental to the administration of a land trust."

It is well established and has long been the understanding in common law that beneficial interests in a land trust are considered personal property, not real property. *See In re Garfinkle*, 577 F.2d 906, 908 n.5 (5th Cir. 1978) ("the interest of a beneficiary in a trust is considered personal property"); *Goldman v. Mandell*, 403 So. 2d 511, 512 (Fla. Dist. Ct. App. 1981); *In re Saber*, 233 B.R. 547, 553 (Bankr. S.D. Fla. 1999). The Attorney General of Florida has explained that "[a] beneficiary's interest in a land trust is generally deemed to be personal property." Op. Att'y Gen. Fla. 1994-50. Indeed, First American's own General Counsel, John Murray, writing about the virtues of land trusts in his 2010 article entitled "*The Use of Land Trusts and Business Trusts in Real Estate Transactions*," proclaimed "[t]he land trust has attained its popularity and wide use because of the practical elements that the beneficial interest provides [including that] the interests of the beneficiaries will not be disclosed without order of court[,] the interests are not subject to partition[, and] ***the beneficial interest is personal property***." AC Exhibit F (emphasis added). Because legal and equitable title of land trust property remains with the trustee, beneficial interests in a land trust are conveyed only by agreement (not by deed). *See, e.g.*, First American Sample Land Trust Interest Assignment, annexed as Exhibit A to the Declaration of Jeffrey M. Norton ("Norton Decl.").

### D.  What Marriott Purports to Convey

While Marriott argues that it conveys real property in the form of a timeshare estate comprised of a beneficial interest in a land trust (Marriott Mem. at 11), this is unsupported by the law, and, in fact, contradicted by the MVC Trust timeshare instruments. Indeed, the "Legal Structure of the Multisite Timeshare Plan," as described in the MVC Trust Public Offering Statement (the seminal compliance document for new timeshare offerings), provides that "[t]he Trustee will hold legal and equitable title to the Trust Property for the use and benefit of the Beneficiaries of the Trust in accordance with the Trust Agreement and Sections 721.08(2)(c)3

and 4., *Florida Statutes*." AC, Exhibit L (p. 13 Sec. III(c)). Fla. Stat. § 721.08(2)(c)3, however, provides the guidelines for timeshare plans which offer ***personal property timeshare interests***, as opposed to Fla. Stat. 721.08(2)(c)2 which provides the guidelines for timeshare plans which offer timeshare estates. The MVC Trust Public Offering Statement further provides that:

> the transfer of an Interest by the Developer to a Beneficiary will be characterized by the Developer and the Trust as the transfer by the Developer to such Beneficiary of […] an economic interest in the Trust ('**Economic Rights**').

*Id.* (at p. 29). This identical language appears in the MVC Trust Purchase Agreement as well. *See* AC, Exhibit D ((at p. 5, Sec. 24(h)). And, the MVC Trust Agreement expressly provides that "[a] Beneficiary shall not have any right, title, or interest in or to any portion of the legal and equitable title to the Trust Property." AC Exhibit M (p. 10, Sec. 4.1(c)).

Although the MVC Trust Public Offering Statement stated to the contrary, Defendants argue that the MVC Trust Consumer Deeds convey a real property "timeshare estate." Marriott Mem. at 19; First Amer. Mem. at 17. Marriott takes the position that it "is not conveying title to MVC Trust property," as Plaintiffs claim, "rather, MORI is conveying title to beneficial interests in the MVC Trust." Marriott Mem. at 13. This makes no sense. For one, if Marriott is purporting to sell off its beneficial interests in the trust (which *is* the MVC Trust property), then this would mean Marriott is conveying something *other* than its beneficial interest (*i.e.*, not a *bona fide* interest in the MVC Trust). Furthermore, there is no such thing as a conveyance of legal title to beneficial title. One can only convey what one holds and only the trustee can convey legal title to trust property by deed.

Even if this concept of deeding legal title to beneficial title was permissible, Marriott's timeshare plan also falls outside the Timeshare Act framework. Marriott repeatedly refers to the MVC Trust Product as a nonspecific multisite timeshare plan. *See* Dkt. No. 77, Memorandum of

Law, p. 16; Dkt. No. 79, Memorandum of Law, p. 10; *see also*, the MVC Trust Purchase Agreement (at p. 2, Sec. VII) (providing, *inter alia*, that "Purchaser is acquiring a non-specific interest in the Trust Property rather than acquiring an interest in any particular Accommodation or unit"); and MVC Trust Public Offering Statement (at p. 3, Art. III, Sec. 1(c)) (providing, *inter alia*, that "a Beneficiary does not directly own a specific interest in any single Accommodation"). Assuming this to be true, then the MVC Trust Consumer Deeds are void, *ab initio*, because, as detailed above, timeshare estates ***cannot*** be offered in nonspecific multisite timeshare plans. And, if the MVC Trust multisite product is not nonspecific, then it must be within a multisite timeshare plan pursuant to Fla. Stat. § 721.57. *See* Fla. Stat. § 721.52 (2010). Given there are two types of § 721.57 timeshare plans, Marriott contends that the MVC Trust is one containing a trust compliant with Fla. Stat. § 721.08.[7] As discussed below, the MVC Trust does not comply with Fla. Stat. § 721.08.

Black's Law Dictionary defines real property as "land and anything growing on, attached to, or erected on it, excluding anything that may be severed without injury to the land." *Real Property*, Black's Law Dictionary (10th ed. 2014). Marriott is not conveying real property, or an interest in real property, or a timeshare estate. In fact, Marriott does not convey any timeshare interest whatsoever, but rather an annually-replenished supply of vacation club points: contractual use rights to access trust property owned and controlled by Marriott. The BI/points given to MVC Trust Owners do not accurately reflect a percentage ownership interest in the MVC Trust, and, in fact, cannot reflect any certain percentage because point values and supply are continually in flux at the whim of Marriott. Even more telling is the fact that Marriott could

---

[7] This is the only plausible option because a plan not compliant with Fla. Stat. § 721.08 must convey a timeshare estate "in one of the component sites." Fla. Stat. § 721.57(2)(a). It is undisputed that purchasers of the MVC Trust do not receive a timeshare estate in a specific component site. *See*, *e.g.*, Lennens' MVC Trust Consumer Deed.

terminate the MVC Trust at any time – causing the "real property" to which MVC Trust Owners supposedly hold "title" to simply vanish.

### E. Marriott's Lobbying Efforts

It is difficult to reconcile Defendants' repeated assertion of compliance with all aspects of Florida law – from the inception of the MVC Trust to present day – with the constant changes to that same law made at the behest of Marriott and all curiously tailored to the unique features of the MVC Trust product. Indeed, many amendments to the Timeshare Act and Land Trust Act appear to be a direct and blatant effort to validate retroactively the MVC Trust structure – despite running counter to well-settled principles of law and logic.

A review of publicly-available legislative histories and review of materials obtained through open records requests, reveal that at the time these amendments were made (many during the pendency of this matter), the sponsors of the bills containing the proposed law changes were being directed by the American Resort Development Association (the "ARDA"), who was itself drafting and commenting on the proposed bill language.[8] Not surprisingly, the Chairman of the ARDA during this time was none other than Steve Weisz, the CEO and President of Marriott Vacations Worldwide Corporation. *ARDA Welcomes New Chairman Steve Weisz of Marriott Vacations Worldwide*, American Resort Development Association (June 8, 2015), http://www.arda.org/arda/news-information/default.aspx?id=5176.

In its motion papers, Marriott emphasizes the unremarkable proposition that lobbying is not unlawful. Marriott Mem. at 35 n. 34. As a general proposition, Plaintiffs do not disagree with

---

[8] The ARDA was also involved in a deliberate financial lobbying effort. In addition to giving individual donations to the bill's sponsors, (*see* www.followthemoney.org), the ARDA gave the Republican Party of Florida $25,000 during discussions about the bill, another $10,000 to the state Republican party when the Legislature scheduled the bill for floor votes, and another $50,000 to Republican Senate leaders after the bill passed. These substantial contributions were made on top of the more than $100,000 donation given by the ARDA to the Republican party each year. *See* Jason Garcia, *Engineering The Law*, Florida Trend, Nov. 2017, at 98.

Marriott's assertion – so long as the lobbying efforts remain ethical and legal. Notwithstanding, Plaintiffs submit that the purpose, timing, and content of the statutory amendments (all overseen by Marriott's CEO), underscore several truths: (a) Defendants created a product without regard to Florida law; (b) the MVC Trust was not compliant with Florida law when established; (c) Marriott has spent nearly a decade simultaneously manipulating non-cohesive aspects of existing Timeshare and Land Trust laws and working to change those laws to retroactively legitimize the MVC Trust structure; and (d) these efforts – many of which were undertaken in direct response to this action – amount to an admission that Plaintiffs' allegations are meritorious. In any event, Plaintiffs submit that the changes in law do not and cannot retroactively validate the MVC Trust scheme.

## III. ARGUMENT

### A. Motion to Dismiss Standard

When reviewing a motion to dismiss, courts must limit their consideration to the well-pleaded allegations, documents central to or referred to in the complaint, and matters judicially noticed. *Day v. Taylor*, 400 F.3d 1272, 1276 (11th Cir. 2005). Further, as a general rule, reviewing courts must accept all factual allegations as true and evaluate all plausible inferences derived from those facts in favor of the plaintiff. *Chaparro v. Carnival Corp.*, 693 F.3d 1333 (11th Cir. 2012). In sum, to "survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). Further, as the Eleventh Circuit has recognized, *Twombly/Iqbal* principles require only that a complaint's allegations be "enough to raise a right to relief above the speculative level." *Speaker v. U.S. Dep't of*

*Health and Human Services Centers for Disease Control and Prevention*, 623 F.3d 1371, 1380 (11th Cir. 2010) (citations omitted).

### B. Plaintiffs' Amended Complaint Complies with Rules 8 and 10

A complaint is not a shotgun pleading when "no count adopts a preceding count; it does not assert claims against multiple defendants without specifying to whom the claim applies; it is not replete with conclusory, vague, and immaterial facts; and it does not allege separate causes of action in the same count." *Johnson v. EZX, LLC*, No. 3:16-CV-1249-J-PDB, 2017 WL 1386810, at *3 (M.D. Fla. Apr. 18, 2017) (internal marks omitted). In dismissing the original complaint in this matter, this Court indicated that to satisfy Rules 8 and 10 of the FRCP:

> Plaintiffs must clearly set forth each cause of action they intend to pursue against each named Defendant, the legal basis for that cause of action, and the factual allegations supporting their entitlement to recovery. Plaintiffs should carefully identify each Defendant and clearly lay out which allegations pertain to which defendants. Finally, each count should incorporate only those facts that are relevant to proving Plaintiffs' entitlement to relief for the specific allegation of that count and should not incorporate any portion of a previous count.
> Order (Dkt. No. 120).

Plaintiffs' Amended Complaint fully addresses each one of the Court's directives. First, Plaintiffs have reduced the number of Defendants, including only those specifically implicated by the factual allegations and counts in the Amended Complaint. AC ¶¶ 9-28. Further, the party allegations have been simplified, and the roles of each named Defendant or group of Defendants have been clarified. *Id.* In addition, each count indicates precisely which Defendants are implicated by the allegations therein, departs from collective definitions where necessary, and sets forth the legal and factual basis for those claims and entitlement to relief. Moreover, each count incorporates *only* those factual allegations which pertain to that count, does not blanketly

reincorporate by reference any portion of a previous count,[9] and does not incorporate any allegations or include any parties not pertinent to the specific count. Finally, while these are not required under Rule 8, for additional clarity, the Amended Complaint contains a reference "Glossary," which in a clear and concise manner, describes all defined terms, a Table of Contents, and an Exhibit List.

Defendants' gripes with the Amended Complaint boil down to one argument: it is too long to read. However, such an objection is meritless. The length of a complaint in and of itself is not a ground for dismissal. *See Simon Prop. Grp., Inc. v. Lauria*, No. 6:11-CV-1598-ORL-31, 2012 WL 1934405, at *4 (M.D. Fla. May 29, 2012) (A complaint may be "lengthy and complex as a result of the size and complexity of the alleged scheme"). Notably, no Defendant moved for a more definite statement under Fed. R. Civ. P 12(e) or had any difficulty responding to each of the counts in the Amended Complaint. *See Weiland*, 792 F.3d at 1324 (rejecting shotgun pleading argument where "defendants did not move for a more definite statement under Federal Rule of Civil Procedure 12(e) or otherwise assert that they were having difficulty knowing what they were alleged to have done and why they were liable for doing it"). Here, each count of the Amended Complaint indicates which Defendants are implicated, the factual allegations pertinent to the count, and the legal basis underlying each claim. This is sufficient to comply with the pleading requirements of Fed. R. Civ. P. Rules 8 and 10 and this Court's prior decision.

---

[9] The only exception being where the substance of a prior or subsequent count serves as a predicate for the incorporating count, as in the case of Plaintiffs' RICO and Punitive Damages counts. Such incorporation does not implicate the ills of shotgun pleading or "materially increase[] the burden of understanding the factual allegations underlying each count." *Weiland v. Palm Beach Cty. Sheriff's Office*, 792 F.3d 1313, 1324 (11th Cir. 2015).

### C. The MVC Trust Consumer Deed is Void Because no Real Property is Conveyed (Count I)

#### 1. The MVC Trust Consumer Deed is Required to Have an Adequate Legal Description Even if it Conveys a Title to a Timeshare Estate in a Multisite Timeshare Plan

Marriott argues that the MVC Trust Consumer Deed does not need a legal description of the underlying real property due to the particular nature of the underlying interest; *i.e.,* a beneficial interest in a land trust. Marriott Mem. at 10-11; *see also* First Amer. Mem. at 12-14. This is incorrect. A deed is an instrument that transfers legal title to a parcel of real property. *See Deed*, Black's Law Dictionary (10th ed. 2014). In order to transfer an intangible interest of real property, equitable title to a timeshare estate,[10] a beneficial interest in a Florida land trust,[11] or a mortgage interest in real property, one must use instruments other than a deed.

Under Florida law, a deed that does not sufficiently describe a parcel of real property is void. *Davis v. Hinson*, 67 So. 3d 1107, 1111 (Fla. Dist. Ct. App. 2011) ("A deed which contains a description so vague that a surveyor would not be able to locate the land is considered a nullity."). "[T]he description of the premises conveyed must be sufficiently definite and certain to enable the land to be identified; otherwise it will be void for uncertainty." *Hoodless v. Jernigan*, 35 So. 656, 660 (1903); *see also Mitchell v. Thomas*, 467 So. 2d 326, 328 (Fla. Dist. Ct. App. 1985) (same). At a minimum, a deed must contain sufficient information such that parol evidence would enable one to "pinpoint the location of the parcels without altering the substance of

---

[10]   *See* Fla. Stat. § 721.05(5)(a), which provides that when closing on a timeshare estate, conveyance of legal title is done by deed while conveyance of beneficial title is not.

[11]   *See* Norton Decl., Exhibit A, which is a template of beneficial interest in a land trust assignment form obtained from First American's website: (www.firstambank.com/wealthmanagement/trustestateservices/landtrust/https://www.firstambank.com/wealthmanagement/trustestateservices/landtrust/). *See also* Norton Decl., Exhibit B, First American's Trust Agreement form. Standard trust agreements, unlike the MVC Trust Agreement, contain a list of trust properties in the body of the document or as exhibits. Beneficial interest assignments, which incorporate the governing trust agreement, transfer ownership over a percentage of the trust properties listed in the trust agreement. Of course, those would not apply here because BI is just a Marriott-created, fictional unit that neither reflects an actual percentage nor portion of the MVC Trust.

the deed." *Rice v. Rice*, 499 F. Supp. 2d 1245, 1249 (M.D. Fla. 2007). There are no statutory exceptions for the legal description requirement. Fla. Stat. § 689.02(1) provides a form of a warranty deed that expressly requires the description of the land conveyed. Fla. Stat. § 689.02(2) further provides that even governmentally-assigned "parcel identification number[s] [are] not a part of the legal description of the property otherwise set forth in the deed and may not be used as a substitute for the legal description of the property being conveyed." Florida's general property statutes do not supersede this common law requirement. *See* Fla. Stat. §§ 689.02(1) and (2); AC ¶¶ 144-45.

On its face, the MVC Trust Consumer Deed lacks a legal description of any identifiable or locatable real property interest. AC, Exhibit C. Instead, the MVC Trust Consumer Deed contains Marriott-generated, alphanumeric codes that appear in no other public document. AC ¶ 70. These "administrative" codes represent purported "Interests" in the MVC Trust. *Id.* The MVC Trust is embodied in the MVC Trust Agreement. However, because the MVC Trust Agreement is unrecorded, the MVC Trust Consumer Deed references the Trust Memorandum – a recorded document which purports to summarize the material terms of the MVC Trust Agreement. AC ¶¶ 5, 61. The Trust Memorandum, however, contains no description of any property within the MVC Trust and no reference to any of the Marriott-generated, alphanumeric codes appearing in the MVC Trust Consumer Deeds. AC ¶ 61. Instead, the Trust Memorandum references recorded and yet-to-be recorded NOAs. AC ¶¶ 60-61, Exhibit I. While the NOAs purport to identify the properties added to the MVC Trust, they do not reference any of the Marriott-generated, alphanumeric codes appearing in the MVC Trust Consumer Deeds. AC ¶ 150.

Marriott asserts that:

No metes and bounds legal description for BIs is necessary or even possible because the BI is an interest in a trust, and, although Plaintiffs mistakenly believe

17

otherwise (*see e.g.*, Am. Compl. ¶ 151), both the Land Trust Act and the Timeshare Act confirm that an interest in a trust need not be a "physical location."

Marriott Mem. at 11. To support this dubious claim, Marriott cites Fla. Stat. § 689.071(2)(b), Fla. Stat. § 721.05(34) (definition of a timeshare estate), Fla. Stat. § 721.53(5) (no such provision exists), and Fla. Stat. § 721.08(2)(c)4 (trustee duties) as authority. *Id.* However, none of these statutes have anything remotely to do with deeds and the requirement that a deed *must* provide an adequate legal description of underlying property. In fact, Marriott fails to provide *any* legal authority whatsoever supporting the argument that a deed lacking a property description is valid.

### 2. The Legal Description of the MVC Trust Consumer Deed is Inadequate Because a Title Searcher Cannot Locate BI Using Public Records

Marriott erroneously contends that the MVC Trust Consumer Deed is valid because a surveyor can locate BI/points through the use of extrinsic evidence.[12] Marriott Mem. at 12. In support, Marriott cites to *Hutchinson Island Realty, Inc. v. Babcock Ventures, Inc.*, 867 So.2d 528, 532 (Fla. Ct. App. 2004), which provides that a deed's legal description is sufficient if the underlying property's location may be ascertained by the use of parole evidence or historical records. But, as the court in *Hutchinson Island Realty, Inc.* made clear, the extrinsic aids used to supplement inadequate legal description in a deed must also be available in public property records.[13]

Here, Marriott does not dispute that the legal description of BI/points in the MVC Trust Consumer Deed is wholly inadequate without the use of extrinsic aids. Rather, Marriott argues that a title searcher would be able to follow the deed's reference to the Memorandum of Trust

---

[12] Marriott does not dispute that H04815, H04816, H04817 and H04818 are merely administrative numbers that are assigned to purchasers' BI for internal tracking. These administrative codes do not appear in any recorded documents nor do they appear in unrecorded timeshare instruments.

[13] Specifically, the court in *Hutchinson Island Realty* reasoned that, "[e]xtrinsic facts pointed out in the description may be resorted to to ascertain the land conveyed, and the property may be identified by extrinsic evidence, as in the case of records of the county where the land is situate." 867 So. 2d at 532-33 (citing *Mendelson v. Great Western Bank, F.S.B.,* 712 So.2d 1194 (Fla. 2d DCA 1988)).

Agreement – a two page document that is recorded in Orange County Comptroller's Office. Marriott Mem. at 12. In turn, the Memorandum of Trust Agreement references recorded NOAs which identify all of the specific parcels of real property that have been conveyed to the MVC Trust, in which BI owners allegedly have a nonspecific, undivided interest. *Id.*

This hypothetical title search of BI/points is preposterous on several grounds. First, Marriott materially misrepresents the fact that the NOAs contain the properties to which BI supposedly represents an indivisible interest.[14] In actuality, by Marriott's own account, BI/points represent a continuously-recalibrating interest in certain properties in the MVC Trust, *i.e.*, only those rendered "unrestricted" by unrecorded NOUs. AC ¶ 104. Thus, although a title searcher may be able to identify the specific parcels of real property contained within the MVC Trust, as detailed by the ***recorded*** NOAs, they cannot identify which of those properties are tied to deeded BI/points, as those remain subject to ***unrecorded*** NOUs.[15] AC ¶¶ 58-59.

Second, even if NOUs were recorded, it is impossible for a title searcher to determine what percentage or proportion of the MVC Trust equates to a unit of BI because, while NOAs indicate the amount of additional points for sale, NOUs do not provide any information about individual or aggregate point values of properties made available to MVC Trust Owners. AC, Exhibit H. Moreover, while each individual property has a unique, non-identical point valuation assigned by Marriott, NOAs provide only an aggregate total number of additional points for the properties listed. AC, Exhibit G. And, although Marriott claims to be recalibrating each unit of

---

[14]    *Id.*; AC ¶ 104. *See also*, AC, Exhibit M: the MVC Trust Public Offering Statement, Sec. III(c), which provides that NOAs contain restricted-use properties to which MVC Trust Owners have no ownership or use-rights. Only the unrecorded NOUs contain a list of timeshare properties (but not corresponding point values) to which MVC Trust Owners have use-rights.

[15]    Furthermore, public records indicate that First American is removing substantial amounts of properties from the MVC Trust by deeding them back to Marriott. *See* Norton Decl., Exhibit C, First American Deed to MORI, dated April 25, 2017.

BI to reflect the actual percentage interest of the MVC Trust, a title searcher would be incapable of performing this task.

Third, setting aside the fact that neither NOA nor NOU are recognized property instruments (and Marriott has not argued otherwise), BI (for "beneficial interest") is an utterly meaningless term and does not reflect any identifiable interest whatsoever. Indeed, Marriott could have just as easily called it "Bridge Interest" (as in, "I have a bridge to sell you") as there is no way a title searcher could discern the interest BI supposedly represents in the MVC Trust. Even if individual property point values were available, Marriott's proprietary and unrecognized *recalibration* process causes the value of BI to be constantly in flux.

In any event, the methodology described by Marriott is not a known survey method and First American (in its role as title insurer) does not state otherwise. Marriott cites no authority for the proposition that a title searcher would endeavor to interpret contracts in order to calculate a proportionate intangible interest and use-rights of the contracting parties. Moreover, there is no extrinsic evidence that would aid a surveyor in locating, let alone valuing, deeded units of BI. Accordingly, Count I should be sustained since Plaintiffs sufficiently allege that the MVC Consumer Deed is void as a matter of law.

3. **Even if the MVC Trust Consumer Deed Conveys an Interest in a Trust Compliant with Fla. Stat. § 721.08(2)(c)(4) that Contains no Personal Interest, the MVC Trust Would Still not Convey a Timeshare Estate (*i.e.,* a "parcel of real property")**

Marriott does not dispute that the MVC Trust product must meet the definition of a "timeshare estate" under Florida law. Fla. Stat. § 721.05(34) (2010) provides that a:

> "Timeshare estate" means a right to occupy a timeshare unit, coupled with a freehold estate or an estate for years with a future interest in a timeshare property or a specified portion thereof. The term shall also mean an interest in a condominium unit pursuant to s. 718.103, an interest in a cooperative unit pursuant to s. 719.103, or an interest in a trust that complies in all respects with the provisions of s. 721.08(2)(c)4., provided that the trust does not contain any

> personal property timeshare interests. A timeshare estate is a parcel of real
> property under the laws of this state.

Marriott interprets this to mean that a trust pursuant to Fla. Stat. § 721.08(2)(c)4 (2010) has the power to convert any type of intangible interest into a parcel of real property. Marriott, however, relies on circular reasoning to argue that "a fundamental premise of the Timeshare Act has always been that an interest in a 'trust that complies … with the provisions of s. 721.08(2)(c)4' … is a 'timeshare estate,' and, as such, is deemed 'a parcel of real property.'" Marriott Mem. at 21. Marriott's argument is patently erroneous.

First, a plain reading of the statute demonstrates that the requirement that timeshare estates be a parcel of real property is a stand-alone provision - a separate attribute. To interpret otherwise would render the provision meaningless and there is nothing supporting Marriott's interpretation that mere compliance with the requirements of Fla. Stat. § 721.08(2)(c)4 would convert an intangible interest into *a parcel* of real property. A "parcel of real property" is not specifically defined in Fla. Stat. § 721. Therefore, a parcel of real property must be created pursuant to the applicable laws depending on the type of real property - for a timeshare parcel in a condominium, it must be created pursuant to Fla. Stat. § 718.

Marriott argues that this "real property" prong is met because the "corpus" of the MVC Trust consists of real property interests. Marriott Mem. at 19. For one thing, a "timeshare estate" is defined as a **parcel** of real property *not* an **interest** in real property – the latter of which can broadly include many types of interests, including timeshare licenses, personal property timeshare interests, mineral rights, easements, mortgages, etc. In the case of the MVC Trust product, use-rights are completely contract-based rights that do not run with the land. If Marriott's interpretation was accurate, a gym membership could be the equivalent of owning title to a parcel of real property so long as a trustee or escrow agent acts as a fiduciary. Nothing

supports Marriott's absurd proposition that a parcel of real property parcel materializes from a mere statutory definition.

Fla. Stat. § 721.08(2)(c)4 does not create a substantive interest in the trust. Fla. Stat. § 721.08(2)(c)4 imposes purely *procedural* safeguards by requiring an independent fiduciary to provide oversight that purchasers are receiving free and clear title to a timeshare estate from a developer. Transferring an interest pursuant to Fla. Stat. § 721.08(2)(c)4 does not magically transform the nature of the underlying property interest.

Furthermore, if the Court were to accept Marriott's interpretation, then an interest that is truly a "timeshare license" can become a "timeshare estate" merely because it is an interest in a trust meeting the requirements § 721.08(2)(c)4(d) (2010). For example, § 721.08 contemplates that, in addition to a timeshare estate, timeshare licenses and personal property timeshare interests can also be interests in a trust complying with § 721.08(2)(c)4. *See* Fla. Stat. §§ 721.08(2)(c)(1)(a)(IV)(B) and 721.08(2)(c)(3)(c)(I). However, the definitions of all three timeshare interests provide they are mutually exclusive of one another. *See* Fla. Stat. § 721.05(37) ("'Timeshare license' means a right to occupy a timeshare unit, which right is not a personal property timeshare interest or a timeshare estate"); Fla. Stat. § 721.05(34) ("'Timeshare estate' means [...] an interest in a trust that complies in all respects with the provisions of s. 721.08(2)(c)4., provided that the trust does not contain any personal property timeshare interests"). Thus, if Defendants' interpretation was correct, then the sole difference between any of the timeshare interests listed in the Timeshare Act would be based on nothing more than what a developer decided to call it.

### D. Marriott Lacks the Legal Capacity to Convey Title to MVC Trust Property (Count II)

Rather than confront Plaintiffs' allegation that, as a trust beneficiary, Marriott lacks the capacity to convey legal title to trust property, Marriott attempts to contort basic property law concepts by arguing that the MVC Trust Consumer Deed does not actually convey title to trust property but rather legal title to a beneficial interest in the MVC Trust. Marriott Mem. at 13. Marriott cites absolutely no authority for this proposition because it defies reason. A deed, such as that received by the Plaintiffs, is an instrument that conveys legal title to a parcel of property, not a fictional "title to beneficial interests in the MVC Trust." Marriott Mem. at. 13. Where the land trust trustee has legal and equitable title to trust property, beneficiaries hold a ***beneficial interest*** in trust property, not legal title to a beneficial interest in trust property.

Here, First American, FSB, as the land trust trustee, holds legal and equitable title to MVC Trust property, and "beneficiaries," like MORI, obtain a "beneficial interest" in trust property. *See* AC, Exhibit M (p. 9, Sec. 4.1(c)). Where the trustee holds legal and equitable title to trust property, legitimate beneficial interests in the trust must be conveyed by a contract that assigns a percentage or proportion of trust property, not by a deed. *See* Norton Decl., Exhibit A. The intra-assignment of trust property is not evidenced by a recorded deed because the primary purpose of a land trust is to shield the identity of the true of owners of the underlying parcels of real property, *i.e.*, the beneficiaries. AC Exhibit F. Intra-trust property rights are listed in the body or attached as an exhibit to the controlling trust agreement and incorporated into the contract for the assignment of beneficial interests. *See* Norton Decl., Exhibit A. In this way, a bona fide beneficial interest in a land trust can be said to convert to fractional ownership of specific real property. *See* AC Exhibit F.

While the law provides that a beneficial interest in a land trust is the same thing as a beneficial interest in the trust property, Marriott argues that the MVC Trust Consumer Deeds convey beneficial interest of BI but *not* a beneficial interest in the MVC Trust properties. This raises the question as to what is BI if it is not an interest in trust property. The simple answer is that BI is *not* a bona fide interest in a land trust. In fact, BI is not a real property interest at all.

As noted above and alleged in the Amended Complaint, BI is a Marriott construct – an endless supply of fictional units created and arbitrarily valued as parcels of real property submitted to the MVC Trust. AC ¶ 70. Once summarized in a recorded NOA, units of BI/points are said to immediately vest in Marriott.[16] However, such "vesting" of BI/points occurs pursuant to an undisclosed proprietary procedure pursuant to contract rather than through operation of any recognized property law.[17]

To be clear, BI has no independent legal existence. Each unit of BI is simply 250 points. BI can be completely eliminated from the MVC Trust Timeshare Plan and replaced with 250 points. BI exists only to create an illusion of real property interests but, in fact, is nothing more than a symbol of contract-based use-rights, like a gym membership where the licensee has right to use the facilities pursuant to membership agreement but has no property interest in the underlying facility. Because of this, the MVC Trust Consumer Deed amounts to a membership certificate and recording of that certificate serves no legal purpose and has no legal significance.

---

[16] Notwithstanding the description of beneficiaries in the MVC Trust Agreement, Marriott is undoubtedly the sole land trust beneficiary of the MVC Trust whereas MVC Trust Owners are contractual licensees lacking any type of ownership rights typical of land trust beneficiaries. MVC Trust Owners cannot even discern what properties are available in the MVC Trust because NOUs are not provided to MVC Trust Owners. Also, the MVCTOA, Marriott's proxy, acts as collective beneficiary for MVC Trust Owners and completely controls all aspects of the trust property.

[17] Marriott purports to summarize the proprietary process in the MVC Trust Agreement, stating "that, as 'Developer of the MVC Plan, MORI shall, from time to time, convey to the MVC Trust legal and equitable title to 'certain real property,' and, in exchange, the beneficial interest in the MVC Trust shall 'immediately and automatically' vest in MORI." Marriott Mem. at 13.

In its motion, First American ignores Count II entirely and instead recasts the allegations as a challenge to Marriott's ability to "assign" beneficial interests in the MVC Trust. First American Mem. at 9-11. As noted above, Plaintiffs do not contest Marriott's ability to assign its beneficial interests in the MVC Trust. Rather, Plaintiffs argue that Marriott cannot convey its beneficial interest in the MVC Trust by warranty deed (an instrument used exclusively for the transfer of legal title to real property – something Marriott does not hold). Because First American does not even address the issue of deed validity, it should be deemed to have conceded Count II. *See, e.g.*, *United States v. Gupta*, 463 F.3d 1182, 1195 (11th Cir. 2006) ("We may decline to address an argument where a party fails to provide arguments on the merits of an issue in its initial or reply brief. Without such argument the issue is deemed waived.").

The only authority that First American cites, *In re Saber,* actually supports Plaintiffs' argument that only a trustee may convey legal title and that a beneficiary's interests are a product of contractual assignment. First American Mem. at 10. In *In re Saber*, after a land trust beneficiary acquired 100% of the beneficial interest in the trust by contractual assignment, the trustee executed a warranty deed conveying legal title to the trust property to the beneficiary and he became the successor trustee. *Id.* at 553. The court ruled that as holder of legal title, the successor trustee was then free to convey legal title to trust property. *Id.* [18]

Here, unlike *In re Sabre,* First American did not execute a warranty deed to transfer legal title to trust properties back to Marriott at any time; nor did First American convey legal title to

---

[18] Notably, the court in *In re Sabre* also determined that because the successor trustee was also the sole beneficiary, the doctrine of merger operated to extinguish the trust. *Id.* at 555. Similarly, here Plaintiffs allege that if Marriott maintains that it was the sole beneficiary of the MVC Trust at its inception and also held legal title to all MVC Trust property (with the legal capacity to covey trust property by deed), then the doctrine of merger should operate to extinguish the MVC Trust *ab initio*. AC ¶ 163. Although the Land Trust Act was amended in 2013 excluding land trusts from dissolution under the doctrine of merger (Fla. Stat. § 689.71(5)), that was *not* the law when the MVC Trust was created. *See In re Sabre*, 233 B.R. at 554 n. 5 (doctrine of merger applies to Florida land trusts).

BI to Marriott (assuming it too is trust property – *it is not*). Therefore, only a deed executed by First American would represent a valid transfer legal title of trust property (again, assuming *arguendo* that BI is really a fractional ownership interest of MVC Trust property and not a made-up unit – *which it is*).

At bottom, Plaintiffs do not take issue with Marriott's ability to assign trust property (by appropriate means) and/or to sell contract-based rights to use trust property in the form of points. However, the issue presented by Count II is whether Marriott, as the MVC Trust beneficiary, had and has the legal authority to act as "Grantor" on a deed purportedly conveying legal title to trust property to MVC Trust Owners. To that end, nothing in Florida law supports the theory that two layers of legal title are created in a land trust and Marriott fails to advance any legal authority stating otherwise. As such, because the Amended Complaint sufficiently alleges that the MVC Trust Consumer Deed is void due to Marriott's lack of capacity, Count II should be sustained.

### E. First American Title Policy Coverage is Triggered Due to Defects in Title (Count III)

Defendants intentionally mischaracterize Count III as a statutory claim lacking a private right of action. Marriott Mem. at 14; First Amer. Mem. at 11-12. As is clear from both the title and the claims for relief, Count III is a claim for declaratory relief; namely, that coverage under the First American Title Policy is triggered based on defects in title. AC ¶¶ 181-82. Plaintiffs' reference to the obligations set forth in Fla. Stat. § 627.784 is solely to contextualize First American's duty to ensure that there are no defects in title prior to issuing title insurance. AC ¶¶ 167-70. This is *not* a statutory claim.

Here, Plaintiffs allege that the First American Title Policy is triggered as a result of two principle defects in title. First, as explained with regard to Counts I and II (*infra*) coverage is triggered due to the fact that: (a) no real property is actually conveyed by the MVC Trust

Consumer Deed; and (b) even assuming, *arguendo*, there was a real property conveyance, the MVC Trust Consumer Deed is void for lack of legal description. Second, Plaintiffs allege that coverage is triggered due to the fact that there are encumbrances to title in the form of Restricted Use Properties in the MVC Trust and Legacy Timeshare Condo Declarations. AC ¶¶ 177-80.

Restricted Use Properties are encumbrances. As discussed herein and alleged in the Amended Complaint (AC ¶¶ 177-80), although Marriott claims to "recalibrate" BI to account for properties for which no NOU has been delivered, this is a secret and unrecorded process. AC ¶¶ 103-04. Each NOA purports to summarize the total amount of points to be added to the MVC Trust but are not itemized by individual parcel. AC Exhibit G. Moreover, the point totals include points for Restricted Use Properties for which no NOU has been delivered. AC ¶ 58, Exhibit G. In addition, the unrecorded NOU do not contain any information about points at all or what portion of BI/points are attached to the newly unrestricted properties. AC Exhibit H. Accordingly, because "recalibration" of BI is done secretively and the recorded documents do not indicate which properties are unrestricted, the issue of whether Restricted Use Properties are encumbrances is a matter of fact and not subject to dismissal at this stage. *See Twin City Fire Ins. Co. v. Hartman, Simons & Wood, LLP*, 609 F. App'x 972, 976 (11th Cir. 2015) (issues of fact are not to be decided on a motion to dismiss).

The Condo Declarations governing the MVC Trust Component Sites are also encumbrances. Notably, after reviewing Plaintiffs' initial complaint, Defendants recognized the obvious flaw in their scheme and undertook an intensive lobbying campaign to change the law to exclude Component Site Condo Declarations from the definition of "encumbrances." AC ¶¶ 446-51. And, recognizing that Marriott could not simply make seven years of void MVC Trust Consumer Deeds valid by simply changing the law, Marriott lobbied to have the statutory

amendments carry a disclaimer that the changes are simply "intended only as a clarification of existing law." Fla. Stat. 721.08 (2017), and so could apply retroactively.

Marriott asserts that these changes are indeed merely "clarifications," but this is patently false. As stated by the Florida Supreme Court, "[j]ust because the Legislature labels something as being remedial, however, does not make it so." *State Farm Mut. Auto. Ins. Co. v. Laforet*, 658 So. 2d 55, 61 (Fla. 1995) ("Even when the Legislature does expressly state that a statute is to have retroactive application, this Court has refused to apply a statute retroactively if the statute impairs vested rights, creates new obligations, or imposes new penalties"). In determining whether an amendment is merely a "clarification," the Florida Supreme Court follows the analysis outlined in *Energy Reserves Grp., Inc. v. Kansas Power & Light Co.*, 459 U.S. 400 (1983); *See U.S. Fid. & Guar. Co. v. Dep't of Ins.*, 453 So. 2d 1355, 1360 (Fla. 1984).

In *Energy Reserves*, the Supreme Court explained that the first step of the analysis is "whether the state law has, in fact, operated as a substantial impairment of a contractual relationship." 459 U.S. at 411 (citing *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 244 (1978)). Here, in addition to the Florida Legislature expressly deeming these amendments as substantial (Norton Decl. Exhibit D), the impact on MVC Trust Owners' rights, not to mention those of Legacy Owners, has been significant. First, for MVC Trust Owners, they have a right to clear and free title. MVC Trust Owners have been paying substantial sums for title insurance (for which First American was required to complete an adequate title search), yet received title which was subject to various Condo Declarations in the State of Florida and elsewhere. AC ¶ 177. Second, and more importantly, Legacy Owners have had their rights substantially impacted by these amendments. When Legacy Owners originally purchased their single-site timeshare estates, their Condo Declaration (did and do) guarantee a reservation system in which they would be

competing against only other Legacy Owners within their single-site property (a number of people exponentially lower than the total amount of MVC Trust Owners). AC ¶ 87. Moreover, the amendments purport to retroactively exclude Legacy Owners' as "interestholders" in the Component Sites. Setting aside that this amendment purports to undermine the property laws of states outside of Florida, it results in a blatant diminution in value and infringement on longstanding property rights of Legacy Owners.

The second step of the retroactive analysis is if the amendment "constitutes a substantial impairment, the State, in justification, must have a significant and legitimate public purpose behind the regulation […] such as the remedying of a broad and general social or economic problem." *Energy Reserves*, 459 U.S at 411–12. Here, no such justification exists. First, the amendment does not implicate ***broad*** and ***general*** issues, but rather, it specifically targets this case and the unique features of the MVC Trust product. Second, there is no social or economic injustice remedied by these amendments. To the contrary, the sole beneficiaries of the changes in the law are Marriott and First American.[19]

Changes to the law aside, First American attempts to deflect liability by arguing that the possibility of Restricted Use Properties and Condo Declarations being encumbrances was expressly disclosed as an exception to coverage. First American Mem. at 14-16. This argument is erroneous. First American cannot (and does not) deny that it had actual knowledge of the Restricted Use Properties and Component Site Condo Declarations but argues that the Lennens should have known of the title defect when the Title Policy went into effect. First American Mem. at 15.

---

[19] The third prong of the analysis is, if a legitimate public purpose has been identified, does the adjustment of rights and responsibilities effectuate the purpose. *See Energy Reserves*, 459 U.S at 412–13. Here, if the purpose of these amendments is to benefit timeshare interest purchasers, such an amendment clearly fails to achieve this end. However, if the goal is to provide Marriott and First American with a defense in this particular lawsuit, it is certainly tailored to that purpose.

However, under Florida Law, an insured's constructive knowledge is not the correct standard as it remains the insurer's burden to "clearly set[] forth what damages are excluded from coverage under the terms of the policy." *Fayad v. Clarendon Nat. Ins. Co.*, 899 So. 2d 1082, 1086 (Fla. 2005). "[A]n insurer may be liable for coverage not included in a written contract if its agent failed to provide it or to notify the insured that such coverage was excluded from the policy issued." *Burns v. Consol. Am. Ins. Co.*, 359 So. 2d 1203, 1207 (Fla. Dist. Ct. App. 1978). Thus, to avoid liability for undisclosed but known title defect, the insurer has the burden of proof to show that insured had actual, express knowledge of the title defect. Constructive knowledge is not sufficient.

Under Florida law, insurance policies are "treated like a contract, and therefore ordinary contract principles govern the interpretation and construction of such a policy." *Fabricant v. Kemper Indep. Ins. Co.*, 474 F. Supp. 2d 1328, 1330 (S.D. Fla. 2007). In Florida, "mutual assent is a prerequisite for the formation of any contract." *Kolodziej v. Mason*, 774 F.3d 736, 741 (11th Cir. 2014). In order for a contract to be binding and enforceable, there must be "mutual assent to certain and definite contractual terms. Without a meeting of the minds on all essential terms, no enforceable contract arises." *Matter of T & B Gen. Contracting, Inc.*, 833 F.2d 1455, 1459 (11th Cir. 1987).

Without having the opportunity to read specific terms of a contract, a plaintiff cannot be found to have had knowledge of and assented to those terms. *See Oce N. Am., Inc. v. Caputo*, 416 F. Supp. 2d 1321, 1327 (S.D. Fla. 2006). Here, Plaintiffs did not have the opportunity to read the First American Title Policy until several months after closing. In fact, while the Plaintiffs signed their MVC Trust Purchase Agreement in December of 2014, and their MVC Trust Consumer Deed was executed in January of 2015 (*i.e.*, the "closing"), and the MVC Trust Consumer Deed was recorded in February of 2015, First American did not deliver a copy of the First American Title Policy until May of 2015 – nearly five months after the closing. AC ¶ 8. Therefore, in order for

First American to bind the Plaintiffs to any express exclusion in the First American Title Policy, it would have to have been delivered prior to the closing. Consequently, to the extent any exclusion listed in the First American Title Policy is valid, it is not enforceable as the Plaintiffs did not take "legal title" to the MVC Trust product subject to the exclusions.

### F. The MVC Trust is Subject to and in Violation of the Condominium Act (Count V)

Both Marriott and First American, in responding to Count V, seemingly contradict themselves by asserting that the MVC Trust is not subject to the Condominium Act while simultaneously admitting that, as a Legacy Owner, the MVC Trust is required to comply with the provisions of the various Component Site Condo Declarations (which are created pursuant to the Condominium Act). Marriott Mem. at 17-18; First American Mem. at 16-17. This bit of illogic aside, Marriott's own exhibits demonstrate that the MVC Trust is undeniably bound by the Condominium Act. Indeed, both letters from the Bureau of Standards and Regulations provide that the MVC Trust must be in compliance with Fla. Stat. § 718. Dkt. No. 78-1 (Greene Decl, Exhibit A). Specifically, the letters provide:

> The amendment to the filing for the referenced timeshare plan(s) received by the Division on August 3, 2010 was reviewed pursuant to 718 and 721, Florida Statutes, as applicable.
>
> THIS APPROVAL VERIFIES THE DEVELOPER'S SUBSTANTIAL COMPLIANCE WITH THE FILING AND DISCLOSURE REQUIREMENTS OF CHAPTER 718 AND 721, FLORIDA STATUTES (as applicable). IT DOES NOT CONSTITUTE THE DIVISION'S ENDORSEMENT OF THE CREATION, SALE, PROMOTION OR OPERATION OF THE TIMESHARE PLAN.
>
> THIS APPROVAL DOES NOT RELIEVE THE DEVELOPER OF ANY DUTY OR RESPONSIBILITY UNDER FLORIDA STATUTES.

*Id.* Despite the requirement to comply with Chapter 718, Marriott's administration of the MVC Trust is in direct violation of the applicable Condo Declarations. Specifically, not one of the

Condo Declarations in the Component Sites mentions or recognizes the MVC Trust or interests created therein. AC ¶ 227.

Fla. Stat. § 718.104(4)(o) provides that:

> If timeshare estates will or may be created with respect to any unit in the condominium, a statement in conspicuous type declaring that timeshare estates will or may be created with respect to units in the condominium. In addition, the degree, quantity, nature, and extent of the timeshare estates that will or may be created shall be defined and described in detail in the declaration, with a specific statement as to the minimum duration of the recurring periods of rights of use, possession, or occupancy that may be created with respect to any unit.

Furthermore, Fla. Stat. § 718.1045 provides that: "No timeshare estates shall be created with respect to any condominium unit except pursuant to provisions in the declaration expressly permitting the creation of such estates." Despite this requirement, Marriott has failed to amend any of the Florida Component Sites Condo Declarations. Accordingly, Defendants are in violation of Fla. Stat. § 718.

### G. MVC Trust is Not a Valid Timeshare Estate in a Multisite Plan (Count VI)

The entire foundation of Defendants' elaborate multi-jurisdictional criminal enterprise is based on the erroneous interpretation of a single statutory definition. Specifically, Defendants argue that transferring timeshare accommodations into a trust meeting the requirements of Fla. Stat. § 721.08 renders any interest a "timeshare estate." Marriott Mem. at 19; First American Mem. at 17-18. This is demonstrably false.

Under Florida law, a timeshare estate is deemed a parcel of real property. Fla. Stat. § 721.05(34) (2010). Like all real property transactions, to close on a purchase of a timeshare estate, the purchaser must receive legal title to the property and the instrument that conveys this title must be recorded pursuant to the state's recording laws - not at a randomly selected

location.[20] A timeshare interest conveyed in a multisite timeshare plan that does not meet the general requirements of Fla. Stat. § 721.57(2)(a) (2010)[21] or a trust meeting the requirements of Fla. Stat. § 721.08 is deemed to be a timeshare license. Fla. Stat. § 721.57(1) (2010). This is because fractional ownership of a timeshare unit is what distinguishes a timeshare estate from the other types of timeshare interests that convey lesser property rights. Accordingly, there is no basis for Defendants' position that an intangible and undefined interest, *i.e.*, BI, is a timeshare estate solely because the timeshare accommodations are transferred into a trust compliant with Fla. Stat. § 721.08(2)(a) (2010).

Marriott argues that "a fundamental premise of the Timeshare Act has always been that an interest in a 'trust that complies … with the provisions of s. 721.08(2)(c)4' … is a 'timeshare estate,' and, as such, is deemed 'a parcel of real property.'" Marriott Mem. at 21. However, if true, that would mean a parcel of real property could materialize whenever an interest in a trust met the procedural requirements imposed on trustees to oversee the conveyance of timeshare interests. On its face, this interpretation of Fla. Stat. § 721.05(34) is clearly erroneous. Although Fla. Stat. § 721.05(34) provides that a timeshare estate is a parcel of real property, this is merely a separate and independent attribute of *all* timeshare estates. This clause is not dependent or related to transferring timeshare plan accommodations to a trust meeting the requirement of Fla. Stat. § 721.08.

---

[20] Recording laws require instruments to be recorded in the location where the subject property is located, not where the "corpus" of the trust is located, as Marriott argues. *See* Marriott Mem. at 8. Recognizing this conundrum, in 2013, Marriott effectuated legislative amendments to the Land Trust Act to retroactively validate recording mortgages secured on BI in Orange County, Florida. AC ¶¶ 430-36. At that time, Marriott wanted to securitize mortgage secured on BI as mortgage-backed securities and ran into a hurdle when others pointed out that before 2010 mortgages for land trust beneficiary interests are perfected pursuant to UCC - not recorded. *See* Fla. Stat 671.071(8)(C) (2013). Nonetheless, the amendment applied only to deed of trust mortgages -- not to real property deeds. Accordingly, there is still no legal basis for MVC Consumer Deeds to be recorded in Orange County, Florida.

[21] Fla. Stat. § 721.08(2)(a) provides that purchaser will receive a timeshare estate as defined in Fla. Stat. § 721.05 in one of the component sites of the multisite timeshare plan.

Indeed, adopting Marriott's interpretation would result in the elimination of the distinction between a timeshare estate and a timeshare license, which by definition is not a timeshare estate. Fla. Stat. § 721.05(37). For instance, under Fla. Stat. § 721.08(2)(c)(1)(a)(IV)(B) (2010), a timeshare plan that conveys timeshare licenses may also "[t]ransfer by the developer of legal title to the subject accommodations and facilities, or all use rights therein, into a trust satisfying the requirements of subparagraph 4." In other words, an interest in a trust meeting the requirement of Fla. Stat. § 721.08(2)(c)4 can contain not only timeshare estates, but also timeshare licenses. By Marriott's reasoning, the only thing separating the two distinct timeshare interests is the developer's option to call it a timeshare estate as opposed to a timeshare license. Unfortunately for Marriott, statutory requirements are not guided by the whim of the developer.[22]

Of course, Marriott's arguments are also at odds with its repeated representations that the MVC Trust is a "'nonspecific multisite timeshare plan,' under which purchasers receive 'no specific right to use any particular accommodations and facilities.'" *See* D.E. No. 77, Memorandum of Law, p. 16; *see also*, AC, Exhibit D (MVC Trust Purchase Agreement at p. 2, Sec. VII) (providing, *inter alia*, that "Purchaser is acquiring a non-specific interest in the Trust Property rather than acquiring an interest in any particular Accommodation or unit"); and AC, Exhibit L (MVC Trust Public Offering Statement at p. 3, Art. III, Sec. 1(c)) (providing, *inter alia*, that "a Beneficiary does not directly own a specific interest in any single Accommodation"). Fla. Stat. § 721.52 (2010) provides that sales of ***nonspecific*** multisite

---

[22] The Florida Legislature clearly did not share Defendants' interpretation of law because Fla. Stat. § 721.52(4)(b) expressly provides that "Timeshare estates may **only** be offered in a multisite timeshare plan pursuant to s. 721.57." (Emphasis added). Fla. Stat. § 721.57(1) (2010) provides that a timeshare interest that otherwise meets all the definition of a timeshare estate (*i.e.*, a parcel of real property) will nevertheless be deemed a timeshare license in a multisite timeshare plan if either Fla. Stat. § 721.08(2)(C)4 (2010) or Fla. Stat. § 721.57(2)(a) (2010) are not met.

timeshare plans are not timeshare estates because there is "no specific right to use any particular accommodations and facilities" and thus the interests are deemed "licenses" or "personal property timeshare interests." Thus, to the extent Marriott represents the MVC Trust to be a "nonspecific timeshare plan," it cannot be deemed a timeshare estate under Florida law.

### H.  The MVC Trust is Not a Trust That Complies with Fla. Stat. § 721.08

#### 1.  First American Lacks Independence From Marriott in Violation of 721.08 (Count VII)

Under Fla. Stat. § 721.08 (2010), both the escrow agent and trustee (the "Timeshare Trustee") act as express fiduciaries for the timeshare plan's purchasers.[23] The Timeshare Trustee is required to expressly accept substantial *personal* liability for any breach of fiduciary duty to the timeshare plan purchasers. *See* Fla. Stat. §721.08(2)(c)4(b) (2010).[24] Any escrow agent or Timeshare Trustee found to have intentionally violated Fla. Stat. § 721.08 "is guilty of a felony of the third degree." *Id.* In fact, a Timeshare Trustee's breach of the statute "is prima facie evidence of an intentional and purposeful violation of this act." Fla. Stat. § 721.08(10)(b) (2010).

The importance of compliance with this section is underscored by making violators of this section subject to Florida's Racketeer Influenced and Corrupt Organizations Act (the "Florida RICO Act"). Fla. Stat. § 895.02(1)(a)(21) (2010). As such, the timeshare developer, escrow agent, or Timeshare Trustee are not only liable for treble damages, but are subject to Florida RICO civil remedies. *Id.* Accordingly, it is evident that the Florida Legislature intended the function of the Timeshare Trustee and escrow agent to be that of unparalleled importance.

---

[23] Fla. Stat.§ 721.05(30) defines a "purchaser" as any person, ***other than a developer***, who by means of a voluntary transfer acquires a legal or equitable interest in a timeshare plan other than as security for an obligation. (Emphasis added). Notwithstanding, the MVC Trust Agreement provides that beneficiaries include both developer and purchasers. Legacy Owners are "Interestholders" as defined in Fla. Stat. §.§ 721.05(21).

[24] "No transfer pursuant to this subparagraph shall become effective until the trustee accepts such transfer and the responsibilities set forth herein." *Id.*

Under Fla. Stat. § 721.08, for First American to be sufficiently independent from Marriott there cannot be any financial relationship with Marriott other than receiving routine transactional fees in a handful of enumerated contexts (*e.g.*, providing fees for issuing lender's or owner's title policy). *See* Fla. Stat. § 721.08(2)(c)4(b)(I); Fla. Stat. § 721.05(20); Fla. Stat. § 721.03(7). First American argues that that a person is not necessarily disqualified from serving as Timeshare Trustee or escrow agent solely because the trustee issues lender's and owner's title insurance policies. First Amer. Mem. at 19. Although true, here, the Amended Complaint alleges multiple financial entanglements with Marriott that go well beyond title insurance.

First, as detailed in the Amended Complaint, the profits to be made by First American off the MVC Trust scheme are considerable and virtually effortless. AC ¶¶ 80-81, When issuing title insurance policies, First American does not incur the cost of performing a title search which typically require professional staffing legal consultation. In fact, the issuing of title policies for fungible BI units with *zero* chain of title likely involves no more than printing costs. *Id.* Even better, First American believed it could completely ignore the risks associated with title insurance because it would never have to pay out claims. *Id.* The unusually high profit margin provided a strong incentive for First American to sell title policies to fake timeshare estates, a policy which First American does not even bother providing a copy of to owners until months after closing. AC ¶ 8.

Second, after receiving the closing affidavit of transfer from MORI (AC ¶¶ 260, 264, 380), First American was (and is) required to independently verify that the timeshare estate is free and clear from encumbrances. *See* Fla. Stat. § 721.08(2)(c)(2). A prerequisite to verifying that title is free and clear is to ensure that a timeshare estate even exists in the first place. First American is well aware that BI does not qualify as either a valid timeshare estate or a parcel of

real property. AC ¶ 382. Based on this, alone, it is clear that First American cannot perform as an independent escrow agent to allow Marriott to make withdrawals of sales proceeds from escrow.

Similarly, First American had (and has) actual knowledge that Marriott's closing affidavit is false and that actual closings do not take place for the MVC Trust Product. When closing on the MVC Trust Product, Marriott emulates the procedural aspects of a legitimate closing, but in reality, the closing has no substantive effect. Indeed, Marriott executed MVC Consumer Deeds without having legal capacity as "Grantor" and without a valid property description. AC ¶¶ 160-62. Additionally, First American had (and has) actual knowledge of the encumbrances on title in the form of the Legacy Owners, as Interestholders, Condo Declarations from Component Sites, and Restricted Use Properties. (AC ¶¶ 176, 178-79, 389). First American argues that an escrow agent is not required to independently verify the contents of the affidavit. First American Mem. at 20-21. However, where, as here, First American has *actual* knowledge of the affidavit's falsity, First American has an affirmative duty to reject it. *See, e.g.*, *Graham v. Lloyd's Underwriters at London*, 964 So. 2d 269, 276 (Fla. Dist. Ct. App. 2007) ("An insurance company should not be permitted to lull the assured into a false sense of security by accepting premiums after knowledge, either actual or constructive, of facts sufficient to avoid the policy, and then when the risk eventuates assert as a basis for escape from liability the existence of facts or conditions of which they were, or should have been, previously aware […] It is equally well settled in insurance law that, when an insurer has knowledge of the existence of facts justifying a forfeiture of the policy, any unequivocal act which recognizes the continued existence of the policy or which is wholly inconsistent with a forfeiture, will constitute a waiver thereof." (Internal marks and citations omitted)). Escrow agents in the context of Fla. Stat. § 721.08 do not

perform ministerial functions like land trust trustees, but rather, must exercise independent judgment at all times.

Finally, it is violation of Fla. Stat. § 721.08(2)(c)4(b)(I) if the regulated party, Marriott, contractually indemnifies the regulator, First American, for breaches of fiduciary duty.[25] The purpose of requiring a trustee to accept personal liability is to encourage the trustee to exercise due diligence. Yet, pursuant to the MVC Trust Agreement (AC, Exhibit M (p. 23, Art. VIII)) that is precisely what Marriott has agreed to do (via the MVCTOA). First American argues that the MVC Trust Agreement excludes from indemnification personal liability that arises from a final judgment declaring that First American acted with gross negligence or willful misconduct. First Amer. Mem. at 20. However, First American failed to mention that even where the Timeshare Trustee acts with gross negligence or willful misconduct, it will be indemnified if there is a settlement that is deemed in the best interest of the MVCTOA – an entity Marriott argues need not be independent. Marriott Mem. at 26-27. In other words, Marriott is the sole determiner of whether First American is indemnified for its misconduct (and, of course, Marriott would never allow First American to be held personally liable).

For these reasons, it is clear that First American lacks the independence required by Fla. Stat. § 721.08(2)(c)4(b)(I) and that Plaintiffs have sufficiently alleged as much. Accordingly, Count VII should be sustained.

---

[25] *See also* Fla. Stat. § 736.1011(1). The Florida Trust Code specifically provides that: "[a] term of a trust relieving a trustee of liability for breach of trust is unenforceable to the extent that the term [… r]elieves the trustee of liability for breach of trust committed in bad faith or with reckless indifference to the purposes of the trust or the interests of the beneficiaries."

## I. Marriott and First American Knowingly Violated Fla. Stat. § 721.08(2)(c)4 by Failing to Properly Transfer Accommodations and Facilities to the MVC Trust (Count VIII)

Based on Marriott's arguments and the recent effectuation of the new amendments to Fla. Stat. § 721.08 (admittedly done at the behest of Marriott), it is rather obvious – indeed it is tantamount to an admission – that First American failed to perform adequately the function of an independent Timeshare Trustee.[26] Quite simply, Marriott did not (and could not) provide First American Trust with evidence that it transferred facilities and accommodations to the MVC Trust that were free and clear from the claims of interestholders because Legacy Owners *are* interestholders. Further, because Marriott could not effect a valid transfer of Legacy Timeshare Estates to First American, it was illegal for Marriott to withdrew proceeds from sales of the MVC Trust product from escrow. Accordingly, the MVC Trust is not a trust that meets the requirements of Fla. Stat. § 721.08(2)(c)(4) (2010).

In the fictional narrative of the MVC Trust timeshare plan, once Legacy Timeshare Estates are transferred to First American, the Component Site Condo Declarations are magically scrubbed away and replaced with the unrecorded MVC Trust Agreement. AC ¶ 95-96. However, in reality, Legacy Timeshare Estates in the MVC Trust remain subject to their Component Site Condo Declarations and the MVC Trust timeshare instruments can have no legal effect on the underlying Legacy Timeshare Estates.[27] Accordingly, Legacy Owners *will always* have a

---

[26]   First American makes the curious argument that as an escrow agent, it is not required to verify that the accommodations are free and clear of encumbrances because it was transferred to the Timeshare Trustee. But First American *is* the Timeshare Trustee. First American Mem. at 21-22.

[27]   Adopting Marriott's absurd reasoning that Legacy Owners do not have a superior claim (Marriott Mem. at 16) would have significant and negative consequences. For example, it would mean that a person that owns a co-op in New York City can dodge all the rules and restrictions governing the unit (including selling restriction and transfer tax implications) simply by transferring title to a Florida land trust. In this example, not only would the New York City co-op unit be bound by the terms of an unrecorded trust agreement (which will omit the cumbersome restrictions of the co-op), but other co-op owners (whose units are not in the land trust) would lack legal rights with regard to co-op violations.

superior claim outside of Fla. Stat. § 721.08. In fact, there are direct conflicts between the MVC Trust timeshare instruments and the Component Site Condo Declarations. For example, Legacy Timeshare Estates must be reserved in an undivided 7-day reservation window. AC, Exhibit K (Reservation Procedures, Ex. E). However, under the Trust Reservation Procedures of the MVC Trust timeshare plan, a lesser 1-day reservation is possible. AC, Exhibit O.

Marriott and First American argue that there is nothing improper in the way Legacy Timeshare Estates are added to the MVC Trust and that the process is fully compliant with Fla. Stat. § 721.08(2)(c)4 (2010). Marriott Mem. at 23; First American Mem. 20-22. Clearly, Defendants take an exceedingly liberal view of the fiduciary obligations under Fla. Stat. § 721.08. A plain reading of the statute says otherwise. Because have sufficiently plead violations of Fla. Stat. § 721.08(2)(c)4 (2010), Count VIII should be sustained.

### J. The MVC Trust Fails to Comply with the Statutory One-to-One Nightly-Use Ratio Requirement (Count IX)

Under Florida law, a developer must ensure that the timeshare plan maintains a ***precise*** one-to-one use night requirement ratio ("One-to-One Use Ratio") at all times. *See* Fla. Stat. § 721.03(10). This remains true every time a timeshare unit is added, substituted, or deleted from the timeshare plan. *See* Fla. Stat. § 721.55(4)(f).[28] To maintain a precise One-to-One Use Ratio, at no time may a timeshare unit be counted as having more than 365 use nights per 12-month period (or 366 use nights in a leap year). Fla. Stat. § 721.05(25) (2010). For calculating the One-to-One Use Ratio, Florida law further provides that the "use rights of each owner shall be counted without regard to whether the owner's use rights have been suspended for failure to pay

---

[28] MVCTOA argues that Fla. Stat. § 721.03(10) applies only to developers, and thus, no claim is stated against the MVCTOA under Count IX. MVCTOA Mem. at 7. As alleged, however, MVCTOA's liability under Count IX arises not from the creation of a plan that defies compliance with the one-to-one nightly use ratio but from its role as a fiduciary for MVC Trust Owners. AC ¶¶ 295-296. The MVCTOA is the recipient of NOU which must comply with Fla. Stat. § 721.55(4)(f).

assessments or otherwise." *Id.* Therefore, if a timeshare unit in the MVC Trust is counted as having 366 use nights (367 use nights in a leap year), the One-to-One Use Ratio is violated.

Marriott argues that various provisions of the MVC Trust timeshare instruments have provided that maintenance of the One-to-One Use Ratio is a "priority of the MVC Trust Administration." Marriott Mem. at 25. However, none of the provisions of the timeshare instruments referred to by Marriott describe a process that would ensure compliance – especially in light of the fact that tens of thousands of properties are added randomly to the MVC Trust each year. AC ¶¶ 56, 97, 207, 401. Notwithstanding, Marriott references Section 5.6 of the MVC Trust Agreement which provides that:

> [T]he total number of Accommodations available to be reserved by Beneficiaries for any given day shall not exceed the total number of Accommodations committed to the Trust Plan and for which a Notice of Use Rights has been delivered.

Marriott Mem. at 24. However, this merely means that MVC Trust Owners will only be able to reserve the available inventory of MVC Trust properties that are not Restricted Use Properties. This had nothing to do with maintaining the One-to-One Use Ratio.

The MVC Trust timeshare instruments do not provide any standardized point allocation system where only 365 use rights can be counted for each timeshare unit per calendar year. In fact, there are multiple variables which necessarily prevent compliance with the One-to-One Use Ratio and create an unlimited number of use rights in the form of points. First, it is completely within Marriott's discretion to determine how many points are attributed to each Legacy Timeshare Estate submitted to the MVC Trust. The arbitrary point assignments attributed to the

individual MVC Trust properties are not recorded anywhere or provided to purchasers.[29] Because Marriott is free to create as many points as it desires without limitations, the One-to-One Use Ratio cannot be maintained.[30]

Second, Marriott violates the One-to-One Ratio by allowing MVC Trust Owners to "borrow" or "bank" points. *See How Vacation Club Points Work*, Marriott Vacation Club, www.marriottvacationclub.com/timeshare-ownership/how-vacation-club-points-work.shtml (last visited Dec. 20, 2017). While the amount of points each MVC Trust Owner has is replenished on an annual basis, Marriott permits MVC Trust Owners to use more in the current use year by borrowing from the next use year. *Id.* Likewise, if an MVC Trust Owner decides not to use all of their points in a given use year, Marriott allows them to "bank" their points from one year to the next use year. *Id.; see also* AC, Exhibit M (p. 13, Art. V, Sec. 5.2(b)) ("THE ABILITY OF A BENEFICAIRY TO USE ALL OF THE BENEFICIARY'S POINTS IN A GIVEN YEAR WILL DEPEND ON … THE NUMBER OF POINTS BANKED FOR USE IN THE IMMEDIATELY FOLLOWING USE YEAR"). As a result, the total amount of points that can be used by MVC Trust Owners in one year certainly does not total the amount of points required to reserve all Trust Properties.

---

[29]   As discussed *infra*, although NOAs contain an aggregate number of points for newly added MVC Trust properties, there is no breakdown of points for each individual property. Moreover, NOUs do not even contain an aggregate number of points made unrestricted, let alone on a per property basis.

[30]   For example, assume that in 2010, Marriott adds, by way of NOA, an Ocean Front 2-bedroom unit in the Marriott Barony Beach Club for a week in May and assigns 4000 points to that property. Marriott then has 4000 points to sell. Then, in 2017, Marriott adds, by way of another NOA, another Ocean Front 2-bedroom unit in the Marriott Barony Beach Club for a week in May, but this time, Marriott assigns 8000 points to the property. Marriott then sells off 8000 points. According to Marriott, this does not run afoul of the One-to-One Use Ratio so long as no more than 12000 points are sold. Marriott Mem. at 24-25. However, this is false because it blatantly ignores a critical aspect of the ratio: how many points the reservation system requires to reserve this particular class of unit. Thus, assuming the reservation system provides that 4000 points are needed to reserve an Ocean Front 2-bedroom unit in the Marriott Barony Beach Club for a week in May, there would be 12000 points sold off to purchasers, but only 8000 points worth of properties to reserve. This creates a musical chairs situation where the purchasers are forced to compete for limited number of units in violation of the One-to-One Use Ratio.

Arguing against Count IX, each Defendant cites *Abramson v. Marriott*, 155 F.Supp. 3d 1056 (C.D. Cal. Jan 4, 2016), as authority relating to the maintenance of One-to-One Ratio. Marriott Mem. at 24; First Amer. Mem. at 24; MVCTOA Mem. at 7-8. This is erroneous for two reasons. First, in *Abramson,* plaintiffs alleged that "their right to reserve was 'impaired,'" and that Marriott's point system left them with "units that were not the quality they requested." *Abramson*, 155 F. Supp. at 1065. Contrary to Marriott's assertion, however, the court did not hold that a plaintiff was required to assert he was unable to reserve a unit; rather, the language Marriott points to comes from the defendants briefing in *Abramson. Id.* ("Defendants sum up the problem succinctly. 'The One-to-One Rule does not address the quality of units; it prohibits selling more units than are available…[T]he SAC…fails to identify a single instance where Plaintiffs tried to reserve a unit during their designated times but were unable to do so.").

Moreover, *Abramson* dealt with violations of ***California's*** One-to-One Rule – not Florida's. The California rule requires that plaintiffs allege that "the total number of purchasers eligible to use the accommodations of a timeshare plan during a given calendar year [exceeded] the total number of accommodations available for use." Cal. Bus. & Prof. Code § 11250. California's One-to-One Rule is *ex post facto*, only coming into effect once units are purchased that exceed the number of accommodations available. In that situation, a plaintiff would likely need to allege that a unit is unavailable in order to state a valid claim. Florida's One-to-One Rule is different,states that "[a] developer or seller ***may not offer*** any number of timeshare interests that would cause the total number of timeshare interest offered to exceed a one-to-one use right to use night requirement ratio. Fla. Stat. § 721.03(10) (emphasis added). The Florida Rule is *ex-ante*, and focuses on when the timeshare units go on sale, not when they are purchased.

As Plaintiffs describe above and allege in the Amended Complaint (AC ¶¶ 296-306), the MVC Product could not and can never meet that requirement. In particular, unlike in *Abramson*, here the Amended Complaint does not address the desirability or the quality of available units, but rather alleges facts relating to whether the sale of use-rights exceeds inventory. AC ¶¶ 293-94. Furthermore, unlike in *Abramson,* Count IX is a statutory claim rather than a contracts claim.

Finally, contrary to Marriott's argument, Plaintiffs did not fabricate the ratio of Points for Sale and Points for Use that was alleged in paragraph 303 of the Amended Complaint. Marriott Mem. at 24-25. In fact, the MVC Trust Agreement expressly provides the ratio as the process to comply with the One-to-One Use Ratio:

> DEVELOPER RESERVES THE RIGHT, TO ITSELF, AND ASSOCIATION DELEGEE, ***TO REASONABLY REVISE THE POINTS FOR USE ASSIGNMENTS FROM TIME TO TIME*** …..PROVIDED THAT THE TOTAL NUMBER OF POINTS FOR USE THAT ARE REQUIRED TO RESERVE ALL USE PERIOD WILL EQUAL OR EXCEED THE TOTAL NUMBER OF POINTS FOR SALE.

AC, Exhibit M (p. 14, Art. V, Sec. 5.2(b)) (caps in original, emphasis added).

The difference between Points for Sale and Points for Use is significant. For instance, by the end of 2011, the total Points for Sale totaled 113,345.750.00[31] while the total Points for Use in 2011 were only 64,845,250.00.[32] Because the total Points for Sale greatly exceeded total Points for Use, Section 5.2 of the MVC Trust Agreement is violated.

Plaintiffs have sufficiently alleged that Marriott is violating the One-to-One Use Ratio by unilaterally manipulating several variables to create additional points without accountability or limitation. More importantly, Plaintiffs sufficiently plead facts demonstrating how the MVC

---

[31]  *See* Norton Decl., Exhibit E, NOA recorded in 2011.

[32]  *See* Norton Decl.*,* Exhibit F, MVC Trust Owner's Association's 2011 Estimated Common Expenses, fn 1, provides that, "[i]n 2011, it is anticipated the Trust Property that will be available for occupancy will consist of 259,381 Interests." 259,381 BI x 250 points = 64,845,250.00.

Trust timeshare plan can never maintain a satisfactory One-to-One Use Ratio. Furthermore, through the review of individual breakdown of points attributed to all trust properties in NOUs and NOAs (which Marriott has steadfastly refused to provide), the extent of Marriott's violation of One-to-one Ratio can be easily ascertained to establish damages. Marriott fails to even recognize the fundamental definition of One-to-one Use Ratio which is that only 365 days of use-rights must be counted for each timeshare unit.[33] Therefore, Marriott has not provided any valid basis for dismissing Count IX.

### K. Adding Legacy Timeshare Estates to the MVC Trust by NOA is a Violation of Fla. Stat. § 721.552(1)(b) (Count X)

Fla. Stat. § 721.552(1)(b) provides that:

> Any person who is authorized by the timeshare instrument to make additions to the multisite timeshare plan pursuant to this subsection shall act as a fiduciary in such capacity in the best interests of the purchasers of the plan as a whole and shall adhere to the demand balancing standard set forth in s. 721.56(6) in connection with such additions. Additions that are otherwise permitted may be made only so long as a one-to-one use right to use night requirement ratio is maintained at all times.

As explained in detail with regard to Count IX, above, Marriott violated Fla. Stat. § 721.552(1)(b) by making additions that violate the One-to-One use ratio. The addition of Restricted Use Properties plays a critical role in the MVC Trust scheme and gives rise to an independent violation of Fla. Stat. § 721.552(1)(b).

Defendants selectively cite language from various MVC Trust timeshare instruments to support the argument that the MVC Trust timeshare plan does not include all the properties listed in an NOA but only those properties in the MVC Trust for which an NOU has been delivered (but not recorded). Marriott Mem. at 6-7; First American Mem. at 14-15. Not surprisingly,

---

[33] *See* Marriott Mem. at 23. Marriott conspicuously omits from the definition of One-to-One Use Ratio, the requirement that a timeshare unit (*i.e.*, a condominium unit) cannot have more than 365 days of use right.

Defendants blatantly omit contradictory language appearing in those same timeshare instruments. Most notably, in the MVC Trust Public Offering Statement (AC, Exhibit L, Art. III, Sec. 1(c)), Marriott represents that "a Beneficiary owns an Interest in the *entire* Trust Property." (Emphasis added). Thus, according to the Public Offering Statement (the seminal timeshare instrument required before any timeshare estate may be sold in a plan), MVC Trust Owners (*i.e.*, "Beneficiaries") *do* have an interest in Restricted Use Property.

As detailed in the Amended Complaint, the withholding of Restricted Use Properties not only infringes upon MVC Trust Owners from accessing properties for which they hold a beneficial interest, it also impinges their ability to access other MVC Trust property. AC ¶¶ 316-319. Indeed, by restricting access to certain Legacy Timeshare Estates in the MVC Trust, Marriott effectively increases competition among MVC Trust Owners. AC ¶ 319. Indeed, while demand rises with the sale of BI (and by extension an increase in MVC Trust Owners), there is a proportional decrease in the availability of MVC Trust properties due to the existence of Restricted Use Properties. This artificial increase in demand is certainly not in the best interest of timeshare plan owners, and thus, Defendants have violated Fla. Stat. § 721.552(1)(b).

### L. The MVCTOA Violates Fla. Stat. § 721.13 (Count XI)

#### 1. The MVCTOA is Manager-operated Managing Entity not a Legitimate Owner's Association

The MVCTOA and Marriott are one and the same. Despite being nothing more than a developer operated managing entity, the MVCTOA is represented to be an owners association in which MVC Trust Owners obtain voting rights once a majority of the interests in the MVC Trust are sold off. AC ¶¶ 122-26. Indeed, the MVC Trust timeshare instruments include multiple references to voting rights that are triggered once the conditions of Art. IV, Sec. 18 of the MVCTOA Bylaws (the "Bylaws") are satisfied. *See* AC ¶ 125, Exhibit N. Art. IV, Sec. 18 of the

Bylaws provides that MVC Owners will have voting rights after Marriott has stopped selling BI for at least two (2) years *and* Marriott has not added any properties to the MVC Trust for a period of not less than four (4) years. Thus, although theoretically possible, it is a virtual certainty that this day of suffrage will never arrive and MVC Owners will never have the right or opportunity to vote for the Board of Directors (the "Board") of the MVCTOA.

In addition to illusory voting rights, the inextricable link between Marriott and the MVCTOA is undeniable. The MVCTOA operates in the headquarters of Marriott, has no staff independent of Marriott's, does not maintain its own listed phone number, and does not have a designated website. AC ¶¶ 112-13. In fact, the three positions on the Board have been comprised consistently of two Marriott employees and another Marriott designee. AC ¶ 116. With the MVCTOA only requiring a majority of the Board's approval to take action, Marriott effectively makes all MVCTOA decisions. *See* AC, Exhibit N (p. 9).

The purpose of disguising the managing entity as an independent owners association is so that Marriott can create buffer to shield itself from transactions ostensibly undertaken by the MVCTOA. For instance, under the terms of the MVC Trust Agreement, if First American is sued for breaching its fiduciary duty to MVC Trust Owners pursuant to Fla. Stat. § 721.08, it is the MVCTOA (not Marriott) that has agreed to indemnify First American. *See* AC, Exhibit M (p. 23, Article VIII). This is critical because if Marriott were to agree to indemnify First American directly, it would be illegal under the Florida Trust Code.[34] AC ¶ 270-271.

Notwithstanding, the Marriott Defendants do not dispute that the MVCTOA is a proxy for Marriott or that MVC Trust Owners lack voting rights and representation on the Board,

---

[34] The Florida Trust Code specifically provides that: "[a] term of a trust relieving a trustee of liability for breach of trust is unenforceable to the extent that the term [… r]elieves the trustee of liability for breach of trust committed in bad faith or with reckless indifference to the purposes of the trust or the interests of the beneficiaries." Fla. Stat. § 736.1011(1).

rather, they argue that because "a developer can be a managing entity, then owner's association that is an alleged proxy for the developer can be a managing entity. Nothing in the Timeshare Act states otherwise." Marriott Mem. at 27; *see also* MVCTOA Mem. at 8-9. As a result of this concession, Plaintiffs are entitled to a declaration that the MVCTOA is a developer-operated managing entity. Currently, the MVC Trust Agreement falsely casts the MVCTOA in the role of an independent fiduciary for the MVC Owners. AC, Exhibit N. However, if the MVCTOA is merely a proxy for Marriott and has power of direction to give orders to First American (as the land trust trustee), and agrees to indemnify First American, the MVCTOA does not serve the interests of MVC Owners, cannot serve in a fiduciary capacity.

## 2. The MVCTOA Breached its Fiduciary Duty to MVC Trust Owners in Violation of Fla. Stat. § 721.13

Under Fla. Stat. § 721.13(2)(a), the managing entity shall act in the capacity of a fiduciary to the purchasers of the timeshare plan. A purchaser, by definition, does not include developer. Fla. Stat. § 721.05(30). Yet, pursuant to the MVC Trust Agreement, the MVCTOA is required to prioritize Marriott's right to sell BI over any fiduciary concerns of MVC Trust Owners.[35] Specifically, Art. IX, Sec. 9.6(b) provides that:

> Effect on Developer. Notwithstanding anything in the Trust Plan Documents to the contrary, so long as Developer holds any Interest, none of the following actions may be taken by the Association without the prior approval of Developer:
> …
> (b)    Detrimental Actions. Any action that would be detrimental to the sales of Interests by Developer as determined by Developer in its sole discretion; provided, however, that an increase in Annual Dues without discrimination against Developer will not be deemed to be detrimental to the sales of Interests.

---

[35] *See* AC, Exhibit N (p. 36, Art. XXII) (providing that the MVC Trust Agreement has the highest level of priority if there are any conflicts among the various timeshare instruments).

Therefore, under the express provisions of the MVC Trust Agreement, it is impossible for the MVCTOA to act as a fiduciary for MVC Trust Owners.

Indeed, the MVCTOA routinely breaches its fiduciary duties to the MVC Trust Owners. For instance, the MVCTOA agreed to impose transfer fees for the sale of the MVC Trust product in connection with executing the contract with Marriott for the exchange program. AC ¶¶ 362-66. In connection with this agreement, the MVCTOA agreed to assess Exchange fees for all MVC Trust Owners and transfer fees. AC ¶¶ 337, 366; *see also*, Norton Decl., Exhibit E (2014 MVC Exchange Procedure).

Marriott argues that the transfer fee is not arbitrary or a breach of its fiduciary duty because it is disclosed. Marriott Mem. at 27. As an initial matter, this is false as the transfer fee is neither disclosed nor do MVC Trust Owners have any right to dispute it. In fact, the MVCTOA imposed this obligation on MVC Trust Owners without notice pursuant to a contract with Marriott. AC ¶ 364. Second, the transfer fees that were assessed are completely arbitrary. AC ¶ 337. The MVC Exchange agreement delineates the terms of voluntary enrollment on an annual basis to exchange use rights to occupy other accommodations in the timeshare plan. Thousands of dollars in transfer fees are assessed when MVC Trust Owners sell their BI to a third party. AC ¶ 377. However, the transfer fee and MVC Exchange agreement have no correlation with one another. Therefore, there is no logical explanation why the transfer fee is a part of the MVC Exchange agreement. Moreover, Legacy Owners are not assessed transfer fees for enrolling voluntarily in the MVC Exchange program. Thus, it is inconceivable that the MVCTOA agreed to this transfer fee for the benefit of the MVC Trust Owners for any other reason but to benefit Marriott. A high transfer fee depreciates the resale value of the MVC Trust Product.

Finally, the MVCTOA enrolls in the MVC Exchange program and agrees to pay fees without providing any type of explanation to MVC Trust Owners or obtaining their consent.[36]

### 3. Marriott Violated the Condominium Act and Condo Declarations to Establish MVCTOA

In addition to being subject to Condominium Act, Chapter 718 of the Florida Statutes, the MVC Trust is subject to the condominium laws of every state where the Component Sites are located. Marriott argues that the MVC Trust Timeshare Plan is immune from application of Fla. Stat. § 718 but this interpretation directly conflicts with the Division's approval letter that had reviewed the filing and disclosure requirement pursuant to Fla. Stat. § 718 as well as Fla. Stat. § 721. Dkt. No. 78-1 (Greene Decl., Exhibit A). Under the various condominium laws, including Florida's, *all* owners of timeshare estates have appurtenant voting rights to vote for the board of directors of the governing owners association. However, MVCTOA directs First American to exercise all voting rights that are tied to the Legacy Timeshare Estates to benefit Marriott, even when those voting rights purportedly belong to MVC Trust Owners collectively. AC, Exhibit M (Art. VII, Sec. 7.2(d).

Because Plaintiffs sufficiently allege how the MVCTOA violates Fla. Stat. § 721.13, Count XI should be sustained.

### M. Marriott and the MVCTOA Unfairly Assess and Collect Common Expenses (Count XII)

Fla. Stat. § 721.15(1)(a) provides that the allocation of common expenses among timeshare interests and units must be reasonable regardless of whether the timeshare interest is

---

[36] *See* Norton Decl., Exhibit G. According to the MVC Exchange Procedures, "[i]n order to enjoy the benefits of Membership in the Program as a Direct Member, the Affiliate Program Manager and/or Association of your Affiliate Program must have voluntarily entered into an Affiliation Agreement with Exchange."

sold or unsold. Defendants try to confuse the issue by arguing a semantic difference between "calculation" and "allocation." Marriott Mem. at 30; MVCTOA Mem. at 12. This is irrelevant.

If there is any issue of semantics, it is with the definition of the term "Restricted Use Property." As defined by § 2.43 of the MVC Trust Agreement, "Restricted Use Property" only means properties that have not been made available by NOU. AC, Exhibit M. There is no requirement that these properties be in disrepair or for some other reason not ready for occupancy. In fact, MORI retains "all rights to the use, occupancy, enjoyment, and rental" of each of these restricted properties. *Id.* Thus, Marriott can effectively evade the requirement that allocation of common expenses be the same for MVC Owners' interests as it is for Marriott's owned or not yet sold interests. By arbitrarily deeming a property as "Restricted Use," Marriott can ensure that it pays ***zero*** common expenses while simultaneously being able profit by exercising its rights to the "use, occupancy, enjoyment, and rental" of the property.[37]

Marriott counters Plaintiffs' claim by arguing that the statue allows for a separate formula for calculating Restricted Use Property common expenses. Marriott Mem. at 30; MVCTOA Mem. at 12. However, Fla. Stat. § 721.15(1)(a) provides that while "[t]he timeshare instrument may provide that the common expenses allocated may differ between those timeshare units that are part of the timeshare plan and those units that are not part of the timeshare plan […] the different proportion of expenses must be based upon reasonable differences in the benefit provided to each." It is implausible that Marriott is not capitalizing on its total discretion without regard to "use" and "rental" rights of Restricted Use Properties to off-set or totally avoid paying common expenses attributed to those properties. Marriott's defense is essentially, "trust me," as

---

[37] The MVCTOA determines the amount owed for Restricted Use Property common expenses. AC, Exhibit M (p. 25, Sec. 9.8). Despite requests for the same by Plaintiffs, to date, the MVCTOA and Marriott have refused to produce documents regarding the actual amount of common expenses paid by Marriott on Restricted Use Properties.

the expense allocation process and formula remains secret. At the very least, a question of fact exists as to whether parity truly exists as to the common expenses Marriott is paying on Restricted Use Properties and how much of those expense MVC Trust Owners shoulder.

Marriott further argues that Fla. Stat. § 721.15(1)(a) does not ***require*** the same basis to be used to allocate common expenses for Marriott "nor would it be possible." Marriott Mem. at 30. First, when a statute says "shall," as Fla. Stat. § 721.15(1)(a) does, it means the compliance is mandatory and therefore required.[38] Second, it is wholly irrelevant whether it would be "possible" as timeshare plans always must comply with the law whether it suits Marriott or not. Timeshare plans should be designed to comply with the law as written, not, as Marriott has done, working backwards into compliance (or changing the law after the fact) to the extent "possible." In any event, it actually *is* possible. Under the MVC Trust timeshare plan, MVC Trust Owners do not own any parcels of real property but, rather, are assigned symbolic units of BIs. Accordingly, MVC Trust Owners pay common expenses per BI. In 2017, the common expense was $138 per BI. AC ¶ 350. Similarly, Restricted Use Properties are immediately vested with BIs as evidenced in recorded NOAs. Therefore, Marriott can and should pay common expenses on Restricted Used Properties per BI just like MVC Trust Owners.

Finally, Marriott claims that because MVC Exchange costs are not applicable to Restricted Use Properties, it should not incur the same common expenses. Marriott Mem. at 30-31. Aside from this assertion's irrelevance, the argument fails on factual grounds because MVC Trust Owners pay separate MVC Exchange fees outside of the common expenses. AC ¶ 337.

---

[38] *See Shall*, Black's Law Dictionary (10th ed. 2014).

## N. Marriott Failed to Provide and Maintain a Separate Reservation System for MVC Trust Owners and Legacy Owners (Count XIII)

Marriott's violation of Fla. Stat. § 721.56 is two-fold. First, Marriott has violated Florida Law by combining different timeshare plan reservation systems into one. AC ¶¶ 362-63. Second, Marriott's conduct is unlawful because, as the Developer, Marriott breached its fiduciary duty to ensure that purchasers of each type of Marriott timeshare plan have optimal access to timeshare properties within that plan. AC ¶¶ 359, 365-66.

### 1. Marriott Cannot Combine Reservation Systems

Defendants do not dispute that the MVC Trust Timeshare Plan is required to maintain a uniform system for MVC Trust Owners to compete *only* with other MVC Trust Owners to reserve timeshare units in the MVC Trust Timeshare Plan. Marriott Mem. at 31. The MVC Trust Timeshare Plan's reservation procedures are part of the timeshare instruments. AC, Exhibit O. Similarly, the MVC Exchange system is a voluntary method for Legacy Owners to exchange their rights of use and occupancy to their component site's accommodations and facilities among the owners of the same timeshare plan.[39] Marriott also does not dispute that the MVC Trust Timeshare Plan must operate independently of the MVC Exchange system. Marriott Mem. at 33.

The advantage of the point-based system is that points can be used to reserve any of the accommodations in the timeshare plan. However, Marriott uses a separate exchange program, the MVC Exchange, to replace the Trust Reservation System created specifically for the MVC Trust. AC ¶¶ 362-65. This allows Marriott to override all timeshare instruments, obscure which properties are MVC Trust properties, and benefit by charging two separate fees for operating overlapping reservation systems. AC ¶ 366.

---

[39] Purchasers as defined and used throughout Chapter 721 to means owners of a specific timeshare plan. Fla. Stat. § 721.05(30).

Marriott argues that the reservation systems are not merged and that the MVC Exchange program provides a supplemental benefit to the Trust Reservation System justifying a separate exchange program fee. Marriott Mem. at 33. This is false. Although Marriott argues that through the MVC Exchange procedures, MVC Trust Owners have the added benefit to use the MVC Trust points to book cruises, hotel accommodations, and other "Special Benefits," this does meet the Florida law requirement that the exchange program provide use rights for accommodations and facilities of the timeshare plan. *See* Fla. Stat. § 721.05(16). "Accommodations" of real or personal property are divided into a timeshare unit (Fla. Stat. § 721.05(1)) whereas "Facilities" are permanent amenities of the accommodations like a swimming pool and common areas (Fla. Stat. § 721.05(17)). Here, the accommodations within the MVC Trust Timeshare Plan are condominium units, and the facilities are permanent amenities of the Legacy Condominium units. AC ¶ 292. Cruises, hotel accommodations, and airline tickets are not the accommodations or facilities of the MVC Trust timeshare plan. Therefore, the right to use MVC Trust points to reserve these "Special Benefits" is not an exchange program services.

Marriott further argues that the MVC Exchange merely "supplements" the Trust Reservation System's multisite reservation system. Marriott Mem. at 33. In particular, Marriott asserts that "BI Owners are only reserving the use of weeks owned by the MVC Trust via MVCD Reservation Procedure." Marriott Mem. at 32. However, both documents pertaining to MVC Exchange program and the application contradict Marriott's representations. Simultaneously with MVC Trust product, Marriott launched a separate multisite exchange program for Legacy Owners called the "Destinations Program."[40] Under the Destinations

---

[40] Incidentally, the offering of the destination program to Legacy Owners violated the terms of the Component Site Condo Declarations since single-site timeshare plans may *not* be converted to multisite timeshare plans without being specifically amended.

Program, Legacy Owners have an option to voluntarily enter into a contract with Marriott to "exchange" their single-site timeshare use rights for points ("Legacy Destination Points").[41] Yet, MVC Trust Owners, unlike Legacy Owners, are enrolled *involuntarily* in the MVC Exchange Program.[42] The MVCTOA, which is fully controlled by Marriott, transferred all of the use-rights in the accommodations of the MVC Trust timeshare plan into the MVC Exchange program. AC ¶ 362. In other words, the use-rights of Legacy Timeshare Estates in the MVC Exchange program and the use-rights of the entire MVC Trust timeshare plan inventory are combined as accommodations and facilities made available through the MVC Exchange program.

Legacy Destination points have the same value as MVC Trust points and can be combined with MVC Trust points to reserve properties in the MVC Exchange program. Therefore, the MVC Exchange program effectively subsumes multiple timeshare plans under a single reservation system. AC ¶ 363. In addition, unlike a multi-site reservation procedure that must be maintained pursuant to uniform application of the reservation system and programmed into computer (*see* Fla. Stat. § 721.56(5)(a)(2)), Marriott retains sole discretion to unilaterally manipulate the MVC Exchange procedures to combine different timeshare plans under the new procedure.[43] And, because MVC Trust Owners already in Trust Reservation System are forced to be in the overlapping MVC Exchange program (involuntarily) and required to pay separate fees for both, they are being effectively double charged for the same reservation system rights.

---

[41]   *See* Legacy Exchange Agreement, Norton Decl., Exhibit H.

[42]   *See* MVC Exchange Disclosure (p. 3, VI(1)), Norton Decl., Exhibit I. Direct Members are MVC Trust Owners. MVCTOA (Marriott), on behalf of MVC Trust Owners, negotiated and entered into the contract with Marriott (itself). Consequently, no other contract is needed even though an exchange program, by definition, must be "voluntary." *See* Fla. Stat. § 721.05(16).

[43]   *See* MVC Exchange Disclosure (p. 7, VIII), Norton Decl., Exhibit I.

### 2. The MVC Exchange Program's Encroachment Upon Purchasers' Ability to Access Timeshare Properties is a Breach of Marriott's Fiduciary Duty

The use of the MVC Exchange program limits timeshare purchasers' ability to access timeshare properties by artificially increasing competition among purchasers. Fla. Stat. § 721.56(6) requires the Developer to "use his or her best efforts, in good faith and based upon all reasonably available evidence under the circumstances, to further the best interests of the purchasers of the plan as a whole with respect to their opportunity to use and enjoy the accommodations and facilities of the plan." However, by involuntarily enrolling MVC Trust Owners into the MVC Exchange program, Marriott unreasonably curtails both MVC Trust Owners' and Legacy Owners' access to reservations.

First, MVC Trust Owners are harmed because, by involuntarily having MVC Trust property thrown into the MVC Exchange program, they not only have to compete for reservations with other MVC Trust Owners but also Legacy Owners and owners from other timeshare plans (*e.g.*, Ritz Carlton Owners). While Marriott may argue that voluntary deposits by Legacy Owners and others increases the total amount of properties proportionally, this assumes, irrationally, that all property is equally desirable. For example, assume the MVC Trust contains 100 properties but only 35 of those are desirable, if Legacy Owners and others contribute a quantity of additional undesirable units, MVC Trust Owners would be forced to compete with non-MVC Trust Owners for 35 properties.

Second, Legacy Owners are harmed because, by transferring its corporately-held Legacy Timeshare units out of the Component Site reservation system and into the MVC Exchange program, Marriott artificially increases competition among Legacy Owners to access their own properties. For example, assume a component site contains 100 units, 25 of which are corporately-held by Marriott, and 75 of which are owned by unique Legacy Owners. In the

normal course, when those 75 Legacy Owners wish to reserve a unit, they are competing against 75 purchasers for access to 100 units. However, when Marriott removes its 25 units from the Component Site reservation system and places then into the MVC Exchange program, those 75 Legacy Owners are competing for 75 units or must surrender their unit to the MVC Exchange program and compete with many others just to reserve units at their own property. While Marriott may argue that as a Legacy Owner it has the right to voluntarily transfer its corporately-held units into the MVC Exchange program, this ignores that fact that Marriott stands in the position of a fiduciary and Fla. Stat. § 721.56(6) obligates it to operate "in good faith" to maximize the ability of timeshare purchasers to access their properties. Wholesale removal of corporately-held Legacy Timeshare Estates from Component Site reservation in order to maximize profits does not "further the best interests of the purchasers" and is certainly not in good faith. *See* Fla. Stat. § 721.56(6).

Because Plaintiffs sufficiently plead a violation of Fla. Stat. § 721.56, Count XIII should be sustained.

### O. Plaintiffs State a Claim Under the Florida RICO ACT (Florida RICO Counts I and II)

Marriott relies on *Am Dental Assn'n v. Cigna Corp.* 605 F.3d 1283, 1293-94 (11th Cir. 2010), for the proposition that Plaintiffs do not sufficiently plead facts to show "a pattern of racketeering activity" because no facts established an agreement between Marriott and First American to achieve an overall objective. Marriott Mem. at 34. This argument is erroneous.

First, showing agreement as to the overall objective is just ***one*** of the ways to establish conspiracy to commit a predicate act under Federal Rico Act - and does not have anything to do with establishing a pattern of racketeering activity which is statutorily defined. *Id.* at 1293. Second, *Am Dental Assn'n* arose out of the Federal RICO Act rather than the Florida RICO Act.

The Florida RICO Act, which specifically applies to violations of Fla. Stat. § 721.08, provides a more element-based definition for "patterns of racketeering activity" than the Federal RICO Act. Specifically, Fla. Stat. § 895.02(7) (2010) provides that:

> "Pattern of racketeering activity" means engaging in at least two incidents of racketeering conduct that have the same *or* similar intents, results, accomplices, victims, *or* methods of commission or that otherwise are interrelated by distinguishing characteristics and are not isolated incidents, provided at least one of such incidents occurred after October 1, 1977, and that the last of such incidents occurred within 5 years after a prior incident of racketeering conduct.

(Emphasis added). Here, tens of thousands of incidents of racketeering conduct have occurred in the last five years, far exceeding the threshold requirement of two such incidents. AC ¶ 391. Marriott and First American's racketeering conduct involve the same method of commission and same accomplices in every closing of MVC Trust Product. For every closing, First American acts as the escrow agent, allowing Marriott to violate Fla. Stat. § 721.08(10) in exchange for profits from selling bogus title policies with the expectation that Marriott (via MVCTOA) will provide full indemnity. AC ¶¶ 80, 254, 270. Since the racketeering conduct is structured within the MVC Trust timeshare plan, it cannot be an isolated incident. Finally, the factual allegations contained in Plaintiffs' Florida RICO Counts I and II demonstrably infer an agreement among Marriott and First American to violate Fla. Stat. § 721.08(10). Accordingly, Plaintiffs' have sufficiently alleged a pattern of racketeering activity for the purposes of the Florida RICO Act.

Marriott also argues that the Plaintiffs failed to plausibly allege violations of Fla. Stat. § 721.08 which would have established a predicate act. Marriott Mem. at 34. But, as argued above with regard to Counts VI and VII, Plaintiffs have sufficiently alleged multiple violations of Fla. Stat. § 721.08 with specific factual allegations arising out of each closing of MVC Trust Product. Therefore, because Plaintiffs sufficiently demonstrated a predicate act *and* separate count of conspiracy in Florida RICO Counts I and II, those claims should be sustained.

**P. Plaintiffs are Entitled to Punitive Damages**

To sufficiently plead a demand for punitive damages, a plaintiff must allege facts that demonstrate the defendant is "guilty of intentional misconduct or gross negligence." Fla. Stat. § 768.72(2). Plaintiffs have alleged that Defendants are guilty of intentional misconduct or gross negligence. "Intentional misconduct" is defined as when "the defendant had actual knowledge of the wrongfulness of the conduct and the high probability that injury or damage to the claimant would result and, despite that knowledge, intentionally pursued that course of conduct, resulting in injury or damage." Fla. Stat. § 768.72(2)(a). "Gross negligence" is defined as when "the defendant's conduct was so reckless or wanting in care that it constituted a conscious disregard or indifference to the life, safety, or rights of persons exposed to such conduct." Fla. Stat. § 768.72(2)(b).

Plaintiffs have alleged facts sufficient to show that Defendants violated Fla. Stat. § 721.08. This alone is sufficient to demonstrate intent because Fla. Stat. § 721.08(10)(b) provides:

> The failure to establish a trust or owners' association, or to transfer property into the trust or owners' association, or the failure of a trustee or officer or director of an owners' association to comply with the trust agreement, articles of incorporation, or bylaws with respect to conveyances or encumbrances of trust or owners' association property, as required by this section, ***is prima facie evidence of an intentional and purposeful violation of this section***.

(Emphasis Added).

In addition to Defendants' violation of Fla. Stat. § 721.08, Plaintiffs have alleged facts demonstrating intent regarding Defendants' aggressive lobbying efforts. Although lobbying, in and of itself, is lawful, Defendants' efforts to change the law show that they were aware that the MVC Trust scheme was unlawful and the only way in which evade liability was to attempt to retroactively amend Florida law.

In addition, the facts underlying the Florida RICO claims show intent, or at least gross negligence. First American (ostensibly an expert in what constitutes legal title) knowingly accepted Marriott's fraudulent affidavits regarding MVC Trust Consumer Deed closings even though it knew in its capacity as the title insurer (*via* First American Title) that MVC Trust Consumer Deeds had no cognizable description of real property sufficient to transfer lawful title. AC ¶ 382. First American, as the title insurer of the MVC Trust responsible for conducting a title search prior to issuance, also must have known that a valid timeshare estate and real property interest did not exist. AC ¶ 388. Further, in its capacity as the land trust trustee, First American had actual knowledge that it accepted title to properties submitted to MVC Trust that were subject to, and encumbered by, the respective Component Site Condo Declarations. AC ¶ 389.

Defendants' also demonstrated their intent by misrepresenting the nature of the MVC Trust timeshare plan to government agencies. For example, when presenting the MVC Trust plan to the division, Marriott was required to include the MVC Trust Public Offering Statement. Fla. Stat. § 721.07. The MVC Trust Public Offering Statement describes the legal structure of the plan as one pursuant to Fla. Stat. § 721.08(2)(c)3, *i.e.*, a plan offering personal property timeshare interests. However, Marriott then told purchasers it was not selling personal property timeshare interests, but real property timeshare estates. Likewise, Marriott, through the MVC Trust Public Offering Statement, claims to convey an interest in the "entire" MVC Trust property. However, Marriott then went on to sell purchasers BI which did not represent the entire trust, but only properties for which a NOU had been delivered.

These allegations are sufficiently detailed to demonstrate "intentional misconduct" and "gross negligence." Accordingly, Plaintiffs are entitled to punitive damages.

## IV. CONCLUSION

For the foregoing reasons, the motions to dismiss of the Marriott Defendants, the First American Defendants, and the MVCTOA should be denied in their entirety.


DATED: December 20, 2017

Respectfully submitted,

**NEWMAN FERRARA LLP**

By: */s/ Jeffrey M. Norton*
Jeffrey M. Norton, *Pro Hac Vice*
1250 Broadway, 27th Fl.
New York, NY 10001
(212) 619-5400
jnorton@nfllp.com

**THE POLASZEK LAW FIRM, PLLC**
Christopher S. Polaszek
3407 W. Kennedy Blvd.
Tampa, FL 33609
(813) 574-7678
chris@polaszeklaw.com

**Soomi Kim, Esq.**
Soomi Kim, *Pro Hac Vice*
2400 South College Drive,
High Point, NC 27260
soomiwork@gmail.com


***Counsel for Plaintiffs***

## CERTIFICATE OF SERVICE

I hereby certify that on December 20, 2017, I electronically filed the foregoing with the Clerk

of the Court by using the CM/ECF system.

*/s/ Jeffrey M. Norton*
Jeffrey M. Norton